```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UNITED STATES OF AMERICA  ) Docket No. A 12-CR-210(6) SS
                               )
 4   vs.                       ) Austin, Texas
                               )
 5   FRANCISCO ANTONIO         )
     COLORADO-CESSA            ) July 25, 2012
 6

 7              TRANSCRIPT OF ALL PENDING MATTERS
                BEFORE THE HONORABLE SAM SPARKS
 8

 9   APPEARANCES:

10   For the United States:      Ms. Michelle E. Fernald
                                 Mr. Douglas W. Gardner
11                               Ms. Jennifer S. Freel
                                 Assistant U.S. Attorneys
12                               816 Congress Avenue, Suite 1000
                                 Austin, Texas 78701
13

14   For the Defendant:         Mr. Mike DeGeurin
                                 Foreman, DeGeurin & DeGeurin
15                               300 Main Street, Third Floor
                                 Houston, Texas 77002
16

17   Interpreters:              Ms. Cristina Helmerichs
                                 Ms. Maurine McLean
18

19   Court Reporter:            Ms. Lily Iva Reznik, RPR, CRR
                                 200 West 8th Street
20                               Austin, Texas 78701
                                 (512)916-5564
21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.
```

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Scott Lawson | 44 | 72 | 73 | |

**E X H I B I T S**

| | Offered | Admitted |
|---|---|---|
| Government's | | |
| (None.) | | |
| Defendant's | | |
| (None.) | | |

09:01:50

09:01:50

| | | |
|---|---|---|
| 09:02:06 | 1 | THE COURT:  Good morning, ladies and gentlemen.  I |
| 09:02:06 | 2 | expect to get some organization in this particular case and bring |
| 09:02:12 | 3 | it back out of chaos that it has been. |
| 09:02:18 | 4 | First, we will go through the individual cases to |
| 09:02:22 | 5 | ensure that we have all of the pending motions.  Then we'll talk |
| 09:02:28 | 6 | about the government's motion with regard -- that says, unopposed |
| 09:02:34 | 7 | with regard to the sale of the subject matter of the forfeiture |
| 09:02:40 | 8 | of the horses.  And then, we will find out where we are with |
| 09:02:46 | 9 | discovery and how long it's going to take for the defendants to |
| 09:02:50 | 10 | obtain the discovery to try to set down a trial date, which will |
| 09:02:56 | 11 | be set down this evening. |
| 09:03:00 | 12 | For those of you who are not of the Austin bar, we've |
| 09:03:06 | 13 | been flooded with multi-defendant cases.  This is not even the |
| 09:03:12 | 14 | heaviest one we have, and as you probably have seen, we've been |
| 09:03:16 | 15 | setting these cases.  Most of them are wiretap cases, and it has |
| 09:03:24 | 16 | been a difficulty in getting all of the discovery to everybody in |
| 09:03:30 | 17 | individualized packages.  In Austin, unless I've been notified |
| 09:03:34 | 18 | otherwise, the United States Attorney pretty much has an open |
| 09:03:40 | 19 | discovery on reciprocal discovery.  So everything that can |
| 09:03:48 | 20 | possibly be given under the law, and even more, is usually given, |
| 09:03:54 | 21 | unless there is a problem. |
| 09:03:56 | 22 | So that's where we are and that's what my intentions |
| 09:04:02 | 23 | are.  And then, at the end, anybody that wishes to speak up will |
| 09:04:06 | 24 | have that opportunity. |
| 09:04:20 | 25 | Okay.  12-CR-210, Defendant No. 3, Jose |

| | | |
|---|---|---|
| 09:04:38 | 1 | Trevino-Morales. |
| 09:04:40 | 2 | MR. GARDNER:  Good morning, your Honor. |
| 09:04:42 | 3 | Doug Gardner, Michelle Fernald and Jennifer Freel for |
| 09:04:44 | 4 | the United States for this defendant and all other defendants in |
| 09:04:46 | 5 | this cause number. |
| 09:04:48 | 6 | MR. FINN:  Good morning, Judge. |
| 09:04:48 | 7 | David Finn, F-I-N-N, for Mr. Trevino-Morales. |
| 09:04:52 | 8 | THE COURT:  And I take it, I still have pending the |
| 09:04:56 | 9 | motion to withdraw filed by. |
| 09:05:00 | 10 | MR. URRUTIA:  Yes, your Honor. |
| 09:05:02 | 11 | THE COURT:  You. |
| 09:05:04 | 12 | MR. URRUTIA:  Yes, your Honor. |
| 09:05:04 | 13 | THE COURT:  I take it you would just as soon go |
| 09:05:06 | 14 | somewhere else? |
| 09:05:06 | 15 | MR. URRUTIA:  Yes, your Honor.  I think I would. |
| 09:05:10 | 16 | THE COURT:  Well, you're a smart fella. |
| 09:05:12 | 17 | MR. FINN:  I think he mentioned the beach, your Honor. |
| 09:05:18 | 18 | MR. URRUTIA:  I wish I was that lucky, although I will |
| 09:05:20 | 19 | miss your company, of course. |
| 09:05:24 | 20 | THE COURT:  That motion is signed.  You are relieved of |
| 09:05:26 | 21 | all further responsibility. |
| 09:05:28 | 22 | MR. URRUTIA:  Thank you. |
| 09:05:28 | 23 | THE COURT:  I have pending in your case, Mr. Finn, not |
| 09:05:44 | 24 | one but two motions to revoke the magistrate judge's detention |
| 09:05:48 | 25 | order and a motion for discovery and inspection of evidence. |

| | | |
|---|---|---|
| 09:05:52 | 1 | MR. FINN:  That's correct, your Honor. |
| 09:05:54 | 2 | THE COURT:  The motion for discovery and inspection of |
| 09:05:56 | 3 | evidence will just simply be dismissed.  You will get all of |
| 09:06:00 | 4 | that. |
| 09:06:00 | 5 | MR. FINN:  I'm working with the government right now. |
| 09:06:02 | 6 | We'll get that resolved. |
| 09:06:04 | 7 | THE COURT:  And I will take up the motion on detention |
| 09:06:08 | 8 | following the hearing of all the defendants in order.  There's |
| 09:06:14 | 9 | several of them. |
| 09:06:14 | 10 | MR. FINN:  Your Honor, I don't know if this is the |
| 09:06:16 | 11 | appropriate time, but you mentioned the horses.  And I've been |
| 09:06:22 | 12 | dealing with Ms. Jennifer Freel for the government and I've also |
| 09:06:26 | 13 | had -- |
| 09:06:26 | 14 | THE COURT:  It's not the appropriate time. |
| 09:06:28 | 15 | MR. FINN:  It's not the appropriate time? |
| 09:06:30 | 16 | THE COURT:  No.  I'm waiting until the moon comes up |
| 09:06:32 | 17 | and then, we'll take up that discussion.  It seems like that's |
| 09:06:34 | 18 | more -- no.  I'll take it up in order.  I want to go through |
| 09:06:38 | 19 | these cases first, see what's next. |
| 09:06:40 | 20 | MR. FINN:  Fair enough. |
| 09:06:46 | 21 | THE COURT:  Is that Zulema Trevino? |
| 09:06:52 | 22 | MR. BRODEN:  Yes, your Honor. |
| 09:06:54 | 23 | THE COURT:  I have no pending motions in your case. |
| 09:06:54 | 24 | MR. BRODEN:  That is correct. |
| 09:07:00 | 25 | THE COURT:  Carlos Miguel Nayen-Borbolla. |

| | | |
|---|---|---|
| 09:07:08 | 1 | MR. FLORES:  Good morning, your Honor. |
| 09:07:08 | 2 | Mario Flores here for lead counsel Frank Rubino. |
| 09:07:12 | 3 | THE COURT:  Mr. Flores, I only have one and that's a |
| 09:07:16 | 4 | Rule 16 discovery request. |
| 09:07:18 | 5 | MR. FLORES:  Correct, your Honor. |
| 09:07:18 | 6 | THE COURT:  All right.  Francisco Antonio |
| 09:07:30 | 7 | Colorado-Cessa. |
| 09:07:32 | 8 | MR. DEGEURIN:  Good morning, your Honor. |
| 09:07:34 | 9 | Mike DeGeurin and Andres Sanchez, your Honor, for Mr. |
| 09:07:38 | 10 | Cessa. |
| 09:07:38 | 11 | THE COURT:  And I have an appeal from a detention |
| 09:07:42 | 12 | order. |
| 09:07:42 | 13 | MR. DEGEURIN:  That's correct. |
| 09:07:44 | 14 | THE COURT:  And that's the only motion I have. |
| 09:07:46 | 15 | MR. DEGEURIN:  That's correct. |
| 09:07:52 | 16 | THE COURT:  Fernando Solis-Garcia. |
| 09:07:56 | 17 | MR. WOMACK:  Good morning, your Honor. |
| 09:07:58 | 18 | Geoff Womack for Mr. Garcia. |
| 09:08:04 | 19 | THE COURT:  And I have what is called an appearance of |
| 09:08:08 | 20 | counsel but I didn't -- appearing earlier. |
| 09:08:12 | 21 | MR. WOMACK:  Guy Womack appeared earlier, your Honor. |
| 09:08:14 | 22 | I filed a notice of appearance last night. |
| 09:08:16 | 23 | THE COURT:  And so, how many lawyers do we have? |
| 09:08:24 | 24 | MR. WOMACK:  Two, your Honor. |
| 09:08:24 | 25 | THE COURT:  So they're both active lawyers here. |

| | | |
|---|---|---|
| 09:08:26 | 1 | MR. WOMACK:  That's correct, sir. |
| 09:08:28 | 2 | THE COURT:  All right. |
| 09:08:28 | 3 | MR. WOMACK:  Thank you. |
| 09:08:36 | 4 | THE COURT:  Victor Manuel Lopez.  Mr. Lopez is not |
| 09:08:44 | 5 | here. |
| 09:08:48 | 6 | Sergio Rogelio Guerrero-Rincon. |
| 09:08:56 | 7 | Adan Farias. |
| 09:08:58 | 8 | MR. WANNAMAKER:  Your Honor, Dan Wannamaker on behalf |
| 09:09:00 | 9 | of Mr. Farias. |
| 09:09:02 | 10 | THE COURT:  I have no pending motions, but the |
| 09:09:04 | 11 | government has filed a motion, I guess you got yesterday, also. |
| 09:09:08 | 12 | MR. WANNAMAKER:  Yes, your Honor. |
| 09:09:10 | 13 | THE COURT:  Are you going to wish a detention hearing? |
| 09:09:12 | 14 | MR. WANNAMAKER:  I believe so, your Honor, and we were |
| 09:09:12 | 15 | going to ask for a little time to prepare for that.  I'm still |
| 09:09:16 | 16 | gathering some evidence. |
| 09:09:20 | 17 | THE COURT:  Well, let's see, my civil docket is set |
| 09:09:26 | 18 | through 2013, and as you noticed in the paper, my criminal docket |
| 09:09:32 | 19 | is set through February. |
| 09:09:36 | 20 | So what do you mean by a little time? |
| 09:09:38 | 21 | MR. WANNAMAKER:  I mean. |
| 09:09:38 | 22 | THE COURT:  I mean, you've had plenty of time.  I |
| 09:09:40 | 23 | intended to take up all pending matters today.  So you have a |
| 09:09:46 | 24 | little time today. |
| 09:09:54 | 25 | Eusevio Maldonado-Huitron. |

| | | |
|---|---|---|
| 09:09:58 | 1 | MR. GONZALEZ-FALLA:  Jose Gonzalez-Falla for Mr. |
| 09:09:58 | 2 | Huitron, your Honor. |
| 09:10:00 | 3 | THE COURT:  And I have no pending motions. |
| 09:10:02 | 4 | MR. GONZALEZ-FALLA:  There are no pending motions, your |
| 09:10:02 | 5 | Honor. |
| 09:10:04 | 6 | For the record, I'm not opposed to reciprocal |
| 09:10:08 | 7 | discovery.  The government wanted me to state that on the record. |
| 09:10:10 | 8 | And I was hoping that you would enter your standard discovery |
| 09:10:12 | 9 | order. |
| 09:10:14 | 10 | THE COURT:  I intend to.  As soon as I can get a trial |
| 09:10:16 | 11 | date, I will enter it, and it will take care of all of the |
| 09:10:20 | 12 | motions that the Houston lawyers and the Dallas lawyers and |
| 09:10:24 | 13 | everybody love to file that are meaningless.  In Dallas and |
| 09:10:28 | 14 | Houston, actually, but certainly here.  I've just been awaiting |
| 09:10:34 | 15 | until we could all get together and sing songs over the campfire. |
| 09:10:44 | 16 | Felipe Alejandro Quintero. |
| 09:10:50 | 17 | MR. MONTALVO:  Gerry Montalvo for Mr. Quintero, your |
| 09:10:50 | 18 | Honor. |
| 09:10:58 | 19 | THE COURT:  And I have a detention problem for you. |
| 09:11:00 | 20 | MR. MONTALVO:  Your Honor, I believe we've come to a |
| 09:11:02 | 21 | release agreement with the government. |
| 09:11:02 | 22 | THE COURT:  Yes.  Well, we'll handle that today. |
| 09:11:06 | 23 | Raul Ramirez. |
| 09:11:12 | 24 | MR. HARRIS:  Robert Harris, your Honor.  And we have no |
| 09:11:14 | 25 | motions. |

09:11:16  1          THE COURT:  Mr. Harris.

09:11:18  2          Luis Gerardo Aguirre.

09:11:22  3          MR. GARDNER:  He's a fugitive, your Honor.

09:11:24  4          THE COURT:  He just may show up.  You never know.

09:11:28  5  That's why I've called all of these individuals.  Stranger things

09:11:32  6  can happen.

09:11:36  7          All right.  Have I called everybody who's here?  All

09:11:40  8  right.  That will straighten up what we will do here today.  Now,

09:11:50  9  I have the unopposed motion for interlocutory sale of any and all

09:12:00  10  horses subject to forfeiture in the instant case, and I'm advised

09:12:06  11  that people wish to speak to that.  So now is appropriate.

09:12:12  12          MR. FINN:  May I approach, your Honor?

09:12:12  13          THE COURT:  You don't need my permission to move in the

09:12:16  14  courtroom, except you can't get in the jury box.

09:12:18  15          MR. FINN:  I've been shooed out before for less.  But

09:12:22  16  thank you.

09:12:22  17          Judge, we are opposed to the sale of the horses.  I've

09:12:26  18  had the opportunity to discuss this with my client at length.  If

09:12:30  19  the government wants to feed the horses, fine, but as far as any

09:12:34  20  sales go, we're not going to agree to that at this point.

09:12:40  21          THE COURT:  For the record, you want to tell us your

09:12:42  22  name and your client's?

09:12:46  23          MR. FINN:  My name is David Finn, F-I-N-N.  And my

09:12:48  24  client is Jose Trevino-Morales, No. 3 in the indictment.

09:12:54  25          THE COURT:  All right.  Any other defendant opposed?

09:13:00    1  Somebody else wanted to speak to it, but talked to Mrs. Sims.

09:13:06    2          Mr. DeGeurin.  Be kind enough for the court reporter to

09:13:10    3  remind the record of your client.

09:13:14    4          MR. DEGEURIN:  Yes.  I'm Mike DeGeurin and I represent

09:13:16    5  Mr. Francisco Colorado-Cessa.

09:13:22    6          Your Honor, we have no opposition to the sale of the

09:13:28    7  horses putting money -- as suggested by the government.  We do

09:13:34    8  have issues with ownership at this point.  We think that's a --

09:13:40    9  whether it's Bailey or ownership, those issues are relevant for

09:13:44   10  trial, I believe, and we haven't gotten our discovery yet.  So

09:13:50   11  for your purposes, we do not oppose the interlocutory motion of

09:13:56   12  sale.

09:13:58   13          THE COURT:  Well, I understand that that -- those

09:14:00   14  issues, of course, they're subject to the forfeiture proceedings

09:14:04   15  that may or may not occur.

09:14:06   16          MR. DEGEURIN:  That's true.

09:14:08   17          THE COURT:  So we'll take that up.  Government want to

09:14:10   18  speak to the opposition?

09:14:12   19          MS. FREEL:  Yes, your Honor.  Jennifer Freel for the

09:14:18   20  United States.

09:14:18   21          Mr. Finn and I have talked previously and exchanged

09:14:22   22  e-mails, and I understood his client to be unopposed.  I

09:14:26   23  understand that when it's in black and white, sometimes that can

09:14:28   24  change a defendant's viewpoint when they see it all listed out.

09:14:32   25          THE COURT:  Has your viewpoint changed?

| | | |
|---|---|---|
| 09:14:36 | 1 | MS. FREEL:  No, your Honor.  We are certainly -- |
| 09:14:38 | 2 | THE COURT:  Well, Mr. Trevino is in no position to |
| 09:14:40 | 3 | handle the horses.  His opposition will be overruled.  I will |
| 09:14:42 | 4 | sign the order today. |
| 09:14:44 | 5 | MS. FREEL:  Thank you, your Honor. |
| 09:14:56 | 6 | THE COURT:  Now, where are we on discovery, counsel? |
| 09:15:00 | 7 | MR. GARDNER:  Your Honor, Doug Gardner for the United |
| 09:15:02 | 8 | States. |
| 09:15:02 | 9 | Your Honor, we're in the process of copying and making |
| 09:15:06 | 10 | separate copies for each one of the attorneys for the defendants |
| 09:15:10 | 11 | of the subpoenaed items, which I anticipate to run about 30,000 |
| 09:15:16 | 12 | pages.  That will be ready by Wednesday of next week. |
| 09:15:18 | 13 | THE COURT:  When you say subpoenaed. |
| 09:15:18 | 14 | MR. GARDNER:  We subpoenaed a number of bank records, |
| 09:15:20 | 15 | horse records, records of American Quarter Horse Association. |
| 09:15:24 | 16 | There's a number of auction houses, et cetera. |
| 09:15:26 | 17 | THE COURT:  And you think those will be ready in 30, 40 |
| 09:15:28 | 18 | days? |
| 09:15:28 | 19 | MR. GARDNER:  A week from today, your Honor. |
| 09:15:30 | 20 | THE COURT:  Okay.  And how about the recordings? |
| 09:15:36 | 21 | MR. GARDNER:  Your Honor, there's about 2,000 |
| 09:15:38 | 22 | consensual phone calls.  Those will be ready, also, on Wednesday. |
| 09:15:42 | 23 | The transcripts -- |
| 09:15:42 | 24 | THE COURT:  In what form? |
| 09:15:44 | 25 | MR. GARDNER:  In the recorded -- |

09:15:46  1          THE COURT:  They aren't translated yet.

09:15:48  2          MR. GARDNER:  Your Honor, the translations are done.

09:15:50  3  They are not finalized.  So some are finalized, some are not.

09:15:54  4  I'll give them a copy of the transcripts.  I'm not for sure if I

09:15:56  5  could make that by Wednesday, but it will be within a short

09:16:00  6  period.

09:16:00  7          THE COURT:  It's not going to be months, like I had

09:16:02  8  yesterday.

09:16:02  9          MR. GARDNER:  No, sir.

09:16:04 10          And, your Honor, we seized about 200 boxes worth of

09:16:08 11  evidence from seven different sites, and we're still going

09:16:10 12  through that.  And Mr. Gonzalez-Falla, his attorney -- defendant,

09:16:16 13  rather, has -- I think we've culled through that and will soon

09:16:20 14  return documents that aren't needed.  We're doing that today.

09:16:22 15  But there are significant number of other documents that we still

09:16:26 16  need to provide that we need to make a copy or make available for

09:16:30 17  inspection.  Most notably, the 50 or so boxes from Mr. Jose

09:16:34 18  Miguel Trevino's ranch in Lexington, Oklahoma that contains the

09:16:38 19  bulk of these records relating to the horses.

09:16:42 20          So I anticipate making that available for either

09:16:44 21  inspection or discovery or working through those issues with

09:16:46 22  counsel under the government's continuing obligation to disclose

09:16:50 23  as we go along, but those are not yet ready for production.

09:16:54 24          THE COURT:  Well, then, with regard to the records that

09:16:58 25  you're going to have for review in your offices, or wherever,

09:17:06  1    just handle that directly with counsel, and those that wish to

09:17:10  2    view it, fine.  Those that wish to object to the procedure, fine.

09:17:14  3    File your objections and I'll handle them.

09:17:20  4         On the recordings on the wires, are you going to

09:17:26  5    individualize each defendant and then, give them a copy of the

09:17:30  6    whole?

09:17:30  7         MR. GARDNER:  Your Honor, they don't pertain to every

09:17:34  8    single defendant, so probably give copies of the calls to

09:17:38  9    everyone.

09:17:38  10        THE COURT:  I expect some of them will be glad to know

09:17:40  11   that their clients are not on them.

09:17:42  12        MR. GARDNER:  Yes, sir.

09:17:42  13        THE COURT:  And would not object to that procedure.

09:17:46  14        But for those that are on them, it's been your standard

09:17:52  15   practice to give them two CDs:  One that identifies the

09:18:00  16   defendants, and then, one because they always want to review

09:18:04  17   everything to see if there's anything else in them.

09:18:06  18        MR. GARDNER:  I could do that, your Honor.

09:18:08  19        My plan was to give them -- of the 2,000 calls, I don't

09:18:12  20   have the exact number.  I believe about 300 are what we deem

09:18:16  21   pertinent, and so, they will have that disc, as well.  And then,

09:18:18  22   I could point out specific as to each defendant where we believe

09:18:22  23   their client is captured on that series of calls or number of

09:18:26  24   calls.

09:18:28  25        THE COURT:  Okay.  Well, I guess what we'll do is just

| | | |
|---|---|---|
| 09:18:32 | 1 | as soon as you have it and furnish it, if there's any additional |
| 09:18:36 | 2 | that you can't work out with these lawyers, then you can file |
| 09:18:42 | 3 | some sort of pleading that will bring my attention to them and I |
| 09:18:46 | 4 | will bring it up.  This doesn't look like it's as bad as the wire |
| 09:18:52 | 5 | I had yesterday with more defendants, actually. |
| 09:18:56 | 6 | MR. GARDNER:  No, sir. |
| 09:18:56 | 7 | We just have one consensual phone.  We don't have a |
| 09:18:58 | 8 | wiretap, and some other recordings, as well. |
| 09:19:02 | 9 | THE COURT:  Well, if it's going to be next week, let's |
| 09:19:04 | 10 | see, I have August the 20th open from yesterday.  It's not much |
| 09:19:14 | 11 | humor in this group. |
| 09:19:20 | 12 | So how long is it going to take for the government to |
| 09:19:24 | 13 | be ready for trial? |
| 09:19:24 | 14 | MR. GARDNER:  Your Honor, we'll be ready when the Court |
| 09:19:28 | 15 | tells us to be ready.  I know you hear that answer all the time. |
| 09:19:30 | 16 | I would say we probably need a month, your Honor, month and a |
| 09:19:34 | 17 | half at the minimum.  We're obviously cognizant of -- I've had |
| 09:19:40 | 18 | some discussions and other people have conflicts.  So I don't |
| 09:19:42 | 19 | know what length of time it will take for them to get ready and |
| 09:19:46 | 20 | go through discovery.  I've obviously had over a year on this |
| 09:19:48 | 21 | investigation to look at things. |
| 09:19:50 | 22 | I believe that it will be about a two-week trial, your |
| 09:19:54 | 23 | Honor, with the number of documents.  And, again, I know the |
| 09:19:56 | 24 | Court has some openings and a number of conflicts.  So that's the |
| 09:20:02 | 25 | government's non-position. |

| | | |
|---|---|---|
| 09:20:06 | 1 | THE COURT: All right. Counsel, who wants to be first |
| 09:20:08 | 2 | on when, how much time you're going to need? I know you're |
| 09:20:12 | 3 | looking at the abstract, but you know the skeleton what's going |
| 09:20:16 | 4 | on. |
| 09:20:18 | 5 | MR. DEGEURIN: Mike DeGeurin for Mr. Cessa. |
| 09:20:22 | 6 | Your Honor, we were looking at a September trial date. |
| 09:20:26 | 7 | We think that our case will take maybe three to four days if we |
| 09:20:34 | 8 | put on the case after the government's case. I'm looking at that |
| 09:20:40 | 9 | timeframe anticipating no problems in discovery. I've been told |
| 09:20:48 | 10 | that there are no consensual recordings that directly relate to |
| 09:20:52 | 11 | Mr. Cessa. Colorado-Cessa. The documents, I think, are |
| 09:20:58 | 12 | primarily bank documents. Once they're in a format that we can |
| 09:21:04 | 13 | search and narrow down the needle in the haystack, realistically |
| 09:21:10 | 14 | I think that we could be ready sometime in September. |
| 09:21:16 | 15 | We do have a trial after the first of the year that's |
| 09:21:24 | 16 | kind of set in stone in Colorado, a man in custody. |
| 09:21:28 | 17 | THE COURT: We? |
| 09:21:30 | 18 | MR. DEGEURIN: I keep saying that because I've got the |
| 09:21:32 | 19 | better half, Mr. Andres Sanchez. |
| 09:21:34 | 20 | THE COURT: Yeah, but it didn't include me. |
| 09:21:38 | 21 | MR. DEGEURIN: Well, Judge, I think the days you and I |
| 09:21:40 | 22 | used to snow ski are long past, but I'm happy to have you up |
| 09:21:46 | 23 | there. I'd like you to take over the case, tell you the truth. |
| 09:21:50 | 24 | THE COURT: I don't know how to handle this on the |
| 09:21:52 | 25 | record. |

09:21:54    1          MR. DEGEURIN:  Well, let's just don't do it then.

09:21:56    2          THE COURT:  I think that's good.  I broke my back in

09:22:00    3   1954 and that was one of the things that the doctor said:  You'll

09:22:06    4   never snow ski again.  Of course, I was born here in Austin and I

09:22:10    5   thought you had to go to Switzerland because the only places I

09:22:12    6   saw snow-skiing was every four years in the Olympics and the

09:22:16    7   movies.  I learned with four sons, however, how expensive it was,

09:22:22    8   so we wouldn't have done it, anyway.

09:22:24    9          Okay.  Everybody else ready to go to trial in

09:22:26   10   September?

09:22:32   11          MR. FINN:  Your Honor, David Finn for Jose

09:22:36   12   Trevino-Morales.

09:22:36   13          I think this is going to be a fairly straightforward

09:22:40   14   case.  Having said that, I haven't received any discovery, but

09:22:44   15   I've had good discussions with the prosecution, and I think that

09:22:48   16   my part would take maybe two days, three days.  But I do have a

09:22:52   17   conflict.  I represent a defendant witness in the Allen Stanford

09:22:58   18   trial with Judge Hittner in Houston.  Mr. Stanford's been tried,

09:23:02   19   he's been sentenced, but two other individuals are going to trial

09:23:06   20   the second week of September and that's -- frankly, it's

09:23:10   21   important that I be there.  And I don't think Judge Hittner's

09:23:14   22   going to budge.  And according to the government --

09:23:16   23          THE COURT:  Oh, I don't know about that, but he might

09:23:20   24   for me.  But his case has been pending a lot longer than that.  I

09:23:22   25   wouldn't ask him to change.

| | | |
|---|---|---|
| 09:23:26 | 1 | MR. FINN:  Other than that, wide open. |
| 09:23:28 | 2 | THE COURT:  Other than that. |
| 09:23:32 | 3 | MR. FINN:  Exactly.  Thank you, Judge. |
| 09:23:34 | 4 | THE COURT:  Next. |
| 09:23:34 | 5 | MR. WOMACK:  Your Honor, Geoff Womack for Mr. Garcia. |

09:23:38  6  The entire month of September, we've got settings that
09:23:40  7  cannot be moved to somewhere in Korea, in different places like
09:23:44  8  that.  We could be ready basically the first week or all of
09:23:50  9  October and on.  But all of September, your Honor, we are locked
09:23:56  10 down military settings.

09:24:00  11 THE COURT:  Okay.

09:24:02  12 MR. BRODEN:  Your Honor, Clinton Broden for Zulema
09:24:04  13 Trevino.

09:24:04  14 I've got a two-week trial set in the Northern District
09:24:06  15 of Texas beginning of October and a two-week trial set in the
09:24:10  16 Southern District of Mississippi at the end of October.  So any
09:24:14  17 time but October works with me.

09:24:16  18 THE COURT:  Well, September.

09:24:20  19 MR. BRODEN:  September is fine.  August 20th is fine.

09:24:22  20 THE COURT:  All right.  Counsel, we need to do a little
09:24:24  21 bit better here because my order is going to be simple.  The case
09:24:28  22 will be tried when I set it.  If you're not going to be here,
09:24:30  23 your client must get another counsel.  Go ahead.

09:24:36  24 MR. FLORES:  Your Honor, Mario Flores on behalf of
09:24:40  25 Carlos Nayen-Borbolla.

| | | |
|---|---|---|
| 09:24:44 | 1 | Mr. Rabino actually has a big four-week trial in |
| 09:24:48 | 2 | October, won't be available.  Prior to that, again, we just need |
| 09:24:52 | 3 | an opportunity to review discovery to really ascertain what the |
| 09:24:56 | 4 | government has on our client.  So we're looking at after October, |
| 09:25:02 | 5 | probably November.  So close to beginning of December or |
| 09:25:06 | 6 | beginning of the year.  Thank you, your Honor. |
| 09:25:12 | 7 | MR. WANNAMAKER:  Your Honor, on behalf of Mr. Farias, |
| 09:25:16 | 8 | Dan Wannamaker. |
| 09:25:16 | 9 | Anything in September on is fine with us.  And I would |
| 09:25:20 | 10 | anticipate not knowing when, our case taking one to two days. |
| 09:25:28 | 11 | MR. HARRIS:  Robert Harris for Raul Ramirez. |
| 09:25:30 | 12 | August, September is fine with me, your Honor.  We're |
| 09:25:32 | 13 | ready. |
| 09:25:36 | 14 | MR. GONZALEZ-FALLA:  Your Honor, I believe I could be |
| 09:25:36 | 15 | ready in September or October.  Whatever date the Court sets. |
| 09:25:40 | 16 | MR. MONTALVO:  Gerry Montalvo for Mr. Quintero. |
| 09:25:44 | 17 | I have trial settings in the Southern and Northern |
| 09:25:46 | 18 | District of Texas in October.  So November would work best for |
| 09:25:50 | 19 | me. |
| 09:26:00 | 20 | THE COURT:  I have somebody that November is already |
| 09:26:02 | 21 | booked.  Somebody came up there talking about November. |
| 09:26:08 | 22 | MR. DEGEURIN:  Your Honor, I do have a trial in |
| 09:26:10 | 23 | November that's one of nine indictments pending.  They're going |
| 09:26:18 | 24 | to try one after the other is the threat.  But it's been set for |
| 09:26:22 | 25 | quite some time.  It's a state case but it's -- |

| | | |
|---|---|---|
| 09:26:26 | 1 | THE COURT:  Counsel, one of the difficulties, also, I |
| 09:27:10 | 2 | have is in November, at some point into December, we're closing |
| 09:27:16 | 3 | this courthouse and moving to the new courthouse.  I don't think |
| 09:27:22 | 4 | that we are going to be able to have the appropriate facilities |
| 09:27:28 | 5 | in action to try any multi-defendant case for a couple of weeks. |
| 09:27:36 | 6 | So if we go into November, we're really looking into January. |
| 09:27:46 | 7 | What says the government with all of these conflicts? |
| 09:27:50 | 8 | MR. GARDNER:  Your Honor, again, I mean, I know these |
| 09:27:52 | 9 | gentlemen are busy.  The government obviously will be ready when |
| 09:27:56 | 10 | the Court tells us to be ready.  I don't have any objection to |
| 09:27:58 | 11 | the Court setting a date. |
| 09:28:00 | 12 | THE COURT:  Well, after with the exception of people in |
| 09:28:02 | 13 | detention, which I know is a problem, it's a problem in all of |
| 09:28:06 | 14 | these cases that we have such extensive preparation time.  This |
| 09:28:10 | 15 | is not one that's quite as bad as the last two, Monday's and |
| 09:28:16 | 16 | Tuesday's cases, but with the interlocutory removal or sale of |
| 09:28:24 | 17 | these horses that other than people being in detention awaiting |
| 09:28:30 | 18 | trial, I can't see any other problems. |
| 09:28:34 | 19 | MR. GARDNER:  Nor can I, your Honor, unless there's |
| 09:28:36 | 20 | some unforeseen discovery.  But I'll do my best to work with the |
| 09:28:38 | 21 | counsel. |
| 09:28:40 | 22 | THE COURT:  Looks like you're going to have plenty of |
| 09:28:40 | 23 | time to get all the foreseen out. |
| 09:28:44 | 24 | MR. GARDNER:  I do have a -- I forgot one thing, your |
| 09:28:46 | 25 | Honor.  I do have military duty at the end of September, so I |

| | |
|---|---|
| 09:28:48 | 1 |
| 09:28:52 | 2 |
| 09:28:58 | 3 |
| 09:29:00 | 4 |
| 09:29:06 | 5 |
| 09:29:10 | 6 |
| 09:29:14 | 7 |
| 09:29:20 | 8 |
| 09:29:28 | 9 |
| 09:29:32 | 10 |

```
09:28:48   1   could change it obviously.  But that would be my one conflict I

09:28:52   2   have, I forgot to mention, for the fiscal year.

09:28:58   3            THE COURT:  Well, September is not going to be -- there

09:29:00   4   are too many lawyers that can't participate.  With a strong

09:29:06   5   setting as I do with the warning that we're going to go and if

09:29:10   6   they need to make modifications of their representation, that

09:29:14   7   gives them enough time to do so.  It's a sad thing that we have

09:29:20   8   to do it that way, but we're looking at many months simply

09:29:28   9   because of the choice of the lawyers of the defendants, although

09:29:32  10   some of you are here by invitation, I understand.

09:29:44  11            So I take it that there are no conflicts for jury

09:29:48  12   selection on January the 7th and trial on the 8th.

09:29:52  13            MR. GARDNER:  None from the government, Judge.

09:29:56  14            MR. DEGEURIN:  Your Honor, I mentioned that in 2013, we

09:30:00  15   have a case that's set.  It was set for trial in August and it

09:30:06  16   was reset, because of the Court's schedule and other matters, all

09:30:12  17   the way to January the 7th, and we had a lot of discussion about

09:30:18  18   that because it's a businessman, he's in custody.  And so, any

09:30:26  19   time before that, you know, I could work with other judges.

09:30:36  20            Mr. Cessa is in custody, although we do have a

09:30:38  21   detention hearing coming up.  He's a businessman, Mr. Cessa is,

09:30:44  22   works with Pemex Oil Company.  He's unaccustomed to being in

09:30:50  23   custody of the Court.  There's a possibility maybe with -- if

09:30:56  24   there's some movement of some of the defendants, it will be a

09:31:00  25   shorter trial, and maybe a severance of our client, or anything
```

| | | |
|---|---|---|
| 09:31:02 | 1 | that we could work with the Court on and the Court's schedule and |
| 09:31:08 | 2 | have it before -- sometime this year, even if it's early |
| 09:31:16 | 3 | December.  It's possible. |
| 09:31:18 | 4 | THE COURT:  Right now, they're scheduled to move the |
| 09:31:20 | 5 | courtrooms and the judges on the week of November -- they're |
| 09:31:38 | 6 | starting the weekend of December 3rd.  And, of course, they say |
| 09:31:46 | 7 | everything will be just fine and dandy by then, the week of |
| 09:31:50 | 8 | December 3rd.  We won't have the facilities to try this case. |
| 09:32:06 | 9 | MR. DEGEURIN:  My thought was, Judge, it may not be a |
| 09:32:10 | 10 | large case, you know, by the time we get to trial. |
| 09:32:16 | 11 | THE COURT:  Well, I anticipate that most of you will be |
| 09:32:18 | 12 | gone.  That's true. |
| 09:32:26 | 13 | MR. DEGEURIN:  If there's no wiretaps, it's all |
| 09:32:28 | 14 | consensual recordings, you've already commented on that.  That's |
| 09:32:32 | 15 | going to make a big difference.  The bank records, you know, are |
| 09:32:34 | 16 | going to be narrowed down quickly.  So we're talking about the |
| 09:32:40 | 17 | informant testimony primarily and records custodians.  If there's |
| 09:32:46 | 18 | any courtroom we could use during that moving time.  Moving now, |
| 09:32:58 | 19 | you and I don't pick up the boxes, someone else does.  We just |
| 09:33:00 | 20 | mark them.  So, I mean, we could try it while that moving's going |
| 09:33:06 | 21 | on. |
| 09:33:08 | 22 | THE COURT:  I don't believe the marshals will permit me |
| 09:33:10 | 23 | to do that in this particular case.  But it was a good try. |
| 09:33:14 | 24 | MR. DEGEURIN:  This is the first time that I saw you |
| 09:33:18 | 25 | worrying about. |

| | | |
|---|---|---|
| 09:33:18 | 1 | THE COURT:  All right.  Counsel, look at your calendars |
| 09:33:22 | 2 | again.  Let's see -- let's go back and look at October 22nd. |
| 09:33:32 | 3 | MR. DEGEURIN:  That will do it. |
| 09:33:36 | 4 | MR. BRODEN:  Your Honor, I'm in trial in the Southern |
| 09:33:36 | 5 | District of Mississippi. |
| 09:33:38 | 6 | THE COURT:  Whose court? |
| 09:33:40 | 7 | MR. BRODEN:  They've just moved judges, so I'd have to |
| 09:33:44 | 8 | get you the name of the judge.  We just switched judges, but we |
| 09:33:46 | 9 | moved it from one day to that date to accommodate that judge.  My |
| 09:33:52 | 10 | partner did the hearing because I wasn't available. |
| 09:34:02 | 11 | THE COURT:  Well, what kind of case is it? |
| 09:34:06 | 12 | MR. BRODEN:  It's a Medicare fraud case, your Honor. |
| 09:34:08 | 13 | THE COURT:  I won't have any trouble with that judge. |
| 09:34:12 | 14 | If you have any trouble with that judge, just tell me and I won't |
| 09:34:14 | 15 | have any trouble. |
| 09:34:16 | 16 | MR. BRODEN:  All right. |
| 09:34:20 | 17 | THE COURT:  You said federal court? |
| 09:34:22 | 18 | MR. BRODEN:  Yes, your Honor. |
| 09:34:22 | 19 | MR. FINN:  Judge, David Finn for Jose Trevino-Morales. |
| 09:34:26 | 20 | I'm going to have to check, but I think I've got a |
| 09:34:28 | 21 | trial set in -- with Judge Richard Schell's court in Plano.  It's |
| 09:34:34 | 22 | sort of up in the air right now.  My client is not in custody in |
| 09:34:36 | 23 | that case and Judge Schell's pretty flexible.  But. |
| 09:34:40 | 24 | THE COURT:  He's a very, very -- he's easy to work |
| 09:34:46 | 25 | with, good guy.  Well, if you'll tell him the circumstances and |

09:34:48   1   call and tell his clerk, I don't think we'll have any problem

09:34:54   2   with Judge Schell.

09:34:56   3          All right.  We will then have jury selection on October

09:35:04   4   the 22nd.  For those two weeks -- as we get closer to the trial

09:35:26   5   with the number of defendants that are remaining and the issues

09:35:28   6   that are there, then we can figure out the time if it's going to

09:35:34   7   be more than two weeks, less than two weeks, so that you can

09:35:38   8   schedule.  But for scheduling purposes, the weeks of the 22nd and

09:35:42   9   the 29th of October.  I'll hear all the trial motions on

09:36:22   10  September the 27th, which is my birthday.  I want all motions

09:36:34   11  filed by September the 7th.  Responses by the 19th.

09:37:14   12         If, for any reason, there are motions that can't be

09:37:22   13  heard on the 27th, it will spill over to the 28th.  I have

09:37:26   14  sentencing and motions in other cases on that day, but we will

09:37:32   15  try to complete it in one day.  An Ellis order will also be on

09:37:54   16  the 27th of September.  Counsel, I enforce Ellis orders.

09:38:02   17         Okay.  The government have anything else other than the

09:38:06   18  detention issue?

09:38:08   19         MR. GARDNER:  No, your Honor.

09:38:08   20         THE COURT:  Anybody other than those that are involved

09:38:10   21  in detention matters have anything else that you'd like to

09:38:14   22  present?

09:38:16   23         Counsel, if you get with the Mississippi judge, tell

09:38:20   24  him that I don't have a whole lot of choice, I'll be glad to

09:38:26   25  discuss it with him.  And if you'll find out which judge it is,

| | | |
|---|---|---|
| 09:38:30 | 1 | I'll call.  Mississippi's in my territory, so I don't really |
| 09:38:34 | 2 | anticipate any problem. |
| 09:38:34 | 3 |           MR. BRODEN:  That will be the plan.  It's just a |
| 09:38:36 | 4 | multi-defendant case, so we'll have to see. |
| 09:38:40 | 5 |           THE COURT:  Well, you know, I used to make a lot of |
| 09:38:42 | 6 | money in those cases myself defending, but I don't make a lot of |
| 09:38:48 | 7 | money anymore.  And they just have to yield to the criminal |
| 09:38:54 | 8 | docket.  I think if you explain it. |
| 09:38:58 | 9 |           MR. BRODEN:  Your Honor, maybe I wasn't clear.  It's a |
| 09:39:00 | 10 | Medicaid fraud criminal trial. |
| 09:39:02 | 11 |           THE COURT:  Oh, it's a criminal. |
| 09:39:04 | 12 |           MR. BRODEN:  Yes. |
| 09:39:04 | 13 |           THE COURT:  Well, then, that may have some trouble.  We |
| 09:39:06 | 14 | may have to arm-wrestle him.  But let's get it so that they know |
| 09:39:12 | 15 | of the conflict. |
| 09:39:16 | 16 |           MR. BRODEN:  I will, your Honor. |
| 09:39:16 | 17 |           THE COURT:  Who do you represent? |
| 09:39:18 | 18 |           MR. BRODEN:  Oh, in this case, Zulema Trevino, your |
| 09:39:22 | 19 | Honor. |
| 09:39:22 | 20 |           THE COURT:  And same goes for you.  If you'll contact. |
| 09:39:28 | 21 |           MR. FINN:  Judge Schell. |
| 09:39:30 | 22 |           THE COURT:  Judge Schell. |
| 09:39:30 | 23 |           MR. FINN:  He's a prince and it won't be a problem. |
| 09:39:32 | 24 |           THE COURT:  I don't believe so, but we still need to |
| 09:39:34 | 25 | give him notice. |

| | |
|---|---|
| 09:39:36 | 1 |

```
09:39:36   1              MR. FINN:  I will.

09:39:36   2              THE COURT:  All right.  I'll have a 15-minute break and

09:39:38   3    then, I'll take up the detention.  Everybody else will be

09:39:42   4    excused.

09:39:42   5              (Recess.)

09:52:52   6              THE COURT:  Mr. Finn, the motion is yours.

09:52:56   7              MR. FINN:  Your Honor, the detention hearing -- is that

09:53:04   8    what you're referring to?

09:53:04   9              THE COURT:  Yeah.  Your motion to revoke the magistrate

09:53:06  10    judge's detention order.  And, of course, I have CDs of what went

09:53:16  11    on at the -- in each of the hearings, which I have reviewed, plus

09:53:22  12    the orders.

09:53:26  13              MR. FINN:  Judge, the hearing was, I think, fairly

09:53:28  14    straightforward.  They put a case agent on who indicated that,

09:53:30  15    you know, my client had been buying and selling horses with dirty

09:53:36  16    money.  Clearly it's not a presumption case.  I don't know

09:53:38  17    whether the magistrate -- I couldn't read his mind, but his

09:53:42  18    initial order indicated that he was, in fact, treating it as a

09:53:46  19    presumption case.  Perhaps it was a clerical error.  I don't

09:53:50  20    know.  But it's not a presumption case.

09:53:52  21              My client is a U.S. citizen.  He's got no criminal

09:53:56  22    history whatsoever.  He's got extensive ties to the community,

09:53:58  23    including a very supportive family.  And I just don't understand

09:54:04  24    why home confinement and/or electronic monitoring when the

09:54:08  25    government's already taken his passport and a magistrate found he
```

09:54:12  1   is not a danger to the community, that he's simply a flight risk.

09:54:18  2   Judge, with the publicity related to this case, you know, you've

09:54:22  3   got horse sense, pun intended.  The last place on the planet my

09:54:26  4   client is going to go with this kind of publicity is Mexico.

09:54:32  5            THE COURT:  Well, is this related to the Trevinos that

09:54:36  6   have decided to stay in Mexico?

09:54:38  7            MR. FINN:  That's the allegation.

09:54:40  8            Judge, I've been doing defense work for ten years now.

09:54:42  9   Prior to this, I was a state and federal prosecutor and criminal

09:54:46  10  trial judge albeit on a much lower level, a misdemeanor bench in

09:54:50  11  Dallas.  In those ten years, you know how many of my clients have

09:54:52  12  fled?  None.  My people don't flee.  He is not going to flee.

09:55:00  13  You can put him under lock and key and lockdown in his house, and

09:55:06  14  he will show up for court.  He will be able to help me get this

09:55:10  15  case ready for trial because, right now, it's a nightmare dealing

09:55:14  16  with the Bastrop County jail.  They've got him on lockdown.

09:55:16  17  Every time I go there, it takes me two hours to get in and see

09:55:20  18  him.  The first time I went there, they wouldn't even let me in

09:55:22  19  to see him.  He's not going anywhere, Judge.

09:55:30  20           THE COURT:  Where's my marshal?

09:55:36  21           U.S. MARSHAL:  Yes, sir.

09:55:38  22           THE COURT:  I set all of those procedures in Bastrop.

09:55:46  23           U.S. MARSHAL:  As far as I know, yes, sir.

09:55:46  24           THE COURT:  Let's check on that because they were to

09:55:52  25  have a room, have a computer, be with their lawyer.  And I

| | | |
|---|---|---|
| 09:55:58 | 1 | haven't heard from all of them.  It may be that this case is just |
| 09:56:02 | 2 | on the back burner because the other case is more active with all |
| 09:56:10 | 3 | of that.  I'm talking about the Yassine case. |
| 09:56:12 | 4 | U.S. MARSHAL:  Yes, sir. |
| 09:56:12 | 5 | MR. FINN:  Judge, I can tell you that's not happening. |
| 09:56:14 | 6 | I have not been able to have a face-to-face conversation with my |
| 09:56:18 | 7 | client.  Every time I go down there, they say it's a security |
| 09:56:20 | 8 | issue, Mr. Finn, we hope you understand, and I'm talking to him |
| 09:56:24 | 9 | on the telephone. |
| 09:56:24 | 10 | THE COURT:  Well, and it may be a security issue.  I'll |
| 09:56:28 | 11 | just have to check.  But if I can get the same procedures that I |
| 09:56:32 | 12 | can with -- where I can have competence that we have sufficient |
| 09:56:40 | 13 | security clearing the marshal, it's the marshal's choice.  But |
| 09:56:46 | 14 | I'll talk with the marshal and we'll find out exactly what's |
| 09:56:48 | 15 | going on.  But I've cleared it up with a couple of these |
| 09:56:56 | 16 | multi-defendant cases.  And the difficulty, many times, is when a |
| 09:57:04 | 17 | -- they have their own problems. |
| 09:57:06 | 18 | MR. FINN:  I understand.  And I've tried to be as |
| 09:57:08 | 19 | patient as I can, Judge, but -- |
| 09:57:10 | 20 | THE COURT:  Well, you just have to be patient because |
| 09:57:12 | 21 | that's the world we live in. |
| 09:57:16 | 22 | MR. FINN:  My client's wife, who also has no criminal |
| 09:57:18 | 23 | history, was released on a $25,000 unsecured bond.  She showed up |
| 09:57:22 | 24 | here today.  She's going to show up.  What is the difference |
| 09:57:26 | 25 | between my client with no criminal history, a U.S. citizen?  I've |

| | |
|---|---|
| 09:57:30 | 1 |

09:57:30   1   got his passport, no criminal history, Judge.

09:57:36   2          THE COURT:  I've had no criminal history people walk

09:57:38   3   out of here to the airport and be in London before they realized

09:57:44   4   that they haven't checked in with the Pretrial representative.

09:57:54   5          MR. FINN:  Judge, isn't that putting the cart before

09:57:56   6   the horse?  That's presuming something in a non-presumption case.

09:58:00   7   I could understand your concern.

09:58:02   8          THE COURT:  No, no, no, no.  I'm just telling you, you

09:58:04   9   just have a good track record.  I've had people that we've had to

09:58:08  10   go over and get all over the world, American citizens, and we got

09:58:14  11   them -- the government got them generally when they ran out of

09:58:18  12   money because money allows escape.

09:58:22  13          Let me hear from the government.  I take it, counsel,

09:58:28  14   you don't wish to present any additional evidence.

09:58:30  15          MR. FINN:  No, sir.  I'll rest on the record.

09:58:32  16          THE COURT:  Okay, sir.

09:58:34  17          MR. FINN:  Thank you.

09:58:34  18          MR. GARDNER:  Thank you, your Honor.

09:58:36  19          I'd direct the Court's attention to Judge Lane's order,

09:58:40  20   document 124, he lists the circumstances.  And just to briefly

09:58:42  21   review the evidence and addressing Mr. Finn's argument.  It's not

09:58:48  22   an allegation, Judge.  I think the evidence was pretty clear

09:58:50  23   presented at the hearing that this defendant over here, Mr. Jose

09:58:52  24   Trevino-Morales, is, in fact, a brother, a blood brother from the

09:58:56  25   same mother of Miguel and Omar Oscar Trevino.  Those two

09:59:02  1  gentlemen had been under various indictments since 2001.  I

09:59:06  2  believe there's four separate jurisdictions that they're under

09:59:10  3  indictment.  They have evaded capture by both Mexican authorities

09:59:12  4  and the U.S. authorities.

09:59:14  5          Also in the testimony that the Court has in the

09:59:18  6  recording was a report that at least in the Dallas cell, they're

09:59:24  7  shipping 20 to $25 million a month down to Mexico.  So, your

09:59:28  8  Honor, the fact that Mr. Jose Trevino-Morales is, in fact, a

09:59:32  9  defendant of two of the leaders of what is probably the most

09:59:36  10 brutal drug cartel from evading capture for the last ten years, I

09:59:40  11 think makes him more than a flight risk to join his brothers in

09:59:44  12 Mexico and continue to use their ability to bribe, or influence,

09:59:48  13 or pay off, or evade law enforcement until he's either captured,

09:59:54  14 killed years down the road.

09:59:56  15          So we definitely think he's a flight risk, your Honor.

09:59:58  16 The difference is he was born in Mexico.  He is a naturalized

10:00:02  17 citizen.  His wife is a U.S. citizen, born in the U.S.  So his

10:00:08  18 ties to Mexico, based on his birth and his family members,

10:00:10  19 indicate to us that he is a flight risk.

10:00:14  20          THE COURT:  All right.

10:00:48  21          MR. FINN:  Judge, could I add one thing?

10:00:50  22          THE COURT:  Two things.  This is Mr. Sartin.  He's my

10:00:54  23 marshal.

10:00:54  24          MR. FINN:  We just met.

10:00:56  25          THE COURT:  He wants to talk to you.

| | | |
|---|---|---|
| 10:00:58 | 1 | MR. FINN:  Right. |
| 10:00:58 | 2 | THE COURT:  He says if you'd be a little less |
| 10:01:02 | 3 | confrontational with people in Bastrop, that you might get a |
| 10:01:06 | 4 | little bit more cooperation.  But he'll be the person that you |
| 10:01:10 | 5 | call in charge.  If I hear that you're confrontational down |
| 10:01:14 | 6 | there -- I've got hundreds of people there.  I have a pretty good |
| 10:01:22 | 7 | pulse when there is a problem, and when there's a problem, I |
| 10:01:24 | 8 | resolve it.  But I don't have many problems because it's so |
| 10:01:28 | 9 | federalized.  I've got an entire penitentiary down there, and |
| 10:01:32 | 10 | they work with the Bastrop people because there's always |
| 10:01:36 | 11 | exchanges between people going to trial and people going to the |
| 10:01:40 | 12 | penitentiary. |
| 10:01:40 | 13 | MR. FINN:  Judge, I haven't had any issues with the |
| 10:01:42 | 14 | Bastrop jail. |
| 10:01:44 | 15 | THE COURT:  I'm saying that's what's reported. |
| 10:01:46 | 16 | MR. FINN:  No.  They're mad at me because earlier |
| 10:01:48 | 17 | today, one of your marshals chewed me out and started yelling at |
| 10:01:52 | 18 | me, and I bowed up and they didn't like that.  They were rude, |
| 10:01:56 | 19 | they were insolent, and I'm not going to get treated that way, |
| 10:02:00 | 20 | your Honor.  That's why they're mad at me. |
| 10:02:04 | 21 | THE COURT:  Well, okay.  All right.  Well, let's put it |
| 10:02:10 | 22 | this way.  Indirectly, the marshals work for me. |
| 10:02:16 | 23 | MR. FINN:  Right. |
| 10:02:18 | 24 | THE COURT:  And I don't permit rude, unprofessional |
| 10:02:24 | 25 | conduct. |

10:02:24   1          MR. FINN:  From them either, right?

10:02:26   2          THE COURT:  Right.

10:02:28   3          MR. FINN:  Good.

10:02:28   4          THE COURT:  And I don't have it from them either.

10:02:34   5          MR. FINN:  Understood, your Honor.

10:02:36   6          Judge, can I add one thing?  The Pretrial Service

10:02:38   7  report recommended release.

10:02:40   8          THE COURT:  I read the Pretrial Service.

10:02:42   9          MR. FINN:  I failed to mention that earlier.

10:02:50   10         THE COURT:  The motion to revoke the magistrate judge

10:02:52   11  detention order is denied.  Clearly Mr. Trevino is a possible

10:02:58   12  flight risk.  He has allegedly by this indictment and by the

10:03:04   13  information available in the record through his brothers

10:03:08   14  un-measurable ability to live independently outside the United

10:03:16   15  States.  His brothers are living currently outside the United

10:03:20   16  States.  There's no question he's a flight risk, and I affirm

10:03:22   17  that decision and I will do so in writing.

10:03:26   18         MR. FINN:  Your Honor, just for the record, we plan to

10:03:30   19  appeal that detention ruling that you just entered to the Fifth

10:03:34   20  Circuit.  And I would also ask -- and I need to put on the

10:03:38   21  record, we plan to appeal your order the sale of the horses, and

10:03:40   22  we would ask that you stay that order for a couple of days so

10:03:44   23  that we can perfect our appeal.

10:03:46   24         THE COURT:  Well, I'll allow you a couple of days to

10:03:54   25  obtain the stay by the circuit, but I will not stay the order.

10:04:00  1   But in the order I will give you time to make an application for

10:04:02  2   a stay.

10:04:04  3             MR. FINN:  Thank you, your Honor.

10:04:12  4             THE COURT:  Mr. Farias.

10:04:20  5             MR. DEGEURIN:  Your Honor, Mike DeGeurin.

10:04:20  6             THE COURT:  I mean, this is Mr. Cessa.  I'm sorry.

10:04:22  7             MR. DEGEURIN:  Did you want another?

10:04:24  8             THE COURT:  Yeah.

10:04:28  9             MR. GARDNER:  Your Honor, Mr. Farias is upstairs.

10:04:30  10            THE COURT:  No.  I just pulled the wrong file.

10:04:32  11            MR. DEGEURIN:  Mike DeGeurin for Cessa-Colorado.

10:04:38  12            MR. BRODEN:  Your Honor, I'm sorry, are the other

10:04:40  13  lawyers excused?  I didn't --

10:04:40  14            THE COURT:  You're all excused.

10:04:42  15            MR. BRODEN:  I wasn't clear on that.  Leave the party

10:04:46  16  early.

10:04:50  17            MR. DEGEURIN:  We have an appeal of the detention

10:04:52  18  hearing.  Would you like to hear my position at this point?

10:04:56  19            THE COURT:  Yes.  And any additional evidence that you

10:05:00  20  may want to produce.

10:05:00  21            MR. DEGEURIN:  All right.  First of all, your Honor, I

10:05:06  22  have done a lot of work with Pemex Oil Company.  I've represented

10:05:12  23  the director of Pemex.  As you are aware, it's the state-owned

10:05:18  24  oil company, the oil company of Mexico.  It's very -- it's not an

10:05:24  25  illegitimate company in any way.  It's a very important company.

10:05:30  1    Francisco Colorado-Cessa had been working for 18 years,
10:05:34  2    I believe, doing servicing work for the Pemex Oil Company.  All
10:05:40  3    of his contract -- all of his income is directly from Pemex Oil
10:05:44  4    Company.  He's got a very -- he does things like Red Adair used
10:05:50  5    to do here, he puts out fires, it cleans up their sites where
10:05:54  6    they go in and drill.  He's the owner-CEO of the company.  His
10:06:02  7    connections -- he's from Vera Cruz, Mexico.  He's a Mexican
10:06:06  8    citizen, Mexican national.
10:06:08  9    He has no prior criminal record of any sort.  When he
10:06:14  10   learned that his -- there were possible charges after him, he
10:06:20  11   didn't know for sure, he came to my office.  His wife and child
10:06:26  12   are in school and outside of Houston and learning English near
10:06:34  13   the Woodlands.
10:06:38  14   And he came to my office and I made my calls to the
10:06:40  15   marshals I deal with in Houston, and the marshals confirmed that
10:06:48  16   there was -- although it was sealed, there was a warrant for his
10:06:52  17   arrest out.  I asked him, when can we arrange a presentation with
10:06:58  18   Mr. Cessa to face these charges?  I think there could very well
10:07:04  19   be a mistake that he's being charged in the first place.  And
10:07:08  20   they said, well, can you come in day after tomorrow?  And I said,
10:07:12  21   well, that will be fine.  We did.  We appeared before the
10:07:14  22   magistrate, before the marshal presenting himself.
10:07:18  23   Now, take this, your Honor.  He walks from very a
10:07:24  24   respected position in a business suit in to be at the marshal's.
10:07:34  25   I'm here to face these charges.  Haven't seen the indictment yet,

| 10:07:38 | 1 | but I'm here to face them.  He's handled at that moment with |
| 10:07:44 | 2 | great respect, just as he should be.  The next day, I appear in |
| 10:07:52 | 3 | the magistrate's court with Mr. Cessa, and he is in a suit like |
| 10:07:58 | 4 | that.  He's handcuffed -- stay with me on this, Judge.  He's |
| 10:08:04 | 5 | handcuffed at the wrist, waist, and he's walking like this.  He |
| 10:08:08 | 6 | can't even raise his hand up to swear himself. |
| 10:08:12 | 7 | All I'm saying is we've been around quite a while, |
| 10:08:16 | 8 | Judge.  And sometimes we get immune -- we get used to what is |
| 10:08:24 | 9 | happening because we say that, well, this is just a -- it's the |
| 10:08:28 | 10 | marshal's way of securing things.  The problem is we strip the |
| 10:08:32 | 11 | man of his dignity.  One of the deputy marshals said, you don't |
| 10:08:40 | 12 | look so innocent now, Mr. Cessa, as he walked in.  He meant that |
| 10:08:42 | 13 | kind of as a joke, not mean-spirited, but it sank in.  And I made |
| 10:08:50 | 14 | this speech to the magistrate, who is relatively new working for |
| 10:08:58 | 15 | the federal judges, at the detention hearing. |
| 10:09:02 | 16 | But I do think we need to take note of that.  It's not |
| 10:09:06 | 17 | only -- he's not a flight risk.  That's not the problem.  They |
| 10:09:08 | 18 | didn't even say he was a flight risk.  He's not a presumption |
| 10:09:14 | 19 | case.  He is a businessman.  The allegations, as I understand |
| 10:09:20 | 20 | from the indictment and from the affidavit that I saw, is that as |
| 10:09:24 | 21 | a businessman, he also has a horse ranch in Mexico, and he buys |
| 10:09:30 | 22 | and sells horses.  He loves horses.  It's a hobby.  It's a big |
| 10:09:34 | 23 | hobby of his, but he loves horses. |
| 10:09:38 | 24 | Some of the horses he bought ended up on Mr. -- on the |
| 10:09:44 | 25 | Tremor farms, which is owned by Mr. Trevino.  And we know in the |

10:09:48  1  undercurrent in the background that there's allegations that some

10:09:54  2  bad people in Mexico have a hobby of horses, too, and in the

10:10:00  3  process, they get to launder money somehow in the United States

10:10:02  4  by buying and selling horses.

10:10:04  5       I believe the evidence is going to show in the very end

10:10:06  6  that Mr. Cessa, the last thing he wants, the last thing that he

10:10:12  7  wants -- he's a successful businessman making much more money in

10:10:18  8  the oil business than would ever think about in the horse

10:10:24  9  business, this level of horses.  For example, he has a little

10:10:30  10  ranch called Los Angelitos, little angels.  He heard, he learned

10:10:38  11  that autistic children have some sort of connection to horses.

10:10:44  12  He hired the number one person out of Switzerland in that field

10:10:50  13  and brought him to Vera Cruz, and he set up a little place for

10:10:56  14  autistic and Down Syndrome children.  That's his -- that's just

10:11:00  15  to let you know the love and respect he has for horses.

10:11:06  16       In the end in this case, I think we're going to end up

10:11:08  17  having is someone -- the last thing he wants is to have anything

10:11:14  18  to do with the Los Zetas.  He doesn't want anything to do with

10:11:20  19  them because they're dangerous people by reputation.  You don't

10:11:26  20  -- you want to stay clear of them, and he would do everything he

10:11:30  21  could.  His business associates, the director of the Pemex.

10:11:38  22  Anyway, the whole group that he's related to, the lawyers that I

10:11:44  23  know in Mexico that are his lawyers and friends all were happy

10:11:52  24  that he was going to be able to present himself and clear himself

10:11:56  25  in trial in the United States.

| | | |
|---|---|---|
| 10:11:58 | 1 | So what the government has done here is they through |
| 10:12:14 | 2 | OFAC, Office of Financial Corruption, whatever it stands for, had |
| 10:12:18 | 3 | him designated as related to or somehow connected to the Trevinos |
| 10:12:24 | 4 | in Mexico.  By that happening, he is put on the OFAC list and the |
| 10:12:30 | 5 | lights go on, and immediately his United States bank accounts are |
| 10:12:38 | 6 | frozen.  All of his Mexican banks and stuff cannot deal with any |
| 10:12:44 | 7 | American bank.  I even hear that they're thinking about trying to |
| 10:12:52 | 8 | take the bank accounts or freeze the bank accounts of his |
| 10:12:56 | 9 | business with -- 18-year business with Pemex Oil Company.  We're |
| 10:13:02 | 10 | talking about large amounts of money.  And I understand your |
| 10:13:06 | 11 | position that money allows people to run, right? |
| 10:13:12 | 12 | In this case, we have -- |
| 10:13:12 | 13 | THE COURT:  That's the only thing that allows them to |
| 10:13:14 | 14 | run. |
| 10:13:16 | 15 | MR. DEGEURIN:  Huh? |
| 10:13:16 | 16 | THE COURT:  In this world, it's the only thing that |
| 10:13:18 | 17 | allows them to run. |
| 10:13:20 | 18 | MR. DEGEURIN:  Yeah. |
| 10:13:20 | 19 | THE COURT:  Far. |
| 10:13:22 | 20 | MR. DEGEURIN:  Right.  And if you saw -- well, and I |
| 10:13:28 | 21 | understand that that's a point.  Any wealthy person could be |
| 10:13:32 | 22 | incarcerated because of that facing time in the penitentiary. |
| 10:13:38 | 23 | THE COURT:  It depends.  Tell me why and how I can let |
| 10:13:48 | 24 | Mr. Cessa, in light of these allegations -- and I have an idea |
| 10:13:52 | 25 | what the government's going to say because I reviewed the record |

| 10:13:56 | 1 | -- ensure his attendance?  He is a person, he's very smart, he |

10:13:56   1   -- ensure his attendance?  He is a person, he's very smart, he

10:14:04   2   can get in and out of this country, just like you can, just like

10:14:08   3   I can, and he's got moneys that he can protect him.  And he can

10:14:18   4   stay in Vera Cruz the rest of his life, without any problems,

10:14:24   5   because of his professional status.  I could see why he doesn't

10:14:28   6   want to do that.

10:14:30   7          MR. DEGEURIN:  Exactly.

10:14:30   8          THE COURT:  But I don't know what influence and I don't

10:14:34   9   think we're going to have any evidence that Trevinos would have

10:14:38   10  on him.  I would think there are people that you would have to

10:14:42   11  certainly listen to.  That's part of the reason that he's in

10:14:52   12  shackles because all of the people are in shackles.  I have an

10:15:00   13  eight percent cut this year from the Congress going into effect.

10:15:04   14  That means I have eight percent less security of marshals, and

10:15:12   15  so, we have more and more shackles.  I don't like it, but that's

10:15:18   16  the world we're living in right now.

10:15:24   17         So tell me how I could be assured that this gentleman

10:15:30   18  is going to be here in all of the hearings that we have and the

10:15:36   19  trial.

10:15:36   20         MR. DEGEURIN:  I will have him in a house arrest.  We

10:15:42   21  will pay for security.  We will not ask for the government to pay

10:15:46   22  for security.  By security I mean by that, I can assure you, I

10:15:50   23  will have deputy sheriffs, Travis County deputy sheriffs if you

10:15:54   24  want him here, Harris County deputy sheriffs if you want him in

10:15:58   25  Harris County.  I've done this before.  I'll have him posted at

| | |
|---|---|
| 10:16:04 | 1 | his home 24/7.  And I will assure the Court and Mr. Cessa will |
| 10:16:10 | 2 | assure the Court that he will not leave that house during the |
| 10:16:14 | 3 | pendency of this, except for transportation to and from court, |
| 10:16:18 | 4 | which we will also pay for. |
| 10:16:20 | 5 |         We do have a situation, Judge, where you can see this |
| 10:16:26 | 6 | person needs to be in shackles, this person doesn't.  I know it's |
| 10:16:28 | 7 | easier to put everybody in shackles, but you know what, it's not |
| 10:16:32 | 8 | necessary.  We have a person that is a man of great honor.  His |
| 10:16:38 | 9 | family has great honor.  His friends and family have great honor. |
| 10:16:42 | 10 | He does business in the United States, as well as Mexico, with |
| 10:16:46 | 11 | regard to the oil business. |
| 10:16:48 | 12 |         THE COURT:  I'm not questioning that.  I'm taking him |
| 10:16:54 | 13 | at his word.  But when they get back to the confinement. |
| 10:17:00 | 14 |         MR. DEGEURIN:  Yes. |
| 10:17:00 | 15 |         THE COURT:  With so many of the people I have to deal |
| 10:17:04 | 16 | with that I didn't even know existed before 1991, if you're not |
| 10:17:10 | 17 | in shackles and they are, you're in jeopardy when you're in |
| 10:17:14 | 18 | security.  And it's difficult to protect everybody, particularly |
| 10:17:22 | 19 | with the gang problem we have.  And you know that more than I do. |
| 10:17:26 | 20 |         MR. DEGEURIN:  I do.  And I am concerned about his |
| 10:17:30 | 21 | security.  But here's what I -- |
| 10:17:32 | 22 |         THE COURT:  Far more dangerous for him if I said I |
| 10:17:34 | 23 | don't want him in shackles on Mr. Cessa. |
| 10:17:38 | 24 |         MR. DEGEURIN:  Why?  I don't quite follow that. |
| 10:17:42 | 25 |         THE COURT:  Because he's in the same truck with people |

10:17:42   1   that do have shackles.

10:17:44   2           MR. DEGEURIN:  Oh, okay.  I mean in the courtroom.

10:17:46   3           THE COURT:  He's eating meals with people that have to

10:17:48   4   have shackles.

10:17:50   5           MR. DEGEURIN:  Okay.  You're right.

10:17:50   6           THE COURT:  It's just his own personal safety.

10:17:54   7           Now, so there's two things and that's inadequate

10:17:58   8   housing with security people that we have now in the federal

10:18:02   9   courts.  It's decreased -- my docket has tripled since '91, civil

10:18:12  10   and criminal, and my personnel has dropped 36 percent.  Not just

10:18:20  11   marshals and not just security officers.

10:18:22  12           MR. DEGEURIN:  And, you know, Judge, only one thing you

10:18:24  13   can do with that situation is what you do.  You handle one case

10:18:30  14   at a time.  You ensure that when a case comes to your court, it's

10:18:34  15   fairly handled.  You have been able to list all the pressures

10:18:38  16   that they put on federal district judges in today's time without

10:18:42  17   minimizing, sacrificing anything about what happens in your

10:18:46  18   courtroom.

10:18:48  19           THE COURT:  I sure hope so.

10:18:50  20           MR. DEGEURIN:  And I admire you for that.  But here's

10:18:52  21   my -- I really honestly believe, Judge, we can set up --

10:18:58  22           THE COURT:  All right.  Let me hear from the

10:18:58  23   government, and then, you can rebut what he said, because I'm

10:19:04  24   interested from the government as to what they have in evidence

10:19:10  25   that you're going to get or have already received that connects

| | | |
|---|---|---|
| 10:19:14 | 1 | him with the Trevinos.  That's what I want to hear from the |
| 10:19:20 | 2 | government. |
| 10:19:20 | 3 | MR. GARDNER:  Your Honor, may I approach counsel? |
| 10:19:22 | 4 | THE COURT:  Yes. |
| 10:19:28 | 5 | MR. DEGEURIN:  Your Honor, we had a sidebar because Mr. |
| 10:19:32 | 6 | Gardner had promised me he would have the agent here and the |
| 10:19:34 | 7 | agent is here. |
| 10:19:36 | 8 | THE COURT:  All right. |
| 10:19:38 | 9 | MR. DEGEURIN:  He was going to call him, but I think |
| 10:19:38 | 10 | you want to hear the overall picture first and that's fine.  But |
| 10:19:42 | 11 | we do have the agent here. |
| 10:19:44 | 12 | THE COURT:  All right.  Thank you. |
| 10:19:46 | 13 | MR. GARDNER:  I wasn't going to call him, Judge.  I |
| 10:19:46 | 14 | offered him because Mr. DeGeurin asked.  So I didn't know if Mr. |
| 10:19:50 | 15 | DeGeurin wanted to talk to the agent first or -- |
| 10:19:54 | 16 | THE COURT:  Let's have a name. |
| 10:19:56 | 17 | MR. GARDNER:  His name is Scott Lawson, Special Agent, |
| 10:19:58 | 18 | FBI. |
| 10:19:58 | 19 | THE COURT:  He's present in court. |
| 10:20:00 | 20 | MR. GARDNER:  I'm confused, which is not un-normal for |
| 10:20:04 | 21 | me.  Judge, you want to hear my position first? |
| 10:20:06 | 22 | THE COURT:  Yeah.  What is it that makes it |
| 10:20:10 | 23 | inconsistent with having Mr. Cessa with his own compound by his |
| 10:20:16 | 24 | own money with hired, off-duty officers securing him or securing |
| 10:20:30 | 25 | him in his residence?  I don't know that I've ever done that. |

10:20:38  1  But what is the reason that we should not do that in this case?

10:20:42  2      MR. GARDNER:  Your Honor, he has no visa.  He has an

10:20:46  3  ICE detainer.  Should the Court decide to release him, he will go

10:20:50  4  to ICE, and he will be deported to Mexico.  Now, the government

10:20:52  5  is more than willing to parole him in for the trial, but he has

10:20:56  6  no status here in the United States.  And so, the government's

10:21:00  7  position is that were he to get back to Mexico, he would never

10:21:04  8  return based on the same reasons that Mr. Jose Trevino has.  He

10:21:08  9  has enormous access to wealth and the ability to move freely

10:21:14  10  within Mexico.

10:21:14  11      THE COURT:  Well, we have -- obviously you have a lot

10:21:18  12  of information and evidence as to the criminal conduct of the

10:21:22  13  Trevinos.  But as to Mr. Guess, what is it?

10:21:30  14      MR. GARDNER:  Your Honor, Mr. Cessa, I believe the

10:21:32  15  evidence will show --

10:21:32  16      THE COURT:  Cessa, excuse me.

10:21:34  17      MR. GARDNER:  I think it's Colorado-Cessa, your Honor.

10:21:38  18  The evidence will show at trial that Mr. Cessa, essentially the

10:21:40  19  money man, was wiring and paying for the wiring drug proceeds

10:21:46  20  from the Republic of Mexico to the United States to pay for the

10:21:50  21  horse-racing business.  For example, in one auction he paid $2.2

10:21:54  22  million for horses that were bid upon and purchased by Carlos

10:22:00  23  Nayen, who we believe is his godson, and Jose Trevino.  Mr. Raul

10:22:06  24  Ramirez was present, another codefendant who actually bid on the

10:22:08  25  horses for which Mr. Cessa paid for.

10:22:12    1        So, your Honor, there's a number of those instances
10:22:14    2   which show that Mr. Cessa is funneling -- responsible as a
10:22:16    3   conduit for funneling the money from Republic of Mexico to the
10:22:20    4   United States.  In conjunction with Mr. Nayen --
10:22:22    5        THE COURT:  These are horses being purchased at auction
10:22:26    6   by individuals and he's funding them?
10:22:28    7        MR. GARDNER:  Yes, sir.  So we believe that's
10:22:30    8   essentially the gist of his role, your Honor.  But more so, it's
10:22:34    9   the fact that once he gets deported, we don't believe he'd ever
10:22:38   10   return.
10:22:46   11        MR. DEGEURIN:  Thank you, your Honor.
10:22:48   12        THE COURT:  Do you wish to call the witness?
10:22:48   13        MR. DEGEURIN:  Yes.  But I wondered with regard to the
10:22:56   14   visa, we've already talked about that at the magistrate level.
10:22:58   15   We do have an immigration lawyer who's working on that.  He can
10:23:02   16   be paroled out of the immigration into this court.  There's no
10:23:08   17   problem there.  So it's not a obstacle that cannot be overcome,
10:23:14   18   in the least bit.  But we do agree that the overall picture's
10:23:18   19   correct.
10:23:20   20        THE COURT:  What do you mean he can be paroled -- if I
10:23:22   21   give him -- if I release him, even on bond, ICE will have the
10:23:28   22   detainer.  Then you would say that you'd have a procedure and
10:23:32   23   they have the authority to parole him?
10:23:36   24        MR. DEGEURIN:  Well, grant bail pending the immigration
10:23:40   25   judge's --

| | | |
|---|---|---|
| 10:23:40 | 1 | THE COURT:  Everybody gets a turn. |
| 10:23:44 | 2 | MR. DEGEURIN:  And I'll call the agent. |
| 10:23:46 | 3 | THE COURT:  All right. |
| 10:23:50 | 4 | MS. FERNALD:  Your Honor, Michelle Fernald for the |
| 10:23:50 | 5 | United States. |
| 10:23:54 | 6 | And I handled the detention hearing which this will be |
| 10:23:56 | 7 | in the transcript that the Court has had an opportunity to |
| 10:24:00 | 8 | review.  But as this court is well aware, the INS status or the |
| 10:24:04 | 9 | ICE status is a separate issue from the visa.  The visa, of |
| 10:24:08 | 10 | course, is issued from a different department than the ICE.  So |
| 10:24:14 | 11 | they're two separate creatures.  Although on a practical level, |
| 10:24:18 | 12 | if Mr. Cessa is released on bond from this court, he will have |
| 10:24:20 | 13 | the INS or the ICE issue to deal with, and he could potentially |
| 10:24:24 | 14 | get bond.  However, the ICE agent at the hearing testified that |
| 10:24:28 | 15 | it's very unlikely that he would get bond.  But even having said |
| 10:24:32 | 16 | that, he has no visa and no visa rights in the United States. |
| 10:24:36 | 17 | THE COURT:  I've seen them bond, multiply, residents of |
| 10:24:46 | 18 | South America who have a track history and who were arrested with |
| 10:24:52 | 19 | large amounts of cocaine and guns, and I've seen them bond them |
| 10:24:56 | 20 | out for a thousand dollars. |
| 10:24:58 | 21 | MS. FERNALD:  I have, too, your Honor.  But what I am |
| 10:25:00 | 22 | also saying is he has an additional roadblock, and that is the |
| 10:25:04 | 23 | visa, because he has no visa status.  So he has two roadblocks in |
| 10:25:08 | 24 | which he would have to pass in order for him -- |
| 10:25:10 | 25 | THE COURT:  He had a visa when he came. |

10:25:12    1         MS. FERNALD:  That is correct and it has since been

10:25:12    2    revoked.

10:25:14    3         THE COURT:  They revoked.  So he's in a position

10:25:16    4    without a visa as a result of government action.

10:25:20    5         MS. FERNALD:  That is correct.

10:25:24    6         THE COURT:  Okay.  If the agent will come forward,

10:25:28    7    please.  Be sworn.

10:25:36    8              (Witness sworn.)

10:25:54    9         THE COURT:  Tell us your full name, please, sir, and

10:26:00   10    spell your last.

10:26:00   11         THE WITNESS:  Yes, sir.  My name is Scott Lawson,

10:26:06   12    L-A-W-S-O-N.

10:26:08   13         THE COURT:  You may proceed.

10:26:08   14         SCOTT LAWSON, called by the Defendant, duly sworn.

10:26:08   15                    DIRECT EXAMINATION

10:26:10   16    BY MR. DEGEURIN:

10:26:10   17    Q.    Agent Lawson, have we met before?

10:26:12   18    A.    No, sir.

10:26:12   19    Q.    I didn't think so.

10:26:14   20         Before we began, did you have an opportunity to review

10:26:20   21    any notes or -- that you have or reports that you have concerning

10:26:24   22    this case?

10:26:24   23    A.    No, sir.  I haven't reviewed anything in the immediate

10:26:28   24    future -- in the immediate past.

10:26:30   25    Q.    But you've reviewed them for other testimony and other

10:26:32    1    detention hearings?

10:26:32    2    A.   No, sir.  This is the first detention hearing.

10:26:36    3    Q.   All right.  And can you just give me an idea of the -- how

10:26:40    4    many reports you have?

10:26:42    5         THE COURT:  About this case?

10:26:44    6         MR. DEGEURIN:  About this case.  Thank you.

10:26:46    7    A.   Sure.  I have a substantial number of reports in regards to

10:26:50    8    this case.  It would be a wild guess if you would like a guess.

10:26:56    9    Probably 60 or more.

10:27:00   10    Q.   Those would be reports that would accurately reflect your

10:27:06   11    participation in the -- in the investigation of this case?

10:27:10   12    A.   Yes, sir.

10:27:10   13    Q.   And they are, I guess, in the possession of the U.S.

10:27:16   14    Attorney as well as you?

10:27:18   15    A.   Yes, sir.  They have been turned over to the U.S. Attorney.

10:27:20   16    Q.   So we have a picture here because if you've been in the

10:27:26   17    courtroom, you realize that a lot of people want to be in this

10:27:28   18    courtroom, and we don't have time for everybody.

10:27:32   19         But how long would it take for you to get those notes

10:27:34   20    for me to review for my asking you questions?

10:27:38   21         MR. GARDNER:  Excuse me, your Honor.  I'm going to

10:27:38   22    object.  Page 7 of Mr. DeGeurin's report says Mr. Colorado has no

10:27:46   23    intention of using this detention as a discovery tool.  This is

10:27:48   24    Mr. DeGeurin's witness, your Honor, so I don't believe he has the

10:27:52   25    opportunity to review anything.  And if he wanted to call him, he

```
10:27:56   1   should have subpoenaed him and his notes.
10:27:58   2           THE COURT:  Well, he can answer the question if he can.
10:28:02   3           How long do you think it would take to get all of the
10:28:04   4   reports?
10:28:06   5   A.   I'm not extremely familiar with how they're filed at the
10:28:10   6   U.S. Attorney's Office, but most of what I've written has been
10:28:14   7   turned over and stored at the U.S. Attorney's Office.  So
10:28:18   8   whatever amount of time it would take us to go over there and
10:28:20   9   pull files.
10:28:22  10   Q.   (BY MR. DEGEURIN) You don't have it on computer or CD?
10:28:24  11   A.   No, sir.
10:28:26  12   Q.   You just have handwritten notes, typed notes?
10:28:28  13   A.   Our reports go into a system and once they're approved by
10:28:34  14   supervision, then we can print them out.  Once we print them out,
10:28:38  15   after they've been approved, we turn them over to the U.S.
10:28:42  16   Attorney's Office.
10:28:42  17   Q.   And then, you don't have them anymore.  You can't print them
10:28:44  18   out again.
10:28:46  19   A.   Yes, sir.  I can still print them out again.
10:28:46  20   Q.   The last question there is, how long would it take you to
10:28:50  21   print out just the reports pertaining to Mr. Francisco
10:28:56  22   Colorado-Cessa?
10:28:56  23   A.   The case file has a number of reports, a large number, and
10:29:02  24   it would take -- it would take some time to search through those
10:29:06  25   and see which ones pertain to Mr. Cessa.  I'd have to go to an
```

| | | |
|---|---|---|
| 10:29:12 | 1 | FBI office here in town to access that type of database, and a |
| 10:29:16 | 2 | good estimate would be two, two-and-a-half hours. |
| 10:29:20 | 3 | Q.   Well, let me go about it this way for the time being.  I'm |
| 10:29:26 | 4 | going to ask a few general questions to kind of narrow the |
| 10:29:30 | 5 | situation. |
| 10:29:30 | 6 | A.   Sure. |
| 10:29:30 | 7 | Q.   Have you met Mr. Colorado-Cessa? |
| 10:29:34 | 8 | A.   No, sir. |
| 10:29:34 | 9 | Q.   Have you seen him before, and if so, where? |
| 10:29:44 | 10 | A.   I do not recall seeing Mr. Cessa before. |
| 10:29:46 | 11 | Q.   Now, let's just suppose, for time sake, that it is a given |
| 10:29:56 | 12 | that Mr. Colorado-Cessa buys horses and that -- and any of the |
| 10:30:04 | 13 | thousands of bank accounts, et cetera, that may have been |
| 10:30:08 | 14 | subpoenaed, a thousand documents, 30,000 documents will show that |
| 10:30:14 | 15 | money spent on horses came from his business account with Pemex |
| 10:30:22 | 16 | Oil Company. |
| 10:30:22 | 17 | A.   I've seen -- |
| 10:30:26 | 18 |          THE COURT:  Whoa, whoa, let him finish the question. |
| 10:30:28 | 19 |          THE WITNESS:  I'm sorry. |
| 10:30:28 | 20 | Q.   (BY MR. DEGEURIN) And that money goes from that account to |
| 10:30:32 | 21 | maybe an account in the United States and/or wired directly to |
| 10:30:36 | 22 | the -- wherever the horses are bought.  Let's just say that that |
| 10:30:38 | 23 | is established.  Okay. |
| 10:30:42 | 24 |          Now, what reports do you have past that?  How long |
| 10:30:50 | 25 | would it take to get the reports past that fact? |

10:30:54  1   A.   That the money already being at the receiving end of the

10:30:58  2   financial institutions in the United States?   Is that your

10:31:00  3   question?

10:31:00  4   Q.   Yeah.   Let's just suppose -- take money out of it for the

10:31:04  5   time being.   Let's just say all the horses, even those that

10:31:06  6   they've alleged that we're not sure of have been purchased by Mr.

10:31:12  7   Colorado-Cessa through his account.   Legitimate money paid for

10:31:20  8   the horses.   You know the allegation is that he bought the horses

10:31:26  9   with legitimate money, but there was some sort of agreement with

10:31:32  10  the bad guys that they could have the horses for little or no

10:31:40  11  money at all, and that the idea would be he would be laundering

10:31:44  12  money for the bad guys.

10:31:46  13         Isn't that the allegation against him?   Helping them?

10:31:50  14  A.   Well, there's a belief that he was back-paid with drug money

10:31:54  15  for the money he sent from his personal accounts.

10:31:56  16  Q.   Okay.   There was a belief that he was given money back?   Is

10:32:02  17  that what you're saying?

10:32:02  18  A.   Yes, sir.

10:32:02  19  Q.   Okay.   Now, please tell the Court what evidence you have

10:32:10  20  that he was paid -- other than the informants.   We'll talk about

10:32:14  21  that.

10:32:14  22         What evidence do you have of any cash money going into

10:32:18  23  any account of Mr. Cessa?

10:32:22  24  A.   We have a hard time subpoenaing Mexican bank records.   So

10:32:26  25  most of our intelligence to that regard would come from the

10:32:30  1   interview of the cooperating informants.

10:32:32  2   Q.   Okay.  So if I were to provide you this afternoon his

10:32:36  3   Mexican bank records, you said you have a hard time getting them.

10:32:42  4   Don't you just request it through a subpoena?  Can't you get them

10:32:46  5   that way?

10:32:46  6   A.   Well, it's a request -- international treaty request to get

10:32:52  7   records from another country.  It can be done, but it takes time.

10:32:56  8   Q.   So you haven't done that?

10:32:58  9   A.   I believe it's in the process.

10:33:00  10  Q.   Okay.  So you don't have right now -- you'd have to -- for

10:33:04  11  whatever reason, you don't have any evidence that any cash money

10:33:06  12  has gone into his bank accounts in Mexico.

10:33:10  13  A.   No, sir.

10:33:12  14  Q.   All right.  Do you have any evidence that --

10:33:16  15       THE COURT:  That is from records.

10:33:18  16       MR. DEGEURIN:  Yeah.  From records.  Thank you.

10:33:22  17  Q.   (BY MR. DEGEURIN) All right.  Now, let's talk about any

10:33:26  18  other evidence that you have that has you believing -- not that

10:33:30  19  you could prove it or that you believe beyond a reasonable doubt,

10:33:34  20  but just what evidence you have that has you believing that he's

10:33:40  21  receiving some cash money paid to him by the bad guys.

10:33:44  22  A.   I stated that would come from a debrief of multiple

10:33:48  23  individuals.

10:33:48  24  Q.   Okay.  Well, let's go one-by-one.  When you say multiple,

10:33:54  25  I'd like to know absent -- Judge would like to know who those

| | | |
|---|---|---|
| 10:33:58 | 1 | people are. |
| 10:34:00 | 2 | MR. GARDNER: Your Honor, at this point I'm not sure if |
| 10:34:02 | 3 | Mr. DeGeurin's question was clear to me, anyway. And I assume |
| 10:34:06 | 4 | he's not asking for names of informants in order to -- |
| 10:34:08 | 5 | THE COURT: It's exactly what he's asking. |
| 10:34:10 | 6 | MR. GARDNER: Well, your Honor, we'd object to that. I |
| 10:34:12 | 7 | don't see a particular motion on disclosing the names of the |
| 10:34:14 | 8 | informants. So we would request that the agent be allowed to |
| 10:34:16 | 9 | just discuss the informant in general terms. I don't have any |
| 10:34:20 | 10 | problem with Mr. DeGeurin asking what the motivation is for that |
| 10:34:24 | 11 | informant's testimony is. |
| 10:34:26 | 12 | MR. DEGEURIN: All right. |
| 10:34:26 | 13 | THE COURT: You may inquire as to in general terms |
| 10:34:30 | 14 | without identity what he's been advised. |
| 10:34:34 | 15 | Q. (BY MR. DEGEURIN) Okay. Well, let me put it this way. So |
| 10:34:38 | 16 | those people will not be witnesses against Mr. Cessa, anyway, at |
| 10:34:42 | 17 | trial? |
| 10:34:42 | 18 | A. Not today. |
| 10:34:44 | 19 | Q. Huh? |
| 10:34:44 | 20 | A. Not today. |
| 10:34:44 | 21 | Q. Okay. But possibly in the future? |
| 10:34:46 | 22 | A. Possibly. |
| 10:34:46 | 23 | Q. In fact, they'd have to be, wouldn't you think, some of |
| 10:34:50 | 24 | them? |
| 10:34:50 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 10:34:50 | 1 | Q.   Okay.  Let's go with without giving me the name, informant |
| 10:34:58 | 2 | No. 1, we'll call him that.  Tell me the situation around |
| 10:35:04 | 3 | informant No. 1. |
| 10:35:06 | 4 | A.   Could you be more specific to situation? |
| 10:35:08 | 5 | THE COURT:  Just tell him, please, sir, what |
| 10:35:10 | 6 | information was given to you by the informant. |
| 10:35:16 | 7 | A.   Informant No. 1 can testify -- |
| 10:35:18 | 8 | THE COURT:  Well, nobody knows who informant No. 1 is, |
| 10:35:22 | 9 | and somebody that reads this record's going to wonder who in the |
| 10:35:24 | 10 | hell it was.  So just -- he's interested in -- he's interested in |
| 10:35:30 | 11 | getting names, but he's not going to get it. |
| 10:35:32 | 12 | THE WITNESS:  I understand that, sir. |
| 10:35:34 | 13 | THE COURT:  He's also interested in what's been told as |
| 10:35:36 | 14 | to why this gentleman is sitting over there and whether or not I |
| 10:35:42 | 15 | should let him out on bond.  What you have been told by people |
| 10:35:50 | 16 | who you thought reliable that would have involved him in this |
| 10:35:56 | 17 | offense charged in the indictment. |
| 10:36:00 | 18 | THE WITNESS:  Sure.  Your Honor, I think it would be |
| 10:36:02 | 19 | easier in the future if I just speak in terms of I had one |
| 10:36:06 | 20 | informant and this is what he'll say, instead of numbering them. |
| 10:36:08 | 21 | I'm afraid it will come out with different numbers. |
| 10:36:12 | 22 | THE COURT:  Not numbers.  Just say informants or |
| 10:36:14 | 23 | whatever. |
| 10:36:14 | 24 | A.   We have a variety of informants, and I'll speak kind of one |
| 10:36:18 | 25 | at a time because I know that's what we want to get at that could |

10:36:22   1    testify that Mr. Cessa's original reliance to wealth came from an

10:36:30   2    association with Zeta 14 in Vera Cruz, Mexico.  We know that Mr.

10:36:36   3    Cessa.

10:36:38   4    Q.   (BY MR. DEGEURIN) Wait a minute.  When you say you know, you

10:36:40   5    mean you've been told or?

10:36:42   6    A.   Intelligence has led me to believe.

10:36:44   7    Q.   Okay.

10:36:44   8    A.   Okay.  That Mr. Cessa was an associate of the PRI governor

10:36:52   9    candidate in Mexico.

10:36:52   10   Q.   That's the same party that is now in control in Mexico.

10:36:58   11   A.   That is correct.  A Fidel Herrera.  We have a confidential

10:37:04   12   informant who can place Mr. Cessa as intermediary between Mr.

10:37:12   13   Fidel Herrera and Zeta 14, Efrain Torres, an agreement.

10:37:18   14   Q.   Go ahead.  I was going to stop you.  A date on that.  Are

10:37:20   15   you talking about, like, 25 years ago?  Are you talking about ten

10:37:22   16   years ago?

10:37:22   17   A.   We're talking about approximately 2003, 2004.

10:37:30   18   Q.   All right.

10:37:32   19   A.   Established himself as an intermediary between the Zetas and

10:37:34   20   the government of Vera Cruz, and that money was paid through Mr.

10:37:40   21   Cessa to the government of Vera Cruz as a way to get to Zetas

10:37:48   22   freedom of range and freedom of moving the narcotics in the state

10:37:50   23   of Vera Cruz, and also as a way to help Mr. Fidel Herrera finance

10:37:54   24   his campaign for the governorship of Vera Cruz.

10:37:58   25          We believe that Mr. Cessa and his association with

10:38:04  1   horses does go back quite some time, but that so did Zeta 14's

10:38:10  2   love for horses in the same area of Vera Cruz of Mr. Cessa's, and

10:38:16  3   the relationship was formed through that.

10:38:20  4   Q.    Now, let me ask you one thing with regard to names.  I don't

10:38:22  5   want to violate any security things.  But No. 14, from what I can

10:38:28  6   brief from your affidavit, they're down to 40 now.  So is No. 14

10:38:32  7   not alive?

10:38:32  8   A.    No. 14 is not alive.

10:38:34  9   Q.    Can you give me his name?

10:38:36  10  A.    Yes, sir.  I believe I did.  It's Efrain Torres.

10:38:38  11  Q.    All right.

10:38:46  12  A.    And it's my belief through the debrief of these informants

10:38:48  13  that Mr. Cessa's reward for being an intermediary was the

10:38:54  14  government contracts with Pemex from the governor of Vera Cruz.

10:38:58  15  Q.    May I stop you right there just for a moment?

10:39:00  16  A.    Sure.

10:39:00  17  Q.    Do you know how the Pemex contracts are done?  Do you know

10:39:10  18  how they are awarded?

10:39:12  19  A.    I have some loosely based knowledge.  I'm not an expert by

10:39:18  20  any means.

10:39:18  21  Q.    Isn't it true that the governor of Vera Cruz has nothing to

10:39:24  22  do with the contract from Pemex, the national oil company which

10:39:28  23  was run by the director, which is not a free person but was a pan

10:39:36  24  person, appointed by a pan governor -- I mean, President Fox when

10:39:42  25  President Fox was the president, Calderon.

10:39:44  1      So for years you're talking about was -- there was a

10:39:48  2 pan director or appointed director of Pemex.  So how does the

10:39:56  3 governor -- whatever this person told you, what makes you to

10:40:00  4 believe that governor of Vera Cruz, who has a four-year term

10:40:06  5 limit, has any control over what the bidding processes are in the

10:40:10  6 contracts of Pemex Oil Company?

10:40:12  7 A.   I believe he has a six-year term, but I can't speculate to

10:40:18  8 how all the inter-politics of the Mexican government work.  But

10:40:22  9 this is not the first situation where in different cases reported

10:40:26 10 that governors of the state are influential in rewarding

10:40:30 11 contracts, national government contracts to different persons.

10:40:34 12 Q.   Well, no.  I want to stop you right there.

10:40:36 13      There's a difference between a contract like road

10:40:40 14 construction contract inside a state or city inside a state.

10:40:46 15 There's difference between that and oil company contracts with

10:40:52 16 the national oil company Pemex in this case, is there not?

10:40:58 17 A.   I understand that.  Yes, sir.

10:41:00 18 Q.   Okay.  Back to my question.

10:41:02 19      What evidence do you have other than this kind of an

10:41:06 20 opinion, I guess, of an informant that the government or his

10:41:12 21 association with the governor of Vera Cruz back in 2003 has

10:41:18 22 provided him the oil contracts with Pemex for the last eight, ten

10:41:24 23 years?

10:41:26 24 A.   We have people in place who can testify who -- with an

10:41:34 25 intermediary to get Mr. Cessa the money that went to Fidel

10:41:38  1  Herrera from Zetas.

10:41:38  2  Q.   All right.  So assuming that, just for the moment, that

10:41:46  3  there's some truth to that information you've received from an

10:41:48  4  informant back in 2003 or that he's thinking about happened back

10:41:54  5  in 2003, what you're saying is you have a person who said that

10:42:02  6  money that was somehow given to the governor for his election

10:42:08  7  went through Mr. Colorado-Cessa, and that money, you're saying,

10:42:14  8  was provided by people that were associated with Los Zetas.

10:42:20  9  A.   They were the Los Zetas.

10:42:22  10  Q.   Well, aren't they all over Mexico, Los Zetas?

10:42:26  11  A.   Exactly.  Yes, sir.

10:42:28  12  Q.   Okay.  So, I mean, businessman, you could be a businessman

10:42:34  13  and have a legitimate business but also be a Zeta?

10:42:36  14  A.   You could.

10:42:36  15  Q.   Yeah.  So not everybody knows that when you receive money

10:42:42  16  from a businessman, whether the source is Zetas --

10:42:46  17         THE COURT:  Let's don't argue.  You're asking him what

10:42:50  18  information he has, and that's what we're going to have a trial

10:42:52  19  on.  We're not going to have a minitrial here.

10:42:54  20         And as far as Pemex is concerned, I'll have to tell

10:43:00  21  you, I've been familiar with that since the '50s.

10:43:04  22         MR. DEGEURIN:  Yes, I have, too.  Not that long but --

10:43:06  23         THE COURT:  Yeah.  All of the families that were

10:43:10  24  involved in the '50s when the government took it.  And I've been

10:43:16  25  familiar with that because I've lived on the border all of the

10:43:20  1   time and how the contracts are awarded, and all of that, none of

10:43:24  2   which has a thing to do with this lawsuit.  So let's get back to

10:43:30  3   the inquiry that does.

10:43:30  4   Q.   (BY MR. DEGEURIN) All right.  So you have the information

10:43:32  5   from an informant that back in 2003, that he had some influence

10:43:38  6   with the governor and money that was given to the governor's

10:43:42  7   campaign may have originated with Zetas?

10:43:46  8   A.   Yes, sir.

10:43:46  9   Q.   Now, let's move on to what else do you have?

10:43:48  10  A.   Sure.  We have open-source reporting from Mexican media that

10:43:54  11  a branch owned by your client --

10:43:56  12  Q.   You're talking about now TV and newspapers?

10:43:58  13  A.   Yes, sir.

10:44:02  14  Q.   That's part of -- is that what was part of this -- brought

10:44:06  15  this indictment?

10:44:08  16  A.   It's part of any investigation to look at the totality of

10:44:12  17  information that is out there.

10:44:16  18  Q.   Okay.

10:44:18  19        THE COURT:  Let's go back to specific questions and

10:44:24  20  make specific answers.

10:44:24  21        MR. DEGEURIN:  Well, I was just going to say.  We could

10:44:26  22  sit here about newspapers right now, but I don't think that the

10:44:28  23  Court wants to know what newspapers he's --

10:44:30  24        THE COURT:  Well, your question is general.  What else,

10:44:34  25  what does he have, what did he do, well, that's not really --

10:44:38    1    that's too general.

10:44:38    2    Q.    (BY MR. DEGEURIN) Well, other than the newspapers that you

10:44:40    3    had and that informant that has him connected to the governor

10:44:46    4    back in 2003, what else?

10:44:48    5    A.    Okay.  We have intelligence from our counterparts in Mexico,

10:44:52    6    U.S. law enforcement counterparts.

10:44:54    7    Q.    That would be DEA in Mexico?

10:44:56    8    A.    That could be DEA and FBI in Mexico.

10:44:58    9    Q.    Okay.

10:45:00    10   A.    That a ranch owned by Mr. Cessa called Flor De Marie, Maria,

10:45:06    11   was raided by the Mexican military in March or April of this

10:45:10    12   year, and that raid, 20 Zetas were captured, two were killed,

10:45:16    13   including the plaza boss for that area.  This happened on Mr.

10:45:20    14   Cessa's ranch.

10:45:22    15   Q.    Now, isn't it correct -- and you've heard this from the

10:45:26    16   agents, right?

10:45:26    17   A.    Yes, sir.

10:45:26    18   Q.    Okay.  Isn't it correct that some Marines were chasing three

10:45:36    19   Suburbans from downtown Vera Cruz, and as they were chasing those

10:45:42    20   three Suburbans and the Suburbans left Vera Cruz, they took a

10:45:48    21   right and busted through a gate to a ranch right outside of Vera

10:45:54    22   Cruz?  Isn't that true?

10:45:54    23   A.    Those facts have not been presented to me.

10:45:58    24   Q.    Okay.  So you don't know the details of how it came about

10:46:02    25   that those three Suburbans ended up on Mr. Zetas' property?

```
10:46:06    1    A.    Mister who?

10:46:08    2    Q.    I mean, Mr. Cessa's property.  Strike that.  If there's ever

10:46:14    3    been a time, your Honor, that striking something should be

10:46:18    4    brought back to our jurisprudence.

10:46:22    5           THE COURT:  Ask your next question.

10:46:24    6    Q.    (BY MR. DEGEURIN)  Okay.  So are you really telling me you do

10:46:28    7    not know the details of how those people got busted through the

10:46:32    8    gate to get onto his property?

10:46:34    9    A.    No, sir.  I don't have the full details at this time.  What

10:46:36   10    I do have is where they were apprehended, and who they were, and

10:46:40   11    who owned the ranch.  And I understand where you're going with

10:46:42   12    that.  We're in the process of getting the full description just

10:46:46   13    as you were alluding to.

10:46:48   14           What I have currently --

10:46:50   15    Q.    That's not true.  What I'm telling you is not new to you, is

10:46:54   16    it?

10:46:54   17    A.    No, sir.

10:46:56   18    Q.    Okay.

10:46:56   19    A.    I'm sorry.  What you're saying about Suburbans going through

10:47:00   20    a fence, that's definitely new to me.  I have not heard that

10:47:02   21    before.

10:47:02   22    Q.    You did not know that they -- that during the chase --

10:47:04   23    A.    I don't know about a chase.

10:47:06   24    Q.    They weren't allowed in the ranch, they busted through the

10:47:10   25    front gate, and then, right behind them came the Marines?
```

10:47:14  1   A.   I think it would be easier if you understood I don't know

10:47:18  2   anything about a chase, Suburbans, a gate.  All I know is a ranch

10:47:22  3   and he was captured.

10:47:22  4   Q.   Who would I -- okay.  All right.  Well, what else?

10:47:30  5   A.   We have other cooperators who were involved with the Zetas

10:47:40  6   in the state of Coahuila, and they have labeled Mr. Cessa and

10:47:46  7   Carlos Nayen as associates who led the horse money-laundering

10:47:54  8   business for the Zetas, and that they used Mr. Cessa's apparently

10:48:00  9   legitimate business accounts to buy their horses.

10:48:04  10          We have the evidence that the persons we know to be

10:48:08  11   front purchasers go to approximately six auctions a year, and a

10:48:16  12   majority of those auctions are paid for by either Mr. Cessa's

10:48:22  13   personal account or ADT business account.  Those horses are

10:48:28  14   maintained in front company names; and ones that prove to be

10:48:30  15   successful and valuable end up in the possession of Mr. Trevino.

10:48:38  16   And many times, we can see little or no payment back to Mr. Cessa

10:48:44  17   for the purchase of these horses.

10:48:48  18   Q.   So he buys the horses for legitimate money from legitimate

10:48:54  19   accounts, correct?  Is what you understand?

10:48:56  20   A.   I don't know that I would call legitimate, but he buys it

10:48:58  21   out of his account.

10:49:00  22   Q.   You say the reason you say it's not legitimate is because in

10:49:04  23   2003, he had a governor that helped him get a contract with

10:49:08  24   Pemex?

10:49:10  25          THE COURT:  Okay.  If we're going to --

10:49:10   1          MR. DEGEURIN:  That was what I've been told, your

10:49:14   2   Honor.

10:49:14   3          THE COURT:  Well, I'm sure he told that.  And I suspect

10:49:16   4   if you wanted to ask him where the money came that was deposited

10:49:20   5   into those accounts that paid for the horses, he may not know.

10:49:28   6   That's what we're going to determine in the trial.  That's what a

10:49:30   7   jury is going to determine.

10:49:32   8          Let's -- I'm just -- I was interested in what the

10:49:40   9   government's evidence is to make a judgment as to whether or not

10:49:42  10   to let Mr. Cessa out on bond.  That's what I'm trying to do now.

10:49:46  11   If you've got any further questions if you want to ask this

10:49:50  12   witness on that issue, I'll be glad to listen.

10:49:52  13   Q.   (BY MR. DEGEURIN) Do you have any evidence of any criminal

10:49:54  14   background of Mr. Colorado-Cessa?

10:49:58  15   A.   We have an informant who stated part of their agreement was

10:50:02  16   that the Zetas would take care of business robberies of Mr.

10:50:08  17   Cessa.  Personal action of him, no, I do not.

10:50:12  18   Q.   Do you have any recordings of Mr. Cessa, Mr. Colorado-Cessa?

10:50:16  19   A.   Not with -- Colorado, I have reportings of him mentioned but

10:50:22  20   not of his personal speaking.

10:50:26  21   Q.   Any -- the mention of Mr. Colorado-Cessa that you're talking

10:50:30  22   about where he's mentioned, is there any kind of violence being

10:50:34  23   talked about?

10:50:36  24   A.   No, sir.

10:50:38  25   Q.   It's the horse business, I suppose.

10:50:40  1    A.    It's horse and payments.  Yes, sir.

10:50:42  2    Q.    If you buy a horse at these auctions, if you bid on them and

10:50:50  3    you get them -- some of these are very expensive horses, right?

10:50:54  4    A.    Yes, sir.

10:50:54  5    Q.    And Mr. Colorado-Cessa is known to have some of the best

10:50:56  6    horses in Mexico, isn't he?

10:50:58  7    A.    I'm not sure what he has in Mexico, but I would assume that

10:51:02  8    in his position, he has great horses.

10:51:04  9    Q.    And it's true that when you buy horses in the United States

10:51:08  10   at these auctions -- there's a Mexican organization, there's an

10:51:12  11   American organization that work together, isn't there, quarter

10:51:16  12   horse organization?

10:51:16  13   A.    I'm not familiar with the Mexican quarter horse

10:51:20  14   organization.

10:51:22  15   Q.    When you buy the horses at auction, young fillies, whatever

10:51:28  16   they call them, then isn't it true, Agent, that you then take

10:51:32  17   those horses and you keep them on horse-training forms until they

10:51:40  18   reach an age to where either you know they're going to be a

10:51:42  19   successful running horse or not?

10:51:42  20   A.    That's true.

10:51:44  21   Q.    Isn't that what happens?

10:51:46  22   A.    Most of the time.  Yes, sir.

10:51:46  23   Q.    And they have those horse forms in different places,

10:51:48  24   including in Austin, Texas.

10:51:50  25   A.    Yes, sir.

```
10:51:52   1   Q.   And there's a man here in Austin that's quite well-known and
10:51:56   2   quite respected, and he has a horse that belongs to one of the
10:51:58   3   Zetas on his farm, right, on his little ranch, or did?
10:52:04   4   A.   We did see some horses belong to this organization in the
10:52:08   5   Austin area.
10:52:08   6   Q.   And you seized horses that Mr. Colorado-Cessa had sitting on
10:52:16   7   different places around the United States, also, didn't you?
10:52:20   8   A.   That's correct.
10:52:24   9   Q.   Since you brought this blanket down and charged Mr.
10:52:30  10   Colorado-Cessa, have you -- do you have any information about
10:52:34  11   anybody talking about Mr. Cessa?  You know, like he's going to
10:52:40  12   escape or he's hired a --
10:52:46  13   A.   No, sir.
10:52:46  14   Q.   -- assortment of crafty lawyers?  Nothing?
10:52:48  15   A.   I heard that he hired lawyers but --
10:52:52  16   Q.   Careful with the adjectives.
10:52:56  17        THE COURT:  Did they identify that lawyer?
10:52:58  18   Q.   (BY MR. DEGEURIN) How do you spell his last name?
10:53:00  19   A.   I could never get that right, sir.
10:53:02  20        I have not heard plans to flee, if that's the question.
10:53:06  21   Q.   Okay.  Do you have -- if I were to set up a house arrest
10:53:20  22   situation for Mr. Cessa where he's in a house with local law
10:53:26  23   enforcement officers --
10:53:28  24        THE COURT:  This gentleman's opinion is not relevant.
10:53:32  25   Q.   (BY MR. DEGEURIN) Okay.  In your affidavit for a search
```

| | | |
|---|---|---|
| 10:53:46 | 1 | warrant, did you do the affidavit for that search warrant?  It's |
| 10:53:50 | 2 | the only affidavit that we've been provided by the government. |
| 10:53:54 | 3 | A.   I'm not sure which -- there were several out there and I |
| 10:53:58 | 4 | assisted in some of them, but I don't think I swore. |
| 10:54:04 | 5 | Q.   Now, but you mentioned -- I guess you're aware of if you |
| 10:54:08 | 6 | didn't sign this particular affidavit.  It's the only one that's |
| 10:54:12 | 7 | been used so far in this case, as far as I know. |
| 10:54:16 | 8 | A.   Okay. |
| 10:54:16 | 9 | Q.   That there was named some legitimate businessmen in Mexico |
| 10:54:22 | 10 | that were buying horses.  One of them was Ramiro Villarreal.  One |
| 10:54:28 | 11 | of them was Alejandro Verales.  There's a guy that' -- I don't |
| 10:54:36 | 12 | know, it sounds like an agency.  And then, they also named |
| 10:54:38 | 13 | Francisco Colorado also bought horses through his ADT Petro |
| 10:54:46 | 14 | Services account, which is the Pemex account.  And then, you go |
| 10:54:52 | 15 | on to say that sometimes businessmen are coerced into selling |
| 10:54:58 | 16 | their horses to the Zetas, correct?  Is that the general thing? |
| 10:55:02 | 17 | A.   Yes, sir. |
| 10:55:02 | 18 | Q.   In other words -- |
| 10:55:04 | 19 | A.   I want to make it clear that I didn't write that.  But I do |
| 10:55:06 | 20 | agree with the statement of the writer that some of these |
| 10:55:10 | 21 | businessmen were coerced. |
| 10:55:10 | 22 | Q.   So in the big picture, one of the things that's -- that |
| 10:55:18 | 23 | connection is that these other businessmen, as well as Mr. |
| 10:55:20 | 24 | Colorado, is the theory, would buy their -- they love horses, |
| 10:55:24 | 25 | they buy horses, but then, through coercion they end up having to |

| | | |
|---|---|---|
| 10:55:30 | 1 | sell the horse to a Zeta for dime on the dollar. |
| 10:55:36 | 2 | A.   Some of them.  Some of the businessmen. |
| 10:55:38 | 3 | Q.   And you said that you found very little evidence of any |
| 10:55:40 | 4 | money coming back to Mr. Colorado for horses that he or his |
| 10:55:44 | 5 | agents purchased that ended up with the trailer forms, or |
| 10:55:52 | 6 | whatever the name of that training place is that Mr. Trevino |
| 10:55:58 | 7 | owns? |
| 10:55:58 | 8 | A.   Yes. |
| 10:55:58 | 9 | Q.   So they're bought by Mr. Colorado, they end up out there, |
| 10:56:04 | 10 | and you can't find any money -- so far, hadn't found any money |
| 10:56:06 | 11 | going back to Mr. Colorado.  Is that the general thing? |
| 10:56:10 | 12 | A.   I believe that's little to no money. |
| 10:56:14 | 13 | Q.   Little money.  Well, what would be -- that begs the |
| 10:56:18 | 14 | question:  So how much money? |
| 10:56:20 | 15 | A.   I think it's important to differentiate that as the FBI part |
| 10:56:26 | 16 | of the case, my team led operations debriefing of sources, and |
| 10:56:32 | 17 | the IRS part of this case led to financial analysis.  I am |
| 10:56:36 | 18 | familiar with a lot of the financial analysis, but I am not as |
| 10:56:42 | 19 | familiar as the IRS agents are on part of that. |
| 10:56:44 | 20 | Q.   I'm not going to hold you to a specific number.  You said |
| 10:56:48 | 21 | little or no money.  What money? |
| 10:56:48 | 22 | A.   At this time I can't think of any money that went back to |
| 10:56:52 | 23 | Mr. Cessa. |
| 10:56:54 | 24 | Q.   You're hoping to find out when you look through business |
| 10:56:58 | 25 | records, hope to find some money going into his accounts other |

| | | |
|---|---|---|
| 10:57:02 | 1 | than from strictly from the oil company. |
| 10:57:06 | 2 | A.   It's not my belief that money paid to Mr. Cessa came from |
| 10:57:10 | 3 | this side.  It's my belief that he was backfilled in Mexico. |
| 10:57:16 | 4 | Q.   Back-dealing? |
| 10:57:16 | 5 | A.   Backfilled by the Zeta organization in Mexico. |
| 10:57:22 | 6 | Q.   I'm sorry.  Back field? |
| 10:57:24 | 7 | A.   Okay. |
| 10:57:24 | 8 | THE COURT:  Backfilling, he said, in other words. |
| 10:57:28 | 9 | Q.   (BY MR. DEGEURIN) Does that mean something to the Court? |
| 10:57:30 | 10 | THE COURT:  I just assume that backfilling means that |
| 10:57:32 | 11 | he was paid back in Mexico. |
| 10:57:38 | 12 | THE WITNESS:  That's correct.  Thank you. |
| 10:57:40 | 13 | Q.   (BY MR. DEGEURIN) Is there a person who said, I delivered |
| 10:57:42 | 14 | him $5,000 or $10,000 cash, or any amount of money? |
| 10:57:52 | 15 | A.   I do not have a person that says they personally took Mr. |
| 10:57:56 | 16 | Cessa money. |
| 10:57:56 | 17 | Q.   So you have people that say, I heard people took him money? |
| 10:58:00 | 18 | A.   Yes. |
| 10:58:00 | 19 | Q.   And that's it.  And those people right now are confidential |
| 10:58:04 | 20 | informants? |
| 10:58:06 | 21 | A.   Yes, sir. |
| 10:58:06 | 22 | Q.   That say they heard that.  If it's true, the government's |
| 10:58:14 | 23 | theory is true that on occasions, some -- in the affidavit they |
| 10:58:22 | 24 | talk about something like 30 horses being bought at one auction, |
| 10:58:24 | 25 | and three of them ended up with Trevino.  I mean, for time sake, |

| | | |
|---|---|---|
| 10:58:36 | 1 | I'm saying maybe a hundred horses were bought and three of them |
| 10:58:40 | 2 | ended up over there? |
| 10:58:40 | 3 | A.   Sure. |
| 10:58:40 | 4 | Q.   And the other ones, Mr. Colorado's, either came down to |
| 10:58:46 | 5 | Mexico or went to other farms? |
| 10:58:48 | 6 | A.   Yes, sir. |
| 10:58:50 | 7 | Q.   And it's the government's theory that the Zetas with their |
| 10:58:58 | 8 | reputation would go to Mr. -- or go to a representative of Mr. |
| 10:59:02 | 9 | Colorado and say, we want that horse or that horse, and he would |
| 10:59:06 | 10 | let them have it or sell it to them for next to nothing. |
| 10:59:12 | 11 | A.   That is not my theory. |
| 10:59:16 | 12 | Q.   That was the theory that was in the affidavit. |
| 10:59:18 | 13 | A.   I believe you're grouping parts of the affidavit into |
| 10:59:24 | 14 | summaries that are not accurate.  I do not include Mr. Cessa as |
| 10:59:28 | 15 | part of those coerced businessmen in Mexico.  I believe Mr. Cessa |
| 10:59:32 | 16 | to be in his mutually beneficial relationship with the Zetas. |
| 10:59:40 | 17 | Q.   Making money in the horse business? |
| 10:59:42 | 18 | A.   No.   Protection. |
| 10:59:44 | 19 | Q.   Laundering money or? |
| 10:59:44 | 20 | A.   Yes. |
| 10:59:46 | 21 | Q.   Laundering what kind of money?  I mean whose money? |
| 10:59:50 | 22 | A.   The Zetas' money for one, which is our theory of this horse |
| 10:59:54 | 23 | case.  But the benefits he received from the Zetas, I believe, |
| 10:59:58 | 24 | are more for payoffs for political connections and the dealing |
| 11:00:06 | 25 | with adversarial persons to Mr. Cessa. |

| | | |
|---|---|---|
| 11:00:18 | 1 | Q.   One moment, Judge. |
| 11:00:18 | 2 | THE COURT:  Yes, sir. |
| 11:01:22 | 3 | Q.   (BY MR. DEGEURIN) May I approach the witness, your Honor? |
| 11:01:30 | 4 | THE COURT:  You don't need my permission. |
| 11:02:32 | 5 | MR. DEGEURIN:  This is actually saving us time, Judge, |
| 11:02:34 | 6 | might be doing it this way. |
| 11:02:36 | 7 | THE COURT:  Take your time. |
| 11:18:04 | 8 | (Recess.) |
| 11:18:14 | 9 | THE COURT:  You may proceed. |
| 11:18:14 | 10 | MR. DEGEURIN:  Thank you, your Honor. |
| 11:18:16 | 11 | Your Honor, during the break, I came to a conclusion |
| 11:18:18 | 12 | that much of this is going to come out at trial.  And I can ask |
| 11:18:30 | 13 | him about paragraphs of the time and try to get him to amplify |
| 11:18:32 | 14 | it, but I don't think that that serves any of us well at this |
| 11:18:38 | 15 | moment. |
| 11:18:42 | 16 | I do have a proposal to make after I pass the witness. |
| 11:18:46 | 17 | THE COURT:  However you want. |
| 11:18:46 | 18 | MR. DEGEURIN:  So stay with me until I get through. |
| 11:18:50 | 19 | THE COURT:  Well, I don't think I can go anywhere. |
| 11:18:54 | 20 | MR. DEGEURIN:  I meant mentally.  All right.  I will. |
| 11:18:58 | 21 | THE COURT:  I don't know what they say out there, but |
| 11:19:00 | 22 | I'm not quite that old yet. |
| 11:19:02 | 23 | MR. DEGEURIN:  Actually, you're looking -- |
| 11:19:04 | 24 | THE COURT:  Although I'm looking forward to it. |
| 11:19:06 | 25 | MR. DEGEURIN:  Actually, you're looking actually very |

11:19:08    1    good.  The last time I was here, you were really having back

11:19:10    2    problems, but you don't seem to have quite as much.

11:19:14    3           THE COURT:  My old body is much older than the mind,

11:19:16    4    fortunately.  Go ahead.

11:19:18    5           MR. DEGEURIN:  As long as I don't become a pain in your

11:19:20    6    -- I shouldn't have said that.

11:19:22    7           THE COURT:  This is -- I allotted the entire day for

11:19:26    8    this case because I didn't know how many hearings I was going to

11:19:30    9    have.  So we've got plenty of time, as long as we can rest Lily

11:19:36   10    every once in a while.

11:19:38   11           MR. DEGEURIN:  Then I will ask one more question then.

11:19:40   12           THE COURT:  All right.

11:19:42   13           MR. DEGEURIN:  It's mainly out of curiosity, but it

11:19:44   14    also might be relevant, eventually.

11:19:48   15    Q.   (BY MR. DEGEURIN) In the indictment, I'm going to -- take my

11:19:52   16    word for it, I'm quoting a paragraph.  I don't have the

11:19:54   17    indictment with me, but I copied it and pasted that says on --

11:20:00   18    see if you're familiar with it.  On September 3rd through the 5th

11:20:06   19    of 2010, Jose Trevino, who's one of the codefendants, Carlos

11:20:14   20    Nayen, codefendant, Sergio Rincon, and Raul Ramirez, and others,

11:20:20   21    attended a Ruidoso horse sales company yearly sales in Ruidoso,

11:20:26   22    New Mexico.

11:20:28   23           Now, those are like -- those sales are annual or

11:20:34   24    quarterly sales of horses are advertised and you could go there

11:20:40   25    to purchase yearling horses?

| | | |
|---|---|---|
| 11:20:44 | 1 | A.   Yes, sir. |
| 11:20:44 | 2 | Q.   So those people were there in September 3 through 5, 2010. |
| 11:20:50 | 3 | And it says, Raul Ramirez bid on quarter horses on behalf of |
| 11:20:56 | 4 | Nayen and Trevino.  And then, it says, members of the |
| 11:21:02 | 5 | organization purchased 23 horses.  Now, for over $2 million? |
| 11:21:12 | 6 | A.   Yes. |
| 11:21:12 | 7 | Q.   After the auction, Defendant Francisco Colorado was listed |
| 11:21:18 | 8 | on the auction paperwork as the owner of those horses and |
| 11:21:24 | 9 | provided a check in the amount of $2 million plus for those 23 |
| 11:21:30 | 10 | horses. |
| 11:21:30 | 11 | A.   Yes, sir. |
| 11:21:30 | 12 | Q.   All right.  Are you familiar with that paragraph? |
| 11:21:32 | 13 | A.   Yes, sir. |
| 11:21:34 | 14 | Q.   So on that occasion, are you saying that Mr. Colorado was |
| 11:21:42 | 15 | present, also, and bid on the horses? |
| 11:21:44 | 16 | A.   I'm not saying that he bid.  No, sir. |
| 11:21:46 | 17 | Q.   But you're saying he was present? |
| 11:21:48 | 18 | A.   I'm not sure if he was in the auction.  I'm aware that he |
| 11:21:54 | 19 | came with a check at the conclusion of the auction. |
| 11:21:56 | 20 | Q.   Personally came or wired the money from his account or what? |
| 11:22:00 | 21 | A.   I know a check in Mr. Cessa's personal name was provided to |
| 11:22:06 | 22 | the auction manager. |
| 11:22:06 | 23 | Q.   Do you know how many horses Mr. Colorado-Cessa has in his |
| 11:22:16 | 24 | hobby? |
| 11:22:18 | 25 | A.   No, sir.  I do not. |

| | | |
|---|---|---|
| 11:22:18 | 1 | Q.   Could it be over a hundred?  Two hundred? |
| 11:22:22 | 2 | A.   Are you speculating for the states in Mexico or just through |
| 11:22:26 | 3 | this organization? |
| 11:22:28 | 4 | Q.   How about horses that you think he owns that he has on ranch |
| 11:22:34 | 5 | farms in the United States. |
| 11:22:40 | 6 | A.   That's really tough to summarize -- to approximate because |
| 11:22:46 | 7 | most of the horses I've seen didn't stay in his name. |
| 11:22:50 | 8 | Q.   And what does it take to transfer a horse from one name to |
| 11:22:52 | 9 | others?  Just a piece of paper you fill out? |
| 11:22:56 | 10 | A.   It's a sheet of paper from American Quarter Horse |
| 11:22:58 | 11 | Association in which the buyer and seller are supposed to sign |
| 11:23:00 | 12 | and date. |
| 11:23:02 | 13 | Q.   And is it also true -- I mean, that goes on commonly, you |
| 11:23:06 | 14 | found out. |
| 11:23:06 | 15 | A.   Yes, sir. |
| 11:23:08 | 16 | Q.   One person buys it, transfers it to somebody else. |
| 11:23:12 | 17 | A.   Yes, sir. |
| 11:23:12 | 18 | Q.   Okay.  And so, what the FBI has been trying to do is where |
| 11:23:18 | 19 | those horses or any of those horses were transferred to anybody |
| 11:23:22 | 20 | that you found associated with the Trevinos, you're trying to |
| 11:23:28 | 21 | find out some link between those horses and Mr. Cessa's bank |
| 11:23:32 | 22 | account? |
| 11:23:38 | 23 | A.   Can you rephrase? |
| 11:23:40 | 24 | Q.   Yeah.  What you and the FBI analysis are trying to do is to |
| 11:23:44 | 25 | find some link between his accounts that he purchased horses with |

| | | |
|---|---|---|
| 11:23:52 | 1 | and those horses ending up in the hands -- some of them in the |
| 11:23:56 | 2 | hands of bad people. |
| 11:23:58 | 3 | A.   Yes, sir.   That's correct. |
| 11:23:58 | 4 | Q.   You're not saying all of them or even a large majority, |
| 11:24:02 | 5 | you're just saying some of them did, aren't you? |
| 11:24:08 | 6 | A.   Since I've been involved with this and the auctions that |
| 11:24:12 | 7 | I've studied, I believe that some of the horses did remain in |
| 11:24:20 | 8 | personal ownership of Mr. Cessa.   I do believe that when they |
| 11:24:26 | 9 | would go to these auctions and buy 20 to 30, that it was known |
| 11:24:30 | 10 | all along that if a star was produced, it was going to end up |
| 11:24:34 | 11 | going to Jose Trevino. |
| 11:24:36 | 12 | Q.   Okay.   So generally speaking, you don't know when you buy |
| 11:24:42 | 13 | these horses, how they're going to turn out, do you? |
| 11:24:44 | 14 | A.   Exactly. |
| 11:24:44 | 15 | Q.   So you buy a number of horses and you train them, and you |
| 11:24:48 | 16 | hope that some of them might turn out to be winners? |
| 11:24:50 | 17 | A.   Yes, sir.   You can research bloodlines and how their parents |
| 11:24:56 | 18 | did as runners, and that's where most of the educated guesses -- |
| 11:24:58 | 19 | educated buys come from. |
| 11:25:00 | 20 | Q.   And so, it's the government's theory or the agent's theory |
| 11:25:04 | 21 | through talking to these informant -- whoever these informants |
| 11:25:08 | 22 | are, they say they believe that when the horses were purchased by |
| 11:25:16 | 23 | Mr. Cessa, there was already an agreement that if there's a good |
| 11:25:20 | 24 | horse there, Mr. Trevino could end up buying from him or getting |
| 11:25:26 | 25 | it from him. |

11:25:28  1    A.   I'm not certain that's something that they sat down and

11:25:30  2    decided pretext.

11:25:32  3    Q.   Well, that's what I thought you said.  That's what I was

11:25:36  4    asking you to clear up.

11:25:36  5    A.   What I am certain is all the horses that Mr. Cessa bought,

11:25:40  6    the best ones went to Mr. Trevino.  The ones who won trials and

11:25:44  7    looked like they could earn money.

11:25:46  8    Q.   Well, are you aware that he has horses at a very -- very

11:25:52  9    good horses, horses that won big races that are still in his

11:25:58  10   name?

11:25:58  11   A.   Yes, sir.  I do know that he, over the years, has ran his

11:26:02  12   own horses in different races.

11:26:06  13   Q.   And sells embryos from those bloodlines, those great horses?

11:26:12  14   A.   I'm not aware of that.  That would not surprise me, but I'm

11:26:14  15   not aware of that.

11:26:16  16   Q.   All right.  Your Honor, I'll pass the witness.

11:26:26  17                    CROSS-EXAMINATION

11:26:26  18   BY MR. GARDNER:

11:26:26  19   Q.   Just one question, Special Agent, going back to this Flor De

11:26:32  20   Maria ranch owned by Mr. Cessa.  Did the information you received

11:26:34  21   from the law enforcement in Mexico indicate that they interviewed

11:26:40  22   persons on the ranch following the raid?

11:26:42  23   A.   My partner -- one of my partners in this case received intel

11:26:46  24   from his counterpart in Mexico that persons were interviewed at

11:26:50  25   the race, and I've had discussions with that agent about his

11:26:54   1   conversation with his counterpart.

11:26:56   2   Q.   And what did those agents say with respect to Mr. Cessa's

11:26:58   3   involvement with Zeta personnel on the ranch?

11:27:02   4   A.   Some of the persons detained at Flora De Maria told the --

11:27:06   5   during their interviews that they had seen Mr. Cessa meet with

11:27:10   6   Miguel Trevino.

11:27:12   7   Q.   Pass the witness, your Honor.

11:27:16   8                    RE-DIRECT EXAMINATION

11:27:22   9   BY MR. DEGEURIN:

11:27:22  10   Q.   Let me get this straight.  Your intel in Mexico spoke to

11:27:28  11   some other intel in Mexico who said they interviewed some of the

11:27:40  12   -- some of the people that were apprehended in that, whether it

11:27:44  13   was a chase or whatever, and that those people you understand

11:27:50  14   said that one of those people had seen Mr. Cessa talking at one

11:27:58  15   time with Mr. Trevino.  Is that what you just said?

11:28:02  16   A.   I think so.

11:28:06  17   Q.   Not what they were talking about.

11:28:06  18   A.   I'll clarify if that would be easier for the Court.

11:28:10  19   Q.   Okay.

11:28:10  20   A.   Each federal agency or most federal agencies have

11:28:14  21   counterpart of the same agency in Mexico City.  My partner in the

11:28:18  22   case, as I said, IRS, as the co-lead, receives information from

11:28:26  23   IRS Mexico City that persons detained at the ranch were

11:28:30  24   interviewed and two of -- or at least four spoke and two said

11:28:34  25   they had seen Miguel Trevino with Mr. Cessa.

| | | |
|---|---|---|
| 11:28:36 | 1 | Q.   When? |
| 11:28:38 | 2 | A.   And I learned about it through my conversation with Mr. -- |
| 11:28:40 | 3 | Q.   Had seen him with Mr. Trevino when? |
| 11:28:42 | 4 | A.   I'm not certain, sir. |
| 11:28:44 | 5 | Q.   Your Honor, you can see that that would be difficult in a |
| 11:28:50 | 6 | trial with all that type of information, it would have come in a |
| 11:28:54 | 7 | sterile and protected environment.   That was my point. |
| 11:28:58 | 8 | I'll pass the witness. |
| 11:28:58 | 9 | MR. GARDNER:  Nothing further, your Honor. |
| 11:29:00 | 10 | THE COURT:  You may step down. |
| 11:29:02 | 11 | THE WITNESS:  Thank you, your Honor. |
| 11:29:08 | 12 | MR. DEGEURIN:  I want to make a proposal for you to |
| 11:29:10 | 13 | consider and it has to do with the -- having a location here in |
| 11:29:18 | 14 | Austin which would be his home detention location.   And I would |
| 11:29:24 | 15 | like to have -- I will have this plan in place presented to you |
| 11:29:30 | 16 | in writing by this Friday for you to consider, and it will |
| 11:29:38 | 17 | include -- and I'm still working through it a little bit, but it |
| 11:29:40 | 18 | will include a house in Austin -- in Houston.   A house in Austin |
| 11:29:48 | 19 | that will be guarded by deputy sheriffs, off-duty, of course, but |
| 11:29:56 | 20 | so they won't be paid by the county -- that will ensure that no |
| 11:30:02 | 21 | one comes and goes from that house other than the lawyers and |
| 11:30:06 | 22 | perhaps his wife, who's not charged, of course, his children or |
| 11:30:14 | 23 | small children, some small, some in college.   We could restrict |
| 11:30:22 | 24 | who comes and goes, if you wanted. |
| 11:30:24 | 25 | In addition, we would agree that the FBI could go into |

| 11:30:30 | 1 | the house without a search warrant, will give pre-consent to go |

11:30:30   1   the house without a search warrant, will give pre-consent to go

11:30:36   2   to the house at any time they want to.  Drop in as long as they

11:30:40   3   don't interrogate, question him out of my presence.  And that a

11:30:48   4   report of the activities at the house would be generated on a

11:30:54   5   two, or three, or four-day basis.

11:31:00   6          He would also be under GPS monitoring, so if he walked

11:31:04   7   in the backyard, or anything like that, he would not leave the

11:31:06   8   house to the satisfaction of the Court.  It will provide -- I

11:31:12   9   don't need to go into the details of the difficulty is.  Even

11:31:18   10  with your standing order with Bastrop, the difficulty it is to

11:31:22   11  try to go meet with him in Bastrop and sit down and have

11:31:28   12  meaningful preparation time.  We're prepared to do that, we're

11:31:32   13  prepared to fund that.

11:31:34   14         I did get a license from the United States Treasury

11:31:38   15  Department to represent Mr. Cessa.  I got that license a week

11:31:42   16  ago, I think, and so, I now can receive funds to represent him

11:31:48   17  and, also, any expenses reasonably related to the case, which

11:31:54   18  would include, in my opinion, the house arrest.  Thank you.

11:32:04   19         MR. GARDNER:  Your Honor, again, that presupposes that,

11:32:10   20  you know, should the Court release him and ICE detains him and

11:32:14   21  deports him, much like they would do with a 1326 case.  So I

11:32:18   22  don't think Mr. Cessa should be treated any differently just

11:32:20   23  because of his assets.  I would be a little concerned about OFAC

11:32:24   24  releasing that money for that purpose.

11:32:26   25         But, your Honor, I think the more important thing is

11:32:28  1  now the Court has in front of him evidence that ties Mr. Cessa

11:32:32  2  deeply with the leadership of the Zeta drug-trafficking

11:32:36  3  organization.  So I don't think electronic monitoring system

11:32:42  4  would suffice for the four hours it would take him to drive to

11:32:46  5  the border and get across the border to meet with his buddies,

11:32:50  6  the Zetas, and not return to court.

11:32:50  7         So for those reasons, your Honor, we respectfully ask

11:32:52  8  the Court to uphold the magistrate's decision to detain Mr.

11:32:58  9  Cessa.

11:33:00  10         MR. DEGEURIN:  Drive to Laredo, you have to bus through

11:33:02  11  the deputy sheriffs and the FBI at his house and that would be

11:33:08  12  around his house.

11:33:10  13         THE COURT:  It would be an impediment.  I will say

11:33:14  14  that.

11:33:14  15         But I'm going to deny the motion to revoke.  There's no

11:33:20  16  question that Mr. Cessa has an escape factor, no different from

11:33:36  17  any other defendants.  The fact that he has sufficient funds

11:33:42  18  which may or may not be tainted, depending upon the evidence,

11:33:46  19  that would keep him with more difficulty in getting out of the

11:34:00  20  United States.  The Court doesn't have any doubt that he could do

11:34:02  21  it if he wanted to, not that the Court knows that he would or

11:34:08  22  wouldn't.

11:34:08  23         But Mr. Cessa, I am sure, does not wish to proceed

11:34:14  24  through this case.  And the only way I'm confident that he's

11:34:24  25  going to be here to defend himself, to do whatever he wants in a

| | | |
|---|---|---|
| 11:34:30 | 1 | trial, is to remain in custody.  And I will enter an order on |
| 11:34:32 | 2 | that so that you can have an appeal, if you wish. |
| 11:34:38 | 3 | Now -- |
| 11:34:40 | 4 | MR. DEGEURIN:  May I make a parting shot?  Parting shot |
| 11:34:44 | 5 | is -- |
| 11:34:44 | 6 | THE COURT:  I'd be disappointed if you didn't. |
| 11:34:46 | 7 | MR. DEGEURIN:  Okay.  Oftentimes, I wake up thinking, |
| 11:34:50 | 8 | why didn't I -- why wasn't I more effective in what I was trying |
| 11:34:54 | 9 | to get across? |
| 11:34:54 | 10 | The way I view this is Mr. Cessa wanted an opportunity |
| 11:35:02 | 11 | to show that he's not a member of some Zeta conspiracy.  He |
| 11:35:12 | 12 | wanted -- because it's important not only for months he may get |
| 11:35:16 | 13 | here -- |
| 11:35:16 | 14 | THE COURT:  It's very easy for him in your presence to |
| 11:35:20 | 15 | decide what to do.  He wanted to show and establish how all that |
| 11:35:26 | 16 | money went through his account.  That's something for the three |
| 11:35:30 | 17 | of you to decide and not on the -- on this. |
| 11:35:38 | 18 | If you want to make your proposal to the government and |
| 11:35:42 | 19 | the government and you can work out something with the |
| 11:35:46 | 20 | immigration people where there's controls, once I release him to |
| 11:35:52 | 21 | immigration, I have no control.  And I have little confidence in |
| 11:36:02 | 22 | the immigration courts that they do the right thing, and that |
| 11:36:06 | 23 | they do it promptly, and that they do it at all. |
| 11:36:12 | 24 | But if you and the government can work something out, |
| 11:36:14 | 25 | I'll be glad to reconsider.  But this point in time, I'm not |

11:36:18   1   going to reverse the magistrate based on the evidence I have

11:36:24   2   heard and that's final.

11:36:26   3           MR. GARDNER:  Nothing further from the government,

11:36:28   4   Judge.  Thank you.

11:36:28   5           THE COURT:  All right.  I'm in recess.

           6           (End of proceedings.)

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                            * * * * * *

2

3

4    UNITED STATES DISTRICT COURT)

5    WESTERN DISTRICT OF TEXAS    )

6

7        I, LILY I. REZNIK, Official Court Reporter, United States

8    District Court, Western District of Texas, do certify that the

9    foregoing is a correct transcript from the record of proceedings

10   in the above-entitled matter.

11       I certify that the transcript fees and format comply with

12   those prescribed by the Court and Judicial Conference of the

13   United States.

14       WITNESS MY OFFICIAL HAND this the 21st day of September, 2012.

15

16

17                              /S/ Lily I. Reznik
                                LILY I. REZNIK, RPR, CRR
18                              Official Court Reporter
                                United States District Court
19                              Austin Division
                                200 W. 8th Street, 2nd Floor
20                              Austin, Texas 78701
                                (512)916-5564
21                              Certification No. 4481
                                Expires:  12-31-12
22

23

24

25