1    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF TEXAS
2         AUSTIN DIVISION

3

UNITED STATES OF AMERICA      )
4                             )     Criminal Action
VS.                           )     No. 12-210-6
5                             )
FRANCISCO ANTONIO             )
6    COLORADO-CESSA           )
_____

7

8    OFFICIAL TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
        BEFORE THE HONORABLE DONALD E. WALTER
9        UNITED STATES SENIOR DISTRICT JUDGE
            SHREVEPORT, LOUISIANA
10            OCTOBER 20, 2015

11

 FOR THE GOVERNMENT:
12     AUSA DOUGLAS W. GARDNER
       AUSA MICHELLE EVETTE FERNALD
13     AUSA DANIEL M. CASTILLO
       U.S. Attorney's Office
14     816 Congress Avenue, Suite 1000
       Austin, Texas  78701
15

 FOR THE DEFENDANT:
16     MR. CHRIS FLOOD
       Flood & Flood
17     914 Preston at Main, Suite 800
       Houston, Texas  77002-1832
18

       MR. DAVID ISAAK
19     Smyser, Kaplan & Veselka
       700 Louisiana Street, Suite 2300
20     Houston, Louisiana  77002

21  REPORTED BY:
       Marie M. Runyon, RMR, CRR
22     Federal Official Court Reporter
       300 Fannin Street, Room 4212
23     Shreveport, Louisiana  71101
       (318) 934-4756

24

     Record produced by mechanical stenography, transcript produced
25   by computer.

```
 1        (In chambers at 9:57 a.m.)
 2             THE COURT:  Good morning, everyone.
 3        Mr. Gardner?
 4             MR. GARDNER:  Yes, sir.
 5             THE COURT:  Ms. Fernald?
 6             MS. FERNALD:  Michelle Fernald.
 7             THE COURT:  Mr. Castillo is back there?
 8             MR. CASTILLO:  Yes, sir.
 9             THE COURT:  And Marie is back here.  We will have a
10   transcript made.
11        Mr. Isaak?
12             MR. ISAAK:  Yes, Your Honor.
13             THE COURT:  I signed your order, your pro hac vice.
14             MR. ISAAK:  Thank you.
15             THE COURT:  Mr. Flood?
16             MR. FLOOD:  Yes, Your Honor.
17             THE COURT:  And Ms. Brantley?
18             MS. BRANTLEY:  Yes.
19             THE COURT:  And Ms. DeLeon; is that right?
20             MS. DeLEON:  Yes, that's correct.
21             THE COURT:  I just want to hear from the people
22   around the table, unless I ask.  Okay?
23        I understand the marshal will be joining us soon -- it's
24   Mr. Sartin -- the courtroom deputy, Ms. Wallace; and the jury
25   administrator, whenever we get started.
```

```
 1            Y'all haven't reached an amicable settlement, while we're
 2     sitting here?
 3              MR. FLOOD:  I'm sorry?
 4              THE COURT:  You haven't reached a settlement?
 5              MR. FLOOD:  We're still working on it.  Actually,
 6     Your Honor, it's not been without a lack of trying by the
 7     lawyers.
 8              THE COURT:  Well, nothing better than I see that a
 9     good will's tried before trial.
10              MR. GARDNER:  I think we're done, so maybe doing
11     this -- the 90 days are running on the second case now, the
12     mandate having issued.
13          (Austin courthouse staff join conference via
14            videoconference.)
15              THE COURT:  Good morning, everyone.  Let's see.  I'm
16     going to ask those of you who are joining us, can you hear me
17     all right?
18              THE COURTROOM DEPUTY:  We can hear you in Austin.
19              THE COURT:  Okay.  As I understand it, in Austin is
20     Mr. Sartin for the Marshals Service?
21              THE DEPUTY MARSHAL:  Yes, sir.
22              THE COURT:  And Ms. Wallace for the -- as courtroom
23     Deputy?
24              THE COURTROOM DEPUTY:  Yes, sir.
25              THE COURT:  And the jury administrator is
```

1    Ms. Demings?

2              THE JURY ADMINISTRATOR:  Yes, sir.  Right here.

3              THE COURT:  And who else do we have?

4              THE JURY ADMINISTRATOR:  We have Amanda Dodger.

5    She's my -- she's training to be my jury backup.

6              THE COURT:  Oh.  Okay.  All right.  Thank you very

7    much.

8         Here in Shreveport --

9              THE DEPUTY MARSHAL:  And, Judge --

10             THE COURT:  -- for the Government is Mr. Gardner and

11   Ms. Fernald, and for the defense is Mr. Isaak and Mr. Flood.

12   Okay?

13             MR. GARDNER:  Judge, I think we have one more --

14             THE DEPUTY MARSHAL:  Judge, there's four other

15   deputies here with me that are going to help with the trial; so

16   they're here to kind of listen.

17             THE COURT:  I don't care.  That's fine.

18        All right.  The first thing that -- we're here on a

19   pretrial conference on the *Cessa* case.

20        Mr. Isaak has now been admitted *pro hac vice*.

21        The first thing I'd like -- well, the law clerk, as you

22   all know, here is Marshall Perkins.  I believe you all have his

23   address, so -- and I have no objection to *ex parte* contact with

24   him.

25        We have trial of a single count beginning November 30,

1  2015, at 9:00, presently scheduled for Austin.  I'm inclined

2  now to keep in it Austin.  I had been talking about San

3  Antonio, but I think Austin is probably the best place.  Any

4  conflicting opinions there?

5          MR. GARDNER:  Not from the Government, Your Honor.

6          MR. FLOOD:  No, Your Honor.

7          THE COURT:  Okay.  The first thing I want to address

8  is the motion in limine by the Government.  I'm going to deny

9  it.  You can put on evidence of duress.  I won't give a --

10 well, I won't go that far.  You know under which terms I can

11 give an instruction on duress, and I'll be watching for that.

12 If you cross that bar, I'll do it.

13     The question that intrigues me is that if you do it and

14 don't successfully cross the bar yet there has been sufficient

15 evidence in there for you to argue to the jury, do I give the

16 *duress*?  Does the Government ask me for the duress instruction?

17         MR. GARDNER:  Judge, I've seen one case where the

18 Government did ask for it --

19         THE COURT:  I saw it.  And they said no.

20         MR. GARDNER:  Over the objection of the defense

21 attorney, which are not -- you know, they could not meet that

22 burden, so --

23         MR. FLOOD:  *Wiley*, under the --

24         THE COURT:  Yeah.  I know the case.

25         MR. GARDNER:  Yes, sir.  So I think that would be

1    something I'd have to look at, maybe, down the road.

2              THE COURT:  It may be distinguishable.  So I'm not

3    ruling, but I want y'all to think along those lines.  Okay?

4              MR. FLOOD:  Your Honor, in *Wiley*, they did say it was

5    error, just -- but they just did not say it was reversible

6    error.

7              MR. GARDNER:  Right.

8              MR. FLOOD:  Yeah.  I agree with the Court --

9              THE COURT:  Depending on what you say in closing

10   argument, I'm going to be looking at it, because it just seems

11   a certain fairness.

12        The renewed motion for bond, we're only talking about a

13   month and a half; is it really worth it in taking half a month

14   to get all the things that you say you're going to put in?

15             MR. FLOOD:  Well, certainly for the defendant, Your

16   Honor, any days of being free to be able to attend trial and

17   help us in his defense certainly makes it worth it.

18        But I agree with you, it does seem like -- I guess the

19   question you're asking is, is it worth it to you to take the

20   risk of him fleeing.  You know, he did surrender, Your Honor.

21             THE COURT:  Yeah.

22             MR. FLOOD:  And I don't think he's a flight risk.

23   What I think doesn't really matter.  And I think that -- you

24   know, don't forget, even if successful in this trial, there may

25   be another trial.

1      THE COURT:  Let me address this case -- let me

2   address it, in which case the motion for bail may be moot or it

3   may be a heck of a lot better.

4      MR. FLOOD:  Sure.

5      THE COURT:  Let me address this to the marshal:  How

6   much access will Mr. Flood have to Mr. Cessa the week before

7   trial --

8   Week before?

9      MR. FLOOD:  Two weeks before trial.

10      THE COURT:  -- two weeks before trial and on a daily

11   and weekend basis?  Marshal?

12      THE DEPUTY MARSHAL:  Your Honor, Mr. Flood has had --

13   I mean, we've had good communication with Bastrop County jail.

14   They emailed them direct.  They set up the conference room for

15   them to meet.  I've heard of no issues whatsoever that they've

16   had.

17   Mr. Flood, I don't know if you've had any issues.

18   We set this up a long time ago, and the communications,

19   as far as I've been told, have been pretty good.

20      MR. FLOOD:  Yes.  We don't have the access that we

21   will need going into a trial, but we have had access.  We had

22   to work around the jail schedule.  So --

23      THE COURT:  Let me ask the marshal this:  Would it be

24   possible for Mr. Flood and his group to have access on a daily

25   basis, even if that winds up as late as 7:00 or 8:00 at night?

1       THE DEPUTY MARSHAL:  I believe I can call the jail

2   captain and kind of see what their parameters are, and we can

3   talk again with Mr. Flood to figure out what -- to make

4   something work.

5       THE COURT:  There's nothing like a face-to-face with

6   your client when you're trying a case; so I guess that's what

7   I'd like to see, if you can at all work that out.

8       And, Mr. Flood, you ought to be able to finish by 8:00 at

9   night, surely?

10      MR. FLOOD:  I sure hope so, Your Honor.  I need to

11  get my sleep too.

12      THE COURT:  Okay.  Let's try for that.  Okay?  Any

13  dissent there?

14      MR. FLOOD:  No, Your Honor.

15      It has not been a problem.  Mr. Sartin is correct,

16  they've worked with us.  But it's been under different

17  circumstances.  This is -- those were visitations where we set

18  it up days in advance, they'd tell us they have something going

19  on in what's called the MP-4 or the MP-3 room, which is really

20  the only room that we're -- that they're equipped to allow us

21  to meet with him.

22      I'm just worried that if -- you're right, on a daily

23  basis, after we've adjourned court, if I want to have face to

24  face, I need to have that room available.  So I assume that

25  Mr. Sartin can make that arrangement?

1          THE COURT:  Any problem, Mr. Sartin?

2          THE DEPUTY MARSHAL:  Your Honor, I can get with the

3  captain and get back to y'all probably sometime this week.  And

4  we can reserve it; just give me advance notice, let me see what

5  I can figure out.

6          THE COURT:  Thank you very much.

7      The 404(b), allowed the indictment -- excuse me --

8  "allowed members of Los Zetas to meet at his ranch in

9  Veracruz," do you object to that?

10         MR. FLOOD:  Well, Your Honor, I don't -- I don't know

11  what the evidence is in support of that allegation.  I've not

12  been given any of the discovery surrounding most of the 404(b)

13  notice, so I --

14         THE COURT:  Well, assuming that they can prove that

15  he did allow them to use his ranch, do you -- that seems to be

16  a valid relevant --

17         MR. FLOOD:  Exception?

18         THE COURT:  Yeah.

19         MR. FLOOD:  That is the one that jumped out at me

20  that may be the most relevant admissible one, Your Honor.

21      What I was going to propose is that now that we've

22  received the Government's notice -- I've had an informal

23  meeting with Mr. Gardner, who said he would provide me with the

24  evidence in support of those allegations so that we can

25  effectively prepare to defend against them.

1      At the same time, we will prepare a motion in limine,

2   Your Honor, with regard to the 404(b) notice, and we'll state,

3   I guess, in that motion why we don't think it's appropriately

4   admitted under the exception.

5      But just off the top of my head, Your Honor, I would

6   agree with your assessment that that one seems to be probably

7   the only one that might be able to be admitted to prove some

8   sort of --

9          THE COURT:  Let me say I have been known to change my

10  mind, so -- but right now it appears that only "A" will be

11  admissible.  The other after-the-fact or -- I don't want to

12  have a trial within a trial, and I'll exclude it under 403 if

13  nothing else.  But that's pretty much where I stand, and that's

14  what you -- that's the hurdle you have.

15         MR. GARDNER:  I understand that, Your Honor.  But

16  just sort of a heads up, the evidence that we have is that any

17  arrest defense is contemporaneous with most of the stuff in the

18  404(b).

19         THE COURT:  Well, you heard what I --

20         MR. GARDNER:  Yes, sir.  I'm just letting you know --

21         THE COURT:  Okay.

22         MR. GARDNER:  -- that that's where we're going with

23  that.

24         THE COURT:  Is there a problem with the business

25  records affidavit?

1          MR. FLOOD:  We got the Government's notice, and we

2   have started to compare the business records affidavits to the

3   records that they want to introduce pursuant to that notice.

4          I've been told that, unfortunately, some of the business

5   records affidavits say, for instance, "These are all the

6   business records," there's 2,000 of them and yet there's 27- or

7   2800 documents that have been included in the notice.

8          So there doesn't appear to be -- at least I haven't had

9   sufficient time to be able to compare the Government's notice

10  to the actual records supporting the affidavits.  We just got a

11  list of documents.

12         Here's what I propose on that, Your Honor.  I'm not going

13  to -- I don't anticipate needing all of these custodians.  And

14  I asked -- I told Mr. Gardner last week when I met with them,

15  said, you know, I'm going to probably agree to all of this,

16  but, in my experience, there may be one or two custodians that

17  we need to come in to explain the records that they've

18  certified.  And then I told him I'd let him know which one of

19  those custodians it was -- they were -- once we compare the

20  records in the notice to what we've been given.

21         THE COURT:  We're just trying to do away with

22  custodians.  We're not agreeing on the admissibility.  That's

23  all we're trying to do; right?

24         MR. FLOOD:  Not on the authenticity, no, sir.

25         THE COURT:  What about it, Mr. Gardner?  You think

1    you're going to be able to work that out?

2           MR. GARDNER:  Well, I just need Mr. Flood to let me

3    know what it is he's talking about.

4           THE COURT:  Okay.  What's a reasonable time?

5           MR. GARDNER:  Well, it depends on what the documents

6    are.  If it's a local bank, I can probably get a custodian up

7    there fairly quick.  But if it's, say, Bank of America, we have

8    to pull those people in.  And Michelle is actually -- has

9    probably more --

10          MS. FERNALD:  Your Honor, I've been -- and Michelle

11   Fernald, for the record.  But I've been working on the business

12   record affidavits, and did on the last trial also.

13       I think what a part of the confusion may be for Mr. Flood

14   is that the discovery and those business record pages don't

15   necessarily reflect the actual records that we had placed into

16   evidence at the previous trial; so it could be less, obviously.

17          MS. BRANTLEY:  Right.

18          MS. FERNALD:  It could be equal to or even less.  So

19   all that they need to do is be able to come over to our office

20   and look at those records which are contained in the boxes --

21          MS. BRANTLEY:  Right.

22          MS. FERNALD:  -- that they've had previous access and

23   that they know exactly where they are, and look at those and

24   just do a little scan of them.  And I think that that would

25   resolve this issue pretty quickly.

1    MR. FLOOD:  I don't have any reason to believe that's
2    not true.
3          THE COURT:  All right.  How about by next Friday?
4          MR. FLOOD:  That would be fine, Your Honor.
5          MS. FERNALD:  Perfect.
6          THE COURT:  A resolution --
7          MR. FLOOD:  On the custodians.  That's fine.
8          THE COURT:  On the custodians.  Okay.
9          MR. FLOOD:  In that regard, if I don't -- if you
10   don't mind me making one other comment?
11         THE COURT:  Go ahead.
12         MR. FLOOD:  In the last meeting I had with
13   Mr. Gardner, he had mentioned he may even have all the exhibits
14   electronically soon.
15         MR. GARDNER:  Working on it, yeah.
16         MR. FLOOD:  And that would actually speed up the
17   process of me comparing the exhibits to the actual discovery
18   and the custodian.
19         MR. GARDNER:  Let me caveat that.  I don't think
20   we're going to go through the process of scanning the entire
21   business record.  More I was talking about was the search
22   warrant evidence that was presented during the last trial.
23         So I just want to make sure that was clear.  Because you
24   already have all that electronically in the discovery.  I
25   wasn't going to make that as an exhibit.  It was 4,000 pages on

1    one they have.  It took forever to scan all that.

2            THE COURT:  Ms. Wallace, I haven't seen the courtroom

3    yet.  I assume it's fully equipped for a paperless courtroom;

4    is that right?

5            THE COURTROOM DEPUTY:  Yes.  With the -- like Elmo;

6    is that what you're talking about?  And they can also go in

7    with their laptops.

8            THE COURT:  Okay.  So we're set to --

9            THE COURTROOM DEPUTY:  Yes.

10           THE COURT:  So we're not passing anything to the

11   jury; right?

12           MR. GARDNER:  Correct.

13           MR. FLOOD:  That would be right.

14           THE COURTROOM DEPUTY:  What did you just ask, Your

15   Honor?

16           THE COURT:  We're not going to be passing anything to

17   the jury.

18           THE COURTROOM DEPUTY:  There will be no paper

19   exhibits?

20           THE COURT:  I hope not.

21           MR. FLOOD:  I hope not too.

22           MR. GARDNER:  No.

23           THE COURT:  Both sides say that that's correct.  They

24   will do their best, barring some emergency.

25           MR. GARDNER:  The jury has screens in front of them,

1     Judge, or one per every two jurors, and then --

2              THE COURT:  Could you hear that, Ms. Wallace?

3              THE COURTROOM DEPUTY:  The jury will have access to

4     them in the courtroom, but they won't have -- what are they

5     going to use in the --

6              THE COURT:  Oh, they'll have a hard copy in case --

7              THE COURTROOM DEPUTY:  -- deliberation room?

8              THE COURT:  -- they want something.  There has to be

9     a hard copy so that --

10             THE COURTROOM DEPUTY:  That's right.  Yes.

11             THE COURT:  -- during deliberations.

12             THE COURTROOM DEPUTY:  Yes.  There's a large screen

13    in the courtroom, and then there's also individual monitors in

14    between each of the jury seats in the box.

15             THE COURT:  Okay.  Good.  All right.  Thank you.

16             MR. FLOOD:  Your Honor, if we could get an electronic

17    copy of the exhibits, the actual exhibits that are going to be

18    admitted in the trial as soon as we can, that would expedite

19    this whole process of custodians and everything.  Because --

20             THE COURT:  Ms. Fernald?

21             MR. FLOOD:  Oh, I'm sorry.

22             THE COURT:  How soon can you get them to him?

23             MS. FERNALD:  Well, I'm not sure, because we're

24    scanning a lot of exhibits right now; so I don't want to make a

25    promise to the Court or to Mr. Flood that I can't live up to.

 1   But we've started the scanning process, and we'll get it to

 2   them as quickly as we get it.  That's the best that I can say.

 3        They have had access to these records.  And, of course,

 4   they have them under discovery.  So it's not like they don't

 5   have a copy of them.

 6        THE COURT:  Yes.  He's asking for convenience, I

 7   gather.

 8        Mr. Flood?

 9        MS. FERNALD:  Yeah.  And I'm going to try to

10   accommodate him as much as we can.

11        MR. FLOOD:  I think what I'm talking more about is

12   let's assume I got 5,000 pages from a bank in discovery.  All

13   right?

14        And they say, "Well, our exhibit is in those 5,000

15   pages."

16        And I say, "I know.  Let me see which pages you're

17   talking about that you're trying to introduce as an exhibit and

18   then I'll see if I need to have a custodian and all that."

19        THE COURT:  At least can you identify it so he can go

20   look in his 5,000 sheets?

21        MS. FERNALD:  Yes.  And he can also probably refer to

22   the previous trial and have a little bit of notice through some

23   of the records there.  But we certainly can do that.

24        MR. FLOOD:  So they're the same?

25        MS. FERNALD:  They're the same records from the

1   previous trial, yes.

2         MR. FLOOD:  I guess what I'm saying, your exhibits

3   are going to be the same?

4         MS. FERNALD:  Yes.  From the previous trial,

5   absolutely.  They're the very same exhibits from the previous

6   trial.

7         MR. FLOOD:  That helps.

8         THE COURT:  All right.  How long do you think this

9   trial will take?

10         MR. GARDNER:  That was a question we had for you,

11   Judge, depending on your schedule.  I didn't know if you wanted

12   to work 8:30 to 5:30, Saturdays.

13         THE COURT:  Look, the only people I am really

14   concerned with in a trial are the jurors.  I'll go as late as

15   they want to go.  I'll do as little as they want to do.  So I

16   can't really tell you about that.

17       I will tell you that I once upon a time did a three-week

18   trial, but I haven't done one since then.

19         MR. GARDNER:  The last one took three weeks, Judge,

20   with 54 witnesses and 5 defense attorneys.  I would imagine we

21   could probably cut a week off that, if not more, depending on

22   the jury schedule.

23         THE COURT:  What do you think, Mr. Flood?

24         MR. FLOOD:  I think it will take two weeks, Your

25   Honor, at least.

1      THE COURT:  Okay.  I do occasionally do two-week
2  trials.
3      My friend Tom Scott, who used to be a judge down in
4  Miami, said he would rather try it twice for a week each than
5  have to come back and do it for two weeks.  We'll see.
6      Opening statement, how long?
7      MR. GARDNER:  15 minutes, Judge, if that.
8      THE COURT:  How long?
9      MR. GARDNER:  15, if that.
10      THE COURT:  Defense?
11      MR. FLOOD:  I think 15 minutes sounds fine to me as
12  well, Your Honor.
13      THE COURT:  Great.
14      Let me -- and here -- excuse me.  Here, Ms. Demings, feel
15  free to jump in.  Okay?
16      Here's how I like to pick a jury.
17      How much publicity are we looking at?
18      MR. GARDNER:  There were two or three reporters in
19  the courtroom last time, Judge, a local --
20      THE COURT:  No.  I mean pretrial.
21      MR. GARDNER:  There was -- when the opinion came out
22  from the Fifth Circuit, there was a brief news story buried
23  somewhere in the paper in the back pages.
24      MR. FLOOD:  But there was also daily coverage during
25  the first trial.

1        MR. GARDNER:  Yes.

2        THE COURT:  No.  I'll take care of that.  I'm worried

3   about picking the jury right now.

4        Ms. Demings, how about if we -- can we comfortably seat,

5   let's say, 48?

6        THE COURTROOM DEPUTY:  Absolutely.  I was afraid your

7   number was going to be much higher.

8        THE COURT:  Well, I would like to have, say, another

9   20 in reserve from the following day, if possible.

10       THE COURTROOM DEPUTY:  Following day?

11       THE COURT:  In other words --

12       THE COURTROOM DEPUTY:  Yes, we can do that.

13       THE COURT:  -- we'll start with 48, and I think I can

14  pick them within 48; but in case I can't, we may have to spill

15  over to the next day.

16       THE COURTROOM DEPUTY:  Are you expecting voir dire to

17  last all day?

18       THE COURT:  I'm expecting voir dire to last something

19  like two hours, if they're lucky.

20       THE COURTROOM DEPUTY:  Okay.

21       THE COURT:  Okay.  This is a good time.  I will seat

22  all of the prospective jurors.  I'll get to the questionnaire

23  in a minute.  I ask a general voir dire.  You can get a copy of

24  it from Marshall.

25       I then allow you voir dire.  It is essentially what I

1  call the "Scheherazade rule":  As long as you can keep me
2  entertained, you can ask questions.  You may not wave the flag.
3  You may not argue your case.
4      I used to be a trial lawyer in real life.  There's
5  nothing like talking to a juror to see if he hates your guts
6  right away.  So you can ask questions about their golf game or
7  anything like that, that gets you familiar with them.
8      If you violate the rule, I will tell you that your time
9  is about to expire; and on the second warning, it has expired.
10     Any questions about that?
11         MR. GARDNER:  No, sir.
12         MR. FLOOD:  No, Your Honor.
13     What about a questionnaire prior to --
14         THE COURT:  I'll get to that.
15         MR. FLOOD:  Okay.  Okay.  I'm sorry.
16         THE COURT:  No.  That's all right.
17     Well, let me go on.  After we finish that, there will be
18  a few people that I find, you know, they have an embarrassment
19  that they want to talk about; so I usually take them back in
20  the jury room for individual.
21     So before you begin your voir dire, I will call you up to
22  the bench and I'll show you the ones that I intend to take back
23  and I'll take suggestions from y'all as to who we should take
24  back.
25     It may be that during your voir dire I will stop you and

1    say, "We'll discuss that with Ms. Smith in the back room."

2         That's going to cause a problem with the press, because

3    now, apparently, I have to tell everybody out in the audience

4    that we're trying to avoid embarrassment but they have an

5    absolute right to see it and "if you insist, we can do it here,

6    but then I'll have to excuse all these jurors and you'll delay

7    the trial a lot," and there I am.  I don't see any way around

8    it.

9              MR. FLOOD:  I don't understand the problem with the

10   press.  I've done voir dire before where the people approach

11   the bench and there's a bench conference with the juror.

12             MR. GARDNER:  White noise.

13             MR. FLOOD:  Yeah, with white noise.  And I've never

14   heard of the press objecting to that.

15             THE COURT:  Well, maybe so.  But, essentially, I have

16   to ask them if there is an objection, because we have,

17   according to the Supreme Court, open trials.  And if they

18   object, I think I have to say, "Okay, everybody out, all of the

19   prospective jurors out of the courtroom, we just keep this one

20   in here."  It's going to be a pain.

21             MR. FLOOD:  Yep.

22             THE COURTROOM DEPUTY:  Judge?

23             THE COURT:  Yes?

24             THE COURTROOM DEPUTY:  But the way that they've done

25   it traditionally here is pull them up to the bench -- and we

1    turn the white noise on so nobody else can hear -- and it's a
2    private conversation between yourself and the prospective juror
3    at the bench.
4                THE COURT:  Well, show me.
5                THE COURTROOM DEPUTY:  Okay.
6                THE COURT:  I guess I would prefer that.
7                THE COURTROOM DEPUTY:  Yeah.  I think Doug has seen
8    that before in the courtroom, and Michelle.  I don't know if
9    Mr. Flood has been in our courtroom when we've done that
10   before.
11               MR. FLOOD:  I've not, but I've done that in other
12   courtrooms.
13               THE COURTROOM DEPUTY:  Okay.  The Southern District,
14   I believe --
15               MR. FLOOD:  But I like the idea of going back in
16   chambers, as you suggested, Judge, or wherever -- into a room.
17               THE COURT:  Well, again, the problem gets to be do I
18   have to excuse the audience.
19               MR. FLOOD:  Right.
20               THE COURT:  I fail to see the difference, but --
21               MR. GARDNER:  Yes, sir.
22               THE COURT:  -- I'm not one of the nine.
23          Let's see.
24               MR. FLOOD:  Judge, if you want my input, I have no
25   objection to there being private discussions for jurors that

1  want to talk privately with the Court and the parties as long

2  as I'm a party to it.

3          THE COURT:  I tell you what -- well, that's what

4  we're going to do.  I'm going to leave it at that.  I'm not

5  going to offer it to them, but if someone stands up and

6  objects, then I'm going to have to do it.

7          MS. FERNALD:  Right.  Sure.

8          THE COURT:  Let's don't burn that bridge until we

9  come to it.

10      The jurors.  We have jury questionnaires?  Ms. Wallace,

11  do we have jury questionnaires?

12          THE COURTROOM DEPUTY:  I'm going to defer that

13  question to Ms. Demings.

14          THE COURT:  Oh, I'm sorry.

15          THE JURY ADMINISTRATOR:  We do.

16          THE COURT:  Ms. Demings, do we have them?

17          THE JURY ADMINISTRATOR:  Yes.

18          THE COURT:  How are they identified?

19          THE JURY ADMINISTRATOR:  By their names.

20          THE COURT:  Not address?

21          THE JURY ADMINISTRATOR:  No.  We can do an anonymous

22  jury, if you prefer.

23          THE COURT:  My basic reaction to anonymous juries is

24  some it will frighten and some it will prejudice, and so I'm

25  not really inclined to do anonymous jurors.  But how about, as

1    a compromise, they go by their first name only during voir
2    dire?
3              MR. GARDNER:  That's fine.
4              THE JURY ADMINISTRATOR:  I'm sure we can accommodate
5    that.
6              MR. FLOOD:  I don't see that as a problem, Your
7    Honor.
8              THE COURT:  All right.  So you can give them the jury
9    questionnaires the Friday before, if they want them.
10             THE JURY ADMINISTRATOR:  Okay.
11             THE COURT:  Here's the deal.  They're not to be used
12   by anybody but trial counsel.  You're not to share them with
13   clients or with the FBI or anybody.  They're for your use and
14   your use only.  You will not make a copy, and you will
15   surrender them to the -- to Ms. Demings or to Ms. Wallace after
16   the jury is sworn in.
17             MR. FLOOD:  I understand, Your Honor.
18             THE JURY ADMINISTRATOR:  Your Honor?
19             THE COURT:  Yes, Ms. Wallace?
20             THE JURY ADMINISTRATOR:  Your Honor, just to make --
21             THE COURT:  Ms. Demings.
22             THE JURY ADMINISTRATOR:  Just to make sure everyone
23   is clear, on those jury information sheets, there is no
24   personal information on those sheets where jurors could be
25   contacted.  There is no home address listed.  A city is, and a

1    county, but no home address and -- or employers.

2              THE COURT:  Okay.  Good.

3              THE JURY ADMINISTRATOR:  Additionally, Your Honor,

4    you had mentioned that they would be available on Friday.  Our

5    courthouse is closed that Friday.  Would you like to make those

6    available on the Wednesday before -- the day before

7    Thanksgiving?

8              THE COURT:  Oh, that's right.  Yes.  Yes.  That would

9    be fine.

10             THE JURY ADMINISTRATOR:  We can do that.

11             MR. FLOOD:  Your Honor, I'm going to file a requested

12   jury questionnaire that might eliminate a lot of this

13   questioning that we might need to do in this case.  If I could

14   have a deadline for that?  Maybe --

15             THE COURT:  You mean to give to them?

16             MR. FLOOD:  To give to them, that might have more

17   information or that we think is relevant to this case that can

18   be answered prior to the voir dire process.  I've done it in

19   many cases, and I assume the Government may want to also have

20   some of those answers to those, I think, relevant questions in

21   this case.  How about if I just file a proposed one and see

22   what you think?

23             THE COURT:  Okay.  I'll think about it.  Get that to

24   me by Friday, this Friday.

25             MR. FLOOD:  This Friday?  Okay.

1        THE COURT:  Please.

2        THE JURY ADMINISTRATOR:  Your Honor, just a word

3   about questionnaires --

4        THE COURT:  Yes, Ms. Demings.

5        THE JURY ADMINISTRATOR:  -- that are mailed out.  We

6   need to give plenty of time for those jurors to return those.

7        THE COURT:  Yep.

8        THE JURY ADMINISTRATOR:  We have business reply

9   envelopes that we use in situations like that, and the Post

10  Office is notorious for holding up delivery on those.

11       THE COURT:  Well, we can but try.

12       THE JURY ADMINISTRATOR:  Yes, sir.

13       MR. FLOOD:  I'll get it to you by Friday, Your Honor.

14  And I think there was one last time.

15       MR. GARDNER:  I think there was.  I can't remember

16  if -- some of it was granted, some of it was denied.

17       (The law clerk confers with the Court off the

18       record.)

19       THE COURT:  All right.  Any questions about my

20  procedure for picking a jury?

21       MR. FLOOD:  No, Your Honor.

22       THE COURT:  All right.  Let's see.  It will be ten

23  and six on the -- or six and ten on the strikes.  Two

24  alternates?  That gives us three, because we can drop to

25  eleven.

1        MR. FLOOD:  That would be fine, Your Honor.

2        MR. GARDNER:  (Nods head.)

3        THE COURT:  Okay.  So, Ms. Demings, we'll shoot for

4   having fourteen people in the box.

5        MR. GARDNER:  And, Judge, I have one strike on the

6   alternate?

7        THE COURT:  That's right, one strike on the

8   alternates.

9        Okay?

10       I would like jury instructions, joint, to me the week

11  before.  If there is a question about whether -- what is

12  legitimate or not, give me that case with a pinpoint Fifth

13  Circuit case on your side.  And, as I say, that's due one week

14  before trial, Monday, November 23.

15       I assume y'all will have no trouble coming up with a

16  commingling instruction this time.

17       I assume everyone will use the courtroom equipment to

18  display the exhibits.  If you want a rehearsal or anything with

19  it, contact Ms. Wallace at 512-391-8711.

20       MR. GARDNER:  Judge, just to interject on that, what

21  we've done in the past -- and, obviously, we'll offer to

22  Mr. Flood -- is we have an IT and she's fairly fast out with

23  it, so you can use her to ask her to bring up whatever; that

24  way you don't have to worry about plugging in your own stuff.

25       MR. FLOOD:  I'll have my own IT person, too, that I

1    use in every trial, but --

2              MR. GARDNER:  We're offering her.

3              MR. FLOOD:  -- maybe they can coordinate.

4              MR. GARDNER:  Okay.

5              THE COURT:  It occurs to me now that I did not

6    introduce you-all to our court reporter.  Marie is sitting back

7    there.  Best court reporter in the country.  And if you want a

8    copy of this transcript, you can call her and get it.

9         The court reporter there for the trial will be, I

10   believe, Lily Reznik?

11             THE COURTROOM DEPUTY:  Yes, that is correct.

12             THE COURT:  The week before, please get to her any

13   unusual terms or names so she can load it into her computer.

14             THE COURTROOM DEPUTY:  She actually handled the first

15   trial -- that's the reason we're going to use her again for

16   this one -- so she's very familiar with all of the parties and

17   a lot of the evidence.

18             THE COURT:  Great.  Thank you.

19        Familiarize yourself with the local rule AT-5 about

20   courtroom decorum.

21        If you want to make an objection, please rise, be

22   recognized.  I'll ask you what the objection is.  You tell me

23   what the basis is, whether it's relevance or hearsay or

24   whatever -- or, as I one time learned from Racehorse Haynes,

25   bolstering -- and tell me what -- if I need an argument, I'll

1    ask for it.  Okay?

2            MR. FLOOD:  Okay.

3            THE COURT:  Okay.  Is there anything I can do to help

4    the Government, Mr. Gardner?

5            MR. GARDNER:  A couple things, Your Honor.  The

6    marshals -- not Mr. Sartin, but the special security

7    marshals have asked that --

8            THE COURT:  Just a second.  After we finish, I'm

9    going to go to each of them and ask them what I can do to help

10   them.

11           MR. GARDNER:  Okay.  That would probably be within

12   his purview.

13           THE COURT:  So anything I can do to help you?

14           MR. GARDNER:  Mr. Flood has asked me about witnesses,

15   and I haven't made a final decision yet.  I'm more than happy

16   to help Mr. Flood if he wants a witness that I may not want to

17   call, but I need him to either give me a subpoena -- through

18   you, obviously, if he wants to disclose that to me, whether

19   it's an in-custody witness or a non-in-custody witness.

20           For example, we had two or three that testified came from

21   Mexico voluntarily last time.  They're outside of my control.

22   The in-custody witnesses are obviously in my control.  So if I

23   wasn't planning on bringing one of those but Mr. Flood would

24   like them, I can assist him.  I just need to know asap.

25           And same thing with the last trial's witnesses.  I may or

1  may not call them all, but if you want to issue a subpoena to

2  the Court, disclose that to me, we'll be more than happy to

3  facilitate rather than having the marshals go find them.

4          MR. FLOOD:   Right.   We had a discussion about this,

5  Your Honor.

6          And I said, you know, "Doug, I need to know who it is

7  that you plan on calling as witnesses, because there may be

8  some of your witnesses that I need to have access to or would

9  like to call them."

10         He said, "Well, whoever those people are, just let me

11 know and I'll do whatever I can to help you."

12         THE COURT:   What's your problem with giving him a

13 witness list?

14         MR. GARDNER:   I can give him the roll, Judge, I just

15 may not call those folks.   I just don't know yet.   I mean,

16 we're still going through the transcripts and still looking at

17 it to try to streamline this trial from last time.

18         THE COURT:   We have a pretrial conference set for the

19 16th; is that correct?

20         MR. GARDNER:   I don't know if that was scheduled or

21 not.

22         THE COURT:   Is that right?

23         THE LAW CLERK:   I haven't heard that.

24         THE COURT:   Why do I think we had one set for the

25 16th?

1    MR. FLOOD:  No.

2    THE COURT:  Okay.  Forget it.  I must have dreamed

3 it.

4    THE LAW CLERK:  We can set one.

5    THE COURT:  Well, look, I'll tell everybody right

6 now, if we need to get together again, I'll go to Austin.  It's

7 a miserable drive, but I'll go to Austin.

8    MR. GARDNER:  Judge, he does have -- you know, I had

9 54 witnesses last time.

10    THE COURT:  How can you get this down to -- for

11 instance, if you need a writ of *habeas corpus ad testificandum*,

12 I need it soon.  The marshals just can't -- they've got budget

13 problems.  They've got all kinds of problems with those.  So I

14 need that as soon as you can possibly get it to me.

15    MR. FLOOD:  I understand.  And that's my concern.  If

16 the Government says, "Hey, look, here's my witness list, you

17 can rely on that, I can get these people here," then that's

18 great.  If it's, "Here's my witness list, but I may not call

19 all these people," then I guess I need to start subpoenaing

20 them myself.

21    THE COURT:  I guess you do.

22    MR. FLOOD:  Okay.

23    THE COURT:  Give him an honest list as fast as you

24 can, please.

25    MR. GARDNER:  I'll give you the 54 I called last

1    time.  You know, we'll call it that.  If there's any of those
2    you need -- you know, I may add, as we already talked, some
3    witnesses.  I may add or detract from that.  But look at the
4    54.  If you need any of those --
5              MR. FLOOD:  Let you know.  I mean, if you say, "Well,
6    I wasn't planning on calling that person, so you need to do
7    it"?
8              MR. GARDNER:  Right.
9              MR. FLOOD:  Okay.  That's fair enough.
10         So maybe -- I know you just mentioned maybe a pretrial
11   conference on the 16th, Your Honor.  My motion in limine that I
12   said I wanted to file on the 404(b) notice, I guess we just
13   need a defense motion date or Government's motion date -- well,
14   final motions.
15             THE COURT:  How about all motions must be filed by
16   the 9th?
17             MR. FLOOD:  We can do that, Your Honor.
18             MR. GARDNER:  Judge, the other thing I have pending
19   is a -- and I don't know if you combine these two, but we have
20   the business records affidavit on the business records
21   custodians and we also have the request for stipulation on the
22   search warrant evidence from the seizing agents as well as the
23   jail calls from the two jails.
24             MR. FLOOD:  And here's my issue on that.  It's not a
25   big issue.  I have no problem stipulating to a number of

    1    these -- a lot of this evidence that was seized pursuant to a
    2    search warrant.
    3             THE COURT:  Yeah.
    4             MR. FLOOD:  But I'm trying to identify them.  Some of
    5    them I have a hard time identifying what they are.  I just have
    6    an address that I'm not -- I wasn't involved in the first
    7    trial, so I don't know what that address is necessarily.
    8         And then the last part of the stipulation was stipulating
    9    to the phone calls that had been intercepted from the Bastrop
   10    County jail and the federal correctional institution in Terre
   11    Haute, Indiana.  I don't have all those calls, so I have a hard
   12    time stipulating that they were all obtained properly until I
   13    have all of those calls.  I believe I received most of them.
   14             THE COURT:  How can it possibly be improper?
   15             MR. GARDNER:  You have them all.
   16             MR. FLOOD:  You mean how could they have not all been
   17    taken by -- you know, until I hear them all, Judge, I don't
   18    know if there's additions or deletions.  I mean --
   19             THE COURT:  Okay.
   20             MR. FLOOD:  I agree with you, Your Honor, I just -- I
   21    have a job to do for my client and --
   22             THE COURT:  I understand.  Well, all I can say is do
   23    your best.
   24             MR. GARDNER:  Do you think you -- because here's the
   25    problem last time.  It wasn't your client's previous attorney,

1    it was another defense attorney.  We brought in 13 custodian
2    witnesses, you know, and -- and I know you're not concerned
3    about the Government's expenses that great, but -- and almost
4    at the end, the last one, decided to stipulate.  So I can bring
5    in all 13 FBI agents to say, "I picked up a bunch of papers and
6    shoved them in a box" --
7               MR. FLOOD:  No.  No.  No.  Doug, you didn't hear what
8    I said.  I don't think I have any problem with the stipulation,
9    except for the last part about the phone calls.
10              MR. GARDNER:  Okay.
11              MR. FLOOD:  And I'm pretty confident I'm going to be
12   able to stipulate that these calls were all recorded properly,
13   I just need to listen to the calls.
14              MR. GARDNER:  I'm fine with that, if you could just
15   confirm with me.  Because to me, the jail calls, I mean, I can
16   run out to Bastrop and get the lady out at Bastrop.  That's no
17   problem.  I'm more concerned about the FBI agents who showed --
18              THE COURT:  But you're going to have no -- I gather
19   you have no problem with that?
20              MR. FLOOD:  I have no problem with that, and I'm just
21   trying to make sure that I've identified when it says "Dallas,
22   Texas, SW."  I've asked my staff, you know, what search was
23   that, and we think that's Jose Trevino's house.
24              MR. GARDNER:  Yeah.  I can tell you all that stuff,
25   if you want.  I mean, I'm more than willing to work with you on

1    that to make you comfortable.

2              MR. FLOOD:  Good.  Good.  That's all I needed.

3              MR. GARDNER:  If you'll just give me -- again, I'm

4    more concerned about that stuff -- because the agents are

5    everywhere -- than I am about the jail calls.

6              MR. FLOOD:  Don't worry about the agents.  Don't

7    worry about the agents executing the search warrants.

8              THE COURT:  Okay.  Anything else?

9              MR. FLOOD:  I don't want to try this case any longer

10   than you do.  I mean, it is between Thanksgiving and Christmas.

11             MR. GARDNER:  Judge, as Mr. Flood said earlier, I

12   don't think it's the lawyers that you've heard in the way of

13   the settlement here.  And I know you don't want to get involved

14   in that.  But I ask the Court, given Mr. Colorado's, I'm going

15   to call them shenanigans, pursuant to *Missouri v. Frye*, to

16   inquire as to whether or not the defense attorney -- and I'm

17   not saying he hasn't, but I just think we need to make sure the

18   defense attorney has explained the two offers ago provided in

19   all of this.

20             THE COURT:  Okay.  Is there any doubt you've done it?

21   Have you done it?

22             MR. FLOOD:  Well, you know, Your Honor --

23             MR. GARDNER:  For protection.

24             MR. FLOOD:  -- I don't mind telling you.  I had a

25   meeting with Mr. Gardner last week.  Somebody was on vacation

1    who normally translates for me.  Okay?  I didn't anticipate

2    getting an offer.  I walked in on another matter, and he handed

3    me an offer and said, "This expires --" two days or whatever it

4    was.

5         I went back by the Bastrop County jail to talk to him

6    about it.  The translator I used then was less than ideal and

7    certainly not the person that we've established a rapport with.

8    So I was somewhat concerned that he didn't quite understand

9    everything I was telling him.

10        And I remember leaving and thinking, hey, you know, this

11   offer is going to expire, I'm not sure he understood everything

12   I just told him.  So we plan on going back tomorrow --

13             THE COURT:  Is the offer still on the table?

14             MR. GARDNER:  I am not in a position to say I'm done

15   negotiating, Judge.  I'm not there yet.

16             THE COURT:  Oh, okay.

17             MR. GARDNER:  I know that's a fancy way of saying

18   yes, but that's where I'm at.

19             THE COURT:  Okay.

20             MR. FLOOD:  And I'm glad to hear that, because he is

21   being truthful when he says we're working hard to try to get to

22   something that everybody can live with.  I think the mandate

23   coming back on the second case helps us, believe it or not.  I

24   think it kind of puts all options on the table.

25             THE COURT:  Well, I wanted a quick resolution; I

1   didn't care particularly which way it was done, but a quick

2   resolution, because then everybody knows where they stand.

3   Okay, and that's done.

4        Anything else?

5             MR. GARDNER:  I'm sorry, judge.  I've got a little

6   bit of a longer list.

7        Asset forfeiture, I know the Court's seen my brief,

8   just -- and I don't -- we talked with Mr. Flood.  I think he

9   doesn't have to do anything today to apprise the Court of the

10  fact, he just needs to make election prior to the jury being

11  sent into --

12            MR. FLOOD:  On the forfeiture, yes, sir.

13            MR. GARDNER:  -- deliberation.

14            THE COURT:  It's always been left to me.

15            MR. FLOOD:  Right.  And I've only tried one case

16  where we went to the jury on the forfeiture, and I was telling

17  Mr. Gardner about it.  The jury convicted him and then gave him

18  all his property back.  That's why I'm always hesitant to just

19  say, "No.  No.  No.  We'll waive it."

20       But in this case, it's a little odd, Your Honor, because

21  they're also asking for a money judgment.  So even assuming --

22            THE COURT:  Okay.

23            MR. FLOOD:  -- that the jury gave it back, I think

24  you would probably say, "Well, now, wait a minute."  So that --

25            THE COURT:  It's a call.

1    MR. FLOOD:  It's my call, and I'll talk to my client
2  about it.  I'll explain all of this to him.  I haven't gone to
3  see him since we received that trial brief.  But we'll have an
4  answer to the Court by the pretrial conference for sure.
5    MR. GARDNER:  Two other minor things, Judge.  I
6  didn't know if the Court was considering the schedule of the
7  bribery case at this point?
8    THE COURT:  I'm not.
9    MR. GARDNER:  Okay.  And then --
10   THE COURT:  We've got 90 days, which puts us where?
11 You told me.
12   THE LAW CLERK:  70 days from mandate, which was two
13 weeks ago?
14   THE COURT:  No.  Just last week.
15   MS. FERNALD:  Last week.
16   MR. FLOOD:  Yeah.
17   THE LAW CLERK:  That puts us the beginning of
18 January.
19   MR. FLOOD:  And is it 90 or 180?  I thought last time
20 we decided it was 180 days.
21   THE LAW CLERK:  It's 70 from the mandate, but it can
22 be extended upward to a ceiling of 180.
23   MR. FLOOD:  Okay.  All right.
24   MR. GARDNER:  I think that's what we did.
25   THE COURT:  That's what we did.

1      MR. GARDNER:  And then, Judge, I don't think I

2  need -- Mr. Flood had promised me reciprocal discovery.  He

3  said he's working on that.

4      MR. FLOOD:  Right.

5      MR. GARDNER:  So that's the last thing on my agenda,

6  so . . ..

7      MR. FLOOD:  And I'll certainly have that.  You want a

8  pretrial motion done by the 9th?  I'll have that by the 9th.

9      MR. GARDNER:  And whether or not -- I haven't looked

10  at them, Judge.  Whether or not we'll contest their

11  authenticity or not, I just don't know at this point.

12      THE COURT:  You'll have that by the 9th?

13      MR. FLOOD:  I'm trying to get it certified.  I'll let

14  you know if I run into problems on that.

15      THE COURT:  All right.

16      MR. FLOOD:  Some of them are foreign records, and you

17  have to get a certification and all that, you know.

18      THE COURT:  Anything else?

19      MS. FERNALD:  I think that's it.

20      MR. GARDNER:  Yes, sir, that's it.

21      THE COURT:  Okay.  Anything I can do to help the

22  defense?

23      MR. FLOOD:  If I may have one minute?

24      One thing that -- we have received some of the *Jencks*

25  material on, I think, Hinojosa --

1          MR. GARDNER:  And Barrera.

2          MR. FLOOD:  And Barrera.  And thank God we did,

3    because I think in Hinojosa's case there was --

4          MR. GARDNER:  60-some discs.

5          MR. FLOOD:  Of *Jencks* material.  The Government has

6    agreed to give us *Jencks* material, I think, the Friday before

7    trial.

8          MR. GARDNER:  I'll do that.  I'll start getting that

9    out to you as soon as I can.  It's just there's a lot of it,

10   and I'll get it to you as I get to it.  So anything you get

11   Friday before trial would be minimal.

12       It should be, Judge.

13         MR. FLOOD:  Okay.

14         THE COURT:  That's very nice.

15         MR. FLOOD:  That is very nice.

16         MR. GARDNER:  It's all from the first trial, so it's

17   not a secret.

18         THE COURT:  Next?  Anything else I can do for you?

19         MR. FLOOD:  Not that I can think of.  No, Your Honor.

20   I think we're good.

21         THE COURT:  All right.  Now, let's see.  Mr. Sartin,

22   tell me what I can do to help the marshals.

23         THE DEPUTY MARSHAL:  Personally or professionally?

24         THE COURT:  Either way.

25         THE DEPUTY MARSHAL:  A few things, Judge.

1    I want to make sure and let Mr. Flood know.  Mr. Cessa is
2   currently in Bastrop County.  Now, when we get to trial time,
3   we're planning to move him to Travis County, which is downtown.
4   Because if we leave him in Bastrop, that's an hour drive every
5   day.  For manpower-wise, we're going to try to move him
6   downtown to Travis County, which is three blocks away.
7             MR. FLOOD:  Is there still a --
8             THE DEPUTY MARSHAL:  (Indiscernible.)
9             MR. FLOOD:  Go ahead.  I apologize.  I interrupted
10  you.
11            THE DEPUTY MARSHAL:  That's the way we did last --
12  for the last trial just because of manpower and it's easier to
13  go three blocks than, you know, 45 miles every day.  So I'll
14  work with Mr. Flood on making sure that when we move him, he
15  knows, and for visitation and everything.
16            THE COURT:  All right.  Anything else?
17            THE DEPUTY MARSHAL:  Yes, sir.  The -- we're going
18  to -- we have to -- with the trial, with some of our inspectors
19  are here, we need a plan with headquarters as far as budgeting
20  and hours; so we're going to plan on longer hours and working
21  Saturday.  We can always draw back, but just trying to put that
22  out so everybody knows what -- we're going to plan for that and
23  we'll adjust as we get to trial time.
24            THE COURT:  I think that's safe.  I'm going to ask
25  the jury to please let us do a complete day and go on Saturday

1    also.  But if they don't want to do it, we're not going to do

2    it.

3              THE DEPUTY MARSHAL:  No.  That's fine.  We'll plan on

4    it for -- for courthouse opening and personnel and everything,

5    we'll plan on it, and then we can -- it's easy -- always easier

6    for us to draw back a little bit.

7         And then just -- are we having another pretrial

8    conference?  I didn't quite hear.  Is there a date set, or are

9    we --

10             THE COURT:  I will try -- are we going to need one?

11             MR. FLOOD:  I think we will, Your Honor.  If we can

12   do it on the 16th?  I mean, I don't know --

13             THE COURT:  We can do it on the 16th by phone.  Okay?

14   We've now all seen each other.

15             MR. FLOOD:  Okay.

16             THE COURT:  Okay.  If needed, you tell me and I'll --

17   I may be taking my grandson to Washington, but I'll have a

18   phone.  Okay?

19             MR. GARDNER:  Sure.

20             THE COURT:  All right.  Anything else?  Marshal,

21   anything else?

22             THE DEPUTY MARSHAL:  I'm sorry.  Did -- are they -- I

23   didn't hear what Mr. Gardner said.  Are we -- the bribery case,

24   is it going back to back, or are we doing it later on?

25             THE COURT:  We're doing it later on.  I haven't set

1    it yet.

2          THE DEPUTY MARSHAL:  Okay.  Perfect.

3       And then we'll call Chambers offline about some other

4    security needs, but we'll contact Marshall Perkins and talk to

5    you about that at a later date.

6          THE COURT:  All right, sir.  Anything else?

7          MR. GARDNER:  Can I interject?

8       Mr. Sartin, did you cover or are you going to cover with

9    chambers later on what Robert Aguilar's concerns are with

10   witness security?

11         THE DEPUTY MARSHAL:  Yes.  Inspector Aguilar is here,

12   but it's something we want to call the chambers direct and talk

13   to him direct.

14         MR. GARDNER:  Okay.

15         THE COURT:  Okay.  Let's see if I can anticipate a

16   little bit.  What I have tried to do is if they have something

17   other than orange suits, I'd like for them to have them on; but

18   if they don't, then that's fine.  You can't hide the fact from

19   the jury that they're in custody.

20      I would like to limit it to leg irons, but in all this, I

21   am -- you guys, the marshals, are the experts on security, I'm

22   not, so you can talk me out of it if it's that important.  But,

23   essentially, what I'd like to do is just leg irons.

24         THE DEPUTY MARSHAL:  That's fine, Judge.  And what

25   we'll do is, we'll plan on that.  And it's a case by case.  If

```
 1    we're having some issues we need to report to you, we'll come
 2    in chambers and talk to you and address it there.
 3              THE COURT:  Sounds good.
 4              THE DEPUTY MARSHAL:  And then, like I said, the other
 5    one is just we've got a couple high profile; we'll call you
 6    offline to discuss some issues with them.
 7              THE COURT:  All right.  All right.  Thank you.
 8          Ms. Wallace, what can I do to help you?
 9              THE COURTROOM DEPUTY CLERK:  I'm good, Your Honor.
10              THE COURT:  Okay.  Ms. Demings, what can I do to help
11    you?
12              THE JURY ADMINISTRATOR:  Just to clarify, in
13    anticipation of how long this trial will last, approximately
14    two weeks?
15              THE COURT:  If they say two weeks, we'll be finished
16    in six days.
17              THE JURY ADMINISTRATOR:  Awesome.
18              MR. FLOOD:  That's a shot across my bow right there.
19              THE JURY ADMINISTRATOR:  Oh.  Your Honor?
20              THE COURT:  Yes?
21              THE JURY ADMINISTRATOR:  One quick question about
22    your -- about what you expect jurors' attire to be in the
23    courtroom.  Do you prefer men to wear jackets?
24              THE COURT:  Are you talking about jurors?
25              THE JURY ADMINISTRATOR:  Is that something you
```

1  require?

2          THE COURT:  We've given up on that in the Western

3  District of Louisiana, but . . . .

4          THE JURY ADMINISTRATOR:  Okay.

5          MR. GARDNER:  Awesome.  Even better, Judge.

6          THE COURT:  I wish so, but, you know, it got to be

7  ridiculous that -- no tank tops.  No shoeless.  They have to be

8  neatly dressed, but that's all I ask.

9          THE JURY ADMINISTRATOR:  Very good.  That will work

10  for us.

11          MR. FLOOD:  It will be November, so . . . .

12          THE COURT:  Yeah.  So they may have a sweater or a

13  jacket.

14      All right.  Anything else from you in Austin that we

15  should address?

16          THE COURTROOM DEPUTY:  I think we're good, Your

17  Honor.

18          THE COURT:  Thank you very much for accommodating me

19  on this, and feel free to call me if something arises.

20          THE COURTROOM DEPUTY:  Yes, sir.

21          THE COURT:  Thank you.

22          THE COURTROOM DEPUTY:  Thank you.

23          THE COURT:  How about the rest of you?

24          MR. FLOOD:  Fine, Your Honor.

25          MR. GARDNER:  Good, Judge.

```
1              MS. FERNALD:  Good.
2              THE COURT:  All right.  Are y'all going to be here
3    past noon?
4              MR. FLOOD:  I think so.  Yes, Your Honor.
5              THE COURT:  Giuseppe's, Wine Country, Bella Fresca.
6              MR. FLOOD:  Thank you.
7              MS. FERNALD:  Thank you for the suggestions.
8              THE COURT:  Okay?
9              MR. GARDNER:  I think we're on the same flight.
10       1:40-something?
11             MR. FLOOD:  Yeah.
12             MR. GARDNER:  Yep.  We came up together.
13             THE COURT:  Well, Line Avenue is -- you go up to
14   First Methodist Church, turn left.  It's called Common Street
15   there, but it comes becomes Line.  And all three of the
16   restaurants that I just named are on Line Avenue.
17             MR. FLOOD:  Maybe we try the case here.
18             THE COURT:  You want to?
19             MR. FLOOD:  Would love to.
20             THE COURT:  You want to?
21             MR. GARDNER:  No, sir.
22             THE COURT:  Oh, okay.
23             THE DEPUTY MARSHAL:  Your Honor?
24             THE COURT:  Yes?
25             THE DEPUTY MARSHAL:  If you're available when we're
```

```
 1    done with this conference, if we could call your chambers with
 2    the inspectors that are here?  We could call you in 10 or 15
 3    minutes and address issues?
 4              THE COURT:  Sure.
 5              THE LAW CLERK:  I'll be available.
 6              THE DEPUTY MARSHAL:  We'll call you shortly.  Thank
 7    you.
 8              MR. FLOOD:  Your Honor, December 9, can we have that
 9    day off?
10              THE COURT:  December 9?
11              MR. FLOOD:  And if you say no, I understand.
12              THE COURT:  Why?  If you've got a good reason.  I
13    don't think we'll be there.
14              MR. FLOOD:  I need to be able to tell my wife that I
15    asked for December 9 off.
16              MS. FERNALD:  Is that your anniversary?
17              MR. FLOOD:  Twentieth wedding anniversary.
18              MS. FERNALD:  Wow.
19              THE COURT:  A short-timer.
20              MR. FLOOD:  I'll make promises to treat her to
21    something nice later.
22              THE COURT:  Well, we maybe can leave late -- leave
23    early and you can at least take her out.  But let's see.
24              MS. FERNALD:  Leave by 6:00.
25              THE COURT:  We'll be finished by the 9th.
```

1          MR. GARDNER:  Plus it's Austin.

2          MR. FLOOD:  We'll be finished by the 9th?

3          MS. FERNALD:  I have faith in him.

4          THE COURT:  Okay.  Off the record now, Marie.

5       (Proceedings concluded at 10:52 a.m.)

6

7                         Certificate

8    I hereby certify this 22nd day of October, 2015, that the
     foregoing is, to the best of my ability and understanding, a
9    true and correct transcript from the record of proceedings in
     the above-entitled matter.
10

11                         /s/ Marie M. Runyon
                           Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25