```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UNITED STATES OF AMERICA  ) Docket No. A 12-CR-210(6) DEW
                               )
 4   vs.                       ) Austin, Texas
                               )
 5   FRANCISCO ANTONIO         )
     COLORADO-CESSA            ) December 1, 2015
 6
                     TRANSCRIPT OF TRIAL ON THE MERITS
 7              BEFORE THE HONORABLE DONALD E. WALTER
                         Volume 2 of 9
 8   APPEARANCES:

 9   For the United States:    Mr. Douglas W. Gardner
                               Ms. Michelle E. Fernald
10                             Assistant U.S. Attorneys
                               816 Congress Avenue, Suite 1000
11                             Austin, Texas 78701

12   For the Defendant:        Mr. Charles Flood
                               Mr. Chris Flood
13                             Flood & Flood
                               914 Preston at Main, Suite 800
14                             Dallas, Texas 77002

15                             Mr. John D. Cline
                               Law Office of John D. Cline
16                             235 Montgomery Street, Suite 1070
                               San Francisco, California 94104
17
                               Mr. David Isaak
18                             Smyser, Kaplan & Veselka
                               700 Louisiana Street, Suite 2300
19                             Houston, Texas 77002

20   Interpreters:             Mr. Peter Heide
                               Ms. Cristina Helmerichs
21                             Ms. Maurine McLean
                               Mr. Steven Mines
22
     Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
23                             501 West 5th Street, Suite 4153
                               Austin, Texas 78701
24                             (512)391-8792

25   Proceedings reported by computerized stenography, transcript
     produced by computer.
```

1                           **I N D E X**

2                          <u>Direct</u>     <u>Cross</u>      <u>Redirect</u>   <u>Recross</u>
  <u>Witnesses:</u>

3

4    Mario Alfonso Cuellar    8           41          65

5    Hector Moreno            75          91          98          99

6    Raul Guadalajara-Guia    101         112

7    Jose C. Hinojosa         114         162

8

9                                                                <u>Page</u>

10   Proceedings Adjourned                                        182

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         E X H I B I T S

2                                          Offered    Admitted
     Government's
3

4    #210                                     85          85

5    #250N                                    17          17

6    #250S                                   121         121

7    #250T                                   103         103

8    #250U                                    15          15

9    #250Z                                    84          84

10   #341 through 343                        143         143

11   #420                                    159         160

12   #421                                    162         162

13

14   Defendant's

15   #26                                     164         164

16   #28                                     179         179

17

18

19

20

21

22

23

24

25
```

08:52:46  1          THE COURT:  Good morning.  Be seated, please.  We're a

08:58:39  2   juror short driving in from Llano, Lampasas; is that right?  So

08:58:45  3   let's use this opportunity to go through and do the introduction

08:58:49  4   of the exhibits to which there are no objections.  Okay?

08:58:55  5          MS. FERNALD:  Good morning, your Honor.

08:58:56  6          Michelle Fernald.

08:58:57  7          THE COURT:  Good morning.

08:58:58  8          MS. FERNALD:  Your Honor, first, I'd like to go through

08:59:00  9   the business record affidavits with the custodians that I filed a

08:59:03  10  notice on and move to admit those.  We don't have, actually, the

08:59:06  11  physical evidence in the courtroom, but at the next break, we'll

08:59:10  12  bring them in.  These are the ones that are agreed upon between

08:59:14  13  the government and defend counsel.

08:59:16  14         THE COURT:  I assume there will no objections; is that

08:59:18  15  correct, Mr. Flood?

08:59:19  16         MR. CLINE:  Sorry, your Honor.  John Cline.

08:59:23  17         The overwhelming majority of the exhibits that Ms.

08:59:26  18  Fernald is going to be talking about, we have no objections.

08:59:29  19         THE COURT:  Right.

08:59:33  20         MR. CLINE:  We've talked about it.  We've agreed that

08:59:35  21  they can come in, subject to being stricken later, if that's --

08:59:37  22         THE COURT:  Oh, okay.  Well, then, we'll be able to do

08:59:41  23  it in a single motion, right?

08:59:43  24         MR. CLINE:  I beg your pardon?

08:59:45  25         MS. FERNALD:  Yes, your Honor.  Do you want me to read

08:59:47  1    in the exhibit numbers or would you like --

08:59:48  2              THE COURT:  Why?  Why don't you just -- do you have a

08:59:51  3    list?

08:59:51  4              MS. FERNALD:  I do, sir.

08:59:52  5              THE COURT:  Move its admission.

08:59:53  6              MS. FERNALD:  Your Honor, the government's notice for

08:59:55  7    the introduction of business records that were filed yesterday,

08:59:58  8    which would have been November the 30th.  I'm sorry, I don't have

09:00:02  9    the docket -- document 945, the government moves to admit those

09:00:07  10   business records as described in the notice.

09:00:10  11             THE COURT:  And they are received in evidence without

09:00:14  12   objection, subject to a motion to strike later if it becomes

09:00:20  13   necessary; is that correct?

09:00:22  14             MR. CLINE:  That's correct, your Honor.

09:00:23  15             THE COURT:  Okay.  That's it?

09:00:24  16             MS. FERNALD:  No.  I've got one more list.

09:00:27  17             THE COURT:  Okay.  Sure.

09:00:38  18             MS. FERNALD:  Your Honor, there was a notice to

09:00:40  19   pre-admit evidence, which was document 9 -- the government's --

09:00:48  20   what was the --

09:00:50  21             MS. WALLACE:  Let me look.

09:00:52  22             MS. FERNALD:  Thank you, Katherine.

09:01:00  23             MS. WALLACE:  915, the notice and request to pre-admit

09:01:05  24   evidence is document 915.

09:01:08  25             MS. FERNALD:  So document 915 was the government's

| | | |
|---|---|---|
| 09:01:09 | 1 | motion to pre-admit evidence.  Subsequent to the filing of that |
| 09:01:14 | 2 | motion, the defense has filed an agreed-upon motion in document |
| 09:01:20 | 3 | 933 in this court, and has agreed to some of the exhibits be |
| 09:01:25 | 4 | pre-admitted. |
| 09:01:29 | 5 | THE COURT:  Without objection? |
| 09:01:31 | 6 | MR. CLINE:  Again -- |
| 09:01:32 | 7 | THE COURT:  Again. |
| 09:01:33 | 8 | MR. CLINE:  -- the overwhelming majority of them, we |
| 09:01:35 | 9 | will never have any objection to.  There are a handful -- |
| 09:01:39 | 10 | THE COURT:  That you might well file a motion to |
| 09:01:41 | 11 | strike. |
| 09:01:41 | 12 | MR. CLINE:  We'll file a motion to strike if it becomes |
| 09:01:44 | 13 | necessary. |
| 09:01:44 | 14 | THE COURT:  All right.  Subject to that, they are all |
| 09:01:47 | 15 | received in evidence. |
| 09:01:47 | 16 | MS. FERNALD:  Now, that was too easy. |
| 09:01:52 | 17 | THE COURT:  That was too easy?  Well. |
| 09:01:54 | 18 | MS. FERNALD:  Thank you.  Thank you so much.  I |
| 09:01:58 | 19 | appreciate the cooperation. |
| 09:01:59 | 20 | THE COURT:  Anything else? |
| 09:01:59 | 21 | MS. FERNALD:  No, sir. |
| 09:02:01 | 22 | THE COURT:  All right. |
| 09:03:19 | 23 | We have the jurors present on the record.  I am |
| 09:03:27 | 24 | contemplating when the jury comes in saying to them, I remind you |
| 09:03:36 | 25 | that I have instructed you not to read, watch, or listen to |

09:03:39  1  anything.  I assume all of you have complied with that

09:03:44  2  instruction.  Is that correct?

09:03:47  3          MR. CHRIS FLOOD:  Sorry, your Honor, I didn't hear you.

09:03:49  4  I apologize.

09:03:50  5          THE COURT:  That's okay.  I'm thinking of when the jury

09:03:51  6  comes in saying to them, you will remember I've instructed you

09:03:57  7  yesterday that you were not to watch, listen to, or read

09:04:03  8  anything.  I assume all of you have complied with that

09:04:05  9  instruction.  Is that correct?

09:04:07  10         MR. GARDNER:  That's fine, your Honor.

09:04:08  11         MR. CHRIS FLOOD:  That's fine, your Honor.

09:04:09  12         THE COURT:  Is that a problem?  Okay.  All right.

09:04:11  13  Bring them in, please.  And we're ready for -- tell the marshals

09:04:15  14  we're ready for them.

09:04:19  15         (Jury present.)

09:06:40  16         THE COURT:  Good morning, ladies and gentlemen.

09:06:41  17  Appreciate your being so prompt, especially the two of you that

09:06:44  18  have so far to drive.  You know the government will put you up if

09:06:49  19  you want to.  But I can understand wanting to go home.

09:06:53  20         Okay.  You will remember yesterday, I instructed you

09:06:55  21  all to -- not to read, watch, or listen to any news.  I assume

09:07:01  22  that you have all obeyed, right?  Okay.  I will ask you that each

09:07:06  23  morning.  It's something the Fifth Circuit wants me to do.  All

09:07:09  24  right.

09:07:11  25         Mr. Cuellar, you understand you're still under oath?

| | | |
|---|---|---|
| 09:07:15 | 1 | THE WITNESS:  Yes, sir. |
| 09:07:16 | 2 | THE COURT:  We left off yesterday with:  And the |
| 09:07:25 | 3 | transportation cost that you have to pay when you're talking |
| 09:07:28 | 4 | about the bribes to police and workers and all, all that stuff, |
| 09:07:33 | 5 | that packages into the cost price you say in -- |
| 09:07:38 | 6 | MR. GARDNER:  Yes, sir. |
| 09:07:38 | 7 | THE COURT:  All right.  Go ahead. |
| 09:07:39 | 8 | MR. GARDNER:  Thank you, your Honor. |
| 09:07:41 | 9 | MARIO ALFONSO CUELLAR, called by the Government, duly sworn. |
| 09:07:41 | 10 | DIRECT EXAMINATION (Resumed) |
| 09:07:41 | 11 | BY MR. GARDNER: |
| 09:07:42 | 12 | Q.   Good morning, Mr. Cuellar. |
| 09:07:43 | 13 | A.   Good morning, sir. |
| 09:07:44 | 14 | Q.   When you get the money back, how much money would you |
| 09:07:59 | 15 | receive on a monthly basis? |
| 09:08:00 | 16 | A.   I don't understand the question. |
| 09:08:02 | 17 | Q.   You sent the cocaine north to the United States and you get |
| 09:08:07 | 18 | money back from the sale of that cocaine, correct? |
| 09:08:14 | 19 | A.   Yes, sir.  Uh-huh. |
| 09:08:16 | 20 | Q.   And how much would you get back per month?  How much money? |
| 09:08:34 | 21 | A.   It would depend on the amounts.  If it was 2 million a |
| 09:08:38 | 22 | month, I will get three percent.  If it was 20 million a month, |
| 09:08:41 | 23 | it will be three percent.  It would depend partially on the cost |
| 09:08:45 | 24 | of transporting the money back to Mexico. |
| 09:08:48 | 25 | Q.   And money that you had to turn into the organization, would |

09:08:52   1   you clean that money beforehand?

09:08:58   2   A.   Yes, sir.

09:08:58   3   Q.   And how would you do that?

09:09:10   4   A.   Pulling out the ones, the fives, the tens, the ones that are

09:09:14   5   torn, the ones that have been written on, and the ones that are

09:09:17   6   fake.

09:09:17   7   Q.   Okay.  Why would you do that?

09:09:29   8   A.   Because in Columbia, they wouldn't take lower denomination

09:09:34   9   bills, they wouldn't take them if they were written on or ripped.

09:09:39   10   Q.   What would you do with the ones that are written on or

09:09:43   11   ripped?  What do you do with them?

09:09:54   12   A.   That was the money we used to pay the people that crossed

09:09:56   13   the drugs or crossed the river with the drugs.

09:09:59   14   Q.   Sort of their salary, if you will?

09:10:12   15   A.   I paid them 300 per kilo of cocaine and 50 per kilo for

09:10:17   16   marihuana.

09:10:17   17   Q.   And so that clean money, the 20s, the 50s, the 100s, what

09:10:22   18   would you do with that?

09:10:32   19   A.   We would give it -- deliver it to the accountants for Miguel

09:10:37   20   and Omar, for "40," "42."

09:10:39   21   Q.   Would you do that personally, or would you have a worker do

09:10:41   22   that for you?

09:10:51   23   A.   In the beginning, I did it and then, afterwards, Hector and

09:10:55   24   two other -- two or three other people of mine did it.

09:10:58   25   Q.   And Hector is Hector Moreno?

09:11:01   1   A.   Yes, sir.

09:11:01   2   Q.   And what was his role?

09:11:07   3   A.   Was my partner and my right-hand man.

09:11:11   4   Q.   And the jury's already heard from Jose Vasquez, Sr., but

09:11:15   5   what was -- or Jr., rather.  What was his role?

09:11:27   6   A.   Who?  Hector?

09:11:28   7   Q.   No.  I'm sorry.  Jose Vasquez, Jr.?

09:11:38   8   A.   Oh, he was the one that bought the large amounts of cocaine

09:11:41   9   in Dallas.

09:11:42  10   Q.   And was he also a member of the Zeta organization?

09:11:50  11   A.   He would buy -- I guess you could say yes because he bought

09:11:56  12   Zeta cocaine.

09:11:56  13   Q.   Would you characterize him, based on that answer, more as a

09:11:59  14   customer than a member?

09:12:09  15   A.   Yes.

09:12:10  16   Q.   And one thing I forgot to ask you when you first got on the

09:12:13  17   stand.  Do you have a nickname?

09:12:21  18   A.   Yes, sir.

09:12:22  19   Q.   And what is it?

09:12:24  20   A.   Poncho.

09:12:25  21   Q.   Is that P-O-N-C-H-O?

09:12:29  22   A.   Yes, sir.

09:12:29  23   Q.   Is that short for Alfonso?

09:12:32  24   A.   Yes, sir.

09:12:32  25   Q.   So going back to the money, when you would take the money,

09:12:37  1   the clean money, where would you physically take it?

09:12:51  2   A.   To "40" and "42's" accountants, to Miguel or Omar's

09:12:59  3   accountant.

09:12:59  4   Q.   Do you remember his name?

09:13:00  5   A.   One of them, yes, "Cuno."

09:13:02  6   Q.   "Cuno"?

09:13:03  7   A.   Yes, sir.

09:13:04  8   Q.   And when you delivered the money, did you deliver or did you

09:13:08  9   see any other amounts to the location where you delivered the

09:13:12  10  money that you owed to the Zetas?

09:13:22  11  A.   Yes, sir.

09:13:23  12  Q.   And how much was that?

09:13:29  13  A.   Twenty, 30, 40, $50 million.

09:13:32  14  Q.   And was that on just one occasion or a couple of occasions?

09:13:39  15  A.   Four or five times.

09:13:41  16  Q.   So every time you would deliver your share or your due, if

09:13:45  17  you will, you received additional amounts of currency at "Cuno's"

09:13:52  18  location?

09:14:02  19  A.   Always.

09:14:02  20  Q.   How did you keep track of the money that you owed and the

09:14:07  21  money you got to keep?

09:14:32  22  A.   As per "42," Omar Trevino's orders, I was given 500 kilos

09:14:43  23  and that would be noted by the accountant, then as it crossed

09:14:47  24  over, I would be sending the money back to the accountant.  He

09:14:50  25  would do the accounting, be taking -- maintaining a record of it.

| | | |
|---|---|---|
| 09:14:56 | 1 | And Hector also did all the accounting and maintained records of |
| 09:15:01 | 2 | it. |
| 09:15:01 | 3 | Q.   So when you say the accountant took -- "40," "42's" |
| 09:15:05 | 4 | accountant kept a record of it, have you seen that record that he |
| 09:15:08 | 5 | was keeping? |
| 09:15:17 | 6 | A.   Many times, I saw how he kept it. |
| 09:15:19 | 7 | Q.   And how would he make an entry, say, for example, "42" gave |
| 09:15:27 | 8 | Poncho 500 keys?  How would that entry be made? |
| 09:15:44 | 9 | A.   He had a ledger for each person and besides that, he had his |
| 09:15:47 | 10 | laptop, and he kept an accounting of all of that in his laptop. |
| 09:15:52 | 11 | Q.   And did you see what names he would use beside each account |
| 09:15:57 | 12 | or beside each customer or you?  Did he use your name? |
| 09:16:30 | 13 | A.   Yeah.  My name would be at the top, it says on X date, I |
| 09:16:34 | 14 | delivered 500 kilos to Poncho Cuellar.  He has paid me $8 |
| 09:16:39 | 15 | million.  He has spent money on warehouses, crossing it over, |
| 09:16:44 | 16 | taking it up, bringing it back, and all of that is deducted from |
| 09:16:48 | 17 | the money that's owed. |
| 09:16:49 | 18 | Q.   And so, when the money came back, do you know how it was |
| 09:16:52 | 19 | distributed?  Once you give the money to "Cuno," do you know how |
| 09:16:56 | 20 | it was distributed to the leadership of the Zetas? |
| 09:17:05 | 21 | A.   Yes, sir. |
| 09:17:06 | 22 | Q.   And how was that? |
| 09:17:17 | 23 | A.   Much of it went to the company.  That's what they called the |
| 09:17:21 | 24 | Zetas.  And then, another part went to "40" and "42," Miguel and |
| 09:17:25 | 25 | Omar. |

| | | |
|---|---|---|
| 09:17:28 | 1 | Q.   I want to turn your attention now to quarter horses.  Do you |
| 09:17:35 | 2 | know anything about quarter horse racing? |
| 09:17:40 | 3 | A.   A lot. |
| 09:17:41 | 4 | Q.   Okay.  And how do you know a lot about horse racing? |
| 09:17:50 | 5 | A.   I started in '99 having my own racehorses. |
| 09:17:55 | 6 | Q.   And did you race those horses in Mexico or in the United |
| 09:18:03 | 7 | States? |
| 09:18:03 | 8 | A.   Both. |
| 09:18:04 | 9 | Q.   And starting in '99, roughly, how many horses did you have |
| 09:18:12 | 10 | at any one time? |
| 09:18:14 | 11 | A.   I started having four. |
| 09:18:22 | 12 | Q.   And so, by the time you became involved with the Zetas, how |
| 09:18:27 | 13 | many horses did you have? |
| 09:18:32 | 14 | A.   Twenty to 25. |
| 09:18:34 | 15 | Q.   And when you would buy a horse, what would you look for in |
| 09:18:36 | 16 | terms of the quality of a horse? |
| 09:18:50 | 17 | A.   Its former shape, the size, who the mother was, who the |
| 09:18:59 | 18 | father was, who the other siblings were, how they performed. |
| 09:19:05 | 19 | Q.   So you would look at the bloodlines? |
| 09:19:11 | 20 | A.   Yes, sir. |
| 09:19:12 | 21 | Q.   So if like the mother performed really well in a race, would |
| 09:19:16 | 22 | that give you an indication that the offspring might also perform |
| 09:19:19 | 23 | equally, as well? |
| 09:19:34 | 24 | A.   Sometimes yes, if they were like one of the first of the |
| 09:19:47 | 25 | line, but a lot of times, what you did is the mares, they have |

09:19:51  1   offspring and you look at the males and you look how they've run,

09:19:55  2   and if the three out of five times they've run 90 to 100 over

09:20:00  3   speed limit, those are the ones you buy.

09:20:02  4   Q.   And when you say speed limit, there's a speed index in the

09:20:05  5   quarter horse industry that lets you know how fast the horse

09:20:08  6   runs.

09:20:08  7   A.   Yes.

09:20:09  8   Q.   You mentioned earlier an individual when you first met by

09:20:14  9   the name of "Mamito."  Do you recall that testimony yesterday?

09:20:19  10         THE INTERPRETER:  May the interpreter have the

09:20:22  11  repetition?

09:20:22  12  Q.   (BY MR. GARDNER) Do you remember an individual by the name

09:20:24  13  of "Mamito" that you testified to yesterday?

09:20:29  14  A.   Yes, sir.

09:20:30  15  Q.   May I approach, your Honor?

09:20:32  16         THE COURT:  You may.

09:20:33  17  Q.   (BY MR. GARDNER) I'm going to show you 250U.  And while I'm

09:20:37  18  up here, I'm going to show you 250N, 250Q and 250W.  Do you

09:20:47  19  recognize 250U?

09:20:50  20  A.   Yes.

09:20:52  21  Q.   All right.  Tell me right now if you recognize them, and

09:20:55  22  we'll talk about them in a second.  Do you recognize 250Q?

09:21:03  23  A.   I can't see.

09:21:06  24         THE COURT:  Can y'all hear Mr. Gardner, jury?  Raise

09:21:11  25  your voice, please, Mr. Gardner.

| | | |
|---|---|---|
| 09:21:13 | 1 | MR. GARDNER:  Thank you, your Honor.  I apologize.  I |
| 09:21:14 | 2 | wasn't near a microphone. |
| 09:21:19 | 3 | A.   Him, no. |
| 09:21:21 | 4 | Q.   (BY MR. GARDNER) 250N? |
| 09:21:23 | 5 | A.   Yes. |
| 09:21:23 | 6 | Q.   And then, 250W. |
| 09:21:35 | 7 | A.   No, sir. |
| 09:21:36 | 8 | Q.   Your Honor, at this time, I would offer 250U. |
| 09:21:53 | 9 | MR. CHRIS FLOOD:  No objection, your Honor. |
| 09:21:54 | 10 | THE COURT:  250U's received without objection. |
| 09:21:59 | 11 | Q.   (BY MR. GARDNER) Pull 250U, please, Marisol. |
| 09:22:08 | 12 | And, Mr. Cuellar, who is this individual? |
| 09:22:14 | 13 | A.   That's Zeta 7, it's "Mamito" or Caballero. |
| 09:22:20 | 14 | Q.   And what was his role in the -- |
| 09:22:22 | 15 | A.   Enrique. |
| 09:22:22 | 16 | Q.   I'm sorry.  What was his role in the organization? |
| 09:22:27 | 17 | A.   He was one of the leaders. |
| 09:22:28 | 18 | Q.   And so, when you talked about getting involved in the |
| 09:22:33 | 19 | quarter horse business, was "Mamito" involved in the quarter |
| 09:22:37 | 20 | horse racing? |
| 09:22:44 | 21 | A.   Yes, sir. |
| 09:22:45 | 22 | Q.   And when did he become involved in quarter horses? |
| 09:22:57 | 23 | A.   When I met him, he was already involved in the quarter horse |
| 09:23:01 | 24 | races. |
| 09:23:04 | 25 | Q.   And when you met "Mamito," did you know "40," Miguel |

| | | |
|---|---|---|
| 09:23:09 | 1 | Trevino, or "42," Omar Trevino, was involved in quarter horses? |
| 09:23:25 | 2 | A.    They were not involved. |
| 09:23:26 | 3 | Q.    Okay.  When did they become involved in quarter horses? |
| 09:23:36 | 4 | A.    When I met them within six or eight months, 2008 maybe 2007, |
| 09:23:42 | 5 | 2008. |
| 09:23:43 | 6 | Q.    Does "Mamito" have a number, a Zeta number? |
| 09:23:51 | 7 | A.    No. 7. |
| 09:23:53 | 8 | Q.    So Z-7.  So these horses that you would buy, where would you |
| 09:24:02 | 9 | buy them from? |
| 09:24:08 | 10 | A.    At the Oklahoma or Ruidoso auctions and on certain |
| 09:24:17 | 11 | occasions, directly from the ranchers. |
| 09:24:21 | 12 | Q.    So the auctions were -- and we've heard testimony of this |
| 09:24:25 | 13 | yesterday.  The auctions are public auctions, correct? |
| 09:24:33 | 14 | A.    Yes, sir. |
| 09:24:33 | 15 | Q.    And when you say from the ranches, would that be a private |
| 09:24:37 | 16 | sale between a person who owns a horse and you, for example? |
| 09:24:42 | 17 | A.    Yes, sir. |
| 09:24:48 | 18 | Q.    So on the auctions, would you attend these auctions |
| 09:24:50 | 19 | yourself? |
| 09:24:56 | 20 | A.    In the beginning, yes. |
| 09:24:58 | 21 | Q.    And would you buy horses under your own name in the |
| 09:25:01 | 22 | beginning? |
| 09:25:06 | 23 | A.    Yes.  Not all of them but some of them, yes. |
| 09:25:12 | 24 | Q.    So moving on to later when you were in Mexico, did you buy |
| 09:25:16 | 25 | horses from the auctions in the United States? |

| | | |
|---|---|---|
| 09:25:24 | 1 | A.   Yes, sir. |
| 09:25:25 | 2 | Q.   And how did you do that? |
| 09:25:35 | 3 | A.   We bought them through other people, or Carlitos handled |
| 09:25:41 | 4 | buying them, paying for them, Nayen. |
| 09:25:44 | 5 | Q.   Could we bring up 250E, please? |
| 09:25:52 | 6 | And when you say Carlitos Nayen, I'm showing you |
| 09:25:57 | 7 | Government's Exhibit 250E, is that the individual you know as |
| 09:26:00 | 8 | Carlos Nayen? |
| 09:26:00 | 9 | A.   Yes, sir. |
| 09:26:01 | 10 | Q.   So how would you pick horses for Mr. Nayen to purchase? |
| 09:26:09 | 11 | A.   Many of them, Ramiro Villarreal selected, the photograph you |
| 09:26:19 | 12 | showed me. |
| 09:26:20 | 13 | Q.   So let's get to that one.  Your Honor, I've showed the |
| 09:26:23 | 14 | witness 250N.  I'd offer 250N. |
| 09:26:26 | 15 | MR. CHRIS FLOOD:  No objection, your Honor. |
| 09:26:27 | 16 | THE COURT:  Without objection, it is received. |
| 09:26:30 | 17 | Q.   (BY MR. GARDNER) Can you please show 250N for me, please? |
| 09:26:34 | 18 | And is this the individual you identified as Ramiro Villarreal? |
| 09:26:39 | 19 | A.   Yes, sir. |
| 09:26:42 | 20 | Q.   All right.  So how would he go about purchasing horses that |
| 09:26:48 | 21 | you wanted? |
| 09:27:02 | 22 | A.   He would buy horses for anybody.  He would charge you a fee, |
| 09:27:06 | 23 | a thousand, 2,000, sometimes up to 5,000. |
| 09:27:10 | 24 | Q.   And did he also buy horses for "Mamito" and "40" and "42"? |
| 09:27:18 | 25 | A.   Yes, sir. |

09:27:22   1   Q.   And so, how would you get him, Ramiro, how would you give

09:27:28   2   Ramiro Villarreal the money for the horses?

09:27:39   3   A.   The majority of the money was handed to Carlitos, and

09:27:51   4   Carlitos was the one who handled getting it up here.  I don't

09:27:54   5   have any idea.  I have an idea of how it was done, but I don't

09:27:58   6   know for certain.

09:27:58   7   Q.   Okay.  That's fine.  Let me go back to Ramiro for a second.

09:28:02   8          Do you know when he began buying horses for "40" and

09:28:06   9   "42"?

09:28:12  10   A.   2009.

09:28:14  11   Q.   And I think you answered the question, but do you know how

09:28:24  12   "40" and "42" got Ramiro the money to buy those horses?

09:28:30  13          MR. CHRIS FLOOD:  Objection, your Honor.  I'm going to

09:28:31  14   have to object to hearsay.

09:28:34  15          MR. GARDNER:  I was asking if he knew, your Honor.

09:28:36  16          THE COURT:  Question is, do you know?  Yeah.  So I'll

09:28:43  17   overrule.  You may answer that question.

09:28:51  18   A.   Yes, sir.

09:28:52  19   Q.   (BY MR. GARDNER) And how do you know?

09:28:53  20          THE COURT:  How do you know?

09:28:59  21   A.   Because I was present when the amounts of money were sent.

09:29:03  22   Q.   (BY MR. GARDNER) And so, when you were present, what was

09:29:07  23   said by "40" or "42" with respect to the money sent to Ramiro?

09:29:22  24   A.   That the money should be sent to Ramiro so that he could pay

09:29:31  25   for the horses, that Ramiro had people in Monterrey that would

09:29:35   1   help him pay for the horses.  I don't know who the people in

09:29:37   2   Monterrey were.

09:29:38   3   Q.   Was all the money that you, "Mamito," "40," and "42" sent

09:29:45   4   come from drugs -- the sale of drugs?

09:29:53   5   A.   Of course.

09:29:55   6   Q.   I want to talk to you about one specific horse right now.

09:29:59   7   Are you familiar with a horse called Tempting Dash?

09:30:06   8   A.   Yes, sir.

09:30:07   9   Q.   And how were you familiar with that horse?

09:30:17   10   A.   Because Ramiro had bought that horse very cheap.  The price

09:30:39   11   was somewhere between 27 and 35,000.  And I don't know if I'm

09:30:45   12   pronouncing it correctly because it was one of Freedom Dash's,

09:30:48   13   and to be able to buy a colt from that horse, you would pay at

09:30:53   14   least $30,000.

09:30:56   15   Q.   You said Freedom Dash.  If I were to give you the stallion

09:30:59   16   First Down Dash, would that be something that would jog your

09:31:04   17   memory?

09:31:08   18   A.   Yes.  Correct.

09:31:10   19   Q.   And whose horse was this?

09:31:16   20   A.   That's a very famous horse here in the United States, the

09:31:20   21   sire.

09:31:21   22   Q.   Correct.  I'm sorry.  My question wasn't a good question.

09:31:25   23         Tempting Dash, you said Ramiro Villarreal bought that

09:31:30   24   horse.

09:31:35   25   A.   Yes.  Bought it for "40."

| | | |
|---|---|---|
| 09:31:38 | 1 | Q.   So was "40" the owner of that horse? |
| 09:31:40 | 2 | A.   Yes, sir. |
| 09:31:40 | 3 | Q.   Do you know what "40" did with that horse? |
| 09:31:48 | 4 | A.   That horse first came to my stables, then it was sent to |
| 09:32:02 | 5 | Monterrey so that Arnulfo Cantu, one of the best quarter -- or |
| 09:32:07 | 6 | the best quarter horse trainer in Mexico could train it.  And the |
| 09:32:12 | 7 | name is Arnulfo Guajardo, sorry. |
| 09:32:15 | 8 | Q.   And did that horse eventually come to the United States? |
| 09:32:18 | 9 | A.   Yes.  For surgery. |
| 09:32:23 | 10 | Q.   And did that horse race in the United States? |
| 09:32:26 | 11 | A.   Yes, sir. |
| 09:32:28 | 12 | Q.   And under whose name did it race? |
| 09:32:34 | 13 | A.   Ramiro's. |
| 09:32:35 | 14 | Q.   And when it won or did it -- I guess the question is, do you |
| 09:32:40 | 15 | know if it won any races in the United States? |
| 09:32:45 | 16 | A.   Yes. |
| 09:32:46 | 17 | Q.   And after winning some race, at some point, did the name get |
| 09:32:50 | 18 | transferred out of Ramiro's name to someone else? |
| 09:33:00 | 19 | A.   Yes, sir. |
| 09:33:00 | 20 | Q.   And who was that? |
| 09:33:02 | 21 | A.   Jose Trevino. |
| 09:33:04 | 22 | Q.   May I have 250C, I believe?  Have you met this gentleman? |
| 09:33:16 | 23 | A.   Yes, sir. |
| 09:33:16 | 24 | Q.   On how many occasions? |
| 09:33:22 | 25 | A.   Saw him many times in Mexico. |

09:33:24   1    Q.   And were you present in a conversation when "40" explained

09:33:30   2    why he put that horse in his brother's name?

09:33:40   3    A.   Yes.

09:33:42   4    Q.   And what did "40" say about putting that horse in his

09:33:45   5    brother's name?

09:33:51   6    A.   And it was "42," not "40," who asked me -- asked me what

09:34:18   7    could be done to put the horse in Jose's name.  And I said if

09:34:24   8    it's Tempting Dash, you transfer him, you sell it.  To transfer

09:34:28   9    him, you have to sell him and you sell him -- you make the sale

09:34:31  10    before he wins the race.

09:34:35  11    Q.   So let me get this straight.  So Ramiro Villarreal is the

09:34:39  12    owner when it wins its first race.

09:34:49  13    A.   It was in his name, but he wasn't the owner.

09:34:53  14    Q.   Who was the owner?

09:34:56  15    A.   Forty.

09:34:57  16    Q.   And so, then, if I hear your testimony right, that horse was

09:35:02  17    -- I'll use this word -- sold to Jose Trevino?

09:35:08  18    A.   Yes.

09:35:13  19    Q.   Okay.  Was that a real sale?

09:35:17  20    A.   No.

09:35:19  21    Q.   And so, what happened after Jose Trevino becomes the listed

09:35:24  22    owner of that horse?

09:35:33  23    A.   The IRS, it was good because the horse had been sold at a

09:35:45  24    price -- not a very expensive price, and Jose could show the

09:35:49  25    $30,000.  And so, then, when the IRS would look at it, the horse

09:36:02  1  had won half a million dollars, so the money was clean.

09:36:05  2  Q.   When you say half a million dollars, did that come from the

09:36:09  3  purse of winning the race?

09:36:16  4  A.   A futurity.

09:36:18  5  Q.   A horse race, correct?

09:36:21  6  A.   Yes.

09:36:23  7  Q.   May I have 250E?  Now, you mentioned this individual

09:36:30  8  earlier, Carlos Nayen.  How did you first come to know Carlos

09:36:33  9  Nayen?

09:36:41  10  A.   At the horse races.

09:36:43  11  Q.   In Mexico or in the United States?

09:36:46  12  A.   Mexico.

09:36:49  13  Q.   Do you recall at least a year when you first met him at the

09:36:54  14  horse races?

09:37:01  15  A.   Yeah.  I met him before I met "40" and "42."  I met him at

09:37:09  16  an event in Morelos, Coahuila at a horse race.  Seems like I had

09:37:19  17  already seen him here at Retama, but I don't have a memory of

09:37:24  18  that.  Didn't talk to him.

09:37:27  19  Q.   Do you know an individual by the name of Efrain Torres, Zeta

09:37:34  20  14?

09:37:35  21  A.   Huh-uh.  No.

09:37:42  22  Q.   And when did you first see Carlos Nayen meet with "40" and

09:37:50  23  "42"?

09:38:01  24  A.   It was some races, but I don't remember the year exactly.

09:38:10  25  2008 maybe.

09:38:14  1   Q.   And at some point, did Carlos Nayen begin to be involved in
09:38:18  2   purchasing horses for "40" and "42"?
09:38:25  3   A.   Yes.
09:38:27  4   Q.   When do you recall that being started?
09:38:37  5   A.   2009, 2010.  Those were the years -- those were his
09:38:42  6   strongest years.
09:38:43  7   Q.   "His" being Carlos Nayen's?
09:38:47  8   A.   Yes, sir.
09:38:48  9   Q.   How many meetings would you say you were present when Carlos
09:38:52  10  Nayen was talking to "40" or "42" or "Mamito" about horses?
09:39:05  11  A.   Some 30.
09:39:07  12  Q.   And how would you Carlos Nayen physically get to meet with
09:39:11  13  "40"?
09:39:12  14  A.   Many times, he would show up with me.  I would call "42."
09:39:40  15  I'd sent him a text, and I'd say he's already arrived, where do
09:39:44  16  you want a meeting?  And "42" responded saying, wait until I call
09:39:48  17  you back.  There were times he would -- he left with me two or
09:39:58  18  three days, and then, they'd call and say, bring him now.  Now,
09:40:02  19  yes.
09:40:04  20  Q.   So would Carlos perform the same role as Ramiro in buying
09:40:11  21  horses in the United States for "40" and "42"?
09:40:23  22  A.   Yes.
09:40:24  23  Q.   So would Carlos Nayen attend the auctions in the United
09:40:31  24  States?
09:40:31  25  A.   Yes.

09:40:31  1   Q.   Would "40" ever -- or was "40" ever able to watch these

09:40:37  2   auctions himself while in Mexico?

09:40:40  3   A.   Yes.  Yes.

09:40:45  4   Q.   And how would he do that?

09:40:58  5   A.   Through Hector, he would link up -- or he would go straight

09:41:01  6   into the computer, and then, you could see when they would parade

09:41:05  7   the colts.

09:41:07  8   Q.   And did you ever observe Carlos Nayen communicating with

09:41:11  9   "40" while he was at the auction in the United States and "40"

09:41:16  10  was in Mexico?

09:41:25  11  A.   Many times.

09:41:28  12  Q.   Do you remember any specific horses he tried to buy?

09:41:41  13  A.   They changed the names for most of them to car names like

09:41:56  14  Lamborghini, Ferrari, Bugatti.  I don't know the original names

09:41:59  15  at the auctions.

09:42:01  16  Q.   And you said Mr. Nayen became involved heavily in 2009,

09:42:06  17  2010.  Do you remember how many horses approximately the

09:42:10  18  organization bought in 2009?

09:42:26  19  A.   This came from "40" personally.  He said the first year,

09:42:36  20  they had spent about $2 million that was 2008.  The second year,

09:42:42  21  five, and the third year, they were going on seven.

09:42:45  22  Q.   2008, two million; 2009, five million, and; 2010, seven

09:42:53  23  million?

09:42:54  24  A.   Yes, sir.

09:42:55  25  Q.   Okay.  And when did you come to the United States?

09:43:01  1   A.   2011.

09:43:04  2   Q.   Do you know how "40" would get the money to pay for the

09:43:10  3   horses into the United States?

09:43:19  4         MR. CHRIS FLOOD:  Objection, your Honor.  Lack of

09:43:20  5   personal knowledge.

09:43:22  6         THE COURT:  Well, the question is, do you know.  Yes,

09:43:24  7   no, or don't know.

09:43:29  8   A.   Yes.  Sometimes.

09:43:30  9   Q.   (BY MR. GARDNER) Okay.  On those occasions where you did

09:43:32  10  know, how did "40" get his drug money into the United States to

09:43:38  11  pay for horses?

09:43:39  12        MR. CHRIS FLOOD:  Objection, your Honor.  Lack of

09:43:40  13  personal knowledge.  He hadn't said --

09:43:42  14        THE COURT:  How do you know that?

09:43:46  15        THE WITNESS:  Because a lot of it, I paid.

09:43:49  16        THE COURT:  Proceed.  Overruled.

09:43:51  17  Q.   (BY MR. GARDNER) On those occasions that you paid, how would

09:43:55  18  the money flow from "40" or "42" to get to the auction houses in

09:44:00  19  the United States?

09:44:17  20  A.   I don't know how it was paid at the auction houses, but I

09:44:21  21  tell "Junior" to deliver it to Carlitos so it could be taken to

09:44:25  22  the auctions.  And I was being told, this money is to pay for

09:44:32  23  this horse or this mare, and you need to write that down in your

09:44:38  24  notes.

09:44:39  25  Q.   In your ledger to keep track?

09:44:42  1    A.   Yes, sir.

09:44:45  2    Q.   So among those payments, were you ever requested to send

09:44:50  3    payments to the Ruidoso track in New Mexico?

09:45:04  4    A.   Yes, sir.

09:45:06  5    Q.   For what purpose was that money sent there for?

09:45:11  6              MR. CHRIS FLOOD:  Objection, your Honor.  Lack of

09:45:13  7    personal knowledge.

09:45:13  8              MR. GARDNER:  I'll rephrase, your Honor.

09:45:14  9              THE COURT:  All right.

09:45:15  10   Q.   (BY MR. GARDNER) Were you ever asked to send money to the

09:45:19  11   Ruidoso racetrack?

09:45:24  12   A.   Yes, sir.

09:45:25  13   Q.   Were you told the reason why you were sending the money to

09:45:29  14   the Ruidoso racetrack?

09:45:36  15   A.   I knew exactly what it was for from the beginning.

09:45:40  16   Q.   Okay.  And who told you that?

09:45:42  17   A.   "Forty" and "42."  We had a meeting and that's where we

09:45:51  18   talked about that matter.  And Carlos sent a message saying they

09:46:01  19   had already had the people that were going to release the horses

09:46:05  20   in their pocket paying them 3,000 each one.

09:46:09  21   Q.   So how much money did you send to Ruidoso yourself?

09:46:19  22   A.   I don't remember exactly.  It was between 100 and 120.

09:46:23  23   Q.   And when you say the starters, are you familiar with the All

09:46:29  24   American Futurity race in Ruidoso?

09:46:33  25   A.   Yes.  It's the biggest one here in the United States for

09:46:46  1   quarter horses.

09:46:47  2   Q.   And are you familiar with a horse called Mr. Piloto?

09:46:53  3   A.   Mr. Piloto, yes.

09:46:56  4   Q.   And who was the owner of Mr. Piloto?

09:47:00  5   A.   "Forty."

09:47:02  6   Q.   And who was the listed owner of Mr. Piloto for that race?

09:47:17  7   A.   Seems like Jose, Jose Trevino, but I don't remember whose

09:47:21  8   name it was in.

09:47:22  9   Q.   And did Mr. Piloto win that race?

09:47:27  10  A.   With trickery, yes.

09:47:30  11  Q.   Okay.  And when you say with trick, does that refer to the

09:47:33  12  money that was sent to the starters?

09:47:38  13  A.   Yes, sir.

09:47:43  14  Q.   All right.  Now, being involved in the horseracing business

09:47:46  15  yourself, how does a starter -- how can a starter affect a race?

09:48:03  16  A.   Because a majority of the horses, we call it the bit strap.

09:48:20  17  It's a strap that's on their face, and you hold them by that

09:48:25  18  until the door opens and then, they're released.

09:48:28  19  Q.   And what effect does that have on the race if you hold the

09:48:31  20  horse?

09:48:40  21  A.   Just the minute part of a second that you hold him back, the

09:48:48  22  other horse can take very -- several body -- a lead of several

09:48:54  23  body lengths, which was the case with Mr. Piloto.

09:49:00  24  Q.   How did you come to be arrested, Mr. Cuellar?

09:49:06  25  A.   I turned myself in.

| | | |
|---|---|---|
| 09:49:08 | 1 | Q.   And why was that? |
| 09:49:24 | 2 | A.   2011, I started seeing some strange things with regard to |
| 09:49:39 | 3 | "40" towards me.  He started taking drugs away from me that I had |
| 09:49:43 | 4 | stored, a warehouse, 590 kilos.  He started buying -- taking |
| 09:49:49 | 5 | money from me to buy houses for "42," which I didn't think was |
| 09:49:52 | 6 | right.  This is wrong.  And "40" and "42's" people also let me |
| 09:50:03 | 7 | know that there was a problem with me.  I asked why, I was told |
| 09:50:11 | 8 | they didn't know. |
| 09:50:13 | 9 | Q.   And so, why did you decide to turn yourself in to the United |
| 09:50:20 | 10 | States? |
| 09:50:20 | 11 | A.   Because I already said that things were strange, things were |
| 09:50:51 | 12 | being taken away with me, taken away from me, that means you were |
| 09:50:54 | 13 | going to be killed.  "Forty" said that I should meet him at a |
| 09:51:00 | 14 | horse race.  I didn't go.  I sent my people.  People were sent |
| 09:51:05 | 15 | there to pick me up, then they got there cursing and everything |
| 09:51:10 | 16 | else, and that's when I realized that there was a problem.  And |
| 09:51:24 | 17 | that's when I decided that I was going to cross the border, that |
| 09:51:28 | 18 | I was going to walk across.  That I was going to walk and come |
| 09:51:31 | 19 | into the United States. |
| 09:51:32 | 20 | Q.   Did you contact an attorney, a defense attorney here in the |
| 09:51:38 | 21 | United States? |
| 09:51:38 | 22 | A.   Yes, sir. |
| 09:51:39 | 23 | Q.   Has he guided you through this process? |
| 09:51:44 | 24 | A.   Yes, sir. |
| 09:51:45 | 25 | Q.   And when you came across the United States, did you tell |

| | | |
|---|---|---|
| 09:51:49 | 1 | others to come across with you? |
| 09:51:55 | 2 | A.   All my people. |
| 09:51:58 | 3 | Q.   And when you say all your people, is that Mr. Moreno? |
| 09:52:09 | 4 | A.   Moreno, Jr., Wicho, Jose Luis Garza, Victor, a lot of them. |
| 09:52:23 | 5 | All the people that worked for me. |
| 09:52:25 | 6 | Q.   And did some of those come across and some stay? |
| 09:52:31 | 7 | A.   Yes. |
| 09:52:31 | 8 | Q.   And do you know what happened to those who stayed behind? |
| 09:52:37 | 9 | A.   They were killed. |
| 09:52:40 | 10 | Q.   Now, I want to go back a little bit to the money made by the |
| 09:52:48 | 11 | Zetas.  Did "40," "42" and "Mamito" take steps to conceal their |
| 09:52:58 | 12 | drug activity from law enforcement? |
| 09:53:08 | 13 | A.   No.  Well, some of them, yes, but not for the majority. |
| 09:53:18 | 14 | Q.   And was that because majority of the police in Mexico had |
| 09:53:22 | 15 | been bribed by the Zetas? |
| 09:53:28 | 16 | A.   Oh, yes. |
| 09:53:31 | 17 | Q.   With that money, did you help personally "40" or "42," I'll |
| 09:53:37 | 18 | use the word, invest their drug proceeds? |
| 09:53:54 | 19 | A.   Uh-huh.  With the police? |
| 09:53:56 | 20 | Q.   No.  I'm sorry. |
| 09:53:59 | 21 |      So the Zetas have all this cash, correct? |
| 09:54:04 | 22 | A.   Yes. |
| 09:54:05 | 23 | Q.   Did they attempt to convert that cash into legitimate |
| 09:54:10 | 24 | businesses? |
| 09:54:15 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 09:54:16 | 1 | Q.   And did you help them on certain occasions with investing |
| 09:54:21 | 2 | their drug proceeds in legitimate businesses? |
| 09:54:29 | 3 | A.   Yes, sir. |
| 09:54:30 | 4 | Q.   All right.  If you will, could you tell the jury some of |
| 09:54:33 | 5 | those occasions and how much money you invested for the Zeta |
| 09:54:37 | 6 | leadership? |
| 09:54:39 | 7 | A.   For "42," I bought some heavy equipment, some machinery, |
| 09:55:05 | 8 | some caterpillars D-9s and B-10s, more than a million dollars.  I |
| 09:55:13 | 9 | got one of his companies to be working in coal.  It was in his |
| 09:55:18 | 10 | wife's name. |
| 09:55:20 | 11 | Q.   You say coal like coal mining or -- |
| 09:55:23 | 12 | A.   Yes, sir. |
| 09:55:26 | 13 | Q.   And why did he put it in his wife's name, if you know? |
| 09:55:34 | 14 | A.   Because he couldn't have anything in his name. |
| 09:55:38 | 15 | Q.   Does any of the Zeta leadership have any businesses in their |
| 09:55:42 | 16 | name? |
| 09:55:47 | 17 | A.   No. |
| 09:55:48 | 18 | Q.   And so, you said coal company and construction equipment. |
| 09:55:53 | 19 | What was the construction equipment used for? |
| 09:56:07 | 20 | A.   The majority of it was for building roads and highways. |
| 09:56:23 | 21 | Clearing land, rented it also, and the same thing in the coal |
| 09:56:29 | 22 | business. |
| 09:56:29 | 23 | Q.   And when we talked last time, you had mentioned something |
| 09:56:34 | 24 | about money going to a racetrack.  Do you recall that? |
| 09:56:43 | 25 | A.   In Laredo.  More than half a million was used to build the |

09:56:55  1    racetrack.

09:56:56  2    Q.   So when you get this cash, do you take it straight and

09:57:02  3    invest it in a company?  Or how do you get the flow of the money

09:57:05  4    from your cash to investing in these businesses?

09:57:24  5    A.   Through people that could spend that kind of money.

09:57:26  6    Q.   And what kind of people were those?

09:57:29  7    A.   Rich people.

09:57:32  8    Q.   Do you know Francisco Colorado-Cessa?

09:57:37  9    A.   Yes, sir.

09:57:38  10   Q.   How many times have you met him?

09:57:41  11   A.   Maybe twice.

09:57:44  12   Q.   And during the time that you were involved with the Zetas,

09:57:47  13   did you hear "40" or "42" talk about Pancho Colorado?

09:57:57  14            MR. CHRIS FLOOD:  Objection.  Hearsay, your Honor.

09:57:59  15            THE COURT:  Overruled.

09:58:02  16   A.   Many times.

09:58:03  17   Q.   (BY MR. GARDNER) And did you hear Carlos Nayen talk about

09:58:07  18   Pancho Colorado?

09:58:09  19   A.   Yes, because he would call the man dad.

09:58:16  20            MR. CHRIS FLOOD:  Objection.  Nonresponsive.

09:58:24  21            MR. GARDNER:  I can ask a followup question, your

09:58:26  22   Honor.

09:58:26  23            THE COURT:  All right.  Do that.

09:58:28  24   Q.   (BY MR. GARDNER) What would you hear Carlos Nayen refer to

09:58:34  25   Francisco Colorado as?

09:58:48  1   A.   Because he said that he would have been his dad, that he

09:59:04  2   loved him a lot.   That I would ask him why, he would kid around

09:59:07  3   saying things about his mom that we knew weren't true, that she

09:59:11  4   had been with him.   But I think he was raised with him for quite

09:59:16  5   some time.

09:59:16  6   Q.   Now, on an earlier occasion, I asked you to identify Mr.

09:59:21  7   Colorado and you couldn't.   Can you explain why you earlier

09:59:25  8   couldn't identify Mr. Colorado?

09:59:38  9   A.   Because when I met him, he had a hat on, like a cowboy hat,

09:59:50  10  like the people from the north do, and here, he was different.   I

09:59:55  11  saw his hair this time.

09:59:58  12  Q.   And the other two occasions, he had the hat on the entire

10:00:01  13  time?

10:00:04  14  A.   Yes, sir.

10:00:05  15  Q.   I'd like to talk about those two occasions.   When did you

10:00:09  16  first meet Colorado-Cessa?

10:00:24  17  A.   He was introduced to me at an event we organized in Morelos,

10:00:33  18  Coahila at a colt race, and the other time, I just saw him.   I

10:00:41  19  wasn't there present with him.

10:00:44  20  Q.   Let's talk about the first time.   Was this at a horse race

10:00:47  21  in Morelos?

10:00:53  22  A.   Yes.

10:00:53  23  Q.   And how was he introduced to you?

10:00:59  24  A.   "Forty" yelled out to me -- said, Poncho, come here, let me

10:01:07  25  introduce Pancho Colorado.   He said, have you already met him?   I

10:01:15   1  said I had seen him.  And I greeted the man.  I greeted him.

10:01:32   2  And, yeah, we said hello, hello, and then, he went on, continued

10:01:36   3  talking to "40" and "42," the races started, I stepped back.

10:01:41   4  Q.   So this one race -- let's focus on one race in Morelos.  Was

10:01:48   5  that a private race or a public race?

10:01:58   6  A.   Clandestine.

10:02:00   7  Q.   And were only members of the Zeta organization present?

10:02:09   8  A.   The majority.  Ninety percent.  Yes.

10:02:14   9  Q.   And so, the other ten percent, who were they?

10:02:32  10  A.   There are people -- Mr. Pancho was there, other owners of

10:02:42  11  other colts, but they didn't gather where "40" and "42" were.

10:02:45  12  They were on the other side in some bleachers.  And then, also

10:02:48  13  saw the jockeys and the trainers.

10:02:50  14  Q.   And so, these other owners, was Pancho with the other owners

10:02:55  15  or was he with "40"?

10:03:01  16  A.   "Forty" and "42."

10:03:03  17  Q.   Okay.  You said "40" and "42."  Who else was there -- sorry.

10:03:11  18  That was a bad question.

10:03:12  19         Who else from the Zeta leadership was there?

10:03:25  20  A.   I don't remember if "Mamito" was there, but I believe he

10:03:44  21  was -- 2000 was there.  There were a lot of other people.

10:03:48  22  "Mamito" was there.  There were many of us, some 20 or 30,

10:03:51  23  besides all the ones that were surrounding it.

10:03:54  24  Q.   When you say surrounding it, were you referring to armed

10:03:57  25  guards or security?

10:04:07  1   A.   Yes.

10:04:08  2   Q.   Did you see Pancho Colorado with any of his own security?

10:04:15  3   A.   No.

10:04:18  4   Q.   And so, these races, how long did this event occur?  How

10:04:22  5   many hours?

10:04:29  6   A.   Some three or four hours.

10:04:30  7   Q.   How many races were there?

10:04:36  8   A.   From four to eight.

10:04:38  9   Q.   Did you have any horses running?

10:04:42  10  A.   Four of them.

10:04:45  11  Q.   And did you see that Pancho Colorado had any horses running

10:04:50  12  in this race?

10:04:55  13  A.   Carlitos took some horses, but I don't know if they belonged

10:05:04  14  to him.  He took a maroon and some other horses, but I don't know

10:05:08  15  if they were his.

10:05:09  16  Q.   And did you bet on these races between the other owners,

10:05:14  17  whether it's "40" or "42" or the others?

10:05:22  18  A.   Yes.

10:05:23  19  Q.   How much was the bet per race?

10:05:31  20  A.   Per race, 5,000 per colt.  Besides all the side bets, a

10:05:39  21  thousand, 2,000.

10:05:44  22  Q.   And did any of your horses win any of the races?

10:05:49  23  A.   I won two and I lost two.

10:05:51  24  Q.   Okay.  Did you collect any of the winnings?

10:05:55  25  A.   No.

| | | |
|---|---|---|
| 10:05:56 | 1 | Q.   Why was that? |
| 10:05:58 | 2 | A.   Didn't like to pay.  He was the boss. |
| 10:06:02 | 3 | Q.   You mean he, you mean "40." |
| 10:06:10 | 4 | So going back a little bit, did you ever observe Carlos |
| 10:06:14 | 5 | Nayen talking to Pancho Colorado on the phone? |
| 10:06:23 | 6 | A.   Lots. |
| 10:06:25 | 7 | Q.   Approximately how many times a week? |
| 10:06:31 | 8 | A.   I think it was like 15 to 20. |
| 10:06:34 | 9 | Q.   And did you overhear some of these conversations? |
| 10:06:45 | 10 | A.   Well, yeah.  Most of it was about horses or their stuff. |
| 10:06:50 | 11 | Q.   Were you ever present when "40" asked Carlos Nayen to get in |
| 10:06:54 | 12 | touch with Pancho Colorado? |
| 10:07:01 | 13 | A.   Yes. |
| 10:07:01 | 14 | Q.   And what did "40" say? |
| 10:07:05 | 15 | MR. CHRIS FLOOD:  Objection.  Hearsay, your Honor. |
| 10:07:07 | 16 | THE COURT:  Not offered for the truth.  He's just |
| 10:07:11 | 17 | telling what he heard.  Go ahead.  Overruled. |
| 10:07:20 | 18 | A.   Can you repeat the question, please? |
| 10:07:21 | 19 | Q.   (BY MR. GARDNER) What would "40" say to Carlos when he |
| 10:07:25 | 20 | wanted to get in touch with Pancho Colorado? |
| 10:07:28 | 21 | MR. CHRIS FLOOD:  Same objection, your Honor. |
| 10:07:29 | 22 | THE COURT:  Same ruling. |
| 10:07:36 | 23 | A.   Call your dad. |
| 10:07:38 | 24 | Q.   (BY MR. GARDNER) Have you ever heard "40" make threats |
| 10:07:44 | 25 | directly to Pancho Colorado? |

10:07:51  1   A.   Never.

10:07:52  2   Q.   Have you ever heard "40" address others in the organization

10:07:57  3   making threats about Pancho Colorado?

10:08:06  4   A.   No.

10:08:08  5   Q.   So going back --

10:08:12  6   A.   Not that I was there.  No.

10:08:16  7   Q.   So going back to that race in Morelos, what happened after

10:08:21  8   the races were over?

10:08:52  9   A.   Well, while the event was still going on, I went over to

10:08:59  10  where there were some of the city people, not the Zeta people.

10:09:03  11  And "40," who was cursing but basically he said, Poncho, what are

10:09:07  12  you doing over there?  Have you already told them?

10:09:10  13        MR. CHRIS FLOOD:  Judge, I object.  It's nonresponsive.

10:09:12  14  It also calls for hearsay.

10:09:15  15        THE COURT:  Question was what -- what happened after

10:09:18  16  the races were over, perhaps you ought to narrow it a little bit.

10:09:24  17  Q.   (BY MR. GARDNER) Okay.  So you testified earlier that "40"

10:09:27  18  and Pancho Colorado were together during this race?

10:09:36  19  A.   Yes, sir.

10:09:37  20  Q.   At some point, did you leave that group and go across the

10:09:41  21  racetrack?

10:09:48  22  A.   Yes.

10:09:48  23  Q.   And at that point, was "40" and Pancho Colorado still

10:09:53  24  standing side-by-side?

10:10:00  25  A.   Close.  Yes.

| | | |
|---|---|---|
| 10:10:03 | 1 | Q.   And did "40" yell something to you across the racetrack? |
| 10:10:11 | 2 | A.   Yes. |
| 10:10:12 | 3 | Q.   And was that within the hearing of Pancho Colorado? |
| 10:10:19 | 4 | A.   Of course, he yelled it. |
| 10:10:21 | 5 | Q.   Could everyone else that you were sitting with on the other |
| 10:10:24 | 6 | side of the racetrack hear it? |
| 10:10:30 | 7 | A.   Yes, sir. |
| 10:10:31 | 8 | Q.   And what did "40" say to you? |
| 10:10:34 | 9 | A.   He asked -- well, he was saying, are you ashamed to be here |
| 10:11:02 | 10 | with us?  Have you told them that with your former bosses, you |
| 10:11:05 | 11 | didn't pay anything and with us, you're making millions of |
| 10:11:08 | 12 | dollars?  And so, then, I crossed back over to where they were |
| 10:11:11 | 13 | and he says, are you shamed to be with us?  You're a drug dealer |
| 10:11:15 | 14 | just like the rest of us.  And I just stayed there. |
| 10:11:19 | 15 | Q.   Stayed back on the side with "40" and Pancho Colorado, |
| 10:11:23 | 16 | right? |
| 10:11:23 | 17 | A.   "Forty-two" and everybody. |
| 10:11:26 | 18 | Q.   Now, Morelos, what state was that in? |
| 10:11:32 | 19 | A.   Coahuila. |
| 10:11:33 | 20 | Q.   And is that Zeta territory? |
| 10:11:37 | 21 | A.   Yes. |
| 10:11:39 | 22 | Q.   All right.  So you said earlier that you did not see Pancho |
| 10:11:42 | 23 | Colorado with any security.  When he came to that race, was he |
| 10:11:46 | 24 | protected by the Zetas? |
| 10:12:02 | 25 | A.   Well, I guess you could say that was true for all of us |

10:12:16  1  because if someone showed up there, they were the ones that were

10:12:19  2  going to fight it.  None of us were armed.

10:12:22  3  Q.    So once you become part of the organization, are you

10:12:26  4  protected by the organization?

10:12:32  5  A.    Yes.

10:12:33  6  Q.    Do you become a target of other organizations, other

10:12:38  7  drug-trafficking cartels?

10:12:43  8  A.    A hundred percent.

10:12:46  9  Q.    Do you personally know whether Pancho Colorado had the

10:12:52  10  protection of the Zetas?

10:13:03  11  A.    Yes, a hundred percent.

10:13:06  12  Q.    Based on your experience in the cartel and what you've seen,

10:13:12  13  did the leadership of the cartel have any reason to kill Pancho

10:13:24  14  Colorado?

10:13:24  15  A.    No.

10:13:25  16  Q.    Why is that?

10:13:34  17  A.    While I was there, Pancho Colorado was one of their

10:13:38  18  preferred people.

10:13:39  19  Q.    Why is that?

10:13:53  20  A.    Because he's a rich man, and so, he's like a trophy.

10:13:59  21  Through him I can become involved in politics and other things

10:14:03  22  through him.

10:14:06  23  Q.    How much territory did the Zetas control when you were

10:14:11  24  there?  How many states?

10:14:18  25  A.    Twenty-six or 27 states.

| 10:14:21 | 1 | Q.   My geography's a little fuzzy, but how many states in |

Q.   My geography's a little fuzzy, but how many states in
Mexico, 33?
A.   No.  It's 30 or 31 with a federal district -- plus a federal
district.  I hope I'm not mistaken.
Q.   Close enough.
     How much money did "40" have?
A.   I don't know how much, but I think he had a billion dollars.
Q.   Would "40" have any reason to extort more money out of
Pancho Colorado?
A.   From the time Pancho Colorado helped "40" buy one of his
horses here in the United States, he had become a friend.
Q.   So was "40" looking for more money?
A.   Launder money.
Q.   And was that his money?  I'm sorry, was that "40's" money
that he was seeking to launder?
A.   Yes.
Q.   Now, up until the time you left for the United States, did
you have good relations with "40"?
A.   Real good one.
Q.   Did he ever threaten you?
A.   Never.
Q.   And did you learn, at the end, why you had to flee the
United States or flee Mexico to the United States?
A.   Yes.
Q.   And why was that?

10:16:38  1  A.    Without me knowing it, Hector Moreno, Jr., Hector Moreno's

10:16:52  2  dad, and one of Hector's brothers were working with the U.S.

10:16:56  3  authorities.

10:16:57  4  Q.    Were you working with the U.S. authorities at that time?

10:17:02  5  A.    No.

10:17:03  6  Q.    So why would "40" or the Zeta leadership be upset at you?

10:17:13  7  A.    Because they always thought I was the one that was

10:17:17  8  cooperating.

10:17:19  9  Q.    May I have one moment, your Honor?

10:17:21  10          THE COURT:  You may.

10:17:33  11          MR. GARDNER:  Your Honor, I'll pass the witness.

10:17:37  12          THE COURT:  One second.  All right.  Your witness,

10:17:45  13  counsel.

10:17:46  14          MR. CHRIS FLOOD:  Thank you, your Honor.  I could use a

10:17:49  15  bit more of a break.  I don't know what time you like to -- I can

10:17:54  16  probably polish up my cross and shorten it.

10:17:56  17          THE COURT:  Yeah.  This is probably a good time.

10:17:58  18  Fifteen-minute recess, ladies and gentlemen.

10:33:44  19          (Recess.)

10:33:47  20          THE COURT:  All right.  You may be seated until the

10:33:50  21  jury comes in.

10:35:30  22          (Jury present.)

10:35:32  23          THE COURT:  Mr. Flood.

10:35:33  24          MR. CHRIS FLOOD:  Thank you, your Honor.

10:35:34  25

```
10:35:34   1                        CROSS-EXAMINATION

10:35:34   2   BY MR. CHRIS FLOOD:

10:35:38   3   Q.   Mr. Cuellar, my name is Chris Flood.  You and I have never

10:35:41   4   spoken before, correct?

10:35:45   5   A.   No, sir.

10:35:48   6   Q.   Yesterday, you testified that you went to Mexico, I think,

10:35:54   7   in 2005?

10:36:01   8   A.   Yes, sir.

10:36:03   9   Q.   Because you believed that the FBI was investigating you and

10:36:07  10   was planning on charging you with crimes that you had committed

10:36:11  11   in the United States.

10:36:21  12   A.   I didn't believe.  I was certain of it.

10:36:23  13   Q.   Okay.  Because you had done those things that they were

10:36:29  14   going to charge you with, correct?

10:36:33  15   A.   Yes, sir.

10:36:34  16   Q.   And after returning to Mexico, I think you've testified that

10:36:42  17   you began working for the Zetas.

10:36:53  18   A.   In the beginning, no, because the Zetas weren't there.  And

10:37:01  19   I stopped working because I didn't have any clients because all

10:37:07  20   of them had been picked up.

10:37:08  21   Q.   And that you then later started working for the Zetas,

10:37:12  22   moving cocaine north.  Is that a fair depiction of what your job

10:37:17  23   was?

10:37:28  24   A.   Yes, sir.

10:37:29  25   Q.   And you said you were not a Zeta yourself, but you were work
```

| | | |
|---|---|---|
| 10:37:34 | 1 | ing for the Zetas? |
| 10:37:39 | 2 | A.   Yes, sir. |
| 10:37:40 | 3 | Q.   And that you weren't like the Zetas, you just worked for |
| 10:37:45 | 4 | them? |
| 10:37:50 | 5 | A.   Yes, sir. |
| 10:37:52 | 6 | Q.   And that after working for them for some period of time, you |
| 10:37:57 | 7 | came to the United States because you started feeling strange |
| 10:38:01 | 8 | about the way "40," the leader of the Zetas, was treating you. |
| 10:38:18 | 9 | A.   Not strange.  It was that all the indications was -- were |
| 10:38:27 | 10 | that there was trouble.  Because it had already been done to |
| 10:38:32 | 11 | other people in the same fashion. |
| 10:38:36 | 12 | Q.   All right.  And when in 2011 did you come to the United |
| 10:38:53 | 13 | States? |
| 10:38:53 | 14 | A.   Between March 2010, the 18th -- I don't remember the exact |
| 10:39:03 | 15 | date.  Tenth -- between the 10th, the 15th, the 16th, I don't |
| 10:39:07 | 16 | remember the exact date. |
| 10:39:08 | 17 | Q.   In fact, didn't you flee to the United States because you |
| 10:39:12 | 18 | were under investigation for crimes committed in Mexico? |
| 10:39:26 | 19 | A.   No. |
| 10:39:27 | 20 | Q.   May I approach the witness? |
| 10:39:29 | 21 | A.   I had never had -- I've not had charges in Mexico, ever. |
| 10:39:35 | 22 | Q.   I'm going to show you what I've marked as Defendant's |
| 10:39:38 | 23 | Exhibit No. 22, and I'm going to hand the extra copy to the |
| 10:39:42 | 24 | government, your Honor. |
| 10:39:43 | 25 | A.   I can't see. |

10:39:52  1  Q.   Thank you.  Last time that didn't work well.

10:39:59  2  A.   Thank you, sir.

10:40:00  3  Q.   And I'm going to first ask you, have you ever seen that

10:40:04  4  document before?

10:40:05  5            MR. GARDNER:  Your Honor, I'm going to object at this

10:40:06  6  point.  Improper impeachment.

10:40:08  7            THE COURT:  I'm sorry?

10:40:10  8            MR. GARDNER:  Improper impeachment, your Honor.  I

10:40:14  9  think the Court probably needs to look at this first.

10:40:17  10           MR. CHRIS FLOOD:  I've only asked him if he's seen it,

10:40:19  11  sir.  I haven't moved to introduce it.

10:40:22  12           THE COURT:  Ladies and gentlemen, I'm going to excuse

10:40:24  13  y'all for a minute.  I'll try and make this quick.

10:40:55  14           (Jury not present.)

10:40:59  15           THE COURT:  You want the witness excused?

10:41:02  16           MR. GARDNER:  Yes, your Honor.

10:41:03  17           THE COURT:  Marshal.  Let me guess, this is the Mexican

10:41:15  18  indictment.

10:41:15  19           MR. CHRIS FLOOD:  It's the Mexican charges, your Honor,

10:41:17  20  yes.  The allegations of the crime were about ten days before --

10:41:22  21           THE COURT:  Everybody can be seated.

10:41:25  22           MR. CHRIS FLOOD:  May be a little more than ten days.

10:41:28  23  More like 30 days before fleeing to the United States, your

10:41:30  24  Honor.

10:41:31  25           THE COURT:  He get served with it?

10:41:34  1        MR. CHRIS FLOOD:  I'm asking to see if he's ever seen
10:41:37  2  it before, Judge.  I don't know if he's been served with it or
10:41:39  3  not.
10:41:40  4        THE COURT:  And --
10:41:41  5        MR. GARDNER:  Your Honor, the case file says, case
10:41:43  6  filed on July 25, 2012, well after he was in the United States.
10:41:49  7        MR. CHRIS FLOOD:  And I'm not moving to introduce it,
10:41:51  8  your Honor.  I was not doing that.
10:41:52  9        THE COURT:  Well, then, what are we doing with it?
10:41:55  10        MR. CHRIS FLOOD:  I'm asking if he's seen it.
10:41:57  11        THE COURT:  And what relevance does that have?  What
10:41:59  12  fact at issue is made more probable than not by referring to this
10:42:04  13  subsequent Mexican indictment or charge?
10:42:07  14        MR. CHRIS FLOOD:  I think it impeaches his claim that
10:42:10  15  he fled to the United States because of "40."  He fled to the
10:42:14  16  United States because he'd committed these crimes that are
10:42:18  17  alleged in this document.  I can just ask him if he committed the
10:42:20  18  crimes because -- see if that was his --
10:42:24  19        THE COURT:  If he says he's not aware of it, wasn't
10:42:26  20  aware of it before he fled, where are you?
10:42:29  21        MR. CHRIS FLOOD:  I can then ask him if he committed
10:42:33  22  the crimes himself and that was his motive for fleeing to the
10:42:36  23  United States, just like he did in 2005, when he fled to Mexico,
10:42:39  24  Judge.
10:42:40  25        THE COURT:  Not referring to these charges, if he says

10:42:43  1   that he didn't see these charges, he wasn't aware of them before

10:42:49  2   he fled, where are you?

10:42:51  3          MR. CHRIS FLOOD:  I think I can then ask him if he

10:42:53  4   committed the crimes in 2011, right before fleeing, and that's

10:42:57  5   why he fled to the United States.

10:42:58  6          THE COURT:  Well, he's admitted to that.

10:43:01  7          MR. CHRIS FLOOD:  No, he's not, Judge.  He's not

10:43:03  8   admitted to these crimes.  Not these crimes.

10:43:05  9          THE COURT:  What are those crimes?

10:43:07  10         MR. CHRIS FLOOD:  He and Hector Moreno beat one person

10:43:13  11  until they were lifeless and killed another 30 days before he

10:43:18  12  fled to the United States.

10:43:21  13         MR. GARDNER:  Your Honor, these are in Coahuila.

10:43:24  14         THE COURT:  Just a second.

10:43:25  15         MR. GARDNER:  Yes, sir.

10:44:02  16         THE COURT:  Okay.  As I understand it, what you want to

10:44:05  17  do is ask him if he's ever seen that and the question come up,

10:44:08  18  then, is dated subsequently to his fleeing.  So you would admit

10:44:14  19  that whether he saw it at any time is irrelevant.

10:44:19  20         MR. CHRIS FLOOD:  Unless I can then tie it to what he

10:44:22  21  expects to get in exchange.

10:44:24  22         THE COURT:  How can you ever tie it?

10:44:26  23         MR. CHRIS FLOOD:  Well, if I ask him, has the

10:44:28  24  government told you that you will not be extradited on these

10:44:31  25  charges in exchange for your testimony?

10:44:34   1          THE COURT:  If you want to ask him, have you ever been

10:44:36   2     told by the government you would not be extradited by any

10:44:39   3     charges, period.

10:44:40   4          MR. CHRIS FLOOD:  Right.  I mean, but that's a separate

10:44:42   5     matter.  As I said, I'm not moving to introduce this, Judge.

10:44:45   6          THE COURT:  And I'm telling you that right now, you're

10:44:48   7     not even going to talk about it.  I want to see.

10:44:51   8          MR. CHRIS FLOOD:  The fact that there's charges.

10:44:52   9          THE COURT:  By the fact that there's charges.

10:44:54   10         MR. CHRIS FLOOD:  Okay.

10:44:55   11         THE COURT:  But see where we are.  Tell me where you're

10:44:57   12    going with this, and I'll tell you whether I'm going to exclude

10:45:00   13    it under 403 or I'm going to allow it.

10:45:03   14         MR. CHRIS FLOOD:  I'm just going to try to impeach the

10:45:06   15    witness' statements as to why he fled to the United States, and

10:45:12   16    it's going to be --

10:45:12   17         THE COURT:  And how are you going to do that?

10:45:15   18         MR. CHRIS FLOOD:  To show that he fled to the United

10:45:17   19    States because he was under investigation for these crimes, not

10:45:22   20    because he was worried about "40."

10:45:23   21         THE COURT:  And he said he was -- I believe he said he

10:45:26   22    didn't know he was under investigation.

10:45:27   23         MR. CHRIS FLOOD:  No.  He hadn't said that yet, your

10:45:31   24    Honor.

10:45:31   25         THE COURT:  All right.  If he says that, then where are

```
10:45:33   1   you?

10:45:34   2           MR. CHRIS FLOOD:  Then I guess I have to move on, your

10:45:39   3   Honor, because I'm doing it to impeach his statement that -- you

10:45:45   4   recall I set it up by him saying, now you fled to Mexico for

10:45:49   5   crimes you're under investigation for that you committed, and he

10:45:52   6   said yes.  That's right.  And then, you fled from Mexico to the

10:45:56   7   United States, but you say it was because of "40."  I want to be

10:45:59   8   able to show the jury that, in fact, his motive for coming to the

10:46:03   9   United States is because he knows he's under investigation for

10:46:06  10   this crime.

10:46:07  11           THE COURT:  And if he says, I didn't know I was under

10:46:09  12   investigation by the Mexican authorities, where are you?

10:46:19  13           MR. CHRIS FLOOD:  I may be able to ask him about the

10:46:21  14   crimes themselves because he did not disclose those in his direct

10:46:26  15   testimony that while he was down in Mexico, that's what he was

10:46:30  16   doing.

10:46:30  17           THE COURT:  I'll exclude that under 403.  So now what?

10:46:37  18   I mean, we're not going to go investigate and bring all of the

10:46:41  19   crimes that he might have committed in Mexico in here to impeach.

10:46:46  20   403 clearly excludes that.

10:46:50  21           MR. CHRIS FLOOD:  I'm actually trying to offer it to

10:46:52  22   show that he's not being truthful in his previous testimony.

10:46:54  23           THE COURT:  Well, you can make an offer of proof.

10:46:57  24           MR. CHRIS FLOOD:  I'll ask him if he knew he was under

10:46:59  25   investigation.
```

| | | |
|---|---|---|
| 10:47:00 | 1 | THE COURT:  No.  I'll ask him.  All right.  Bring him |
| 10:47:07 | 2 | back.  Bring the jury back. |
| 10:48:09 | 3 | (Jury present.) |
| 10:48:48 | 4 | THE COURT:  Mr. Cuellar, prior to your moving or going |
| 10:48:57 | 5 | to the United States, did you know that you were under |
| 10:49:00 | 6 | investigation by the Mexican authorities? |
| 10:49:04 | 7 | THE WITNESS:  No, sir. |
| 10:49:06 | 8 | THE COURT:  Your witness, counsel. |
| 10:49:09 | 9 | MR. CHRIS FLOOD:  Your Honor, I'd like to make an offer |
| 10:49:10 | 10 | of proof.  Do you want me -- |
| 10:49:12 | 11 | THE COURT:  Well, you can make it after the jury's not |
| 10:49:14 | 12 | here. |
| 10:49:14 | 13 | MR. CHRIS FLOOD:  Okay. |
| 10:49:17 | 14 | Q.   (BY MR. CHRIS FLOOD) Mr. Cuellar, when you came back to the |
| 10:49:27 | 15 | United States in 2011, did you turn yourself in to the |
| 10:49:33 | 16 | authorities? |
| 10:49:38 | 17 | A.   Yes, sir. |
| 10:49:39 | 18 | Q.   And were you held in custody, in jail? |
| 10:49:45 | 19 | A.   Yes. |
| 10:49:46 | 20 | Q.   All right.  And is that when you hired your lawyer, Frank |
| 10:49:53 | 21 | Perez? |
| 10:49:57 | 22 | A.   Yes. |
| 10:49:57 | 23 | Q.   Is he the same lawyer for Mr. Vasquez, Jr. and Sr.? |
| 10:50:08 | 24 | A.   Correct. |
| 10:50:10 | 25 | Q.   And how long were you in custody before you sat down and |

10:50:20   1  talked to the government?

10:50:34   2  A.   I don't understand.  Are you asking when I was taken to

10:50:39   3  court?

10:50:40   4  Q.   Well, the authorities I was talking about was when was it

10:50:45   5  that you first sat down with the agents that were investigating

10:50:50   6  you and/or the prosecutor that was prosecuting you?

10:51:07   7  A.   Before.  Before I was detained.

10:51:10   8  Q.   Okay.  So you sat down with which agents before you were

10:51:18   9  detained?

10:51:29   10  A.   They were federal agents from all the agencies, but I

10:51:32   11  couldn't tell you which ones were there and which ones weren't.

10:51:35   12  There were too many of them.

10:51:37   13  Q.   Okay.  Was it Agent Lawson or Agent Pennington, the agents

10:51:42   14  that are sitting here in the courtroom?

10:51:49   15  A.   No, sir.

10:51:53   16  Q.   I think you testified that it was some time in March that

10:51:59   17  you -- in 2011 that you came to the United States.  Was it in

10:52:02   18  March of 2011 that you sat down with the agents that you can't

10:52:07   19  remember their name?

10:52:17   20  A.   No.

10:52:20   21  Q.   Okay.  Did you sign what's called a proffer letter with the

10:52:31   22  government before talking to the agents about your activities?

10:52:40   23  A.   I don't know what you're talking about.  I don't understand.

10:53:05   24  Q.   May I approach the witness?

10:53:07   25         THE COURT:  Yes.

10:53:11  1   Q.    (BY MR. CHRIS FLOOD) I want to show you what I've marked as

10:53:15  2   Defendant's Exhibit No. 23 and ask you, is that your signature on

10:53:21  3   that document?

10:53:32  4   A.    Yes.  Of course, yes.

10:53:34  5   Q.    And would this document refresh your recollection as to when

10:53:39  6   it was that you first sat down with the government to tell your

10:53:44  7   story?

10:53:58  8   A.    Truthfully, I was in such state at that time that I couldn't

10:54:12  9   tell you about the dates.  I couldn't remember the dates.  I also

10:54:16  10  can't read English.  I just -- whatever the attorney said for me

10:54:20  11  to sign, I signed.

10:54:20  12  Q.    Could you read the date of that document to him in Spanish?

10:54:29  13  A.    That I can do.

10:54:29  14  Q.    Okay.

10:54:31  15  A.    It was March 28th, 2011.

10:54:35  16  Q.    Okay.  And do you recall that you signed that document

10:54:39  17  before you ever sat down with the agents and your lawyer and told

10:54:43  18  your story?

10:54:59  19  A.    Yes.

10:55:04  20  Q.    Did you meet with the agents on that day, March 28th, the

10:55:08  21  day you signed that document?

10:55:17  22  A.    I believe so.

10:55:19  23  Q.    And even though it wasn't these two agents here, you were

10:55:25  24  there with your lawyer, and was the prosecutor in your case

10:55:29  25  there?

| | | |
|---|---|---|
| 10:55:39 | 1 | A.   Yes, sir. |
| 10:55:42 | 2 | Q.   And I think you've already said you don't remember the names |
| 10:55:45 | 3 | of the agents that were there for the government. |
| 10:55:56 | 4 | A.   Not all of them. |
| 10:55:57 | 5 | Q.   Okay.  And at the time that you signed that letter and the |
| 10:56:02 | 6 | time that you met with the agents, was it explained to you that |
| 10:56:07 | 7 | you had to be truthful in your statements to them? |
| 10:56:22 | 8 | A.   Yes, sir. |
| 10:56:26 | 9 | Q.   Did they explain to you that you had to be complete in your |
| 10:56:31 | 10 | answers and you couldn't leave anything out? |
| 10:56:38 | 11 | A.   Uh-huh.  Yes.  Yes.  Sorry. |
| 10:56:47 | 12 | Q.   And during that interview, did the agents that were there, |
| 10:56:51 | 13 | did they appear to take notes of what you were saying? |
| 10:57:00 | 14 | A.   All of them. |
| 10:57:03 | 15 | Q.   And have you been shown a report that was generated by the |
| 10:57:09 | 16 | agents who were taking the notes on March 28th of 2011? |
| 10:57:23 | 17 | A.   No. |
| 10:57:23 | 18 | Q.   You never saw that report? |
| 10:57:25 | 19 | A.   No. |
| 10:57:29 | 20 | Q.   Now, that prosecutor, those agents were from the Eastern |
| 10:57:36 | 21 | District of Texas up near Dallas. |
| 10:57:44 | 22 | A.   Yes. |
| 10:57:44 | 23 | Q.   And before testifying in Dallas, did they show you the |
| 10:57:52 | 24 | report that you -- that was generated from your interview in |
| 10:57:55 | 25 | March of 2011? |

| | | |
|---|---|---|
| 10:58:05 | 1 | A.   No. |
| 10:58:08 | 2 | Q.   And in that first interview in March of 2011, did you tell |
| 10:58:14 | 3 | the agents the things that you've told this jury in the last two |
| 10:58:19 | 4 | days? |
| 10:58:31 | 5 | A.   But I didn't see the agents in 2011. |
| 10:58:35 | 6 | Q.   In March of -- |
| 10:58:37 | 7 | A.   Oh, oh, March.  March 11th of 2011? |
| 10:58:44 | 8 | Q.   March of 2011. |
| 10:58:50 | 9 | A.   Okay.  Can you repeat the question? |
| 10:58:51 | 10 | Q.   Yeah.  In March of 2011, did you tell the agents the things |
| 10:58:55 | 11 | that you've told us the last day and a half? |
| 10:59:00 | 12 | THE COURT:  You want to rephrase that question, please? |
| 10:59:02 | 13 | I'm not sure I understand it. |
| 10:59:04 | 14 | MR. CHRIS FLOOD:  Okay.  I'm sorry. |
| 10:59:05 | 15 | Q.   (BY MR. CHRIS FLOOD) In March of 2011, did you tell the |
| 10:59:10 | 16 | agents the things that you've testified to this morning and |
| 10:59:14 | 17 | yesterday? |
| 10:59:15 | 18 | THE COURT:  What I don't understand is, are you saying |
| 10:59:17 | 19 | everything that he's testified to, or are you saying something |
| 10:59:22 | 20 | less? |
| 10:59:23 | 21 | MR. CHRIS FLOOD:  Well, your Honor, I think he's |
| 10:59:25 | 22 | testified that he understood he had to be complete in his |
| 10:59:29 | 23 | debriefing with the agents in March.  He'd have to tell them |
| 10:59:32 | 24 | everything about what he'd done. |
| 10:59:33 | 25 | THE COURT:  Okay.  I don't want an argument.  Just |

| | | |
|---|---|---|
| 10:59:36 | 1 | focus your question one way or the other. |
| 10:59:39 | 2 | Q.   (BY MR. CHRIS FLOOD) Did you tell the agents in March what |
| 10:59:42 | 3 | you've said to us in court? |
| 10:59:42 | 4 | THE COURT:  The same thing.  Did you tell them |
| 10:59:46 | 5 | everything that you've said here in court? |
| 10:59:54 | 6 | THE WITNESS:  Much of it.  The majority of the things, |
| 10:59:56 | 7 | yes.  If we spoke about the man, if you're referring to Pancho |
| 11:00:06 | 8 | Colorado, he was talked about.  It was -- I was questioned for |
| 11:00:13 | 9 | three days.  Everything I remembered at that time, I told.  As we |
| 11:00:19 | 10 | had more meetings, more things have come out.  There are way too |
| 11:00:25 | 11 | many things in my head. |
| 11:00:26 | 12 | Q.   (BY MR. CHRIS FLOOD) There's what? |
| 11:00:27 | 13 | A.   Way too many things in my head. |
| 11:00:30 | 14 | Q.   And after you told the agents -- let me ask it this way. |
| 11:00:39 | 15 | After March of 28th of 2011 -- and I think you just |
| 11:00:46 | 16 | answered my question.  You actually met with the agents for three |
| 11:00:49 | 17 | days during the first meeting? |
| 11:01:02 | 18 | A.   I don't know the exact date, but I was questioned for three |
| 11:01:11 | 19 | days. |
| 11:01:11 | 20 | Q.   Okay.  And then, after those initial meetings, when was the |
| 11:01:19 | 21 | next time you met with the agents? |
| 11:01:30 | 22 | A.   They went to go see me in the county where I was. |
| 11:01:34 | 23 | Q.   I'm sorry?  I didn't hear that answer. |
| 11:01:36 | 24 | A.   They went to go see me in the county where I was. |
| 11:01:39 | 25 | Q.   Okay. |

| | | |
|---|---|---|
| 11:01:42 | 1 | A.   I cannot give you dates because I don't remember them. |
| 11:01:44 | 2 | Q.   All right.  But after meeting with them, they gave you a |
| 11:01:51 | 3 | benefit in exchange for your discussions with them, did they not? |
| 11:02:13 | 4 | A.   The prosecutor said this to me:  We're not promising |
| 11:02:18 | 5 | anything and nothing's been offered.  Those are the rules there |
| 11:02:22 | 6 | are. |
| 11:02:23 | 7 | Q.   Right.  But -- |
| 11:02:24 | 8 | A.   And he also said that to me in court. |
| 11:02:27 | 9 | Q.   Well, after you met with them, the prosecutor agreed to |
| 11:02:30 | 10 | release you on bond. |
| 11:02:38 | 11 | A.   Oh, yes. |
| 11:02:40 | 12 | Q.   And so, you then were let out of jail in exchange for |
| 11:02:46 | 13 | telling the agents what they wanted to hear, right? |
| 11:02:57 | 14 | A.   I believe I qualified for the bond because I was a U.S. |
| 11:03:10 | 15 | citizen, and I had a brace on, they were monitoring me all the |
| 11:03:16 | 16 | time.  And I was asked for a bond. |
| 11:03:20 | 17 | Q.   Do you recall that the government said because of your |
| 11:03:23 | 18 | cooperation in their investigation, that that's why they're |
| 11:03:27 | 19 | agreeing to release you on bond? |
| 11:03:40 | 20 | A.   I don't remember that conversation you're telling me about. |
| 11:03:45 | 21 | Q.   May I approach the witness, your Honor? |
| 11:03:49 | 22 | THE COURT:  You may.  And raise your voice when you're |
| 11:03:51 | 23 | away from the microphone.  The jury's having a little difficulty |
| 11:03:55 | 24 | hearing the lawyers when they approach the witness. |
| 11:03:57 | 25 | MR. CHRIS FLOOD:  Thank you, your Honor. |

11:04:28  1          THE COURT:  You may approach the witness.

11:04:30  2          MR. CHRIS FLOOD:  Well, in a minute, your Honor.  I

11:04:31  3  need one more question.

11:04:32  4          THE COURT:  Oh, sure.

11:04:34  5  Q.   (BY MR. CHRIS FLOOD) Just so I'm clear, in March of 2011,

11:04:39  6  when you signed that letter, you were actually in jail, correct?

11:04:42  7  A.   I don't remember.

11:04:54  8  Q.   All right.  If I may approach the witness now.

11:04:57  9          THE COURT:  You may.

11:04:59  10 Q.   (BY MR. CHRIS FLOOD) I've placed before you what I've marked

11:05:09  11 as Defendant's Exhibit No. 24, and I'm going to ask you, have you

11:05:14  12 ever seen that document?

11:05:33  13 A.   I've seen a lot of documents.  I can't tell you specifically

11:05:37  14 that this document I had seen, but I have seen a lot of

11:05:41  15 documents, and I signed them and I've signed everything through

11:05:43  16 my attorney.

11:05:44  17 Q.   All right.  Does that refresh your memory that on May 2nd of

11:05:48  18 2011, after meeting with the agents, the government agreed to

11:05:53  19 release you on bond or recommend that the Court release you on

11:05:57  20 bond?

11:06:03  21 A.   Correct.

11:06:18  22 Q.   After you were released on bond, when was the next time you

11:06:31  23 met with the government?

11:06:43  24 A.   There were a lot of times.  I don't remember the dates.

11:06:45  25 Q.   Can you estimate for us how many times you sat down with the

| | | |
|---|---|---|
| 11:06:50 | 1 | government agents and was interviewed? |
| 11:07:04 | 2 | A.    Twenty, 30 times, 40, I don't know. |
| 11:07:08 | 3 | Q.    And each time, did the agents appear to be taking notes of |
| 11:07:18 | 4 | what you were saying? |
| 11:07:20 | 5 | A.    Yes, sir. |
| 11:07:32 | 6 | Q.    And have you seen any of the reports from those interviews |
| 11:07:38 | 7 | that occurred after you were released on bond? |
| 11:07:49 | 8 | A.    No.  Not that I remember. |
| 11:07:54 | 9 | Q.    Sorry? |
| 11:07:55 | 10 | A.    Not that I remember. |
| 11:07:58 | 11 | Q.    Now, I have and I'll mark again for identification purposes |
| 11:08:24 | 12 | -- may I approach the witness, your Honor? |
| 11:08:26 | 13 | THE COURT:  You may. |
| 11:08:27 | 14 | MR. GARDNER:  Your Honor, I'm going to object to the |
| 11:08:29 | 15 | attorney showing the witness this particular document. |
| 11:08:32 | 16 | THE COURT:  I beg your pardon? |
| 11:08:33 | 17 | MR. GARDNER:  I'm objecting to the defense attorney |
| 11:08:35 | 18 | showing the witness this particular document.  It's improper |
| 11:08:38 | 19 | impeachment. |
| 11:08:40 | 20 | THE COURT:  Let me see a copy.  Let me see yours. |
| 11:08:49 | 21 | MR. GARDNER:  I believe the witness responded he had |
| 11:08:50 | 22 | not seen any of the reports to the last question. |
| 11:09:03 | 23 | THE COURT:  A 302? |
| 11:09:04 | 24 | MR. GARDNER:  Yes, sir. |
| 11:09:05 | 25 | THE COURT:  Okay.  I want to see where you go with it. |

11:09:26  1   Have you ever seen that document?

11:09:32  2           THE WITNESS:  No, no.  In fact, I don't remember

11:09:42  3   anything about any of the papers I'd signed.  I'm not saying that

11:09:53  4   I didn't sign it.  I'm just saying I don't know what this

11:09:56  5   document -- any document it is, whether I signed it or not signed

11:09:59  6   it, what it says.

11:10:01  7           THE COURT:  Does your signature appear on that?

11:10:16  8           THE WITNESS:  No.

11:10:18  9           THE COURT:  Do you recall ever seeing it before today?

11:10:23  10          THE WITNESS:  No, sir.

11:10:25  11          THE COURT:  All right.

11:10:28  12  Q.   (BY MR. CHRIS FLOOD) Do you recall meeting with Special

11:10:32  13  Agent Lawson on November 14th of 2011?

11:10:43  14  A.   I don't know who Lawson is.

11:10:45  15  Q.   Okay.  Special Agent Scott Lawson, you don't recall meeting

11:10:50  16  with him in November of 2011?

11:10:54  17  A.   I don't remember, but I did see him several -- many times.

11:11:09  18  I don't know the dates.

11:11:11  19  Q.   Would the report prepared by Agent Lawson on November 18th,

11:11:16  20  2011 of your interview on November 14th, 2011 refresh your memory

11:11:22  21  about whether or not you met with him?

11:11:25  22          MR. GARDNER:  Your Honor, I object.  He's attempting to

11:11:28  23  impeach the witness or refresh the witness' recollection with

11:11:31  24  another witness' statements.

11:11:32  25          THE COURT:  Yeah.  As the question is phrased, I'm

| | | |
|---|---|---|
| 11:11:42 | 1 | going to sustain the objection.  You may try to rephrase it. |
| 11:11:47 | 2 | Q.   (BY MR. CHRIS FLOOD) Would the -- Defendant's Exhibit, what |
| 11:11:52 | 3 | number is it, 24?  I've lost track now.  Twenty-five. |
| 11:11:58 | 4 | Would Defendant's Exhibit 25 refresh your memory about |
| 11:12:02 | 5 | meeting with Agent Lawson and, in fact, Special Agent Steve |
| 11:12:06 | 6 | Pennington on November 14th of 2011? |
| 11:12:10 | 7 | THE COURT:  Yes, no, or I don't know. |
| 11:12:27 | 8 | THE WITNESS:  I don't know. |
| 11:12:29 | 9 | Q.   (BY MR. CHRIS FLOOD) You don't know if it would refresh your |
| 11:12:31 | 10 | memory? |
| 11:12:42 | 11 | A.   Sir, Mr. Attorney, I don't know remember dates.  I don't |
| 11:12:48 | 12 | remember times.  I did see them several times, but I have no |
| 11:12:52 | 13 | memory of years, dates, or when.  If it's here, I saw them, but I |
| 11:13:01 | 14 | don't know the dates.  I'm bad at remembering dates. |
| 11:13:05 | 15 | Q.   Okay.  So you just said if it's here, then I saw them.  Can |
| 11:13:12 | 16 | you review that document and tell us whether or not Agent Lawson |
| 11:13:16 | 17 | has reflected what you said on that date accurately? |
| 11:13:20 | 18 | MR. GARDNER:  Your Honor, I'm going to object to asking |
| 11:13:22 | 19 | the witness to adopt another witness' statements.  Improper |
| 11:13:25 | 20 | impeachment. |
| 11:13:25 | 21 | THE COURT:  Read the document, please. |
| 11:13:40 | 22 | THE WITNESS:  I don't know how to read in English. |
| 11:13:46 | 23 | THE COURT:  Now what are you going to do?  What do you |
| 11:13:51 | 24 | want? |
| 11:13:52 | 25 | MR. CHRIS FLOOD:  What I'm trying to -- |

| | | |
|---|---|---|
| 11:13:54 | 1 | THE COURT:  What do you want from me? |
| 11:13:57 | 2 | MR. CHRIS FLOOD:  Well, your Honor, I was merely asking |
| 11:13:58 | 3 | the witness if that document -- |
| 11:14:00 | 4 | THE COURT:  I'm just -- |
| 11:14:03 | 5 | MR. CHRIS FLOOD:  I'm just trying to see if he recalls |
| 11:14:05 | 6 | meeting with Agent Lawson on November 14th. |
| 11:14:08 | 7 | THE COURT:  And he said he doesn't.  Now what? |
| 11:14:11 | 8 | MR. CHRIS FLOOD:  Then ask him if that document would |
| 11:14:13 | 9 | refresh his memory.  He said if it's there, I did. |
| 11:14:17 | 10 | THE COURT:  He can't read it.  Now what?  I'm probably |
| 11:14:22 | 11 | willing to help you if you will just tell me how. |
| 11:14:25 | 12 | MR. CHRIS FLOOD:  I wanted to ask the witness if he |
| 11:14:27 | 13 | recalls telling Agent Lawson on November 14, 2011 the things he |
| 11:14:34 | 14 | testified to while here in court. |
| 11:14:37 | 15 | THE COURT:  And that doesn't get us any further.  Is |
| 11:14:40 | 16 | there some particular thing that you would like to ask him |
| 11:14:42 | 17 | whether he recalls saying? |
| 11:14:46 | 18 | MR. CHRIS FLOOD:  There's a number of things that he |
| 11:14:49 | 19 | has testified to here today that are not included in that report, |
| 11:14:52 | 20 | your Honor. |
| 11:14:53 | 21 | THE COURT:  Well, ask him whether he ever told on that |
| 11:14:59 | 22 | day -- although I don't know how you're going to get there.  I |
| 11:15:03 | 23 | really don't.  I'm sorry, but you're the lawyer.  I'm just |
| 11:15:06 | 24 | sitting up here calling balls and strikes. |
| 11:15:08 | 25 | MR. CHRIS FLOOD:  Fair enough. |

| | | |
|---|---|---|
| 11:15:11 | 1 | Q.   (BY MR. CHRIS FLOOD) Isn't it a fact that your testimony |
| 11:15:14 | 2 | earlier today where you say that Pancho Colorado was standing |
| 11:15:18 | 3 | next to "40" and "40" yelled across, what, are you ashamed of |
| 11:15:22 | 4 | being a drug dealer, that's -- you never told Agent Lawson that |
| 11:15:26 | 5 | back in November of 2011, did you? |
| 11:15:46 | 6 | A.   No. |
| 11:15:47 | 7 | Q.   And you didn't tell it again on January 24, 2012, when you |
| 11:15:52 | 8 | met with him, either, did you? |
| 11:16:01 | 9 | A.   No, because this -- they weren't specific -- they weren't |
| 11:16:18 | 10 | specifically looking about this case.  They were talking about |
| 11:16:21 | 11 | things in general and my general knowledge as things gone on, and |
| 11:16:25 | 12 | they'd gotten more specific about cases, things have come out. |
| 11:16:35 | 13 | As each case has gone on, things have become more focused on |
| 11:16:40 | 14 | that.  They've gathered on it.  There is more -- they determined |
| 11:16:43 | 15 | more detail and more things have come out.  They're all true. |
| 11:16:50 | 16 | You have your file.  He can tell you that he was there |
| 11:16:53 | 17 | and that I'm not lying if you want to know the truth. |
| 11:16:58 | 18 | Q.   The first time you met with the agents and sat with them for |
| 11:17:02 | 19 | three days, you never mentioned anything about "40" yelling |
| 11:17:06 | 20 | across the racetrack with his good friend Pancho Colorado, did |
| 11:17:10 | 21 | you? |
| 11:17:10 | 22 | THE COURT:  Asked and answered.  He said no. |
| 11:17:13 | 23 | MR. CHRIS FLOOD:  Those are different dates, your |
| 11:17:15 | 24 | Honor.  I'm saying the first time that he was supposed to tell -- |
| 11:17:20 | 25 | THE COURT:  Oh, okay. |

| | | |
|---|---|---|
| 11:17:20 | 1 | Q.   (BY MR. CHRIS FLOOD) You never mentioned anything about |
| 11:17:22 | 2 | Pancho Colorado standing there with "40" and "40" yelling across |
| 11:17:28 | 3 | the racetrack, did you? |
| 11:17:48 | 4 | A.   That he yelled it, no, but that he was there, yes.  I've |
| 11:17:52 | 5 | always said he was there.  And now that this case is coming -- |
| 11:17:55 | 6 | now that this -- that I'm going into more detail, more things are |
| 11:17:58 | 7 | coming out. |
| 11:17:59 | 8 | Q.   So it's your testimony that you said it in March of 2011 |
| 11:18:03 | 9 | when you were debriefed for three days? |
| 11:18:08 | 10 | THE COURT:  Said what? |
| 11:18:11 | 11 | MR. CHRIS FLOOD:  The incident about Mr. Colorado being |
| 11:18:14 | 12 | at the racetrack -- |
| 11:18:15 | 13 | THE COURT:  Ask your question -- |
| 11:18:17 | 14 | MR. CHRIS FLOOD:  -- treating him as a friend. |
| 11:18:20 | 15 | THE COURT:  Ask your question again. |
| 11:18:23 | 16 | Q.   (BY MR. CHRIS FLOOD) Is it your testimony that when you |
| 11:18:25 | 17 | debriefed for three days, where you were supposed to tell the |
| 11:18:28 | 18 | whole truth, you told the agents in March of 2011 about the |
| 11:18:34 | 19 | incident where Pancho Colorado was "40's" friend and "40" yelled |
| 11:18:39 | 20 | across the racetrack at you about -- |
| 11:18:40 | 21 | THE COURT:  That's two questions.  Stop now. |
| 11:18:45 | 22 | Is it your testimony that when you debriefed for three |
| 11:18:49 | 23 | days where you were supposed to tell the whole truth, you told |
| 11:18:52 | 24 | the agents in March of 2011 about the incident where Pancho |
| 11:18:59 | 25 | Colorado was "40's" friend? |

| | | |
|---|---|---|
| 11:19:05 | 1 | THE WITNESS:  As "40's" friend, yes. |
| 11:19:10 | 2 | THE COURT:  Next question. |
| 11:19:12 | 3 | Q.  (BY MR. CHRIS FLOOD) All right.  And did you tell them about |
| 11:19:15 | 4 | yelling across the racetrack, you're a drug dealer just like the |
| 11:19:18 | 5 | rest of us? |
| 11:19:26 | 6 | A.   Everybody heard it. |
| 11:19:28 | 7 | Q.   No.  Did you tell the agents about that in March of 2011? |
| 11:19:33 | 8 | A.   No.  No. |
| 11:19:37 | 9 | Q.   And May of 2012, you were sentenced to 236 months, |
| 11:19:44 | 10 | essentially 19-and-a-half years by Judge Krone in the Eastern |
| 11:19:48 | 11 | District of Texas correct? |
| 11:19:55 | 12 | A.   Yeah.  A little bit more.  Almost 20. |
| 11:20:06 | 13 | Q.   Okay.  And in August of 2013, you testified -- or prior to |
| 11:20:15 | 14 | August of 2013, you testified for the government, didn't you? |
| 11:20:27 | 15 | A.   Yes, sir. |
| 11:20:28 | 16 | Q.   And as a result of your testimony, Mr. Gardner informed the |
| 11:20:35 | 17 | prosecutor up in the Eastern District of your testimony, didn't |
| 11:20:38 | 18 | he? |
| 11:20:47 | 19 | A.   I don't know. |
| 11:20:49 | 20 | Q.   The government through their lawyer in the Eastern District |
| 11:20:53 | 21 | filed a motion with the Court asking that your sentence be |
| 11:20:56 | 22 | reduced from 236 months to 118 months, after you testified for |
| 11:21:04 | 23 | Mr. Gardner.  Isn't that true? |
| 11:21:21 | 24 | A.   No, because I had already gone to two other courts. |
| 11:21:25 | 25 | Q.   Was your sentence reduced to 118 months? |

11:21:38   1   A.   Yes, but not because I came here.  Because I went to three

11:21:43   2   places.

11:21:44   3   Q.   All right.  But you also came here before your sentence got

11:21:49   4   reduced to 118 months; isn't that correct?

11:21:57   5   A.   Yes, sir.

11:21:58   6   Q.   All right.  So after you testified on behalf of the

11:22:04   7   government, at the request of Mr. Gardner, your sentence was

11:22:08   8   reduced from 236 to 118 months.  Yes or no?

11:22:13   9   A.   Yes, sir.

11:22:13   10  Q.   And then, after that, the government -- did I just lose my

11:22:20   11  sound, Judge?  Okay.  No.  Just the screen.  I apologize.

11:22:24   12          After that, the government asked to reduce your

11:22:28   13  sentence even further from 118 months to 78 months.

11:22:47   14  A.   I don't know how much it is.  If it's 78 or -- I don't know

11:22:50   15  how much I have left.  It's somewhere in there between 78, 80 and

11:22:58   16  90.  That's what I have left.

11:22:59   17  Q.   And you've been told by Mr. Gardner that if you come in and

11:23:06   18  testify in this trial, he will make a recommendation to the

11:23:11   19  Eastern District to reduce your sentence even further.

11:23:29   20  A.   Yes, a recommendation, but he's also told me that he's not

11:23:32   21  assuring me of anything.

11:23:34   22  Q.   Right.  But he told you that last time.

11:23:39   23  A.   Yes.  True.

11:23:41   24  Q.   And the last time, it went from 236 months in custody,

11:23:45   25  19-and-a-half years, to 118 months in custody, right?

```
11:23:50   1   A.   Yes.

11:23:50   2   Q.   And then, it went even further down to 78 months in custody,

11:23:55   3   right?

11:24:01   4   A.   I don't have a problem with that, but if that's what you're

11:24:05   5   saying, must be.

11:24:06   6   Q.   And last time you testified for Mr. Gardner, there were

11:24:08   7   other people you were testifying against, correct?

11:24:15   8   A.   I was called here about seven or eight months ago and I

11:24:29   9   came.  If that's the case you're talking about.

11:24:30  10   Q.   You were testifying against other people.

11:24:37  11   A.   I was brought, but I didn't come out because the person

11:24:41  12   signed and pled guilty.

11:24:42  13   Q.   Okay.  But now that you're here to testify against Mr.

11:24:47  14   Colorado, this is the first time that you've ever claimed that

11:24:54  15   "40" yelled across the racetrack and said, you're a drug dealer

11:25:00  16   just like the rest of us, referring to him and Mr. Colorado;

11:25:05  17   isn't that true?

11:25:15  18   A.   Mr. Colorado, no.  Us because there was a bunch of us in

11:25:33  19   that group that we were all working.  When he said us, he was

11:25:42  20   talking about those of us that worked for the Zetas or the Zetas

11:25:45  21   themselves.

11:25:46  22   Q.   Okay.  If I may have just a minute, your Honor.

11:25:59  23        THE COURT:  Certainly.

11:26:06  24   Q.   (BY MR. CHRIS FLOOD) And I think it was your testimony that

11:26:07  25   there were other horse owners there at that race, as well.
```

```
11:26:15   1   A.    Yes, sir.
11:26:16   2   Q.    And I guess those other horse owners, if they brought their
11:26:21   3   armed security, that could create a conflict with the Zetas'
11:26:26   4   armed security, couldn't it?
11:26:36   5   A.    No one could bring.  No one but the Zetas could bring
11:26:42   6   guards.
11:26:42   7   Q.    I don't have any further questions, your Honor.
11:26:47   8             THE COURT:  Redirect.
11:26:48   9             MR. GARDNER:  Thank you, your Honor.
11:26:50  10                  RE-DIRECT EXAMINATION
11:26:50  11   BY MR. GARDNER:
11:26:55  12   Q.    Again, Mr. Cuellar, where was Pancho Colorado standing in
11:27:00  13   relation to "40" during that race in Morelos?
11:27:19  14   A.    Standing in front, looking towards the gates where the
11:27:25  15   horses come out.  We were to the left between two fences.
11:27:29  16   Q.    And was Pancho Colorado standing next to "40" during the
11:27:33  17   races?
11:27:38  18   A.    Much of the time.
11:27:40  19   Q.    And the question that Mr. Flood just asked you about the
11:27:43  20   other horse owners, were they also standing next to "40" and
11:27:50  21   Pancho during much of the races?
11:27:58  22   A.    No.
11:28:00  23   Q.    Would it be safe to say that you've been asked thousands of
11:28:03  24   questions about a lot of things that you know?
11:28:14  25   A.    Thousands.
```

| | | |
|---|---|---|
| 11:28:16 | 1 | Q.   By many agents and many prosecutors? |
| 11:28:21 | 2 | A.   By all of them. |
| 11:28:22 | 3 | Q.   And have always done your best to answer those questions to |
| 11:28:26 | 4 | the best of your ability? |
| 11:28:27 | 5 | MR. CHRIS FLOOD:  Objection, your Honor.  That's |
| 11:28:29 | 6 | argumentative.  I object.  It's argumentative, your Honor. |
| 11:28:32 | 7 | THE COURT:  No.  I'm going to let you answer. |
| 11:28:50 | 8 | MR. CHRIS FLOOD:  Objection.  Nonresponsive. |
| 11:28:51 | 9 | THE WITNESS:  Always and -- |
| 11:28:52 | 10 | MR. CHRIS FLOOD:  Your Honor, I object.  It's |
| 11:28:53 | 11 | nonresponsive. |
| 11:28:56 | 12 | THE COURT:  The question was, have you done your best |
| 11:29:02 | 13 | to answer questions to the best of your ability?  Yes?  No? |
| 11:29:08 | 14 | THE WITNESS:  Yes, your Honor. |
| 11:29:10 | 15 | MR. GARDNER:  Thank you, your Honor.  Pass the witness. |
| 11:29:12 | 16 | MR. CHRIS FLOOD:  I have no further questions, your |
| 11:29:14 | 17 | Honor. |
| 11:29:14 | 18 | THE COURT:  All right.  Is the witness excused? |
| 11:29:17 | 19 | MR. GARDNER:  Please, your Honor. |
| 11:29:19 | 20 | MR. CHRIS FLOOD:  Your Honor, I'd ask that he be held |
| 11:29:22 | 21 | only -- I need to have for the offer of proof. |
| 11:29:25 | 22 | THE COURT:  We're going to do that right now.  So. |
| 11:29:28 | 23 | MR. CHRIS FLOOD:  Okay. |
| 11:29:29 | 24 | THE COURT:  Ladies and gentlemen, this is a good time |
| 11:29:34 | 25 | to take a break.  Do you mind taking your lunch hour at 11:30? |

| | | |
|---|---|---|
| 11:29:39 | 1 | Is that going to be all right?  Okay.  See y'all again at 12:30. |
| 11:29:43 | 2 | Remember, don't discuss it with anybody, not even your nearest |
| 11:29:46 | 3 | and dearest. |
| 11:30:14 | 4 | (Jury not present.) |
| 11:30:26 | 5 | THE COURT:  As you know, Mr. Flood, there are a couple |
| 11:30:29 | 6 | of ways you could do an offer of proof.  Frankly, I'd prefer you |
| 11:30:32 | 7 | tell me what you think you can elicit from him, and then, you can |
| 11:30:38 | 8 | ask him about it.  But how do you want to do it? |
| 11:30:42 | 9 | MR. CHRIS FLOOD:  Well, I'll do it any way the Court |
| 11:30:45 | 10 | wants, however, I want to be able to put in the record that I was |
| 11:30:47 | 11 | going to ask him about why he fled from Mexico.  That had nothing |
| 11:30:50 | 12 | to do with "40." |
| 11:30:51 | 13 | THE COURT:  All right.  Go ahead.  Let's -- |
| 11:30:58 | 14 | MR. CHRIS FLOOD:  I'll make it quick, your Honor. |
| 11:31:01 | 15 | Thank you. |
| 11:31:01 | 16 | THE COURT:  Either way. |
| 11:31:01 | 17 | EXAMINATION |
| 11:31:01 | 18 | BY MR. CHRIS FLOOD: |
| 11:31:03 | 19 | Q.   Mr. Cuellar, you said that you had fled Mexico to the United |
| 11:31:06 | 20 | States because of things that "40" was doing, correct? |
| 11:31:14 | 21 | A.   Yes.  That his people told me.  Yes. |
| 11:31:18 | 22 | Q.   In addition, you fled Mexico because on February 8th of |
| 11:31:25 | 23 | 2011, you and some other individuals, including Hector Moreno, |
| 11:31:33 | 24 | were involved in the abduction of three gentlemen; isn't that |
| 11:31:38 | 25 | correct? |

11:31:50  1   A.   False.

11:31:51  2   Q.   All right.  Did you not with the help of Mr. Moreno abduct

11:31:55  3   Miguel Humberto Uribe, Mauricio Humberto Uribe and Francisco

11:32:03  4   Villarreal?

11:32:06  5   A.   Of the three of them, I knew Miguel Uribe.  I knew his

11:32:13  6   brother existed.  The other guy, I never met.

11:32:16  7   Q.   And isn't it a fact that one of the reasons you left Mexico

11:32:20  8   was because in February of 2011, you hit Francisco Villarreal

11:32:26  9   with a mallet striking him on his leg, arms and body, causing him

11:32:32  10  to bleed profusely while telling Miguel Uribe, this is going to

11:32:36  11  happen to you because you messed with my wife?

11:32:57  12  A.   Hundred percent false.

11:33:00  13  Q.   And that you also ordered Hector Moreno to beat Jose Luis

11:33:06  14  Garza-Gaytan until he was lifeless and appeared dead?

11:33:21  15  A.   Who is Jose Luis Garza-Gaytan?

11:33:26  16  Q.   And isn't it true that you then took the same mallet and

11:33:30  17  beat Miguel Humberto until he was dead?

11:33:39  18  A.   That's not true.  False.

11:33:40  19  Q.   And then, finally, you took -- turned to a third person who

11:33:46  20  accompanied you and Mr. Moreno by the name of Rafa, and you told

11:33:50  21  Rafa to cook the bodies?

11:34:03  22  A.   False.

11:34:04  23  Q.   But you know you've been accused of that in Mexico today,

11:34:09  24  correct?

11:34:15  25  A.   Yes.  Can I tell you why?

| | | |
|---|---|---|
| 11:34:17 | 1 | Q.   And has Mr. Gardner promised any sort of benefit with regard |
| 11:34:24 | 2 | to those allegations against you in exchange for your testimony? |
| 11:34:36 | 3 | A.   Zero. |
| 11:34:36 | 4 | Q.   Are you currently applying for the Witness Protection |
| 11:34:40 | 5 | Program that would then keep you from being extradited? |
| 11:34:55 | 6 | A.   I'm doing that because the problems I have with "40" and |
| 11:35:02 | 7 | "42."  May I add something? |
| 11:35:04 | 8 |         MR. CHRIS FLOOD:  That's what I have for my offer of |
| 11:35:06 | 9 | proof, your Honor. |
| 11:35:06 | 10 |         THE COURT:  All right.  Thank you.  Now, can we excuse |
| 11:35:08 | 11 | the witness? |
| 11:35:10 | 12 |         MR. CHRIS FLOOD:  Yes, sir. |
| 11:35:10 | 13 |         THE COURT:  The witness is excused.  Thank you, sir. |
| 11:35:13 | 14 |         MR. GARDNER:  Excuse me, your Honor.  My next witness |
| 11:35:15 | 15 | is Hector Moreno.  I assume that Mr. Flood wanted to do the same |
| 11:35:19 | 16 | thing with him.  Do you want to reconvene a little bit early to |
| 11:35:22 | 17 | save some time so Mr. Flood could have an offer of proof for Mr. |
| 11:35:26 | 18 | Moreno? |
| 11:35:26 | 19 |         MR. CHRIS FLOOD:  It would depend on how Mr. Moreno |
| 11:35:29 | 20 | answers the questions. |
| 11:35:32 | 21 |         THE COURT:  Let's go. |
| 11:35:32 | 22 |         MR. CHRIS FLOOD:  Before we release him, also, we need |
| 11:35:34 | 23 | to take the matter up with the 302s, I think, have now become |
| 11:35:37 | 24 | relevant in light of the witness' answers. |
| 11:35:40 | 25 |         THE COURT:  All right.  But he can leave, right?  What |

| | | |
|---|---|---|
| 11:35:45 | 1 | do you want -- |
| 11:35:46 | 2 | MR. CHRIS FLOOD:  The 302s were produced and we need to |
| 11:35:48 | 3 | ask him questions of it.  I would rather him not be released, |
| 11:35:51 | 4 | your Honor. |
| 11:35:51 | 5 | THE COURT:  All right.  He is not -- |
| 11:35:54 | 6 | MR. CHRIS FLOOD:  I passed him. |
| 11:35:55 | 7 | THE COURT:  So what do you want? |
| 11:35:56 | 8 | MR. CHRIS FLOOD:  I would like him to be -- remain |
| 11:35:59 | 9 | available until we've had a chance to review the 302s that we |
| 11:36:02 | 10 | anticipate -- |
| 11:36:02 | 11 | THE COURT:  How long have you had the 302s? |
| 11:36:05 | 12 | MR. CHRIS FLOOD:  No, we don't. |
| 11:36:06 | 13 | THE COURT:  You don't have the 302s? |
| 11:36:08 | 14 | MR. CHRIS FLOOD:  We've only been provided the two |
| 11:36:10 | 15 | prior 302s that the government didn't give us. |
| 11:36:12 | 16 | THE COURT:  Why are you entitled to the 302s? |
| 11:36:16 | 17 | MR. GARDNER:  You got it from the government through |
| 11:36:18 | 18 | Mr. DeGeurin. |
| 11:36:20 | 19 | MR. CHRIS FLOOD:  I'm not suggesting that I stole them |
| 11:36:22 | 20 | from the government.  Mr. Gardner has made the tactical decision |
| 11:36:27 | 21 | not to supply us the 302s.  We did have two of the 302s that this |
| 11:36:31 | 22 | witness provided through previous counsel.  I think in light of |
| 11:36:35 | 23 | his -- |
| 11:36:36 | 24 | THE COURT:  On what basis do you get the 302s? |
| 11:36:39 | 25 | MR. CHRIS FLOOD:  Well, I think we're entitled to the |

| | | |
|---|---|---|
| 11:36:40 | 1 | 302s to determine what prior statements the witnesses made to |
| 11:36:44 | 2 | government officials. |
| 11:36:44 | 3 | THE COURT:  You're talking about Jencks?  He hasn't |
| 11:36:47 | 4 | adopted them. |
| 11:36:48 | 5 | MR. CHRIS FLOOD:  I know he hadn't adopted them but -- |
| 11:36:50 | 6 | THE COURT:  Isn't that what's required for Jencks? |
| 11:36:53 | 7 | MR. CHRIS FLOOD:  Well, it's reports in this case -- we |
| 11:36:55 | 8 | believe it's reports of inconsistent statements.  This is |
| 11:36:59 | 9 | Brady-Giglio at this point, your Honor. |
| 11:37:01 | 10 | THE COURT:  Not at this point. |
| 11:37:05 | 11 | MR. CHRIS FLOOD:  In his three days of debriefings, he |
| 11:37:08 | 12 | did not state the evidence that he said in this courtroom the |
| 11:37:12 | 13 | last two days, and I think it would be Brady-Giglio, your Honor. |
| 11:37:16 | 14 | He testified that he told them the whole truth back then and I |
| 11:37:19 | 15 | think -- with all due respect to Mr. Gardner, I don't think he |
| 11:37:24 | 16 | and I share the same views on what Brady-Giglio requires. |
| 11:37:28 | 17 | And so, what I'd ask is that the 302s, if they're not |
| 11:37:31 | 18 | going to be turned over, the 302s of this witness, any prior |
| 11:37:34 | 19 | statements of this witness be made available to the Court for |
| 11:37:39 | 20 | in-camera review, and if it contains Brady or Giglio material, |
| 11:37:43 | 21 | that it be turned over. |
| 11:37:44 | 22 | THE COURT:  You've got them for me? |
| 11:37:48 | 23 | MR. GARDNER:  I do, your Honor. |
| 11:37:49 | 24 | THE COURT:  Just in case I run out of something to do. |
| 11:37:53 | 25 | MR. CHRIS FLOOD:  And just to be clear, your Honor, I |

| | | |
|---|---|---|
| 11:37:54 | 1 | think it would include all 302s relating to this witness. |
| 11:37:57 | 2 | MR. GARDNER:  Your Honor, this is the disc.  I have not |
| 11:37:59 | 3 | marked it.  I assume the Court wants to mark it.  We ask that it |
| 11:38:02 | 4 | be marked a sealed exhibit.  It's all the reports of Special |
| 11:38:06 | 5 | Agent Lawson. |
| 11:38:06 | 6 | THE COURT:  All right.  302s. |
| 11:38:11 | 7 | MR. CHRIS FLOOD:  Your Honor, the only other thing I |
| 11:38:13 | 8 | would ask is if Agent Lawson was not present during the initial |
| 11:38:17 | 9 | interviews of this witness but other government agents were, I'd |
| 11:38:21 | 10 | ask that those also be made part of the record on appeal. |
| 11:38:27 | 11 | THE COURT:  Do you have -- |
| 11:38:29 | 12 | MR. GARDNER:  I have no idea who the other witnesses |
| 11:38:30 | 13 | were, your Honor, or the other agents that have talked to this |
| 11:38:34 | 14 | witness. |
| 11:38:34 | 15 | THE COURT:  Do you have them? |
| 11:38:35 | 16 | MR. GARDNER:  I do not have them. |
| 11:38:36 | 17 | THE COURT:  Have you reviewed them in any way? |
| 11:38:37 | 18 | MR. GARDNER:  No, sir. |
| 11:38:38 | 19 | THE COURT:  So what do you want from him?  What do you |
| 11:38:41 | 20 | want me to do? |
| 11:38:41 | 21 | MR. CHRIS FLOOD:  I think he can inquire of the agents |
| 11:38:44 | 22 | that were handling the Eastern District case for all their case |
| 11:38:46 | 23 | reports.  Certainly I'm like a needle in a haystack if I go |
| 11:38:51 | 24 | looking for them.  You know how much cooperation I would get |
| 11:38:54 | 25 | there.  There's only one government, your Honor, and it's this |

11:38:56  1   gentleman right here.  And --

11:38:58  2        THE COURT:  All right.  What do you want?  Do you want

11:39:02  3   me to ask them to look for 302s from the March three-day

11:39:07  4   interview?  Is that what you want me to ask them to do?

11:39:11  5        MR. CHRIS FLOOD:  Your Honor, I think all of the 302s,

11:39:14  6   prior statements by this witness to the government are -- should

11:39:18  7   be made available to you for your in-camera review and includes

11:39:23  8   information that's Brady and Giglio should be turned over.

11:39:26  9        THE COURT:  Fishing expedition to me, but do you have

11:39:29  10  the 302s?

11:39:30  11       MR. GARDNER:  Only 302s I have, your Honor, are made by

11:39:32  12  my case agents in this case.  I do not have the 302s from any

11:39:37  13  other agent who has interviewed Mr. Cuellar.  I have not seen --

11:39:41  14       THE COURT:  Are they obtainable?

11:39:43  15       MR. GARDNER:  I don't know, your Honor.  I know one DEA

11:39:45  16  who interviewed Mr. Cuellar.

11:39:51  17       THE COURT:  See if you can find it.  If you can, get a

11:39:54  18  copy and I'll look at that, too.

11:39:56  19       MR. GARDNER:  Yes, sir.

11:39:57  20       THE COURT:  All right.  I'm reading a very good book.

11:40:00  21  I hate to spend my time doing this.  But all right.  Anything

11:40:03  22  else?

11:40:07  23       MR. CHRIS FLOOD:  Your Honor, only thing I would ask --

11:40:09  24  and I may have already said it -- I would like that they be made

11:40:11  25  a part of the record on appeal, in the event they're not --

| | | |
|---|---|---|
| 11:40:15 | 1 | THE COURT:  I will review them and I will put them |
| 11:40:17 | 2 | under seal and hand them to the courtroom deputy to put them in |
| 11:40:21 | 3 | the record. |
| 11:40:22 | 4 | MR. CHRIS FLOOD:  Or turn them over to us. |
| 11:40:26 | 5 | THE COURT:  No.  I don't think so.  Now what else?  Now |
| 11:40:28 | 6 | can we let the witness go? |
| 11:40:30 | 7 | MR. CHRIS FLOOD:  Yes, your Honor. |
| 11:40:30 | 8 | THE COURT:  I'm trying to accommodate the marshals |
| 11:40:32 | 9 | here.  You're free to go.  Thank you.  Thank you, marshals. |
| 11:40:37 | 10 | All right.  Now what? |
| 11:40:39 | 11 | MR. GARDNER:  Your Honor, I'm just inquiring as to |
| 11:40:40 | 12 | whether Mr. Flood wants to do the same offer of proof with |
| 11:40:45 | 13 | respect to Hector Moreno. |
| 11:40:47 | 14 | THE COURT:  He says he doesn't know yet.  What else? |
| 11:41:05 | 15 | All right.  See you guys at 12:30. |
| 12:31:37 | 16 | (Lunch recess.) |
| 12:32:48 | 17 | THE COURT:  Okay.  Anything before we bring the jury |
| 12:32:50 | 18 | in? |
| 12:32:51 | 19 | MR. GARDNER:  Nothing from the government, your Honor. |
| 12:32:52 | 20 | THE COURT:  Bring them in, please. |
| 12:32:55 | 21 | (Jury present.) |
| 12:34:37 | 22 | THE COURT:  Call your next witness. |
| 12:34:40 | 23 | MR. GARDNER:  Thank you, your Honor.  The government |
| 12:34:42 | 24 | calls Hector Moreno. |
| 12:34:56 | 25 | (Witness sworn through interpreter.) |

| | | |
|---|---|---|
| 12:35:35 | 1 | MR. GARDNER:  May I proceed, your Honor? |
| 12:35:37 | 2 | THE COURT:  You may. |
| 12:35:38 | 3 | HECTOR MORENO, called by the Government, duly sworn. |
| 12:35:38 | 4 | DIRECT EXAMINATION |
| 12:35:38 | 5 | BY MR. GARDNER: |
| 12:35:39 | 6 | Q.   Mr. Moreno, the jury has heard your name before, but could |
| 12:35:41 | 7 | you please turn and introduce yourself to them and tell them |
| 12:35:45 | 8 | little bit about how old you are? |
| 12:35:57 | 9 | A.   My name is Hector Moreno.  I'm 39 years old. |
| 12:36:00 | 10 | Q.   And where were you born, sir? |
| 12:36:05 | 11 | A.   In Mexico, in state of Coahuila. |
| 12:36:10 | 12 | Q.   Now, Mr. Moreno, the jury has heard a lot about the drug |
| 12:36:14 | 13 | movement from the United States to Mexico and the money back from |
| 12:36:18 | 14 | the United States into Mexico.  Do you know Alfonso Cuellar? |
| 12:36:33 | 15 | A.   Yes. |
| 12:36:33 | 16 | Q.   And who is he, sir? |
| 12:36:38 | 17 | A.   He was my boss in Mexico. |
| 12:36:40 | 18 | Q.   And do you know Jose Vasquez, Jr.? |
| 12:36:49 | 19 | A.   Yes.  He was our client in the U.S. in Dallas. |
| 12:36:53 | 20 | Q.   And who would do most of the contact with Jose Vasquez, Jr. |
| 12:37:00 | 21 | in Dallas, you or Cuellar? |
| 12:37:04 | 22 | A.   Me. |
| 12:37:06 | 23 | Q.   At what point did you come into the United States? |
| 12:37:16 | 24 | A.   End of March 2011. |
| 12:37:18 | 25 | Q.   Why did you come to the United States? |

12:37:26  1   A.   Because I was going to be killed in Mexico.

12:37:29  2   Q.   And the jury's heard some of that.  Now, before coming

12:37:32  3   across, did you contact an attorney here in the United States?

12:37:41  4   A.   Yes.

12:37:43  5   Q.   And like Mr. Cessa here has his attorneys, is Mr. Perez --

12:37:53  6   is that your attorney?

12:37:53  7   A.   Yes.

12:37:54  8   Q.   And has he guided you through the criminal justice system

12:38:01  9   here in the United States?

12:38:03  10  A.   Yes.

12:38:03  11  Q.   And are you currently facing charges in the Eastern District

12:38:07  12  of Texas in Plano?

12:38:14  13  A.   Yes.

12:38:15  14  Q.   And what are those charges for?

12:38:24  15  A.   Trafficking cocaine and money.

12:38:27  16  Q.   Have you been sentenced on those charges yet?

12:38:32  17  A.   No.

12:38:33  18  Q.   Have you entered a plea or elected to go to trial at this

12:38:44  19  point?

12:38:44  20  A.   No.

12:38:45  21  Q.   And have you been cooperating not only with me in this case

12:38:49  22  but also with the Eastern District of Texas folks in their cases?

12:39:01  23  A.   Yes.

12:39:02  24  Q.   And what is your current immigration status, sir?

12:39:08  25  A.   I have a work permit.

| | | |
|---|---|---|
| 12:39:10 | 1 | Q.   That requires you to work here in the United States to |
| 12:39:13 | 2 | maintain that permit? |
| 12:39:17 | 3 | A.   Yes. |
| 12:39:18 | 4 | Q.   So what is your hope today in exchange for your testimony? |
| 12:39:32 | 5 | A.   Cooperating and shorten my sentence. |
| 12:39:36 | 6 | Q.   And you know that only I could make a recommendation up to |
| 12:39:39 | 7 | Ernest Gonzalez, the prosecutor in Plano.  I have no ability to |
| 12:39:43 | 8 | affect your charges.  Do you understand that? |
| 12:39:55 | 9 | A.   Yes. |
| 12:39:56 | 10 | Q.   Was that the same promise I made to you when you testified |
| 12:40:00 | 11 | here previously back in 2012? |
| 12:40:09 | 12 | A.   Yes. |
| 12:40:12 | 13 | Q.   Could we please bring up 250A?  Put them side-by-side with |
| 12:40:18 | 14 | 250B.  Sir, do you recognize those two individuals? |
| 12:40:37 | 15 | A.   Yes. |
| 12:40:37 | 16 | Q.   And the one on the left, who is that? |
| 12:40:41 | 17 | A.   Miguel Trevino, Zeta 40. |
| 12:40:47 | 18 | Q.   And the gentleman on his right, who is that? |
| 12:40:52 | 19 | A.   Omar Trevino, Zeta 42. |
| 12:40:56 | 20 | Q.   So while you were working for Mr. Cuellar in Mexico, how |
| 12:41:00 | 21 | often would you see these two? |
| 12:41:29 | 22 | A.   Once a month, but it would vary.  It was different.  There |
| 12:41:33 | 23 | was a lot of work once a week.  If there were the horse races, |
| 12:41:37 | 24 | every day.  If there was auctions, we would be three or four days |
| 12:41:42 | 25 | watching the auctions. |

12:41:44  1    Q.   When you say auction, is that the horse auctions?

12:41:49  2    A.   Yes.

12:41:50  3    Q.   Were you aware if "40" or "42" sent drug proceeds into the

12:41:57  4    United States for the purpose of these auctions?

12:42:09  5    A.   Yes.

12:42:09  6    Q.   And how did you become aware of that, sending that money to

12:42:16  7    the U.S.?

12:42:21  8    A.   Because Poncho had me make several payments for horses here

12:42:29  9    in the U.S.

12:42:31  10   Q.   So how did that happen?  How did you send money from the

12:42:37  11   drugs into the United States?

12:43:00  12   A.   I would get the money from "Cuno," who was "40" and "42's"

12:43:12  13   accountant.  He would make the payments.  He would get the money

12:43:15  14   to some exchange houses in Nuevo Laredo and Monterrey.  So that

12:43:21  15   the money could be used -- so that people could send the money

12:43:28  16   in.

12:43:29  17   Q.   When you say Ramiro Villarreal, I think you said that.  Have

12:43:33  18   you met Ramiro Villarreal?

12:43:39  19   A.   Yeah.  I saw him several times on "40's" ranch and then, I

12:43:59  20   saw him in Piedras Negras.  And I saw him once in Allende with

12:44:04  21   Jose Trevino that they were going to -- they were working on some

12:44:08  22   kind of agreement regarding the Los Alamitos race.

12:44:13  23   Q.   Could you pull up 250C?  Do you recognize this individual?

12:44:32  24   A.   Yes.  That's the brother.  That's "40's" brother, Jose

12:44:36  25   Trevino.

| | | |
|---|---|---|
| 12:44:38 | 1 | Q.   And do you know of a horse named Tempting Dash? |
| 12:44:44 | 2 | A.   Yes. |
| 12:44:46 | 3 | Q.   And whose horse was that? |
| 12:44:51 | 4 | A.   "Forty's." |
| 12:44:53 | 5 | Q.   Were you aware if that horse raced in Mexico? |
| 12:44:58 | 6 | A.   Yes, under the name Huesos. |
| 12:45:03 | 7 | Q.   In Spanish, Huesos means bones; is that correct? |
| 12:45:07 | 8 | A.   Yes. |
| 12:45:08 | 9 | Q.   And so, when did -- to your knowledge, did the name get |
| 12:45:13 | 10 | changed to Tempting Dash? |
| 12:45:22 | 11 | A.   When he started running here in the United States. |
| 12:45:25 | 12 | Q.   And even though you said that was "40's" horse, did that |
| 12:45:30 | 13 | horse Tempting Dash run under a different name in the United |
| 12:45:41 | 14 | States? |
| 12:45:41 | 15 | A.   In the beginning, it ran under Ramiro Villarreal-Guajardo's |
| 12:45:57 | 16 | name, and when he started doing well, it was switched to Jose |
| 12:46:02 | 17 | Trevino's name. |
| 12:46:03 | 18 | Q.   And were you present during that discussion that "40" talked |
| 12:46:06 | 19 | about turning it into his brother's name? |
| 12:46:15 | 20 | A.   Yes. |
| 12:46:16 | 21 | Q.   Other than Tempting Dash, how many horses did "40" purchase |
| 12:46:21 | 22 | in the United States, let's say, in 2008? |
| 12:46:40 | 23 | A.   He bought a bunch.  That's when I first met him and that's |
| 12:46:46 | 24 | when he bought a bunch of them.  He bought a ranch in Piedras |
| 12:46:50 | 25 | Negras, and he took about 30 horses there. |

| | | |
|---|---|---|
| 12:46:52 | 1 | Q.   I'm sorry.  You said Ramiro or "40"?  I'm sorry. |
| 12:47:00 | 2 | A.   No.  "Forty." |
| 12:47:02 | 3 | Q.   Could you please bring up 250N?  Who is this gentleman? |
| 12:47:14 | 4 | A.   Ramiro. |
| 12:47:15 | 5 | Q.   I believe you said or testified that he was the one |
| 12:47:19 | 6 | initially doing the purchases through a, possibly, casa cambio in |
| 12:47:27 | 7 | Monterrey.  Is that your testimony? |
| 12:47:35 | 8 | A.   Yes. |
| 12:47:37 | 9 | Q.   At some point, did Ramiro Villarreal stop being involved in |
| 12:47:41 | 10 | the purchase of horses? |
| 12:47:58 | 11 | A.   Not that I know.  Well, towards the end, he had some trouble |
| 12:48:01 | 12 | with the brother.  There was some kind of jealousy, and he ended |
| 12:48:05 | 13 | up having trouble with the brother. |
| 12:48:06 | 14 | Q.   When you say the brother, is that Jose Trevino? |
| 12:48:10 | 15 | A.   Yes. |
| 12:48:11 | 16 | Q.   This "42," Omar Trevino also a brother? |
| 12:48:20 | 17 | A.   Yes. |
| 12:48:21 | 18 | Q.   So after Ramiro stopped becoming involved, did they have |
| 12:48:27 | 19 | another person that became involved in buying horses in the |
| 12:48:37 | 20 | United States? |
| 12:48:37 | 21 | A.   Carlos, Carlos Nayen. |
| 12:48:39 | 22 | Q.   Could we have 250E, please?  Is this the person you know as |
| 12:48:46 | 23 | Carlos Nayen? |
| 12:48:47 | 24 | A.   Yes. |
| 12:48:48 | 25 | Q.   And how did you first meet him? |

| | | |
|---|---|---|
| 12:48:53 | 1 | A.   Well, at first, he was bringing horses from the stable of |
| 12:49:10 | 2 | Flor de Maria, and then, he started buying horses for "40." |
| 12:49:14 | 3 | Q.   When you say the stable Flor de Maria, do you know who the |
| 12:49:19 | 4 | owner of that stable was? |
| 12:49:27 | 5 | A.   I didn't know who the owner was until later. |
| 12:49:32 | 6 | Q.   When did you learn who the owner was? |
| 12:49:49 | 7 | A.   Once he started -- Carlos started working directly for "40," |
| 12:50:01 | 8 | he said that his dad had also bought a lot of horses, and then, |
| 12:50:04 | 9 | they started running the colts to see how they would race. |
| 12:50:09 | 10 | Q.   So Carlos Nayen said his dad. |
| 12:50:18 | 11 | A.   Yes.  That's what he called Francisco Colorado. |
| 12:50:23 | 12 | Q.   So were you present in Mexico during the course of any of |
| 12:50:27 | 13 | these auctions? |
| 12:50:40 | 14 | A.   Yeah.  I was present in Mexico watching the auction on the |
| 12:50:46 | 15 | computer. |
| 12:50:46 | 16 | Q.   And did you observe "40" and -- I'm sorry, "40" and Carlos |
| 12:50:51 | 17 | Nayen were communicating during these auctions? |
| 12:50:56 | 18 | A.   Yeah.  Via Blackberry. |
| 12:51:00 | 19 | Q.   And do you know what the communications were? |
| 12:51:15 | 20 | A.   That we should buy a horse, whatever the cost, have the |
| 12:51:19 | 21 | horses been X-rayed, how many horses were they going to buy, that |
| 12:51:23 | 22 | type. |
| 12:51:24 | 23 | Q.   And do you know approximately how many horses "40" or "42" |
| 12:51:29 | 24 | bought in 2009? |
| 12:51:46 | 25 | A.   Yeah.  They bought a lot of horses, way too many horses. |

| | | |
|---|---|---|
| 12:51:54 | 1 | One of the first horses that over half a million dollars they |
| 12:51:58 | 2 | bought. |
| 12:52:03 | 3 | Q.   Are you familiar with a horse called Mr. Piloto? |
| 12:52:10 | 4 | A.   Yes. |
| 12:52:10 | 5 | Q.   Have you seen the All American Futurity in 2010 involving |
| 12:52:15 | 6 | that horse? |
| 12:52:24 | 7 | A.   I saw it several, many times. |
| 12:52:26 | 8 | Q.   Is the All American Futurity the largest quarter horse race |
| 12:52:31 | 9 | in the United States? |
| 12:52:37 | 10 | A.   Yes. |
| 12:52:38 | 11 | Q.   And do you know how much the winning purse is for that race? |
| 12:52:45 | 12 | A.   A million dollars. |
| 12:52:46 | 13 | Q.   Did you personally have any involvement in sending money to |
| 12:52:52 | 14 | Ruidoso for that race? |
| 12:53:05 | 15 |       THE INTERPRETER:  Interpreter's going to ask for |
| 12:53:07 | 16 | repetition. |
| 12:53:10 | 17 | A.   Yes.  I said $110,000. |
| 12:53:13 | 18 | Q.   (BY MR. GARDNER) And who did you receive your instructions |
| 12:53:15 | 19 | from? |
| 12:53:19 | 20 | A.   Poncho. |
| 12:53:20 | 21 | Q.   And were you present when "40" gave those instructions to |
| 12:53:23 | 22 | Poncho? |
| 12:53:32 | 23 | A.   Yes.  He received the message from Carlos and then, I heard |
| 12:53:35 | 24 | him tell Poncho. |
| 12:53:36 | 25 | Q.   And what were you told either through Poncho or "40" about |

12:53:41  1   the money you're supposed to send?

12:53:52  2   A.    That I should send $110,000 to Ruidoso.

12:53:55  3   Q.    And do you know what the purpose of that money was for?

12:54:07  4   A.    It was to pay $10,000 to each one of the gate handlers,

12:54:12  5   gatekeepers, and 10,000 to the handler.

12:54:18  6   Q.    Did that money come from Mexico, or did it come from Jose

12:54:24  7   Vasquez?

12:54:32  8   A.    By way of Jose Vasquez.

12:54:34  9   Q.    So approximately how many times do you recall giving Mr.

12:54:40  10  Vasquez instructions to pay for horse-related expenses?

12:54:55  11  A.    There was several times I paid for a mare in Oklahoma.  I

12:55:22  12  sent several payments to Lone Star in Dallas for the

12:55:26  13  registrations.  I don't know what else.

12:55:29  14  Q.    Could I have one moment, your Honor?

12:55:31  15        THE COURT:  You may.

12:55:34  16  Q.    (BY MR. GARDNER) At some point, did you stop using Jose

12:55:39  17  Vasquez, Jr. to pay the horse expenses?

12:55:53  18  A.    We just paid one 200,000 and -- for 200,000 and then, I told

12:56:08  19  Poncho that we could not.  We had to quit paying for the horses

12:56:11  20  because they were going to start looking at Jose Vasquez because

12:56:15  21  he was paying in cash.

12:56:16  22  Q.    Do you know an individual by the name of "Yo Yo"?

12:56:21  23  A.    Yes.

12:56:24  24        MR. GARDNER:  Katherine, is 250Z in?  I just want to

12:56:27  25  make sure.

| | | |
|---|---|---|
| 12:56:30 | 1 | MS. WALLACE:  Not yet. |
| 12:56:32 | 2 | MR. GARDNER:  Not yet. |
| 12:56:36 | 3 | Q.  (BY MR. GARDNER) Mr. Moreno, I'm going to show you two pages |
| 12:56:44 | 4 | while I'm up here.  One is Government's Exhibit 250Z.  Do you |
| 12:56:47 | 5 | recognize that, sir? |
| 12:56:54 | 6 | A.   Yes.  That's "Yo Yo." |
| 12:56:58 | 7 | Q.   And I'm showing you Government's Exhibit 210.  Do you |
| 12:57:03 | 8 | recognize that, sir?  There's an official translation on the back |
| 12:57:05 | 9 | of it. |
| 12:57:18 | 10 | A.   Yes.  Those are the sheets that either Carlos, "Yo Yo," or |
| 12:57:32 | 11 | Poncho would give me so that I could pay the expenses for the |
| 12:57:38 | 12 | horses, and then, I would give those to Carlos or "Yo Yo" for the |
| 12:57:44 | 13 | money to pay them. |
| 12:57:48 | 14 | MR. GARDNER:  Your Honor, I offer Government's Exhibit |
| 12:57:50 | 15 | 250Z. |
| 12:57:52 | 16 | MR. CHRIS FLOOD:  I have no objection, your Honor. |
| 12:57:54 | 17 | THE COURT:  Without objection, 250Z is received. |
| 12:58:00 | 18 | MR. GARDNER:  Could we pull 250Z? |
| 12:58:02 | 19 | Q.  (BY MR. GARDNER) Mr. Moreno, is this the individual you |
| 12:58:04 | 20 | identified as "Yo Yo"? |
| 12:58:08 | 21 | A.   Yes. |
| 12:58:09 | 22 | Q.   And who did "Yo Yo" work for? |
| 12:58:14 | 23 | A.   For Carlos. |
| 12:58:17 | 24 | Q.   And was this the individual you just testified to that you |
| 12:58:21 | 25 | started sending the expenses through rather than Jose Vasquez, |

12:58:24   1   Jr.?

12:58:29   2   A.    Yes.

12:58:34   3   Q.    Your Honor, I'd also offer Government's Exhibit 210.

12:58:38   4            MR. CHRIS FLOOD:  No objection, your Honor.

12:58:40   5            THE COURT:  Without objection, it is received.

12:58:45   6            MR. GARDNER:  Could we please bring up 210?

12:58:50   7   Q.    (BY MR. GARDNER) Could you please explain to the jury what

12:58:55   8   this is?

12:59:15   9   A.    These are the expenses that they had in Austin, Ruidoso, Los

12:59:21  10   Angeles for food, for the jockeys, for the trainers, for the

12:59:25  11   feed, all of their expenses.

12:59:27  12   Q.    All right.  And, sir, you don't read -- or do you read

12:59:31  13   English is probably a better question?

12:59:32  14   A.    No.

12:59:33  15   Q.    So the translation attached to this, that's certified by the

12:59:39  16   translator and not prepared by you?

12:59:57  17   A.    I turned in the pages.  I had copies in Spanish.

13:00:01  18   Q.    And so, when this says up at the top here, 1 December -- or

13:00:08  19   says Diciembre, did you get these things on a monthly basis?

13:00:26  20   A.    Yes.  Every time that Carlos or "Yo Yo" would go to Piedras

13:00:33  21   Negras, they would take one of these, and then, "40" or "42"

13:00:36  22   would authorize it and Carlos would pay it.

13:00:38  23   Q.    And so, at least for this particular month, do you know a

13:00:41  24   year this was?

13:00:48  25   A.    2010.

13:00:50  1    Q.   And so, was that figure down there, does that represent

13:00:56  2    dollars or pesos?

13:01:01  3    A.   Dollars.

13:01:03  4    Q.   And when you said that you would pay "Yo Yo" or Carlos

13:01:08  5    Nayen, what would you pay them with?

13:01:22  6    A.   The bills that Jose Vasquez would send me, the money that

13:01:25  7    Jose Vasquez would send me.

13:01:28  8    Q.   So money from drugs?

13:01:30  9    A.   Yes.

13:01:31  10   Q.   Now, some of the horses that "40" would buy, you said he put

13:01:45  11   them in his brother's name.  Do you know of any other names that

13:01:50  12   "40" put his horses in?

13:02:14  13   A.   Yes.  He put them in several names, but I don't remember

13:02:18  14   them right now.

13:02:19  15   Q.   Do you remember he put horses in the names of fake

13:02:24  16   companies?

13:02:38  17   A.   Yes.  There were several companies.  I gave him the names

13:02:45  18   when I got here, but it's been four years.  I don't remember them

13:02:48  19   now.

13:02:49  20   Q.   But were those names of those companies, were they real

13:02:54  21   companies?

13:02:57  22   A.   I don't think they were real.

13:03:09  23   Q.   And you mentioned before, you would watch the auctions with

13:03:14  24   some of the races on the internet.

13:03:22  25   A.   That's right.

13:03:23  1   Q.   How do you log into the internet to watch the races?

13:03:45  2   A.   We would send a user name and the password.  The use name

13:03:51  3   was ADT Petro Servicios at, I don't remember what, and the

13:03:55  4   password was Francisco Colorado.

13:03:58  5   Q.   Have you ever met the Defendant Pancho Colorado?

13:04:07  6   A.   I saw him at some races in Morelos, Coahuila.

13:04:12  7   Q.   And do you know what Pancho Colorado, the defendant, does

13:04:17  8   for a living or did for a living?

13:04:29  9   A.   Pancho mentioned once that he had oil concessions.

13:04:35  10  Q.   Do you remember the name of his company or if it was ever

13:04:37  11  told to you?

13:04:43  12  A.   ADT Petro Servicios.

13:04:47  13  Q.   Was that the same name that you put in as a user name on the

13:04:51  14  internet race site?

13:04:57  15  A.   Yes.

13:04:57  16  Q.   Do you know where you got that password from?

13:05:05  17  A.   It was sent to "40" on a Blackberry message.  He showed it

13:05:19  18  to me so that I could type it into the computer.

13:05:24  19  Q.   Do you remember you said you met the defendant at a race in,

13:05:29  20  I believe, Morelos.  Is that your testimony?

13:05:38  21  A.   Yes.

13:05:39  22  Q.   Do you remember the name of the place or the racetrack that

13:05:43  23  you actually attended?

13:05:51  24  A.   The La Ilusion Ranch.

13:05:55  25  Q.   And do you know the owner of that ranch?

13:06:00  1   A.    Remberto Castro.

13:06:02  2   Q.    And who is Mr. Castro?

13:06:13  3   A.    He was the owner of the ranch and he was -- something to do

13:06:20  4   with politics in Morelos.

13:06:23  5   Q.    Was this race in Morelos La Ilusion Ranch, was it a private

13:06:31  6   race or a public race?

13:06:38  7   A.    It was private.

13:06:40  8   Q.    And about how many races happened that day?

13:06:49  9   A.    It was five or six.  It had been all the yearlings and

13:07:19 10   two-year-olds that they bought the year before.  It happened in

13:07:21 11   February or March and they were just testing them out.  And it

13:07:25 12   was "40's" and "42's" and Poncho's, and Carlos had Colorado

13:07:34 13   there.

13:07:34 14   Q.    Horses for Colorado?

13:07:36 15   A.    Yes.

13:07:36 16   Q.    And how long did this race or these sets of races last?

13:07:45 17   A.    Four or five hours.

13:07:47 18   Q.    Do you remember what the defendant was wearing?

13:08:00 19   A.    He had a -- like a red shirt on that had palm trees, or

13:08:08 20   something like that, and he was smoking a cigar.

13:08:11 21   Q.    And where was he during the course of this four years in

13:08:14 22   relation to "40"?

13:08:26 23   A.    Along with "40," "42," "Mamito," Carlos.

13:08:32 24   Q.    And what was his demeanor during this whole race?

13:08:42 25   A.    Normal.  Normal.  There was grilled meat, there was wine,

13:08:53   1   everything was normal.

13:08:55   2   Q.   Was there security at this race?

13:09:02   3   A.   A lot of security.  All of "40," "42's," "Mamito's" escorts.

13:09:10   4   Q.   And do you know if the defendant ever did horse business

13:09:15   5   with "40"?

13:09:22   6          MR. CHRIS FLOOD:  Objection.  Lack of personal

13:09:23   7   knowledge.

13:09:28   8          THE COURT:  Do you know?

13:09:47   9   A.   Carlos Nayen said that if --

13:09:50   10          MR. CHRIS FLOOD:  My objection was lack of personal

13:09:52   11   knowledge.

13:09:56   12          MR. GARDNER:  Can I break it up, your Honor?

13:09:58   13          THE COURT:  Yes.

13:09:59   14   Q.   (BY MR. GARDNER) We've got to go through a process, Mr.

13:10:03   15   Moreno.  So first question is, did you personally know if "40"

13:10:08   16   and Colorado did horse business together?

13:10:21   17   A.   No.

13:10:22   18   Q.   Okay.  Did you hear other people talk about "40" and Pancho

13:10:29   19   Colorado's horse business?

13:10:31   20          MR. CHRIS FLOOD:  Objection.  Hearsay, your Honor.

13:10:33   21          THE COURT:  Well, that's -- you may answer that

13:10:42   22   question.  Go ahead.

13:10:43   23   A.   Yes.  At a house in Nava.

13:10:46   24   Q.   (BY MR. GARDNER) And who -- without telling me what they

13:10:50   25   said, who provided that information?

13:11:01   1   A.   Carlos Nayen and "40."

13:11:07   2   Q.   So you overheard "40" and Carlos Nayen talking about a horse

13:11:12   3   business involving Pancho Colorado?

13:11:25   4   A.   That he was going to pay for them.

13:11:28   5   Q.   What manner was Pancho Colorado going to pay for the horses?

13:11:36   6           MR. CHRIS FLOOD:  Objection.  Hearsay, your Honor.

13:11:39   7           THE COURT:  Overruled.

13:11:41   8   Q.   (BY MR. GARDNER) You may answer the --

13:11:43   9   A.   I don't.

13:11:43  10   Q.   I guess try a better question is, could you let the jury

13:11:46  11   know exactly what was said between "40" and Carlos Nayen?

13:11:51  12           MR. CHRIS FLOOD:  Objection.  Hearsay, your Honor.  And

13:11:53  13   I'd like a continuing objection to this conversation.  Alleged

13:11:58  14   conversation.

13:11:58  15           THE COURT:  I won't give you the continuing, but I will

13:12:00  16   overrule on the basis that it's offered merely for what was said,

13:12:07  17   not for the truth thereof.

13:12:33  18   A.   But how were they going to pay for everything "Pelos" --

13:12:37  19   that's what he called Carlos -- had spent, and that Carlos said

13:12:40  20   no problem, I've already talked to my dad, Pancho Colorado.

13:12:45  21   Q.   (BY MR. GARDNER) Let's talk about the September 2010 auction

13:12:53  22   at Ruidoso.  Did the Zetas buy horses at that auction?

13:13:08  23   A.   Lots.  Lots of horses.  Lots of mares.

13:13:10  24   Q.   Do you remember how much was spent on behalf of "40" and the

13:13:14  25   Zetas at that auction?

13:13:30  1   A.   I have an idea, but Carlos showed up with the horse that he

13:13:37  2   had bought more horses -- he'd been the one that bought more

13:13:41  3   horses at those auctions.

13:13:42  4   Q.   And when you say showed up, was that a meeting where you

13:13:45  5   were present between Carlos and "40"?

13:13:54  6   A.   Yes.

13:13:55  7   Q.   And did you see him and Carlos paying "40" for anything?

13:14:09  8   A.   He handed them -- it was like a horse and then, a belt

13:14:12  9   buckle from when Piloto had won.

13:14:21  10  Q.   May I have one second, your Honor?

13:14:32  11        Did "40" ever tell you why he used his money to buy

13:14:44  12  horses in the U.S.?

13:14:47  13  A.   Because it was a very easy way to launder the money and it

13:14:54  14  cleaned it up very well.

13:14:56  15  Q.   May I have one second, your Honor?

13:14:59  16        THE COURT:  Yes.

13:15:04  17        MR. GARDNER:  Your Honor, I'll pass the witness.

13:15:05  18        THE COURT:  Your witness, counsel.

13:15:14  19                    CROSS-EXAMINATION

13:15:14  20  BY MR. CHRIS FLOOD:

13:15:20  21  Q.   So, Mr. Moreno, you worked for Mr. Cuellar?

13:15:26  22  A.   Yes.

13:15:27  23  Q.   And would it be your responsibility to get the money that

13:15:34  24  was in Dallas from Mr. Vasquez down to Mr. Cuellar?

13:15:48  25  A.   Yes.

| | | |
|---|---|---|
| 13:15:49 | 1 | Q.   And it was Mr. Nayen's job at some point, I guess, to pay |
| 13:15:57 | 2 | for the horse expenses. |
| 13:16:06 | 3 | A.   Yes. |
| 13:16:09 | 4 | Q.   And I think -- could I have 210 back up?  You remember |
| 13:16:35 | 5 | testifying earlier about Government's Exhibit No. 210? |
| 13:16:45 | 6 | A.   Yes. |
| 13:16:46 | 7 | Q.   And if I remember correctly, this is a list of expenses that |
| 13:16:54 | 8 | were related to the horses? |
| 13:17:03 | 9 | A.   Yes. |
| 13:17:04 | 10 | Q.   But these weren't all the expenses for the entire time that |
| 13:17:10 | 11 | Carlos Nayen was in charge of collecting the money, right? |
| 13:17:13 | 12 | A.   No.  It was each month. |
| 13:17:27 | 13 | Q.   By the way, how many times have you testified for the |
| 13:17:32 | 14 | government before today? |
| 13:17:42 | 15 | A.   Twice. |
| 13:17:45 | 16 | Q.   And how often would these expenses be put together, I guess, |
| 13:17:52 | 17 | by Carlos Nayen and his people and delivered to you or Cuellar |
| 13:17:59 | 18 | for payment? |
| 13:18:11 | 19 | A.   Monthly. |
| 13:18:12 | 20 | Q.   Monthly.  And they weren't always typed.  I guess sometimes |
| 13:18:17 | 21 | they'd be handwritten. |
| 13:18:22 | 22 | A.   No.  All the ones I saw were handed to me like this. |
| 13:18:31 | 23 | Q.   Okay.  And you had dealings with "Yo Yo" as well as Mr. |
| 13:18:36 | 24 | Nayen, correct? |
| 13:18:41 | 25 | A.   Yes. |

13:18:42   1    Q.   That was the gentleman that you identified a minute ago on

13:18:47   2    your direct testimony.

13:18:56   3    A.   That "Yo Yo" and Carlos Nayen.

13:19:00   4    Q.   And so, "Yo Yo" was like the right-hand man of Carlos Nayen.

13:19:06   5    Do you know what I mean by the term "right-hand man"?

13:19:14   6    A.   Yes.

13:19:15   7    Q.   And in addition to collecting expense or money for horse

13:19:21   8    expenses, "Yo Yo" also trafficked in cocaine with Carlos Nayen,

13:19:28   9    correct?

13:19:40   10   A.   Yes.

13:19:41   11   Q.   And "Yo Yo" and Nayen started trafficking small, at around

13:19:51   12   10 kilos of cocaine, but that went to 15 and 25 kilos soon

13:19:56   13   thereafter, correct?

13:20:08   14   A.   Yes.

13:20:08   15   Q.   Would you be able to recognize "Yo Yo's" handwriting?

13:20:16   16   A.   No.

13:20:17   17   Q.   Now, the horse race that you say you saw Mr. Colorado at,

13:20:39   18   that horse race was in Morelos; is that correct?

13:20:48   19   A.   Yes.

13:20:49   20   Q.   And it's at the La Ilusion track?

13:20:56   21   A.   Yes.

13:20:56   22   Q.   And Mr. Cuellar was also there, correct?

13:21:04   23   A.   Yes.

13:21:05   24   Q.   And there were other horse owners at the track, as well, not

13:21:08   25   just "40" and "42."

13:21:18  1    A.    Yes, and Chenso, who was "42's" right-hand man.

13:21:28  2    Q.    Right.  But was it a public track?

13:21:32  3    A.    Yes.

13:21:33  4    Q.    So there was not just the Zetas there.  There were other

13:21:38  5    people that were racing horses there, as well.

13:21:46  6    A.    No.  It is a public track, but on that occasion, it was

13:22:00  7    private.  It was just them.

13:22:02  8    Q.    All right.  So there were no other horse owners present at

13:22:05  9    the track.

13:22:15  10   A.    Drug dealers that owned horses.

13:22:17  11   Q.    Okay.  So only drug dealers, not other horse owners.

13:22:23  12   A.    That's correct.

13:22:29  13   Q.    And that was the only occasion you ever saw Mr. Colorado.

13:22:40  14   A.    That's correct.

13:22:41  15   Q.    As far as the access to the internet that you testified

13:22:49  16   about earlier, I believe you said that "40" obtained the access

13:22:57  17   code off of his Blackberry, correct?

13:23:09  18   A.    Yes.  Message had been sent.

13:23:15  19   Q.    And Carlos Nayen would communicate with "40" on his

13:23:20  20   Blackberry quite a bit?

13:23:25  21   A.    Yes.

13:23:26  22   Q.    And if Carlos Nayen worked for Mr. Colorado and his horse

13:23:32  23   operations and had that password, do you know if it was Mr. Nayen

13:23:36  24   that actually gave the password to access the internet to "40"?

13:23:55  25   A.    It may have been Carlos Nayen.

| | | |
|---|---|---|
| 13:23:58 | 1 | Q.   And the conversation that you testified that happened at the |
| 13:24:05 | 2 | house at Nava, do you remember that testimony? |
| 13:24:08 | 3 | A.   Yes. |
| 13:24:16 | 4 | Q.   That was you, "40" and Nayen, correct? |
| 13:24:27 | 5 | A.   "Forty," "42," me, Poncho, and Carlos -- Commander Carlitos, |
| 13:24:44 | 6 | also. |
| 13:24:44 | 7 | Q.   Poncho?  Which Poncho?  Poncho Cuellar? |
| 13:24:52 | 8 | A.   Poncho Cuellar. |
| 13:24:54 | 9 | Q.   Not Mr. Colorado was not there? |
| 13:24:55 | 10 | A.   No. |
| 13:24:56 | 11 | Q.   And it was at that meeting that you heard "40" say, well, |
| 13:25:02 | 12 | how are we going to pay for these horses, right? |
| 13:25:09 | 13 | A.   That's right. |
| 13:25:11 | 14 | Q.   And it was Nayen that said, don't worry, I've already talked |
| 13:25:14 | 15 | to my dad about it, right? |
| 13:25:21 | 16 | A.   That's right. |
| 13:25:34 | 17 | Q.   Do you know if "Yo Yo" would threaten people for Nayen to |
| 13:25:45 | 18 | make payments? |
| 13:25:53 | 19 | A.   No. |
| 13:25:54 | 20 | Q.   Do you know Alfonso Del Rayo? |
| 13:26:00 | 21 | A.   No. |
| 13:26:03 | 22 | Q.   Now, how many times have you met with the government prior |
| 13:26:20 | 23 | to your testimony here today? |
| 13:26:23 | 24 | A.   What do you mean, about this? |
| 13:26:38 | 25 | Q.   Yes.  About the things that you just testified to before |

| | | |
|---|---|---|
| 13:26:43 | 1 | this jury.  How many times did you meet with the government to |
| 13:26:46 | 2 | discuss this matter? |
| 13:26:58 | 3 | A.   Once yesterday. |
| 13:27:02 | 4 | Q.   That's the only time? |
| 13:27:12 | 5 | A.   And recently, one time when I was received and then, |
| 13:27:16 | 6 | yesterday, once. |
| 13:27:17 | 7 | Q.   Okay.  So yesterday is one time and when's the other time? |
| 13:27:25 | 8 | A.   Today. |
| 13:27:27 | 9 | Q.   So yesterday and today? |
| 13:27:31 | 10 | A.   Yes. |
| 13:27:32 | 11 | Q.   If I may have one minute, your Honor. |
| 13:27:53 | 12 | THE COURT:  Yes. |
| 13:28:01 | 13 | Q.   (BY MR. CHRIS FLOOD) Let me just ask one more question. |
| 13:28:04 | 14 | You're pending sentencing and the charge that you pled |
| 13:28:08 | 15 | guilty to. |
| 13:28:19 | 16 | A.   Sorry? |
| 13:28:21 | 17 | Q.   Have you pled guilty to charges? |
| 13:28:30 | 18 | A.   No. |
| 13:28:31 | 19 | Q.   Okay.  So you told the government about your criminal |
| 13:28:37 | 20 | activity, but you've not been charged? |
| 13:28:49 | 21 | A.   Yes. |
| 13:28:50 | 22 | Q.   And is it your agreement with them that if you testify and |
| 13:28:56 | 23 | provide testimony that is truthful, that you will not be charged? |
| 13:29:11 | 24 | A.   Yes. |
| 13:29:13 | 25 | Q.   Do you have immunity from prosecution? |

13:29:19  1   A.   No.  I have a hearing that's pending.

13:29:30  2   Q.   Okay.  Are you also charged out of Mexico?

13:29:37  3   A.   Yes.

13:29:37  4   Q.   What are you charged with in Mexico?

13:29:40  5        MR. GARDNER:  Your Honor, object.  Same objection.

13:29:42  6        THE COURT:  What's the relevance?

13:29:43  7        MR. CHRIS FLOOD:  To decide whether or not he

13:29:45  8   anticipates not being extradited on those charges, your Honor.

13:29:48  9        THE COURT:  Well, just go ahead and ask him.

13:29:52  10  Q.   (BY MR. CHRIS FLOOD) What are you charged with in Mexico?

13:29:55  11       THE COURT:  No.  Do you anticipate being extradited if

13:29:57  12  there are any charges in Mexico?

13:30:07  13  A.   That's what is being asked for and that's what I'm fighting,

13:30:11  14  the extradition.

13:30:13  15  Q.   (BY MR. CHRIS FLOOD) All right.  And is it your

13:30:15  16  understanding that as long as you cooperate with the government,

13:30:19  17  you will not be extradited to Mexico?

13:30:28  18  A.   Well, those charges were filed the day I came to testify

13:30:51  19  here, a year or two years ago, and the first thing they have to

13:30:57  20  do before anything else is prove that those charges are real.

13:31:01  21  Q.   All right.  Do you have an understanding -- first of all,

13:31:04  22  are you seeking to go into the Witness Protection Program?

13:31:14  23  A.   No.  I'm asking for asylum.

13:31:20  24  Q.   But is it your understanding that as long as you testify in

13:31:27  25  a way that they believe it's truthful, you will not be prosecuted

| | | |
|---|---|---|
| 13:31:32 | 1 | and you will not be extradited? |
| 13:31:36 | 2 | A.   Yes. |
| 13:31:51 | 3 | Q.   I don't have any further questions, your Honor. |
| 13:31:54 | 4 | THE COURT:  Redirect? |
| 13:31:55 | 5 | MR. GARDNER:  Yes, your Honor. |
| 13:31:58 | 6 | RE-DIRECT EXAMINATION |
| 13:31:58 | 7 | BY MR. GARDNER: |
| 13:31:58 | 8 | Q.   So when were those charges filed? |
| 13:32:08 | 9 | A.   It was the day I came to testify here. |
| 13:32:10 | 10 | Q.   You were already in the United States when those charges |
| 13:32:12 | 11 | were filed. |
| 13:32:17 | 12 | A.   I'd been here more than a year. |
| 13:32:19 | 13 | Q.   And where were those charges filed? |
| 13:32:23 | 14 | A.   In Piedras Negras, Coahuila. |
| 13:32:25 | 15 | Q.   Piedras Negras, Coahuila, a Zeta-controlled territory? |
| 13:32:32 | 16 | A.   That's correct. |
| 13:32:34 | 17 | Q.   In your experience in Mexico, if you pay enough money, you |
| 13:32:39 | 18 | can get anything done through the government? |
| 13:32:41 | 19 | MR. CHRIS FLOOD:  Objection.  Leading, your Honor. |
| 13:32:47 | 20 | THE COURT:  As framed, it is.  Sustained. |
| 13:32:49 | 21 | Q.   (BY MR. GARDNER) Based on your experience in Mexico, can you |
| 13:32:53 | 22 | get anything done if you pay enough money? |
| 13:33:04 | 23 | A.   That's correct. |
| 13:33:06 | 24 | Q.   Did the Zetas -- again, based on your experience, did the |
| 13:33:10 | 25 | Zetas control the politicians and the police in Piedras Negras? |

13:33:19  1   A.   That's correct.

13:33:21  2   Q.   And when you testified before, were you testifying against

13:33:26  3   "40's" brother?

13:33:32  4   A.   Yes.

13:33:33  5   Q.   Is that why you're seeking asylum here in the United States?

13:33:39  6   A.   That's correct.

13:33:40  7   Q.   That's all I have, your Honor.

13:33:42  8                THE COURT:  All right.

13:33:43  9                MR. CHRIS FLOOD:  Might I have --

13:33:45  10               THE COURT:  Well, let's see.

13:33:46  11               MR. CHRIS FLOOD:  I was going to show him the charges

13:33:47  12   to see if he's aware of the charges that he says they're

13:33:51  13   trumped-up charges out of Mexico, your Honor.

13:33:56  14               MR. GARDNER:  Same objection, your Honor.

13:33:57  15               THE COURT:  No.  I don't think so.

13:33:58  16               MR. GARDNER:  Okay.

13:34:00  17               THE COURT:  No.  We're not going there.  You could have

13:34:02  18   asked that earlier.

13:34:03  19               MR. CHRIS FLOOD:  Well, can I ask a couple of questions

13:34:05  20   about it?

13:34:06  21               THE COURT:  Let's see.

13:34:07  22                         RE-CROSS EXAMINATION

13:34:07  23   BY MR. CHRIS FLOOD:

13:34:08  24   Q.   Is it your testimony, then, that the charges against you in

13:34:11  25   Mexico are false?

13:34:18  1   A.   They're false.  There are more than 300 deaths in Coahuila,

13:34:33  2   and there were no criminal complaints filed because the Zetas

13:34:36  3   would not permit it.

13:34:38  4   Q.   Well, in fact, there was two criminal complaints filed

13:34:43  5   against you charging you with the deaths of --

13:34:45  6              MR. GARDNER:  Your Honor, before the question even gets

13:34:47  7   out.

13:34:47  8              THE COURT:  You may.

13:34:50  9              MR. CHRIS FLOOD:  This is in response to his answer.

13:34:52  10             THE COURT:  This is improper re-cross.

13:34:54  11             MR. CHRIS FLOOD:  I'm sorry, your Honor?

13:34:55  12             THE COURT:  Improper re-cross.

13:34:57  13  Q.   (BY MR. CHRIS FLOOD) Did you just say there were 300 deaths

13:35:00  14  in the state of Coahuila and there are no criminal complaints

13:35:05  15  filed?

13:35:19  16  A.   Yes.  When Poncho and I came here to the United States, they

13:35:29  17  started killing all these innocent people, the family members,

13:35:32  18  tried to go file criminal complaints, and they were told there

13:35:36  19  would be none and they had 24 hours to leave town.

13:35:39  20  Q.   Right.  And then, you were charged by criminal complaint,

13:35:42  21  correct?

13:35:42  22  A.   A year and a half later.

13:35:51  23  Q.   I understand.  But you were charged with crimes that alleged

13:35:55  24  to have occurred before you left Mexico and came here?

13:36:07  25  A.   Yes.

```
13:36:08   1   Q.    And you're accused --
13:36:10   2              THE COURT:  I think we've exhausted this topic.
13:36:13   3              MR. CHRIS FLOOD:  I'm sorry?
13:36:13   4              THE COURT:  We have exhausted this topic.  Do you have
13:36:17   5   something else?
13:36:18   6   Q.    (BY MR. CHRIS FLOOD) You don't expect to be extradited for
13:36:21   7   those allegations in Mexico as long as you testify to the truth
13:36:25   8   that Mr. Gardner wants you to?
13:36:27   9              MR. GARDNER:  We object to that being argumentative,
13:36:29  10   your Honor, and outside the bounds of re-cross.
13:36:30  11              THE COURT:  Well, it's both those things.  I think it's
13:36:34  12   also been answered.
13:36:36  13              MR. CHRIS FLOOD:  I have no further questions, your
13:36:38  14   Honor.
13:36:38  15              MR. GARDNER:  May this witness be excused, your Honor?
13:36:40  16              THE COURT:  Is the witness excused?  The witness is
13:36:43  17   excused.  Thank you, sir.  Call your next witness.
13:36:46  18              MR. GARDNER:  Thank you, your Honor.  The government
13:36:47  19   calls Mr. Raul Guadalajara-Guia.
13:37:43  20              (Witness sworn.)
13:37:49  21              MR. GARDNER:  May I proceed, your Honor?
13:37:50  22              THE COURT:  You may.
13:37:51  23      RAUL GUADALAJARA-GUIA, called by the Government, duly sworn.
13:37:51  24                        DIRECT EXAMINATION
13:37:51  25   BY MR. GARDNER:
```

| | | |
|---|---|---|
| 13:37:52 | 1 | Q.   Mr. Guadalajara, you and I met before.  Good afternoon. |
| 13:37:56 | 2 | A.   Good afternoon. |
| 13:37:56 | 3 | Q.   Please introduce yourself to the jury and explain a little |
| 13:37:59 | 4 | bit about yourself, who you do for a living, and how old you are. |
| 13:38:02 | 5 | A.   Okay.  My name is Raul Guadalajara.  I was born in San |
| 13:38:06 | 6 | Antonio, Texas.  I'm 43 years old and I was raised in Mexico. |
| 13:38:08 | 7 | Q.   And are you a U.S. citizen, sir? |
| 13:38:10 | 8 | A.   Yes, sir.  I was born in San Antonio. |
| 13:38:12 | 9 | Q.   And you speak pretty good English, but you've requested to |
| 13:38:18 | 10 | have the interpreter there in case you need her, correct? |
| 13:38:20 | 11 | A.   Yes.  My first language is Spanish.  I speak more Spanish |
| 13:38:24 | 12 | than English. |
| 13:38:24 | 13 | Q.   So feel free at any time to have the question interpreted |
| 13:38:27 | 14 | and your answer interpreted back.  Your choice. |
| 13:38:30 | 15 | A.   Okay, sir.  Yes. |
| 13:38:32 | 16 | Q.   Sir, what charges are you currently in jail for? |
| 13:38:37 | 17 | A.   For cocaine. |
| 13:38:39 | 18 | Q.   And where is that out of? |
| 13:38:41 | 19 | A.   Out of Piedras Negras, Coahuila.  It was conspiracy. |
| 13:38:47 | 20 | Q.   And are you part of what I'll call a crew? |
| 13:38:52 | 21 | A.   Poncho Cuellar.  I used to work for Poncho Cuellar. |
| 13:38:57 | 22 | Q.   What did you do for Poncho Cuellar? |
| 13:38:59 | 23 | A.   I would supervise all the kilos I would get through the |
| 13:39:02 | 24 | border from Piedras Negras to San Antonio and Dallas. |
| 13:39:05 | 25 | Q.   I'm going to show you what's been marked as Government's |

| | | |
|---|---|---|
| 13:39:07 | 1 | Exhibit 250T.  Do you recognize that, sir? |
| 13:39:09 | 2 | A.    That's Poncho Cuellar, my ex-boss. |
| 13:39:12 | 3 | Q.    Your Honor, I would offer Government's Exhibit 250T. |
| 13:39:16 | 4 | MR. CHRIS FLOOD:  No objection. |
| 13:39:21 | 5 | THE COURT:  Received without objection. |
| 13:39:22 | 6 | Q.    (BY MR. GARDNER) Now, the jury has seen Mr. Cuellar already |
| 13:39:29 | 7 | testified today, but I just want to make sure that you were |
| 13:39:31 | 8 | identifying him.  Is this a picture of Mr. Cuellar? |
| 13:39:34 | 9 | A.    Yes, sir.  That's him. |
| 13:39:35 | 10 | Q.    Okay.  And how long did you work for him? |
| 13:39:36 | 11 | A.    Since '96. |
| 13:39:41 | 12 | Q.    And was that all he was moving? |
| 13:39:43 | 13 | A.    Not all the time.  We used to work with weed first, then we |
| 13:39:46 | 14 | started working for the Zetas in 2004, 2005 moving cocaine. |
| 13:39:50 | 15 | Q.    When you say weed, marihuana? |
| 13:39:51 | 16 | A.    Marihuana. |
| 13:39:52 | 17 | Q.    And during this time that you were helping Mr. Cuellar move |
| 13:39:59 | 18 | cocaine into the United States, where were you living? |
| 13:40:02 | 19 | A.    I was living in San Antonio at the time when we lost that |
| 13:40:06 | 20 | load, I went back to Mexico to live over there. |
| 13:40:08 | 21 | Q.    Okay.  When you say lost a load, what does that mean? |
| 13:40:11 | 22 | A.    We lost some kilos of cocaine, the trooper pulled over and |
| 13:40:16 | 23 | they found. |
| 13:40:18 | 24 | Q.    Were you the driver of that load? |
| 13:40:19 | 25 | A.    No.  Had some people driving it. |

13:40:22  1   Q.   Okay.  So why did that --

13:40:24  2   A.   I was just supervising they get the load to Houston, Texas.

13:40:28  3   Q.   Okay.  So why did you feel you needed to leave the United

13:40:31  4   States?

13:40:31  5   A.   Because I was afraid that they were going to -- the guy that

13:40:35  6   hired the drivers, when he got arrested, he was going to put me

13:40:38  7   through -- back in prison.

13:40:41  8   Q.   Identify you?

13:40:43  9   A.   Yes, sir.

13:40:44  10  Q.   Do you remember when this was?

13:40:46  11  A.   It was 2010, I think.  Believe, 2009, 2010.

13:40:52  12  Q.   And so, when you went to Mexico, what did you do down there?

13:40:56  13  A.   I started doing the same thing for Poncho, started

13:40:59  14  supervising the drugs when at the time "Metro" was the -- he was

13:41:06  15  in charge of Piedras Negras.  He was a plaza boss in charge of

13:41:08  16  all the drugs that they get there.  He would call Poncho.  Poncho

13:41:12  17  would call me to get the loads of cocaine and take them to safety

13:41:16  18  houses.  Get them ready to get across the border.

13:41:19  19  Q.   And so, do you also know Hector Moreno?

13:41:21  20  A.   Yes, I do.

13:41:22  21  Q.   So while you were working for Poncho Cuellar, were you aware

13:41:28  22  of any money being sent for horse expenses in the United States?

13:41:32  23  A.   Yes.  Yes, I did.

13:41:34  24  Q.   Do you know who that was for?

13:41:35  25  A.   At the time, Carlitos was the one that was receiving the

13:41:40   1   money when we send it over here.

13:41:43   2   Q.   Do you know who was giving the orders to send the money?

13:41:47   3   A.   Zeta "Cuarenta" was giving the order to Poncho.

13:41:49   4   Q.   Can you pull up 250A and B, please?

13:42:01   5        250A, sir, there on your left, who is that?

13:42:05   6   A.   That's Miguel Angel Trevino, Zeta "Cuarenta."

13:42:08   7   Q.   That's his nickname, "40"?

13:42:09   8   A.   "Forty."

13:42:11   9   Q.   And who is the one that just popped up?

13:42:13   10  A.   That his brother, Z-42, Omar.

13:42:16   11  Q.   How often did you see them during your time in Mexico?

13:42:19   12  A.   Sometime we used to see them once a month, twice a month, it

13:42:23   13  all varied.  Sometimes it was just two times a week and then,

13:42:27   14  disappeared for month, then come back like maybe three or four

13:42:29   15  months.

13:42:30   16  Q.   And when you say horse expenses, could you identify to the

13:42:34   17  jury what you recall about drug money being sent back to the

13:42:39   18  United States to pay for horses?

13:42:40   19  A.   About how we were sending it?

13:42:53   20  Q.   Let's start with this question.  How many occasions were you

13:42:57   21  aware of in which you sent drug money for horse expenses?

13:43:02   22  A.   There was sometimes when in San Antonio, the drugs that I

13:43:05   23  would sell would give them to one guy, Carlitos, so he can pay

13:43:09   24  for the horses that we were training here for Chevo, one of the

13:43:14   25  trainers, and the other one is Carlitos.  And then, we used to

13:43:18   1   send money so we could buy at the auctions when they were buying

13:43:22   2   it.

13:43:22   3   Q.   So if I understand your testimony, correct me if I'm wrong,

13:43:24   4   you would send directly -- money directly from the United States

13:43:27   5   to Carlos Nayen in San Antonio.

13:43:30   6   A.   We would do it through some guys which name goes by "Yo Yo."

13:43:35   7   I would take some money to Laredo, from Laredo was sent to

13:43:38   8   Monterrey, and from there, I don't know how they do it.   Through

13:43:41   9   the houses exchange.

13:43:42  10   Q.   Exchange houses?

13:43:43  11   A.   Yeah.

13:43:43  12   Q.   And another occasion, you were sending money to pay for the

13:43:46  13   auction house -- auctions in the United States?

13:43:49  14   A.   Yes, sir.

13:43:49  15   Q.   Now, were you present when "40" was watching the All

13:43:59  16   American Futurity with Mr. Piloto in 2010?

13:44:02  17   A.   Yes.

13:44:03  18   Q.   Do you recall what horse won that race?

13:44:07  19   A.   Mr. Piloto.

13:44:09  20   Q.   And do you know who owned Mr. Piloto?

13:44:12  21   A.   Zeta Cuarenta.

13:44:14  22   Q.   Do you know who was listed as the owner of that horse in the

13:44:19  23   United States?

13:44:19  24   A.   Jose Trevino, I believe.

13:44:22  25   Q.   And who is Jose Trevino?

13:44:23  1    A.    His brother.

13:44:24  2    Q.    Have you ever seen him?

13:44:25  3    A.    I never saw him in Mexico.

13:44:27  4    Q.    Have you seen him in the United States?

13:44:30  5    A.    No.

13:44:31  6    Q.    Now, what did "40," "Cuarenta," say about his brother owning

13:44:38  7    that horse after the race?

13:44:39  8    A.    Well, they were watching it in Nava, Coahuila.  We were

13:44:44  9    actually watching through the internet.  It was "40," "46," "42,"

13:44:50  10   another comrade.  Carlitos was there, Poncho, Hector, me, Wicho,

13:44:57  11   and the one at the All American Futurity, "40" told "42" that my

13:45:05  12   compadre thought he was going to be up there, meaning to his

13:45:08  13   brother.

13:45:09  14          MR. CHRIS FLOOD:  I object to hearsay, your Honor.

13:45:22  15          THE COURT:  You could stop at Wicho and the one at the

13:45:28  16   American Futurity, "40" told "42."  Next question.

13:45:36  17   Q.    (BY MR. GARDNER) What did "40" say to "42" in your presence?

13:45:39  18          MR. CHRIS FLOOD:  Objection, your Honor.

13:45:40  19          THE COURT:  Overruled.  It's not again offered for the

13:45:43  20   truth therein, but it's offered that it was said.

13:45:50  21   A.    My brother never thought he was going to be up there racing

13:45:53  22   horses after waking every day at -- to work at 5:00 in the

13:45:57  23   morning.  Now we have him up there working for us.

13:46:01  24          MR. CHRIS FLOOD:  Your Honor, also, I'm unclear if it's

13:46:04  25   Poncho or Pancho, and that's the problem during this trial.

| | | |
|---|---|---|
| 13:46:07 | 1 | MR. GARDNER:  I'll clear that up. |
| 13:46:08 | 2 | THE COURT:  All right. |
| 13:46:09 | 3 | Q.   (BY MR. GARDNER) When you said Poncho, that's Poncho |
| 13:46:11 | 4 | Cuellar? |
| 13:46:12 | 5 | A.   Yeah.  That's Poncho Cuellar. |
| 13:46:13 | 6 | Q.   Have you ever met the Defendant Pancho Colorado? |
| 13:46:19 | 7 | A.   I never met him, but I saw him in Mexico. |
| 13:46:21 | 8 | Q.   As far as the race up in Nava, Coahuila, it was Poncho |
| 13:46:25 | 9 | Cuellar, not Pancho Colorado? |
| 13:46:27 | 10 | A.   No.  It was Poncho Cuellar. |
| 13:46:29 | 11 | Q.   Could we put up 250E?  When you talked earlier about Carlos |
| 13:47:00 | 12 | Nayen, how do you know him, sir? |
| 13:47:04 | 13 | A.   Well, Poncho used to send me to go pick him up at Piedras |
| 13:47:08 | 14 | Negras so he can go meet with Zeta 40 and "42" when he was coming |
| 13:47:12 | 15 | from the United States to Mexico. |
| 13:47:16 | 16 | Q.   And did you ever hear Carlos Nayen talk about Pancho |
| 13:47:20 | 17 | Colorado? |
| 13:47:20 | 18 | A.   That's his step-dad. |
| 13:47:22 | 19 | Q.   That's what he said, that's his step-dad? |
| 13:47:24 | 20 | A.   Yeah. |
| 13:47:25 | 21 | Q.   Did you hear Carlos Nayen say what his step-dad did for a |
| 13:47:31 | 22 | living? |
| 13:47:32 | 23 | A.   No.  I never heard him say anything about that. |
| 13:47:34 | 24 | Q.   You said you've seen the defendant on one occasion.  Where |
| 13:47:40 | 25 | was that? |

| | | |
|---|---|---|
| 13:47:40 | 1 | A.   It was at a private race that was made in Morelos, Coahuila, |
| 13:47:45 | 2 | Mexico. |
| 13:47:46 | 3 | Q.   And were you present there with Poncho Cuellar? |
| 13:47:49 | 4 | A.   Yes, sir.  I was there with Poncho Cuellar. |
| 13:47:51 | 5 | Q.   Hector Moreno.  Who else was there? |
| 13:47:58 | 6 | A.   There was a lot of people like "Mamito" was there, Carlitos |
| 13:48:03 | 7 | Nayen was there, also, Pancho Colorado, and it was just a private |
| 13:48:08 | 8 | race for school racing for other horses that we had. |
| 13:48:10 | 9 | Q.   When you say school racing, is that younger horses? |
| 13:48:13 | 10 | A.   Younger horse, yearlings. |
| 13:48:15 | 11 | Q.   Could you put up 250U?  And when you say "Mamito," is that |
| 13:48:24 | 12 | "Mamito"? |
| 13:48:24 | 13 | A.   That's him.  That's "Mamito." |
| 13:48:26 | 14 | Q.   And what was his role, to your knowledge, in the Zetas? |
| 13:48:28 | 15 | A.   He was comrade.  He was in charge of San Luis Potosi, the |
| 13:48:35 | 16 | state. |
| 13:48:35 | 17 | Q.   And what was your understanding of the role of "40" and "42" |
| 13:48:39 | 18 | at that time? |
| 13:48:44 | 19 | A.   "Forty" was second in charge of the Zetas cartels. |
| 13:48:48 | 20 | Q.   And who was in charge? |
| 13:48:49 | 21 | A.   "Forty" was the second, and in charge at the time was |
| 13:48:54 | 22 | Heriberto Lazcano. |
| 13:48:55 | 23 | Q.   And what Zeta number was Lazcano? |
| 13:48:57 | 24 | A.   I never heard what his number.  I just know him as Heriberto |
| 13:49:04 | 25 | Lazcano. |

13:49:04  1   Q.   All right.  So this horse race, how long did that last?

13:49:12  2   A.   We started at 10:00 in the morning, and it went all the way

13:49:16  3   to 5:00, 6:00 in the afternoon.

13:49:18  4   Q.   And where were you standing or sitting in relation to where

13:49:23  5   you could see Pancho Colorado?

13:49:25  6   A.   I was across from the rail from them, right in front of them

13:49:29  7   at the finish line.

13:49:31  8   Q.   When you say the rail, so you're on one side of the track,

13:49:34  9   and they're on the other side?

13:49:35  10  A.   Yeah.  We're on the right side, and they were on the left

13:49:37  11  side.

13:49:38  12  Q.   And how far in distance is that?

13:49:40  13  A.   Maybe like six meters, eight meters.

13:49:45  14  Q.   And while you were standing on one side of the track and

13:49:50  15  Pancho Colorado was standing on the other side of the track, who

13:49:52  16  was standing or sitting next to Pancho Colorado?

13:49:55  17  A.   Z-40, Miguel, and the other side was Z-42.

13:49:59  18  Q.   Did you hear anything they were saying?

13:50:01  19  A.   No, because Z-40 was sitting next to Pancho, they were

13:50:08  20  betting on the racing.

13:50:09  21  Q.   Betting on the racing?

13:50:11  22  A.   Yeah.

13:50:12  23  Q.   And did you see any bruises on Pancho Colorado?

13:50:15  24  A.   No, sir.

13:50:15  25  Q.   Did he appear to be under an armed guard in front of "40" or

13:50:20  1  "42"?

13:50:21  2  A.    No.  Everybody was having a good time.  Everybody was

13:50:25  3  smiling and talking, laughing.

13:50:27  4  Q.    And after the race, did you attend a dinner or a cookout?

13:50:38  5  A.    Yes, we did.  They did a cookout right there next to the

13:50:42  6  track.

13:50:43  7  Q.    And how many people were at this cookout?

13:50:46  8  A.    There was like 80 bodyguards from the cartels and we all sat

13:50:52  9  -- the bodyguards sat on one side, and the people that was with

13:50:56  10  Zeta 40, the ones that were close to him, were all sitting on the

13:50:59  11  other side close to them.

13:51:00  12  Q.    And where was Pancho Colorado sitting?

13:51:02  13  A.    He was sitting next to Z-40.

13:51:05  14  Q.    And they were just eating dinner?

13:51:06  15  A.    Yeah.  We were just eating dinner and talking, and everybody

13:51:10  16  was talking about the yearling school, who they like and who was

13:51:13  17  going to be the best.

13:51:14  18  Q.    You mean the horses?

13:51:15  19  A.    Yeah.  The horses, sir.

13:51:16  20  Q.    And how long did that dinner take place?

13:51:21  21  A.    About an hour and 30 minutes.

13:51:23  22  Q.    At any time, did you observe the Defendant Colorado-Cessa

13:51:29  23  under any kind of duress?

13:51:29  24  A.    No, sir.

13:51:31  25  Q.    Did you observe him to be under any kind of fear or danger?

13:51:34  1   A.   No, because I was just -- it was private ranch where the

13:51:38  2   people that were close to Z-40.  I mean, everybody was just

13:51:41  3   having a good time there.

13:51:43  4   Q.   When you say private race for the people close to Z-40, was

13:51:47  5   that race by invitation only?

13:51:52  6   A.   Yes.  Only people.  Not any citizen could get through there

13:51:56  7   because you want to go through the track, you have to go through

13:51:59  8   "40."  People that was there shaking -- they were calling inside

13:52:02  9   who you were coming with.  If you didn't knew nobody inside, you

13:52:05  10  couldn't get there.

13:52:06  11  Q.   May I have one moment, your Honor?

13:52:10  12            THE COURT:  You may.

13:52:11  13            MR. GARDNER:  Your Honor, I'll pass the witness.

13:52:12  14            THE COURT:  Your witness, counselor.

13:52:15  15                     CROSS-EXAMINATION

13:52:16  16  BY MR. CHRIS FLOOD:

13:52:16  17  Q.   So were there other horse owners there at the track?

13:52:21  18  A.   Yes, sir.

13:52:22  19  Q.   Okay.  But those people all had to go through the same

13:52:25  20  security, right?

13:52:25  21  A.   Yes, sir.

13:52:26  22  Q.   And was Ramiro Villarreal there?

13:52:33  23  A.   No, sir.  I don't recall seeing him.

13:52:36  24  Q.   Was this gentleman "Yo Yo" there?

13:52:39  25  A.   No, sir.

| | | |
|---|---|---|
| 13:52:40 | 1 | Q.   All right.  Now "Yo Yo" was a guy that you had frequent |
| 13:52:43 | 2 | contact with, right? |
| 13:52:44 | 3 | A.   I saw him one time when I went to Laredo. |
| 13:52:46 | 4 | Q.   Okay.  So you -- only one time to deliver money? |
| 13:52:50 | 5 | A.   Yes, sir. |
| 13:52:50 | 6 | Q.   Did he call himself "Yo Yo" or did other people call him "Yo |
| 13:52:54 | 7 | Yo"? |
| 13:52:54 | 8 | A.   Carlitos told me it was "Yo Yo." |
| 13:52:59 | 9 | Q.   May I approach the witness, your Honor? |
| 13:53:01 | 10 | THE COURT:  You may. |
| 13:53:02 | 11 | Q.   (BY MR. CHRIS FLOOD) Is this the way he signed his name or |
| 13:53:05 | 12 | do you know? |
| 13:53:07 | 13 | A.   I never saw by the way he signed his name. |
| 13:53:09 | 14 | Q.   You've never seen his handwriting? |
| 13:53:11 | 15 | A.   No, sir. |
| 13:53:12 | 16 | Q.   I don't have any further questions, your Honor.  Thank you. |
| 13:53:35 | 17 | THE COURT:  Redirect? |
| 13:53:36 | 18 | MR. GARDNER:  No, your Honor.  May this witness be |
| 13:53:38 | 19 | excused? |
| 13:53:38 | 20 | THE COURT:  May the witness be excused? |
| 13:53:40 | 21 | MR. CHRIS FLOOD:  Yes, your Honor.  No objection. |
| 13:53:41 | 22 | THE COURT:  Witness is excused.  Thank you, sir.  Call |
| 13:54:03 | 23 | your next. |
| 13:54:04 | 24 | MS. FERNALD:  Government would call Jose Carlos |
| 13:54:06 | 25 | Hinojosa. |

| | | |
|---|---|---|
| 13:54:56 | 1 | (Witness sworn through interpreter.) |
| 13:57:55 | 2 | MS. FERNALD:  May I proceed, your Honor? |
| 13:57:57 | 3 | THE COURT:  You may. |
| 13:57:58 | 4 | JOSE CARLOS HINOJOSA, called by the Government, duly sworn. |
| 13:57:58 | 5 | DIRECT EXAMINATION |
| 13:57:58 | 6 | BY MS. FERNALD: |
| 13:57:59 | 7 | Q.   Mr. Hinojosa, please introduce yourself to the jury and tell |
| 13:58:01 | 8 | them where you're originally from. |
| 13:58:11 | 9 | A.   Carlos Hinojosa.  I'm from Miguel Aleman, Tamaulipas, |
| 13:58:11 | 10 | Mexico. |
| 13:58:18 | 11 | Q.   And, Mr. Hinojosa, do you have a nickname that you go by? |
| 13:58:24 | 12 | A.   Yes. |
| 13:58:24 | 13 | Q.   And what is that? |
| 13:58:25 | 14 | A.   "Charly." |
| 13:58:26 | 15 | Q.   So most people refer to you as Charly Hinojosa, correct? |
| 13:58:33 | 16 | A.   Yes. |
| 13:58:35 | 17 | Q.   And do you speak a little bit of English? |
| 13:58:40 | 18 | A.   Yes. |
| 13:58:41 | 19 | Q.   Okay.  So for today, I just want you to speak Spanish so the |
| 13:58:45 | 20 | interpreter can get the interpretation, correct? |
| 13:58:55 | 21 | A.   Okay.  Yes. |
| 13:58:57 | 22 | Q.   You're obviously in custody, are you not? |
| 13:59:01 | 23 | A.   Yes. |
| 13:59:02 | 24 | Q.   Can you tell the jury what you're in custody for? |
| 13:59:11 | 25 | A.   Drug conspiracy and money laundering. |

13:59:13  1   Q.   Where were you charged?

13:59:22  2   A.   McAllen, Texas.

13:59:23  3   Q.   When were you arrested?

13:59:29  4   A.   September 2, 2008.

13:59:32  5   Q.   And have you done -- did you plead guilty on that case?

13:59:36  6   A.   Yes.

13:59:38  7   Q.   And were you sentenced on that case?

13:59:42  8   A.   Yes.

13:59:43  9   Q.   Did you -- prior to you being sentenced on the -- how long

13:59:48  10  were you sentenced for?

13:59:49  11  A.   Twenty-four years for conspiracy, 20 years for money

14:00:01  12  laundering.

14:00:01  13  Q.   And did those sentences run together or are they separate?

14:00:07  14  Are they stacked?

14:00:15  15  A.   They're stacked.

14:00:17  16  Q.   So how many years total are you going to spend in prison?

14:00:28  17  A.   Twenty-four.

14:00:30  18  Q.   Okay.  So those sentences, the 20 years and the 24 are going

14:00:33  19  to run together.

14:00:40  20  A.   Yes.

14:00:40  21  Q.   And you were arrested in September of 2008.  Did you start

14:00:48  22  cooperating with authorities?

14:00:55  23  A.   Yes.

14:00:56  24  Q.   I'm going to bend this mic in front of you just a little bit

14:01:03  25  so we can hear you better.

14:01:09   1   I'll get into it in a little bit, but initially, did

14:01:15   2   you -- were you a hundred percent truthful with the authorities

14:01:19   3   when you began cooperating?

14:01:28   4   A.   No.   Just a bit.

14:01:30   5   Q.   Okay.   Tell the jury why you started off not being

14:01:35   6   one-hundred percent cooperative and forthcoming when you were

14:01:38   7   arrested.

14:01:54   8   A.   Because my brother and my uncle and some of my workers had

14:02:03   9   been kidnapped, and I was being threatened.

14:02:06   10   Q.   And who were they kidnapped by?

14:02:14   11   A.   "Hummer," he was one of the Zeta leaders.

14:02:20   12   Q.   Have you and I spoken before this?

14:02:25   13   A.   I'm sorry?

14:02:27   14   Q.   Have we spoken together before?

14:02:31   15   A.   Yes.

14:02:31   16   Q.   How many times?

14:02:33   17   A.   Don't remember, three or four times.

14:02:38   18   Q.   And each time that I come to you, do I have new questions

14:02:41   19   for you?

14:02:45   20   A.   Yes.

14:02:46   21   Q.   And we've developed the knowledge that you have each time we

14:02:52   22   talked; is that correct?

14:02:58   23   A.   Yes.

14:03:01   24   Q.   Tell the ladies and gentlemen of the jury your educational

14:03:04   25   background.

14:03:16  1   A.   I completed the university.  I have a degree in law.

14:03:21  2   Q.   So are you actually a lawyer?

14:03:25  3   A.   Yes.  In Mexico.

14:03:27  4   Q.   In Mexico.  What year did you graduate law school?

14:03:36  5   A.   '99, 2000.

14:03:38  6   Q.   And where did you go to work as soon as you graduated?

14:03:45  7   A.   At the Miguel Aleman prosecutor's office.

14:03:50  8   Q.   Was that for the federal prosecutors?

14:03:55  9   A.   Yes.

14:03:56  10  Q.   And where is Miguel Aleman?

14:04:05  11  A.   It's located on the Texas border.  It's across from Roland,

14:04:16  12  Texas.

14:04:17  13  Q.   Can we pull up Government's Exhibit 231?  Have you seen this

14:04:32  14  map before, Mr. Hinojosa?

14:04:35  15  A.   Yes.  It's Mexico.

14:04:43  16  Q.   Miguel Aleman is a little bit -- we have Nuevo Laredo,

14:04:51  17  that's located right here?  Thank you so much.  Is Miguel Aleman

14:05:01  18  a little bit north of that?

14:05:08  19  A.   It's where you see Nuevo Laredo and Reynosa, it's between

14:05:12  20  them.

14:05:18  21  Q.   Right there, further down.

14:05:21  22  A.   Further down.  Further down.  More.  Right there.

14:05:26  23  Q.   Right there.  So right there in that little creek?

14:05:31  24  A.   Yes.

14:05:32  25  Q.   And did you study geography in school, by the way?

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

14:05:41  1   A.   All of us have to take that subject.

14:05:44  2   Q.   Okay.  When you started with the federal prosecutor's office

14:05:52  3   in approximately 2000, can you tell the jury a little bit about

14:05:57  4   the cartels in the area and how they worked with the federal

14:06:01  5   prosecutor's office?

14:06:17  6   A.   In what year?

14:06:18  7   Q.   2000.

14:06:34  8   A.   There at the time, the cartel worked independently, so

14:06:46  9   everybody handled how they knew their drugs and how they

14:06:49 10   trafficked.  And so, they had to pay their bribes there at the

14:06:55 11   prosecutor's office for protection so that they wouldn't be

14:07:00 12   bothered so they could do their business.

14:07:02 13   Q.   And what did you do exactly at the prosecutor's office when

14:07:05 14   you were there?

14:07:10 15   A.   I was one of the first clerks.  I was the -- handled the

14:07:31 16   processing of people that had been detained.  And so, I -- for

14:07:37 17   both good and bad reason, we also were the ones that collected

14:07:43 18   the bribes that were being paid.

14:07:45 19   Q.   So were you an intake officer?

14:07:48 20   A.   Yes.

14:07:50 21   Q.   And how long were your there before you started collecting

14:07:54 22   bribe money from the cartel?

14:08:05 23   A.   That was almost immediately.  There's a lot of corruption in

14:08:08 24   Mexico.

14:08:14 25   Q.   And with a lot of corruption in Mexico, is there bribes

14:08:22  1  exchanged with governmental agencies between the cartel and the

14:08:26  2  government's agencies?

14:08:35  3  A.   Yes.

14:08:40  4  Q.   We'll skip to 2001 because that's a significant date in this

14:08:46  5  message that you have for the jury.

14:08:49  6        In April of 2001, can you describe to them a meeting

14:08:52  7  that took place between government workers and the cartel?

14:09:10  8  A.   Yes.  In April of 2001, there was a group of a lot of people

14:09:48  9  showed up and they had all the public servants of the local,

14:09:51  10  state, federal authorities come, and they informed us that the

14:09:58  11  Golfo cartel was going to be the one in charge now and that they

14:10:01  12  didn't want to be bothered.

14:10:03  13  Q.   So when they came, how -- can you tell the jury how they

14:10:07  14  came?  Did they come in armored cars?

14:10:16  15  A.   All kinds, both armored cars and not armored cars, and

14:10:26  16  armed, carrying weapons.

14:10:28  17  Q.   Okay.  And did you know it was the cartel?

14:10:31  18  A.   Not for that day.

14:10:34  19  Q.   Which cartel was this?

14:10:38  20  A.   The Golfo cartel.

14:10:44  21  Q.   And the Gulf cartel, did the Los Zetas work in connection

14:10:51  22  with the Gulf cartel in 2001?

14:10:59  23  A.   Yes.  They were the armed right branch of the cartel.  They

14:11:13  24  were the cartel's bosses.  They were their assassins.

14:11:24  25  Q.   At this meeting, what did the members -- you call it the

14:11:27  1  company, do you not?

14:11:29  2  A.   Yes.   The company.

14:11:30  3  Q.   What did the members of the company tell you about the bribe

14:11:36  4  fees at this meeting?

14:11:39  5  A.   That everything was going to be going through them.   That

14:11:58  6  any -- all the payments, right to work, and all the other

14:12:02  7  payments that were being made would go to them and that they were

14:12:05  8  the ones that would distribute it, distribute the bribes to all

14:12:09  9  the agencies.

14:12:09  10  Q.   And how did that change from how it was working before?

14:12:19  11  A.   Well, now everything was going to go through them and they

14:12:35  12  had to be informed of everything, and that now, all the earnings

14:12:38  13  were going to be more for them than for the agencies.

14:12:44  14  Q.   And did it, in fact, happen that way?

14:12:48  15  A.   Yes.

14:12:48  16  Q.   And while you were at the federal prosecutor's office in

14:12:54  17  2001 to about 2003, did you come in contact with an individual by

14:12:59  18  the name of Efrain Torres?

14:13:05  19  A.   Yes.

14:13:12  20  Q.   Let me show 250S, please.   It has not?   Prior to pulling it

14:13:28  21  up, Marisol, hold on just one moment.   May I approach, your

14:13:34  22  Honor?

14:13:35  23        THE COURT:   Yes, you may.

14:13:38  24  Q.   (BY MS. FERNALD) I'm showing you what has been marked as

14:13:40  25  Government's Exhibit No. 250S.   Do you recognize that photograph?

14:13:46   1   A.   Yes.

14:13:50   2   Q.   Who do you recognize that to be a photo of?

14:13:56   3   A.   Efrain Teodoro Torres, or 14, "Chispa."

14:14:07   4   Q.   Move for introduction of Government's Exhibit 250S.

14:14:10   5        MR. CHRIS FLOOD:  No objection.

14:14:11   6        THE COURT:  Without objection, received.

14:14:20   7   Q.   (BY MS. FERNALD) 250S, is that Efrain Torres?

14:14:25   8   A.   Yes.

14:14:27   9   Q.   Who was Efrain Torres?

14:14:34   10  A.   At that time?

14:14:35   11  Q.   Yes.

14:14:47   12  A.   He was a plaza boss there at Miguel Aleman, of Mier

14:14:52   13  Guerrero, of what we call the small boy, him and "Mamito,"

14:15:00   14  another Zeta.

14:15:04   15  Q.   And you said his nickname, his nickname "Chispa"?

14:15:10   16  A.   Also, yes.

14:15:13   17  Q.   Z-14?

14:15:15   18  A.   Yes.

14:15:15   19  Q.   And how did you get to know him while you were working at

14:15:21   20  the federal prosecutor's office?

14:15:26   21  A.   Because when that meeting happened, I was the one that ended

14:15:40   22  up being the one that had to report to him for our agency and to

14:15:53   23  give an accounting of everything that was done there at the

14:15:55   24  agency.

14:15:56   25  Q.   So at that meeting in April of 2001, were you forced to join

122

14:16:02  1  the cartel, or were you given a chance to do what you wanted?

14:16:13  2  A.   The words were very simple.  Those that want to stay, stay.

14:16:25  3  If you don't, leave.

14:16:27  4  Q.   And did some people leave?

14:16:31  5  A.   No.

14:16:34  6  Q.   Obviously you stayed.

14:16:37  7  A.   Yes.

14:16:37  8  Q.   Why did you stay?

14:16:41  9  A.   Well, because you made money.  You got power and you made

14:16:52  10 money.

14:16:55  11 Q.   Did you leave the prosecutor's office and you began working

14:17:01  12 solely with Efrain Torres?

14:17:10  13 A.   Yes.

14:17:11  14 Q.   How long did you work for Efrain Torres?

14:17:16  15 A.   Well, starting in 2001, I was the one that when he assumed

14:17:49  16 command of the area, I was the one that had to report to him, and

14:17:52  17 then, when I left the agency, I was working directly for him.  I

14:17:56  18 was doing his accounting.  I would report on the payments and the

14:17:59  19 quotas had been paid, and he started trusting me.

14:18:05  20 Q.   And after working with him for seven years during the

14:18:08  21 course, did you meet an individual named Francisco Colorado-Cessa

14:18:12  22 through Efrain Torres?

14:18:24  23 A.   Yes.

14:18:24  24 Q.   And through the course of the seven years that you worked

14:18:27  25 with Efrain Torres, is it fair to say that your responsibilities

14:18:32   1   grew bigger and bigger as you gained trust?

14:18:39   2   A.   Yes.

14:18:49   3   Q.   When you were arrested in 2008 in the Mission, Texas area,

14:19:00   4   can you tell the jury where you went?

14:19:04   5   A.   Are you asking where I was detained or --

14:19:18   6   Q.   Yes.

14:19:21   7   A.   Oh, in La Villa, Texas.  It's a detention area called La

14:19:30   8   Villa, Texas.

14:19:30   9   Q.   Was a search warrant ran on your house?

14:19:34  10   A.   Yes.

14:19:36  11   Q.   And do you know by which agency?

14:19:41  12   A.   FBI and DEA.

14:19:44  13   Q.   Now, can you tell the ladies and gentlemen of the jury, did

14:19:50  14   you run into any problems when you were detained?

14:20:03  15   A.   While I was detained or when I was detained?

14:20:05  16   Q.   When.

14:20:07  17   A.   Yes.

14:20:08  18   Q.   Can you tell them about trying to bribe the warden and the

14:20:12  19   jailers?

14:20:34  20   A.   Well, I'm from Mexico.  With the corruption, I didn't think

14:20:53  21   it was going to be that important, and so, I bought cellphones.

14:21:00  22   I had two cellphones.  I was paying bribes to have extra visits.

14:21:05  23   I was getting good food.  I was getting good clothing.

14:21:09  24   Q.   Did you actually try to bribe the warden with $100,000?

14:21:17  25          MR. CHRIS FLOOD:  Sorry, I didn't hear that question.

| | | |
|---|---|---|
| 14:21:19 | 1 | THE COURT:  I'm sorry. |
| 14:21:20 | 2 | Q.  (BY MS. FERNALD) The question was, did you attempt to bribe |
| 14:21:22 | 3 | a warden with $100,000? |
| 14:21:29 | 4 | A.  Yes. |
| 14:21:30 | 5 | Q.  Can you tell them about that? |
| 14:21:40 | 6 | A.  Well, I was told that if I paid $100,000, that he and |
| 14:21:49 | 7 | another bondsman would get me out.  So I paid the 100,000. |
| 14:21:52 | 8 | Q.  And did you find out that things worked different in United |
| 14:21:56 | 9 | States than it does in Mexico? |
| 14:22:01 | 10 | A.  Yes. |
| 14:22:02 | 11 | Q.  What happened to you? |
| 14:22:09 | 12 | A.  Well, we call it the well or the hole, and that's where |
| 14:22:19 | 13 | you're by yourself, and that's punishment and that things in the |
| 14:22:24 | 14 | government here are not like that. |
| 14:22:26 | 15 | Q.  Did you have an attorney at the time? |
| 14:22:30 | 16 | A.  Yes. |
| 14:22:31 | 17 | Q.  And did he advise you that you were placing your plea |
| 14:22:35 | 18 | agreement in jeopardy? |
| 14:22:37 | 19 | A.  Yes. |
| 14:22:43 | 20 | Q.  You said you did not fully cooperate with authorities at |
| 14:22:51 | 21 | that time.  What made you start -- did you ever start fully |
| 14:22:53 | 22 | cooperating with authorities? |
| 14:23:03 | 23 | A.  Yes. |
| 14:23:04 | 24 | Q.  So what changed? |
| 14:23:06 | 25 | A.  Well, because I promised everything -- the people that had |

| | | |
|---|---|---|
| 14:23:37 | 1 | been kidnapped, it was my family, it was my workers, they were |
| 14:23:41 | 2 | not returned.  And they had them come out and they did not return |
| 14:23:46 | 3 | them, so I decided, okay, enough.  Then what did I have to lose |
| 14:23:55 | 4 | that was better than family. |
| 14:24:00 | 5 | Q.   Okay.  Mr. Hinojosa, I'd like to start a little bit talking |
| 14:24:04 | 6 | about your experience with the cartel, and then, we'll move on to |
| 14:24:07 | 7 | Francisco Colorado-Cessa. |
| 14:24:19 | 8 |      We've heard the terms "plaza boss."  Were you actually |
| 14:24:22 | 9 | a plaza boss yourself? |
| 14:24:28 | 10 | A.   Yes. |
| 14:24:30 | 11 | Q.   And can you tell the jury where you were a plaza boss? |
| 14:24:37 | 12 | A.   In Salinas Hidalgo and since the region where -- |
| 14:24:57 | 13 |      THE COURT:  Wait.  Stop.  Excuse me.  Let's -- |
| 14:25:02 | 14 | projecting up there. |
| 14:25:02 | 15 |      MS. FERNALD:  I'm sorry? |
| 14:25:03 | 16 |      THE COURT:  That's projecting. |
| 14:25:04 | 17 |      MS. FERNALD:  I meant for it to, your Honor.  I was |
| 14:25:06 | 18 | going to use -- |
| 14:25:06 | 19 |      THE COURT:  Well, it's not in evidence.  What are you |
| 14:25:08 | 20 | doing for the jury?  The jury sees it. |
| 14:25:11 | 21 |      MS. FERNALD:  Writing down some dates for the jury that |
| 14:25:13 | 22 | he's testifying to, your Honor. |
| 14:25:14 | 23 |      THE COURT:  Is that an objection? |
| 14:25:16 | 24 |      MR. CHRIS FLOOD:  Not yet, your Honor. |
| 14:25:17 | 25 |      THE COURT:  All right. |

14:25:20  1   A.   And since the Miguel Aleman plaza depended on all the towns

14:25:24  2   along the border, those were in charge, there were a lot of

14:25:28  3   things to do.

14:25:29  4   Q.   (BY MS. FERNALD) All right.  In spring of 2001 is when you

14:25:33  5   had your meeting; is that correct?

14:25:37  6   A.   Yes.

14:25:44  7   Q.   You had started working at the prosecutor's office in about

14:25:48  8   1999?

14:25:49  9   A.   In 2000.

14:26:01 10   Q.   When did you start working for Efrain Torres?

14:26:18 11   A.   It was almost -- after that meeting since I had to report to

14:26:24 12   him, it was as if I.

14:26:29 13   Q.   And what did you call Efrain Torres?

14:26:39 14   A.   "Chispa," Chispa 14.

14:26:50 15   Q.   Is that correct?

14:26:57 16   A.   Yes.

14:27:02 17   Q.   And as a plaza boss, the jury's heard a little bit, but the

14:27:07 18   cartel, how did they make all of their money?

14:27:19 19   A.   Trafficking drugs, selling drugs, distributing drugs.

14:27:26 20   Q.   Did they control any of the politicians in the area?

14:27:33 21   A.   Yes.

14:27:36 22   Q.   And how did they control the politicians?

14:27:45 23   A.   They pay for the campaigns, they decided who would be in the

14:27:58 24   position, who wouldn't.  Through the campaigns, chief of police,

14:28:04 25   you can get into this but don't get into this.

14:28:07   1   Q.   And how would they do that?  Through money?

14:28:11   2   A.   Yeah, through bribery.

14:28:13   3   Q.   And how would they make all of their money?

14:28:24   4   A.   The sale and distribution of drugs and you paid for the

14:28:28   5   right to work.

14:28:30   6   Q.   What about you talked about the federal prosecutor's office.

14:28:34   7   Were there other government agencies that they bribed and used?

14:28:44   8   A.   All of them.

14:28:46   9   Q.   Are you familiar with an agency called Pemex?

14:28:52   10   A.   Yes.

14:28:54   11   Q.   What is Pemex?

14:28:59   12   A.   That's short for -- Mexican oil company and that's where

14:29:13   13   they get all the gas and the oils.

14:29:20   14   Q.   Can you describe to the jury how the drugs flowed from

14:29:24   15   Mexico into the United States and how the money got back over to

14:29:28   16   Mexico?

14:29:51   17   A.   There's the border right there and the river border's right

14:30:04   18   along the United States, and so, it crosses the river, sometimes

14:30:08   19   it crosses the bridge but more the river.  And the money, same

14:30:10   20   thing, sometimes through the bridge but more through the river.

14:30:13   21   Q.   Where does the cocaine come from?

14:30:19   22   A.   Columbia.

14:30:21   23   Q.   And is there a lower price at Columbia than it is in the

14:30:27   24   United States?

14:30:27   25   A.   Yes.

14:30:31   1   Q.   What is the going -- or what was the going rate for a kilo

14:30:35   2   of cocaine in the United States?

14:30:42   3   A.   At that time, 16, $17,000.  Don't remember exactly because

14:30:57   4   it varied.

14:30:58   5   Q.   All right.  And did you keep an accounting of the drugs that

14:31:03   6   Efrain Torres was responsible for?

14:31:11   7   A.   Yes.

14:31:12   8   Q.   And did you also keep an accounting of how much money he

14:31:16   9   made?

14:31:19   10   A.   Yes.

14:31:20   11   Q.   And how many areas or states did he control?

14:31:25   12   A.   There was the state of Veracruz, there was the border area,

14:31:46   13   and there were two other states that he paid to the cartel could

14:31:51   14   work there.

14:31:52   15   Q.   How powerful was his position?

14:31:57   16   A.   He was big.

14:32:00   17   Q.   So based upon the accounting, how many drugs ran through his

14:32:04   18   plazas during the period of time of 2001 through 2007?

14:32:17   19   A.   Tons.

14:32:20   20   Q.   How much money did the company make off of the drugs that

14:32:25   21   were transported into the United States and the money back into

14:32:28   22   Mexico?

14:32:39   23   A.   Millions of dollars.  I don't remember the exact amount, but

14:32:44   24   it was millions.

14:32:47   25   Q.   When the money or the currency traveled back into Mexico,

14:32:53   1   how was it used?

14:33:11   2   A.   To pay for all the company's expenses, the bribes, luxuries,

14:33:20   3   anything you wanted.

14:33:21   4   Q.   On the luxuries, could Efrain Torres put luxury items in his

14:33:27   5   name?

14:33:32   6   A.   No.

14:33:33   7   Q.   Okay.  Why not?

14:33:38   8   A.   Because he was ex-military.  He was ex-military.  He

14:33:57   9   abandoned the military to become an assassin, and he was being

14:34:02   10   hunted.

14:34:04   11   Q.   So how was he able to use the money that he got?

14:34:14   12   A.   Sorry.  What?

14:34:18   13   Q.   How was he able to use the currency that he got from the

14:34:22   14   drugs?

14:34:28   15   A.   Laundering the money or --

14:34:34   16   Q.   That's what I was asking you about.  How did he launder the

14:34:37   17   money?

14:34:40   18   A.   Through businesses.

14:34:42   19   Q.   Okay.  And can you explain to the jury how you launder money

14:34:45   20   through businesses or how he laundered money through businesses?

14:35:00   21   A.   Well, you create a company or you invest in a company,

14:35:08   22   well-known company or something.

14:35:13   23   Q.   I want you to spell this out for us, okay?  Why is that

14:35:17   24   important?

14:35:21   25   A.   Well, because that way you could acquire properties that

| | | |
|---|---|---|
| 14:35:41 | 1 | have been bought with supposedly clean money. |
| 14:35:46 | 2 | Q.   And were businessmen important to the company and to Efrain |
| 14:35:52 | 3 | Torres to be able to use to launder money? |
| 14:36:04 | 4 | A.   Yes. |
| 14:36:05 | 5 | Q.   How? |
| 14:36:19 | 6 | A.   Well, it was through them.  It was through them that you |
| 14:36:22 | 7 | could do business, that you could invest and you could wash, |
| 14:36:29 | 8 | launder the money. |
| 14:36:30 | 9 | Q.   Was Efrain Torres killed? |
| 14:36:36 | 10 | A.   Yes. |
| 14:36:37 | 11 | Q.   When was Efrain Torres killed? |
| 14:36:43 | 12 | A.   March of 2007. |
| 14:36:45 | 13 | Q.   Do you remember the date? |
| 14:36:49 | 14 | A.   It was the 3rd of March, I believe. |
| 14:36:53 | 15 | Q.   Where was he killed? |
| 14:37:03 | 16 | A.   In the state of Veracruz in a town called Villarin. |
| 14:37:10 | 17 | Q.   Do you know where? |
| 14:37:12 | 18 | A.   Yes. |
| 14:37:13 | 19 | Q.   Where? |
| 14:37:17 | 20 | A.   In Veracruz in the horse race, at a horse race. |
| 14:37:22 | 21 | Q.   At a horse track? |
| 14:37:25 | 22 | A.   Yes. |
| 14:37:26 | 23 | Q.   Who had him killed? |
| 14:37:31 | 24 | A.   Supposedly, it was Zeta 40. |
| 14:37:36 | 25 | Q.   What is Zeta 40's name? |

14:37:39  1   A.   Miguel Trevino.

14:37:43  2   Q.   Do you recognize this photograph?

14:37:54  3   A.   Yes.

14:37:54  4   Q.   And who is this?

14:37:58  5   A.   That's Zeta 40, Miguel Trevino.

14:38:19  6   Q.   Just so that we can keep all of these numbers straight, Z-14

14:38:30  7   is Efrain Torres, "Chispa," your former boss, correct?

14:38:42  8   A.   Yes.

14:38:43  9   Q.   And then, Zeta 40 or Z-40 is Miguel Trevino?

14:38:49 10   A.   Yes.

14:38:51 11   Q.   So I want to talk about the period of time between the time

14:38:58 12   that you go to work for "Chispa" in March the 3rd of 2007 when he

14:39:04 13   was killed.  How would you communicate with Efrain Torres?

14:39:18 14   A.   By phone or using the Nextel radios.

14:39:30 15   Q.   Can you tell the jury a little bit about the Nextel radios?

14:39:35 16   A.   It was one of those radio telephone things that you use

14:39:56 17   because supposedly your conversations couldn't be listened to,

14:40:00 18   supposedly your messages were encrypted at that time.

14:40:05 19   Q.   So why did the company use Nextel phones?

14:40:13 20   A.   Because it was more secure.

14:40:15 21   Q.   Did they communicate via regular phones?

14:40:24 22   A.   Sometimes when you couldn't get the Nextel signal.

14:40:28 23   Q.   Were they careful about it?

14:40:32 24   A.   Yes.

14:40:33 25   Q.   Did they e-mail each other back and forth?

14:40:39  1   A.   At that time, sometimes.

14:40:42  2   Q.   Did they stop?

14:40:46  3   A.   Yes.

14:40:46  4   Q.   Why?

14:41:04  5   A.   Because they noticed that they were doing that, more and

14:41:09  6   more information was being sent through that, and that they were

14:41:12  7   starting to talk about operations and so that it was decided that

14:41:16  8   that wasn't going to be done anymore.

14:41:19  9   Q.   Did the Zetas come from a military background?

14:41:24  10  A.   Yes.

14:41:25  11  Q.   Were they aware of all of the law enforcement detection for

14:41:30  12  criminal activity?

14:41:36  13  A.   Yes.

14:41:37  14  Q.   And did they attempt to avoid it?

14:41:40  15  A.   Yes.

14:41:42  16  Q.   And in the course of attempting to avoid it with

14:41:45  17  communications, did they create their own cell towers?

14:41:55  18  A.   Yes.

14:41:56  19  Q.   Can you tell the jury about how sophisticated they were on

14:41:59  20  things like that?

14:42:01  21  A.   They invested a lot in communications.  They set up a lot of

14:42:27  22  towers with a lot of repeaters so that the entire area would be

14:42:31  23  linked wherever they were so it would be more secure.

14:42:35  24  Q.   Did they destroy and change phones often?

14:42:41  25  A.   Yes.

14:42:42  1   Q.   And were they careful about keeping records or not keeping

14:42:45  2   records?

14:42:50  3   A.   Yes.

14:42:51  4   Q.   Tell the jury about that.

14:43:12  5   A.   Well, not anyone could have all of the information, or carry

14:43:16  6   all the notes, or have the accounting nor the registry of

14:43:18  7   everything that was being done.  They were the bosses.  They were

14:43:21  8   out in the streets, so they couldn't have any information about

14:43:26  9   all the vehicles and all that.

14:43:27  10  Q.   Okay.  So what would happen if someone got caught with

14:43:30  11  records at the Los Zetas drug activities or illegal activities?

14:43:45  12  A.   They would have been arrested and they would have realized

14:43:51  13  everything that was happening.

14:43:54  14  Q.   And Efrain Torres, how did he make all of his money?

14:44:06  15  A.   Through the cartel selling drugs, distributing drugs.

14:44:15  16  Q.   How did he travel as far as security?

14:44:21  17  A.   He drove in armored vehicles.  He had assassins.  He had

14:44:38  18  people armed that were around him in a whole convoy.

14:44:42  19  Q.   Where did he live in 2001?

14:44:50  20  A.   In Miguel Aleman.

14:44:51  21  Q.   Where was he originally from?

14:45:04  22  A.   From Veracruz.

14:45:06  23  Q.   And when you say Vera Cruz, are you talking about the state

14:45:09  24  or are you talking about the city?

14:45:10  25  A.   The state.

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

| | | |
|---|---|---|
| 14:45:14 | 1 | Q.   Where in the state of Veracruz was he from? |
| 14:45:18 | 2 | A.   Poza Rica. |
| 14:45:23 | 3 | Q.   And are you familiar with the city called Tuxpan? |
| 14:45:27 | 4 | A.   Yes. |
| 14:45:28 | 5 | Q.   Do you know whether or not Francisco Colorado-Cessa is also |
| 14:45:32 | 6 | from Tuxpan? |
| 14:45:36 | 7 | A.   Yes. |
| 14:45:38 | 8 | Q.   And is Tuxpan between Veracruz and Poza Rica? |
| 14:45:47 | 9 | A.   Yes. |
| 14:45:48 | 10 | Q.   And did Efrain Torres also live in Tuxpan? |
| 14:45:55 | 11 | A.   Yes. |
| 14:45:56 | 12 | Q.   When did he move there? |
| 14:46:01 | 13 | A.   It was approximately between 2003, 2004.  Between 2003 and |
| 14:46:16 | 14 | 2004. |
| 14:46:16 | 15 | Q.   Where were you living in 2003 and 2004? |
| 14:46:23 | 16 | A.   Miguel Aleman. |
| 14:46:24 | 17 | Q.   Did you go to visit Efrain Torres, "Chispa" in Tuxpan? |
| 14:46:39 | 18 | A.   Yes. |
| 14:46:41 | 19 | Q.   And on that occasion in 2003 and 2004, did you, in fact, |
| 14:46:46 | 20 | meet Francisco Colorado-Cessa? |
| 14:46:51 | 21 | A.   Yes. |
| 14:46:54 | 22 | Q.   Does he have a nickname? |
| 14:46:57 | 23 | A.   Pancho.  Pancho Colorado. |
| 14:47:01 | 24 | Q.   Do you see him in the courtroom today? |
| 14:47:05 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 14:47:06 | 1 | Q.   And can you identify him for us?  Where is he sitting? |
| 14:47:10 | 2 | A.   Right next to the young lady that's over on that side. |
| 14:47:17 | 3 | Q.   Can you describe his personality to the ladies and gentlemen |
| 14:47:21 | 4 | of the jury? |
| 14:47:21 | 5 | A.   What his what is? |
| 14:47:32 | 6 | Q.   Can you describe his personality to the jury? |
| 14:47:46 | 7 | A.   He was a businessman that was well-known, well-recognized in |
| 14:47:52 | 8 | the area. |
| 14:47:55 | 9 | Q.   And how many properties did Francisco Colorado-Cessa have in |
| 14:48:03 | 10 | Tuxpan? |
| 14:48:10 | 11 | A.   I couldn't tell you.  I just got to know several ranches. |
| 14:48:15 | 12 | Q.   Two? |
| 14:48:17 | 13 | A.   Yes. |
| 14:48:18 | 14 | Q.   Do you know the name of either ranch? |
| 14:48:27 | 15 | A.   One of them.  I remember one of them. |
| 14:48:30 | 16 | Q.   What is that? |
| 14:48:32 | 17 | A.   Flor de Maria. |
| 14:48:41 | 18 | Q.   Can you describe the relationship at that time that |
| 14:48:48 | 19 | Colorado-Cessa had with "Chispa," or Efrain Torres? |
| 14:49:02 | 20 | A.   Well, they had relationship because of the horses, because |
| 14:49:15 | 21 | of the horse races, because of his relationship with the |
| 14:49:20 | 22 | politicians and with the businessmen. |
| 14:49:23 | 23 | Q.   Whose relationship with the politician and the businessmen? |
| 14:49:31 | 24 | A.   Efrain with Mr. Colorado. |
| 14:49:37 | 25 | Q.   Who had the relationships with the politicians? |

14:49:42   1   A.   Mr. Colorado.

14:49:43   2   Q.   And was he important to Efrain Torres for that reason?

14:49:51   3   A.   Yes.

14:49:53   4   Q.   In 2003, when you met Francisco Colorado-Cessa, did he have

14:50:02   5   a business at that time?

14:50:05   6   A.   Yes.  He had his offices with -- about the horses and then,

14:50:22   7   he had others with the oil business and with Petro Servicios.

14:50:27   8   Q.   What was the name of the company that he had?

14:50:38   9   A.   I think the name was ADT Petro Servicios.  Something like

14:50:42   10  that.

14:50:43   11  Q.   And he had had this business -- in fairness to him, he had

14:50:47   12  had this business prior to Efrain Torres coming in, correct?

14:50:51   13  A.   Yes.

14:50:58   14  Q.   How big was the business at the time?

14:51:10   15  A.   I couldn't tell you because at that time, I was new there.

14:51:23   16  I couldn't tell you everything.

14:51:25   17  Q.   Did it grow from the time that you saw it from the beginning

14:51:28   18  to the end?

14:51:30   19  A.   Yes.

14:51:36   20  Q.   And we'll talk about that in a little bit.

14:51:42   21       Do you know whether or not his company ADT Petro

14:51:46   22  Servicios did business with Pemex?

14:51:52   23       MR. CHRIS FLOOD:  I'm going to object unless he knows

14:51:54   24  of his own personal knowledge.

14:52:02   25  A.   Sorry?

14:52:02  1           THE COURT:  How do you know that?

14:52:13  2           THE WITNESS:  Because Efrain told me that they had

14:52:17  3  invested in that company.

14:52:23  4           THE COURT:  Go ahead.

14:52:24  5  Q.   (BY MS. FERNALD) Do you know -- let me ask just "Yes" or

14:52:26  6  "No."  Do you know whether or not they did business with Pemex?

14:52:37  7  A.   Yes.

14:52:38  8  Q.   How do you know that?

14:52:46  9  A.   Because Efrain told me that they were going to invest in

14:52:50  10 Pemex in jobs that they had in the state.

14:52:54  11 Q.   When did he tell you that?

14:53:05  12 A.   I don't remember, but it was in that period throughout those

14:53:11  13 years when we were getting to know each other, and I would write

14:53:14  14 things down and all.

14:53:16  15 Q.   How many times did you meet with Francisco Colorado-Cessa in

14:53:23  16 2003 and 2004?

14:53:26  17 A.   I don't remember exactly, but every time I went to Veracruz

14:53:43  18 and every time that there were horse races, we were all there

14:53:47  19 together.

14:53:47  20 Q.   So did you attend horse races with them?

14:53:51  21 A.   Yes.

14:53:54  22 Q.   And were these at public tracks or private tracks?

14:54:00  23 A.   Both.

14:54:00  24 Q.   How many horse races did you attend with Francisco

14:54:06  25 Colorado-Cessa over the years?

14:54:15   1   A.   Don't remember exactly, some five or six.

14:54:18   2   Q.   How did Pancho Colorado-Cessa -- how did he travel as far as

14:54:25   3   security was concerned?

14:54:35   4   A.   In what aspect?

14:54:38   5   Q.   Did he have any bodyguards?

14:54:42   6   A.   No.  I never saw him with any.

14:54:48   7   Q.   What month were you arrested?

14:54:56   8   A.   In September.

14:54:57   9   Q.   And the year was 2008?

14:55:03   10   A.   Yes.

14:55:04   11   Q.   So the time period that you're talking about is between 2003

14:55:23   12   and 2008, correct?

14:55:30   13   A.   No.  No.  It was until 2007, when Efrain was killed.

14:55:40   14   Q.   But you actually saw Francisco Colorado-Cessa after Efrain

14:55:45   15   was killed, correct?

14:55:52   16   A.   Yes.

14:55:53   17   Q.   Are you familiar with the percentage fees that is required

14:56:07   18   to bribe governments for contracts in Mexico?

14:56:32   19   A.   Majority of the companies, they charge between 10 and 15 to

14:56:37   20   16 percent.  It depends on the value of the job.

14:56:40   21   Q.   So if you had $100,000 contract that you were bidding on

14:56:45   22   with the government, how much money typically would you have to

14:56:49   23   pay in the bribe?

14:57:01   24   A.   Ten, 12, 15 percent, it would depend on the job and, also,

14:57:13   25   on how much the person that's giving you the job wants.

14:57:17  1   Q.   In 2004, did you take a trip to Veracruz to meet a candidate

14:57:24  2   for governor?

14:57:32  3   A.   Yes.

14:57:33  4   Q.   Who did you go with?

14:57:38  5   A.   With Efrain.

14:57:42  6   Q.   Who else was with you?

14:57:45  7   A.   Mr. Colorado.  That's who we always met up with there.

14:57:55  8   Q.   What year was that?

14:58:08  9   A.   It was approximately 2004.  I don't remember the year

14:58:15  10  exactly.

14:58:16  11  Q.   Okay.  And who was the gubernatorial candidate?

14:58:24  12             MR. CHRIS FLOOD:  Judge, I object.  Could we have a

14:58:26  13  sidebar quickly?

14:58:27  14             THE COURT:  All right.

14:58:33  15             (At the bench, on the record.)

14:58:40  16             MR. CHRIS FLOOD:  I don't know if counsel's

14:58:42  17  purposely --

14:58:43  18             THE COURT:  You can talk.

14:58:44  19             MR. CHRIS FLOOD:  I'm sorry.  I don't know if counsel

14:58:47  20  is purposely dancing around it or if she's suggesting that this

14:58:51  21  defendant was engaged in bribery.  Because if that's the case,

14:58:55  22  they have to give 404(b) notice that's not charged in the

14:58:56  23  indictment --

14:59:08  24             (Audio feed unavailable.)

14:59:08  25             MS. FERNALD:  -- gave the governor or the candidate $12

14:59:11  1  million.

14:59:11  2          THE COURT:  Yes.

14:59:12  3          MS. FERNALD:  To secure contracts with Pemex.

14:59:15  4          THE COURT:  And?

14:59:16  5          MS. FERNALD:  That's it.

14:59:18  6          MR. CHRIS FLOOD:  Not for the defendant.  I mean, the

14:59:19  7  defendant involved.

14:59:20  8          MS. FERNALD:  The defendant through his company -- I'm

14:59:21  9  sorry.  Efrain Torres gave the defendant $12 million to give to

14:59:26 10  Fidel Herrera so that the defendant's company can get contracts

14:59:31 11  through Pemex.

14:59:33 12          MR. CHRIS FLOOD:  That would make him a party to the

14:59:36 13  bribe, Judge.  It's not part of the charges.

14:59:37 14          THE COURT:  I'm going to stop.  We're finished with

14:59:39 15  this.  We'll move on.  Let's get to the meat of the case.  Okay.

14:59:43 16  We've established enough to where you could argue duress.

14:59:47 17          MS. FERNALD:  Yes, sir.

15:00:04 18  Q.   (BY MS. FERNALD) Mr. Hinojosa, were you instructed by Efrain

15:00:09 19  Torres to make an entry in your books on money given to Francisco

15:00:15 20  Colorado-Cessa?

15:00:16 21  A.   Yes.

15:00:28 22  Q.   And how much was that entry?

15:00:38 23  A.   The first one was approximately 12 million.

15:00:41 24  Q.   When was that?

15:00:48 25  A.   It was about 2004.  Yeah, 2004.

| | | |
|---|---|---|
| 15:00:55 | 1 | Q.   Who told you to do that? |
| 15:01:03 | 2 | A.   "Chispa," "14." |
| 15:01:04 | 3 | Q.   How did Efrain Torres get this $12 million? |
| 15:01:17 | 4 | A.   From the sale of drugs. |
| 15:01:20 | 5 | Q.   And how did Francisco Colorado-Cessa know or did he know how |
| 15:01:25 | 6 | he got the money? |
| 15:01:39 | 7 | A.   Can you ask that again, please? |
| 15:01:42 | 8 | Q.   Did Francisco Colorado-Cessa know how Efrain Torres made his |
| 15:01:51 | 9 | money? |
| 15:01:51 | 10 | A.   Everybody in Veracruz knew who Zeta "Catorce" was. |
| 15:02:00 | 11 | Q.   All right.  Tell the jury that. |
| 15:02:12 | 12 | A.   Zeta 14 was head of the entire Veracruz state plaza and he |
| 15:02:19 | 13 | was well-known there. |
| 15:02:21 | 14 | Q.   How would you know who he was if you saw him in Veracruz at |
| 15:02:38 | 15 | the time? |
| 15:02:38 | 16 | A.   Well, because he was always with a lot of bodyguards, a lot |
| 15:02:43 | 17 | of pickups, and at the horse races everybody knew him. |
| 15:02:47 | 18 | Q.   How close was Francisco Colorado-Cessa to Efrain Torres? |
| 15:02:58 | 19 | A.   They were friends. |
| 15:03:00 | 20 | Q.   And when you say friends, how close of friends? |
| 15:03:11 | 21 | A.   Very close.  They're called compadres. |
| 15:03:14 | 22 | Q.   Compadres.  Can you tell the ladies and gentlemen of the |
| 15:03:18 | 23 | jury if Efrain Torres had a son? |
| 15:03:26 | 24 | A.   Yes. |
| 15:03:26 | 25 | Q.   What was his son's name? |

15:03:30   1   A.    Alexander.

15:03:31   2   Q.    And who was the godfather to Alexander?

15:03:40   3            MR. CHRIS FLOOD:  I would object on hearsay, your

15:03:42   4   Honor.

15:03:44   5            THE COURT:  Do you know who was the godfather?

15:03:46   6            THE WITNESS:  Yes.

15:03:47   7            THE COURT:  How do you know?

15:03:49   8            THE WITNESS:  Because I went to the baptism.

15:03:55   9            THE COURT:  Overruled.

15:03:57  10   Q.    (BY MS. FERNALD) Who was Alexander, the son of Efrain

15:04:03  11   Torres, Zeta 14, who was his godfather?

15:04:12  12   A.    Mr. Colorado.

15:04:15  13   Q.    And in the Mexican culture, what does that signify about the

15:04:20  14   relationship between Efrain Torres and Francisco Colorado-Cessa?

15:04:38  15   A.    In Mexico, it was believed that your compadres, it's a

15:04:49  16   friendship where you will always take care of the child that you

15:04:54  17   baptized.

15:04:59  18   Q.    With this $12 million, did ADT's business grow?  Did the

15:05:05  19   defendant's business ADT Petro Servicios grow?

15:05:14  20   A.    The machinery was bought and the machinery was bought so the

15:05:34  21   company, they could take on more -- because there would be more

15:05:37  22   jobs from the government, and that's why money was invested

15:05:41  23   there.

15:05:44  24   Q.    So tell me about the money being invested in ADT.

15:05:57  25   A.    What I was told to write down and what I wrote down was that

| | | |
|---|---|---|
| 15:06:02 | 1 | there was about $6 million invested in it for the purchase of |
| 15:06:05 | 2 | equipment. |
| 15:06:06 | 3 | Q.   Do you know anything about an airplane? |
| 15:06:19 | 4 | A.   Yes. |
| 15:06:22 | 5 | Q.   Was there an airplane purchased with the money? |
| 15:06:27 | 6 | A.   Yes. |
| 15:06:28 | 7 | Q.   May I approach, your Honor? |
| 15:06:40 | 8 | THE COURT:  You may. |
| 15:06:41 | 9 | Q.   (BY MS. FERNALD) I'm showing you now what has been marked as |
| 15:06:45 | 10 | Government's Exhibit 341, 342 and 343.  Have you looked at these |
| 15:06:52 | 11 | photographs before? |
| 15:06:57 | 12 | A.   Yes. |
| 15:06:59 | 13 | Q.   Do you recognize the airplane? |
| 15:07:02 | 14 | A.   Yes. |
| 15:07:04 | 15 | Q.   And what kind of airplane do you recognize it to be?  Who |
| 15:07:07 | 16 | does it belong to? |
| 15:07:13 | 17 | A.   It's a King Air and it's Colorado. |
| 15:07:17 | 18 | Q.   Is this the money purchased with some of that money? |
| 15:07:20 | 19 | A.   Yes. |
| 15:07:22 | 20 | Q.   Move for the introduction of Government's Exhibit 341, 342 |
| 15:07:28 | 21 | and 343. |
| 15:07:37 | 22 | MR. CHRIS FLOOD:  No objection. |
| 15:07:39 | 23 | THE COURT:  Without objection, they're received. |
| 15:07:40 | 24 | Q.   (BY MS. FERNALD) I'm showing you now what has been marked as |
| 15:07:52 | 25 | Government's Exhibit 341.  Do you recognize that? |

```
15:08:03   1   A.   Yes.

15:08:05   2   Q.   And is that the King Air that was purchased?

15:08:10   3   A.   Yes.

15:08:10   4   Q.   You don't know all of the details of the purchase, do you?

15:08:17   5   A.   No.  No.

15:08:18   6   Q.   Government's Exhibit 342.  Is that the same plane?

15:08:30   7   A.   Yes.

15:08:31   8   Q.   And how do you recognize it?

15:08:40   9   A.   Well, because I got in that plane.

15:08:42  10   Q.   All right.  Tell the ladies and gentlemen of the jury, were

15:08:45  11   you and were Efrain Torres allowed to use this plane?

15:08:54  12   A.   Yes.

15:08:56  13   Q.   And why were y'all allowed to use this plane?  Who allowed

15:09:00  14   you to do it?

15:09:15  15   A.   Well, if we needed it and it was like, can you do us a favor

15:09:19  16   and letting us use your plane, and if it was available, we used

15:09:22  17   it.

15:09:22  18   Q.   All right.  And I'm also showing you 343.  Is that another

15:09:29  19   shot of it?

15:09:33  20   A.   Yes.

15:09:33  21   Q.   You said earlier that Efrain Torres had invested in ADT.

15:09:41  22   Could you explain a little bit to the jury how he had invested?

15:09:47  23   A.   With money to buy equipment, to buy what was necessary to do

15:10:09  24   jobs, whatever the company needed.

15:10:11  25   Q.   And how would that benefit Efrain Torres?
```

15:10:14  1   A.   To launder money and to earn money.

15:10:24  2   Q.   Was there a second payment that Efrain Torres made to

15:10:28  3   Francisco Colorado-Cessa that you were required to enter into the

15:10:35  4   books?

15:10:35  5   A.   Yes.

15:10:42  6   Q.   And when was that?

15:10:52  7   A.   It was later.  It was between 2004 and 2005.

15:11:01  8   Q.   How much was that?

15:11:04  9   A.   Six million.

15:11:09  10  Q.   And, again, what was this money used for?

15:11:12  11  A.   To invest in equipment for the company, machinery, things

15:11:21  12  like that.

15:11:21  13  Q.   Was Francisco Colorado-Cessa required to pay Efrain Torres

15:11:28  14  back this money?

15:11:36  15  A.   Yes.

15:11:37  16  Q.   And did he?

15:11:42  17  A.   Up until the day he was killed, he was still in debt.  He

15:11:52  18  never finished paying anything.

15:11:53  19  Q.   And after the six million, is this the total amount in which

15:12:02  20  Efrain Torres gave Francisco Colorado-Cessa, or is there more

15:12:07  21  money?

15:12:12  22  A.   I don't know if there was anything else on the side, but

15:12:21  23  that's what I had listed in my notes.

15:12:23  24  Q.   Okay.  That's what you were ordered to list in your ledger,

15:12:26  25  right?

15:12:30  1   A.    Yes.

15:12:31  2   Q.    And in 2005, 2006, was he paying the money back?  Was

15:12:38  3   Francisco Colorado-Cessa paying back the money?

15:13:01  4   A.    As they were investing and as they were getting the jobs, if

15:13:05  5   they got paid for the jobs, if they got paid for the jobs or not,

15:13:09  6   he would make payments.

15:13:10  7   Q.    Was he able to pay the entire amount back?

15:13:17  8   A.    No.

15:13:19  9   Q.    So was there a deal that was struck between Francisco

15:13:23  10  Colorado-Cessa and Efrain Torres in order to help Francisco

15:13:27  11  Colorado-Cessa pay back some of this debt?

15:13:31  12  A.    Yes.

15:13:40  13  Q.    And what was that arrangement?

15:13:56  14  A.    To invest with him, to help him with the drug business.  We

15:14:02  15  call it a polla.

15:14:04  16  Q.    Okay.  And what does that mean?

15:14:17  17  A.    That you give the company the opportunity to invest so that

15:14:21  18  they can make a profit.

15:14:23  19  Q.    In the drug business?

15:14:27  20  A.    Yes.

15:14:27  21  Q.    So how was that accomplished with Francisco Colorado-Cessa?

15:14:32  22  How was he able to pay back some of that money through the drug

15:14:35  23  business?

15:14:46  24  A.    Well, as I said, Efrain invited him to share in his earnings

15:14:59  25  and his business.

15:15:01  1   Q.   How was that done?

15:15:03  2   A.   The investment would be to buy the drugs at a lower price

15:15:16  3   and then, sell it at a higher price at the border.

15:15:20  4   Q.   At a lower price, the Columbian cut, are you familiar with

15:15:23  5   that term?

15:15:28  6   A.   Yes.

15:15:30  7   Q.   And how would Francisco Colorado-Cessa -- what kind of cut

15:15:35  8   would he get from Efrain Torres at the time?

15:15:37  9              MR. CHRIS FLOOD:  Objection, your Honor.

15:15:43  10             THE COURT:  We're going to stop right there, and we're

15:15:45  11   going to take our afternoon break and talk about it in a second.

15:15:52  12   All rise.

15:16:22  13             (Jury not present.)

15:16:22  14             THE COURT:  Sustain the objection to the question.

15:16:24  15   You're going to have to lay the foundation.

15:16:26  16             MS. FERNALD:  Yes, sir.

15:16:27  17             THE COURT:  All right.  Fifteen-minute recess.

15:16:57  18             (Recess.)

15:30:21  19             THE COURT:  Anything before the jury comes in?

15:30:25  20             MR. CHRIS FLOOD:  Yes, your Honor.  I believe that

15:30:27  21   attorney for the government is trying to elicit testimony about a

15:30:38  22   matter that you've already ruled in your -- in our objection to

15:30:43  23   the 404(b) notice, your Honor.

15:30:45  24             THE COURT:  All right.  In particular, we're talking

15:30:48  25   about?

15:30:48  1          MR. CHRIS FLOOD:  The alleged drug-trafficking

15:30:50  2  activities that Mr. Colorado engaged in with Mr. Torres.

15:30:57  3          THE COURT:  Well, where are you going?

15:30:57  4          MS. FERNALD:  And that's correct.  In other words, to

15:30:59  5  establish knowledge of this organization in this conspiracy, I'm

15:31:02  6  trying to establish that he knows about the drug business because

15:31:05  7  he participated in the drug business.

15:31:09  8          THE COURT:  And how are you going to do that?

15:31:11  9          MS. FERNALD:  That the testimony, I believe, will

15:31:13  10  reflect that the defendant actually used his King airplane that

15:31:18  11  we just showed to transport cocaine for Efrain Torres from Mexico

15:31:25  12  -- inside the country of Mexico.  So that he's aware of

15:31:30  13  knowledge.

15:31:30  14          THE COURT:  He knows that the defendant.

15:31:35  15          MS. FERNALD:  That is correct.

15:31:36  16          THE COURT:  Transported drugs.

15:31:38  17          MS. FERNALD:  Correct.

15:31:39  18          THE COURT:  In the King Air that has been admitted a

15:31:44  19  picture of.

15:31:45  20          MS. FERNALD:  Correct.

15:31:46  21          MR. CHRIS FLOOD:  Our objection is lack of personal

15:31:48  22  knowledge that the defendant transported drugs.  403, your Honor,

15:31:52  23  this is a money-laundering conspiracy having to do with -- and

15:31:57  24  404(b).

15:32:00  25          THE COURT:  Do you know that?  Do you know that the

```
15:32:05   1   defendant transported drugs in his plane?
15:32:13   2          THE WITNESS:  He didn't, the plane did.
15:32:18   3          THE COURT:  So it's not he.
15:32:20   4          MS. FERNALD:  Well, but he authorized this plane to be
15:32:22   5   used for the transportation of the drugs.
15:32:23   6          THE COURT:  Do you know whether he authorized the use
15:32:26   7   of the plane, the defendant, that is?
15:32:29   8          THE WITNESS:  Yes.
15:32:30   9          THE COURT:  How do you know that?
15:32:32  10          THE WITNESS:  Because the plane was used on several
15:32:36  11   occasions.
15:32:41  12          THE COURT:  Give me some more than that?
15:32:46  13          MS. FERNALD:  How do you know that Francisco
15:32:48  14   Colorado-Cessa had his plane used to transport cocaine?
15:32:58  15          THE COURT:  Well, you can all be seated.
15:33:14  16          THE WITNESS:  Because on several occasions, they had --
15:33:18  17   they sent to have the merchandise picked up by the planes.
15:33:21  18          THE COURT:  They?
15:33:23  19          THE WITNESS:  The workers, the ones that had been sent
15:33:31  20   to pick it up to bring it.
15:33:34  21          MS. FERNALD:  And who gave the orders?
15:33:37  22          THE WITNESS:  "Fourteen."
15:33:41  23          MS. FERNALD:  All right.  And who approved it?
15:33:47  24          THE WITNESS:  Well, for the use of the plane?  Mr.
15:33:50  25   Colorado.
```

15:33:50   1              THE COURT:  How do you know that?

15:33:59   2              THE WITNESS:  How could you use a plane without

15:34:00   3   permission?

15:34:03   4              THE COURT:  I could think of several ways.

15:34:09   5   Q.   (BY MS. FERNALD) Was he there when any of this happened?

15:34:15   6   A.   No.

15:34:16   7   Q.   And did Efrain Torres tell you about it happening?

15:34:23   8   A.   Yes.

15:34:24   9   Q.   And what did he tell you, specifically?

15:34:41  10   A.   That there were going to be what they call flocks were going

15:34:46  11   to be transported in the bird so they could be picked up in one

15:34:49  12   place and taken to another.

15:34:50  13   Q.   And was that on the repayment of the $18 million?

15:34:56  14   A.   Well, yeah.  It was the same business entity that it fit in.

15:35:07  15   Q.   And what business was that?

15:35:10  16   A.   What?

15:35:11  17   Q.   What business was that?  What's the same business entity

15:35:14  18   that did all of this?

15:35:23  19   A.   For the debt that there was to have it paid and all of that.

15:35:31  20              MR. CHRIS FLOOD:  Same objection.

15:35:31  21              THE COURT:  So what we have right now in testimony to

15:35:35  22   is No. 14.

15:35:40  23              MS. FERNALD:  Right.

15:35:41  24              THE COURT:  No. 14 told him that we would be using the

15:35:45  25   plane to transport drugs.

15:35:48   1          MS. FERNALD:  That's correct.

15:35:49   2          THE COURT:  So we really have a hearsay thing here

15:35:52   3   because it's being offered for the truth thereof, right?

15:35:55   4          MS. FERNALD:  It's also a coconspirator statement

15:35:57   5   that's made in the course of the conspiracy that establish the

15:36:00   6   knowledge of Francisco Colorado-Cessa.

15:36:02   7          THE COURT:  I'll hear you argument on that, Mr. Flood.

15:36:06   8          MR. CHRIS FLOOD:  Your Honor, it wouldn't be --

15:36:07   9   assuming the statement was ever made, it wouldn't be a statement

15:36:09  10   made be a coconspirator of this conspiracy.  That would be a

15:36:12  11   drug-trafficking conspiracy, and that's 404(b) evidence, your

15:36:15  12   Honor.  Doesn't make it more likely that he engaged in this

15:36:18  13   conspiracy.

15:36:19  14          MS. FERNALD:  This conspiracy involves the illegal

15:36:21  15   distributions of cocaine and marihuana and other types of drugs

15:36:26  16   by the Zeta cartel, and that's the basis of the specified

15:36:30  17   unlawful activity, which is contained in the conspiracy count.

15:36:35  18   And his knowledge to this is imperative for us to be able to show

15:36:39  19   that he's aware of this specified unlawful activity.  And, in

15:36:43  20   fact, we're trying to show that he even participated in the

15:36:46  21   specified unlawful activity, and that's the purpose of the

15:36:50  22   government trying to introduce this.

15:36:55  23          MR. CHRIS FLOOD:  Judge Sparks did not allow it in last

15:36:57  24   time.

15:36:57  25          THE COURT:  I don't care what Judge Sparks did.  He

152

15:36:59  1  didn't care what I do.  I'm not going to allow it under 403.

15:37:04  2  It's an interesting question and maybe even a close one, but tie

15:37:08  3  goes to the defendant.

15:37:10  4          All right.  We're ready.

15:37:11  5          MS. FERNALD:  Thank you for hearing me.

15:37:13  6          THE COURT:  We're ready?  Bring them in.  Don't ever do

15:37:17  7  that again, Mr. Flood.  Don't you ever tell me what another judge

15:37:22  8  did in a similar situation.  I'm not interested.

15:37:25  9          MR. CHRIS FLOOD:  Yes, your Honor.

15:37:27  10         (Jury present.)

15:38:05  11         THE COURT:  All right.  Let's proceed.  You may all be

15:38:10  12 seated.

15:38:11  13 Q.   (BY MS. FERNALD) Mr. Hinojosa, can you describe the

15:38:13  14 ownership versus the control after ADT Petro Servicios as it

15:38:19  15 relates to Francisco Colorado-Cessa and Efrain Torres?

15:38:40  16 A.   Who was the owner?  I'm not sure I understood the question.

15:38:46  17 Q.   Well, Efrain Torres had invested in ADT?

15:38:51  18 A.   Yes.

15:38:52  19 Q.   And who owned ADT?

15:38:56  20 A.   Mr. Colorado.

15:38:59  21 Q.   So what was the ownership and control over ADT between

15:39:02  22 Efrain Torres and Francisco Colorado-Cessa?

15:39:24  23 A.   That they were partners.  They were both investing and they

15:39:28  24 were both earning.

15:39:29  25 Q.   And who had invested the money in the business?

| | | |
|---|---|---|
| 15:39:38 | 1 | A.   A part of it, Efrain. |
| 15:39:43 | 2 | THE COURT:  Okay.  Let's move on the another topic. |
| 15:39:45 | 3 | MS. FERNALD:  I'm sorry, your Honor. |
| 15:39:46 | 4 | THE COURT:  Let's move on to another topic. |
| 15:39:49 | 5 | MS. FERNALD:  Yes, sir. |
| 15:39:49 | 6 | THE COURT:  I think we've exhausted that. |
| 15:39:52 | 7 | Q.   (BY MS. FERNALD) Can you tell us a little bit about the |
| 15:39:54 | 8 | horseracing industry for the Los Zetas cartel? |
| 15:40:06 | 9 | A.   It's been a tradition that everybody have their horses, that |
| 15:40:20 | 10 | they bet on their horses, that they run races both public and |
| 15:40:22 | 11 | private, that it's a contest to see who's got the best horses and |
| 15:40:28 | 12 | to be able to bet money. |
| 15:40:30 | 13 | Q.   And you had mentioned before that Efrain Torres had a hobby |
| 15:40:35 | 14 | with the horse races and the horse racing industry; is that |
| 15:40:45 | 15 | correct? |
| 15:40:45 | 16 | A.   Yes. |
| 15:40:48 | 17 | Q.   Did he ever rename a horse after his son? |
| 15:40:56 | 18 | A.   Yes. |
| 15:40:57 | 19 | Q.   And do you remember the horse's name? |
| 15:41:02 | 20 | A.   Alexander, Alex. |
| 15:41:06 | 21 | Q.   Can you show me Government's Exhibit 250E, please?  Do you |
| 15:41:14 | 22 | recognize this individual? |
| 15:41:17 | 23 | A.   Yes. |
| 15:41:18 | 24 | Q.   Who do you recognize this individual to be? |
| 15:41:26 | 25 | A.   I know him as the light-skinned guy Carlitos Villarin. |

| | | |
|---|---|---|
| 15:41:34 | 1 | Q.   And how is he involved with the horse races? |
| 15:41:49 | 2 | A.   Well, there where he lived, he had a racetrack and he had |
| 15:41:53 | 3 | horses. |
| 15:41:53 | 4 | Q.   Let's go back to Government's Exhibit 250U.  Do you |
| 15:42:09 | 5 | recognize the man in this photograph? |
| 15:42:11 | 6 | A.   Yes. |
| 15:42:12 | 7 | Q.   And what is that man's name? |
| 15:42:20 | 8 | A.   Jesus Enrique, "Mamito." |
| 15:42:26 | 9 | Q.   And did he have a Z number? |
| 15:42:30 | 10 | A.   Yes. |
| 15:42:31 | 11 | Q.   What was his Z number? |
| 15:42:38 | 12 | A.   I don't remember.  We all called him "Mamito." |
| 15:42:44 | 13 | Q.   If I told you Z-7, would that refresh your recollection? |
| 15:42:53 | 14 | A.   Yes.  Yeah. |
| 15:42:57 | 15 | Q.   And during the period of time that you were with Efrain |
| 15:43:03 | 16 | Torres -- could we pull up Government's Exhibit No. 250X?  Do you |
| 15:43:14 | 17 | recognize this man? |
| 15:43:17 | 18 | A.   Yes. |
| 15:43:18 | 19 | Q.   Who is this? |
| 15:43:20 | 20 | A.   Lazcano, Heriberto Lazcano. |
| 15:43:24 | 21 | Q.   And Lazcano-Lazcano, what was his role in the company? |
| 15:43:34 | 22 | A.   He was the leader of the Zetas cartel. |
| 15:43:38 | 23 | Q.   Did he have a Z number? |
| 15:43:42 | 24 | A.   Yes. |
| 15:43:42 | 25 | Q.   And what was that? |

15:43:45  1   A.   Do not remember.

15:43:46  2   Q.   Is he still alive to your knowledge?

15:43:58  3   A.   From what I heard, he had been killed.

15:44:04  4   Q.   I want to go back to March the 3rd.  We're getting close to

15:44:08  5   end of your testimony, but on March the 3rd of 2007, when Efrain

15:44:13  6   Torres was killed, did you attend the funeral?

15:44:26  7   A.   Yes.

15:44:28  8   Q.   And the day after he was killed, was a meeting called?

15:44:36  9   A.   Yes.

15:44:37  10  Q.   Who was the meeting called by?

15:44:41  11  A.   Lazcano and Z-40.

15:44:46  12  Q.   What were their positions in the company at that time?

15:44:56  13  A.   Lazcano was the leader, "40" was second.

15:45:03  14  Q.   And where was the meeting called?

15:45:10  15  A.   In Tampico, Tamaulipas.

15:45:13  16  Q.   What was the purpose of the meeting?

15:45:36  17  A.   Gathered everybody together to do a -- to inform us of what

15:45:43  18  had happened, second, to do an accounting of all the accounts of

15:45:49  19  all -- of all of us that had worked with "14," the inventory of

15:45:54  20  the accounting of all the movements.

15:45:56  21  Q.   So the purpose of the meeting was to find out what the

15:46:01  22  workers were doing under "14's" control or Efrain Torres'

15:46:11  23  control.

15:46:13  24  A.   Yes.

15:46:13  25  Q.   And who was the accountant for Efrain Torres?

15:46:19    1    A.    I was.

15:46:20    2    Q.    And at the time of this meeting, I have March the 4th of

15:46:25    3    2007.  At the time of this meeting, what individual owed Efrain

15:46:30    4    Torres the most money?

15:46:39    5    A.    Mr. Colorado.

15:46:40    6    Q.    Was Francisco Colorado-Cessa present at that meeting?

15:46:47    7    A.    No.

15:46:48    8    Q.    How many people were present?  How many of "Chispa's"

15:46:53    9    workers were present at that meeting?

15:47:02   10    A.    There are about 30, 30-some of us.  I don't remember

15:47:06   11    exactly.

15:47:06   12    Q.    How long did the meeting last?

15:47:11   13    A.    I don't remember.  It was one that was, you know, pretty

15:47:20   14    long.  Everything was explained to us.

15:47:22   15    Q.    All right.  And what was explained to you?  What did the

15:47:25   16    leaders explain to you?

15:47:36   17    A.    That if we could -- would still be continuing to work the

15:47:49   18    way we had been working in the same fashion, in a coordinated

15:47:53   19    fashion, and who was going to be in command.

15:47:58   20    Q.    And was someone selected to be in command at that time?

15:48:04   21    A.    No.

15:48:05   22    Q.    And how did your accounting go with Lazcano and with Miguel

15:48:10   23    Trevino, the leaders of the company?

15:48:27   24    A.    It was fine.  It took us several days to check all the books

15:48:34   25    and to check everything out, but everything came out fine.

157

| | | |
|---|---|---|
| 15:48:37 | 1 | Q.   All right.  And were they looking for Francisco |
| 15:48:41 | 2 | Colorado-Cessa at that time? |
| 15:48:43 | 3 | A.   Not just him, everyone that owed.  Everybody. |
| 15:48:51 | 4 | Q.   Did you have a meeting in McAllen with Francisco |
| 15:48:55 | 5 | Colorado-Cessa after this March 4th meeting? |
| 15:49:00 | 6 | MR. CHRIS FLOOD:  Objection.  Leading, your Honor. |
| 15:49:06 | 7 | THE COURT:  Overruled.  You may answer. |
| 15:49:09 | 8 | A.   Yes. |
| 15:49:10 | 9 | Q.   (BY MS. FERNALD) Can you tell the jury about the meeting |
| 15:49:12 | 10 | that you had with Francisco Colorado-Cessa in McAllen, Texas |
| 15:49:18 | 11 | shortly after this accounting meeting? |
| 15:49:29 | 12 | A.   He was just asking how things were, who had ended up being |
| 15:49:46 | 13 | -- who was going to end up being in charge, and that he was at |
| 15:49:49 | 14 | the service of Lazcano or whoever ended up being in charge. |
| 15:49:52 | 15 | Q.   Okay.  And when you say "he," who are you referring to? |
| 15:49:59 | 16 | A.   Mr. Colorado. |
| 15:50:01 | 17 | Q.   So "he" meaning Francisco Colorado said that he was at whose |
| 15:50:07 | 18 | service? |
| 15:50:09 | 19 | THE COURT:  That is leading. |
| 15:50:13 | 20 | Q.   (BY MS. FERNALD) What did Mr. -- what did Mr. Francisco |
| 15:50:19 | 21 | Colorado-Cessa say in reference to Lazcano? |
| 15:50:27 | 22 | A.   That he was there at his service for whatever he needed.  He |
| 15:50:41 | 23 | was there to be able to work things out. |
| 15:50:44 | 24 | Q.   Where did the meeting take place in McAllen? |
| 15:50:53 | 25 | A.   There at the McAllen mall where they sell food. |

| | | |
|---|---|---|
| 15:51:00 | 1 | Q.   The same court? |
| 15:51:02 | 2 | A.   Yes. |
| 15:51:04 | 3 | Q.   After you had this meeting at the mall shortly after March |
| 15:51:10 | 4 | the 4th, did you receive a phone call from Miguel Trevino? |
| 15:51:23 | 5 | A.   Yes. |
| 15:51:25 | 6 | Q.   And what did he instruct you in regards to Francisco |
| 15:51:31 | 7 | Colorado-Cessa's debt? |
| 15:51:43 | 8 | A.   That it had already been worked out, that I shouldn't be |
| 15:51:46 | 9 | looking for him anymore to try and get payment on the accounts, |
| 15:51:51 | 10 | that the account had been settled. |
| 15:52:05 | 11 | Q.   And how did you keep the books and the records for Efrain |
| 15:52:10 | 12 | Torres?  Did you continue to work for Miguel Trevino until you |
| 15:52:13 | 13 | were arrested in September of 2008? |
| 15:52:27 | 14 | A.   On the computer. |
| 15:52:28 | 15 | Q.   And specifically, did you use a computer or a flash drive? |
| 15:52:41 | 16 | A.   I had it on a flash drive, but I used a computer to update |
| 15:52:45 | 17 | everything. |
| 15:52:46 | 18 | Q.   When you were arrested in September of 2008, did you have |
| 15:52:51 | 19 | information regarding the company's financial information on that |
| 15:52:57 | 20 | flash drive? |
| 15:53:06 | 21 | A.   Yes. |
| 15:53:07 | 22 | Q.   And was that located at your home at 2806 Santa Laura in |
| 15:53:13 | 23 | Mission, Texas? |
| 15:53:20 | 24 | A.   Yes. |
| 15:53:21 | 25 | Q.   And do you know whether or not the FBI and DEA actually |

15:53:26  1   seized that flash drive when they did the search warrant?

15:53:33  2   A.   No.  No.  They didn't seize it.  I don't know where it ended

15:53:45  3   up.

15:53:47  4   Q.   Ma I approach the witness, your Honor?

15:53:54  5             THE COURT:  Just a moment.

15:53:56  6   Q.   (BY MS. FERNALD) I'm showing you what has been marked as

15:53:59  7   Government's Exhibit 420.  Do you recognize this document and

15:54:02  8   have you reviewed it before?

15:54:19  9   A.   Don't remember.  Yes.

15:54:33  10  Q.   What do you recognize this document to be?

15:54:35  11  A.   What was confiscated at my house.

15:54:40  12  Q.   And can you check through the list what was confiscated at

15:54:44  13  your house and tell me whether or not that flash drive is present

15:54:47  14  on that list?

15:54:57  15  A.   No.  It's not included.

15:54:59  16  Q.   So they missed your flash drive, correct?

15:55:07  17  A.   No.

15:55:09  18  Q.   Move for the introduction of Government's Exhibit 4A.

15:55:12  19            THE COURT:  Excuse me.  No, they missed your flash

15:55:14  20  drive?  Or yes, they missed your flash drive?

15:55:20  21            THE WITNESS:  They didn't find it.

15:55:23  22            THE COURT:  Okay.  Now.

15:55:25  23            MS. FERNALD:  Move for the introduction of 420 and he's

15:55:29  24  reviewing it.

15:55:30  25            THE COURT:  All right.

15:55:34  1          MR. CHRIS FLOOD:  I have no objection.

15:55:35  2          THE COURT:  Without objection, it is received.

15:56:07  3  Q.  (BY MS. FERNALD) Mr. Hinojosa, were you aware of any checks

15:56:10  4  that were written by Francisco Colorado-Cessa to Efrain Torres?

15:56:23  5  A.  Just for the horse races and the payments for horses.

15:56:29  6  That's it.  Because the rest of it was being owed.  Supposedly,

15:56:39  7  he had been paid in checks.  At least that's what I was told.

15:56:44  8  Q.  Did you ever see those checks?

15:56:45  9  A.  No.

15:56:46  10  Q.  Do you know whether or not those checks actually exist?

15:56:56  11  A.  Well, yeah, because they were for the payments of races.

15:57:02  12  Q.  I'm talking about checks between Efrain Torres and Francisco

15:57:05  13  Colorado-Cessa.

15:57:13  14  A.  No.  Those accounts -- accounting, I don't know.

15:57:17  15  Q.  Okay.  Do you know what a narco corrido is?

15:57:23  16  A.  Yes.

15:57:24  17  Q.  What is that?  Tell the jury.

15:57:42  18  A.  It's a song that's dedicated to a person.  It's a song, it's

15:57:46  19  the story about a person or what they do or who they are.

15:57:50  20  Q.  And with the cartel, are these popular?

15:57:56  21  A.  Yes.

15:57:57  22  Q.  Did you have a narco corrido actually written for you?

15:58:03  23  A.  Yes.

15:58:04  24  Q.  And do other members of the cartel have narco corridos

15:58:08  25  written for them?

15:58:09  1    A.    Yes.

15:58:14  2    Q.    Do you know what a posada is?

15:58:18  3    A.    Yes.

15:58:19  4    Q.    Can you tell the jury what a posada is?

15:58:24  5    A.    There in Mexico, those are parties that are held during the

15:58:39  6    Christmas season to spend time with friends or with coworkers.

15:58:45  7    It's a Christmastime celebration.

15:58:46  8    Q.    And did the cartel participate in posadas?

15:58:52  9    A.    Yes.

15:58:53  10   Q.    And were bonuses given at posadas?

15:59:00  11   A.    Yes.

15:59:01  12   Q.    And did you actually give some of your workers vehicles at

15:59:05  13   some of those posadas?

15:59:10  14   A.    Yes.

15:59:11  15   Q.    At any time between 2004 and the time that you were arrested

15:59:23  16   in 2008, was this man, Francisco Colorado-Cessa, was he forced to

15:59:31  17   be friends with "Chispa"?

15:59:44  18   A.    No.   That I know of, no.

15:59:47  19   Q.    What about with Miguel Trevino?

16:00:02  20   A.    I never saw them together.   I don't know what kind of

16:00:05  21   relationship they had, but he was there in Veracruz, "40" was in

16:00:11  22   Veracruz.

16:00:12  23   Q.    Was he ever forced to do business with the leaders of the

16:00:16  24   cartel, Francisco Colorado-Cessa?

16:00:30  25   A.    I couldn't tell you.   Through 2008 with "14," no.   With the

16:00:35  1  rest, I couldn't tell you.

16:00:37  2  Q.    Were you forced?

16:00:38  3  A.    No.

16:00:39  4  Q.    Did you choose to do it?

16:00:42  5  A.    Yes.

16:00:43  6  Q.    Why did you choose to do it?

16:00:54  7  A.    Well, because you earn money, you make money.  You have

16:01:01  8  luxuries, luxurious things and power.

16:01:05  9  Q.    What about protection?

16:01:10  10  A.    That's included in the power, the protection.

16:01:13  11  Q.    Your Honor, I have marked for demonstrative purposes my

16:01:17  12  notes that I have written as Government's Exhibit No. 421, and

16:01:22  13  would like to offer that to the Court for demonstrative purposes

16:01:25  14  only.

16:01:27  15              MR. CHRIS FLOOD:  I have no objection, your Honor.

16:01:28  16              THE COURT:  Without objection.

16:01:41  17              MS. FERNALD:  Pass the witness.

16:01:43  18              THE COURT:  Your witness, sir.

16:01:47  19                          CROSS-EXAMINATION

16:01:47  20  BY MR. CHRIS FLOOD:

16:02:00  21  Q.    Mr. Hinojosa, my name is Chris Flood.  You and I have never

16:02:04  22  met before, correct?

16:02:09  23  A.    No.

16:02:10  24  Q.    But you have obviously met with Ms. Fernald, the prosecutor

16:02:18  25  that was just asking you questions, correct?

16:02:27  1   A.   Yes.

16:02:28  2   Q.   And how many times have you met with Ms. Fernald before

16:02:33  3   coming in to testify today?

16:02:39  4   A.   Three or four times.

16:02:44  5   Q.   Three or four times this year or three or four times in

16:02:47  6   total?

16:02:53  7   A.   This year.  This year, yeah.

16:03:00  8   Q.   Okay.  And before this year, have you ever met with Ms.

16:03:04  9   Fernald and discussed with her testifying?

16:03:16  10  A.   Yes.

16:03:19  11  Q.   And when was that?

16:03:28  12  A.   More than two-and-a-half years ago when the other trial

16:03:32  13  happened.

16:03:33  14  Q.   Okay.  And how many times did you meet with her then?

16:03:46  15  A.   I don't remember.  Three times.  I don't remember.  Three

16:03:49  16  times.

16:03:51  17  Q.   All right.  Is Ms. Fernald the only prosecutor that you've

16:03:57  18  met with regarding your testifying?

16:04:08  19  A.   For this case?

16:04:10  20  Q.   For any case.

16:04:11  21  A.   No.

16:04:12  22  Q.   Okay.  Tell the jury who Toni Trevino is.

16:04:24  23  A.   That's a prosecutor that is in charge of my case in McAllen.

16:04:29  24  Q.   In the Southern District of Texas?

16:04:32  25  A.   Yes.

| | | |
|---|---|---|
| 16:04:33 | 1 | Q.   And do you remember that you met with her on November 25th, |
| 16:04:39 | 2 | 2008, when you decided to cooperate with the government and start |
| 16:04:49 | 3 | telling them about the crimes that you've committed? |
| 16:05:08 | 4 | A.   I don't.  I don't remember the date, but I do remember some |
| 16:05:18 | 5 | about that. |
| 16:05:20 | 6 | Q.   Now, you have glasses and you do read English, right? |
| 16:05:26 | 7 | A.   Just a little bit.  Not much. |
| 16:05:28 | 8 | Q.   All right.  May I approach the witness, your Honor? |
| 16:05:31 | 9 | THE COURT:  You may. |
| 16:05:32 | 10 | Q.   (BY MR. CHRIS FLOOD) Have you ever seen that document |
| 16:05:39 | 11 | before? |
| 16:05:55 | 12 | A.   Not that I remember, but I do remember that I -- I did sign |
| 16:06:21 | 13 | a lot of papers. |
| 16:06:22 | 14 | Q.   All right.  Is that your signature on that document? |
| 16:06:27 | 15 | A.   Yes. |
| 16:06:39 | 16 | Q.   Your Honor, we move to introduce Defendant's Exhibit 26. |
| 16:06:42 | 17 | I'll hand it to counsel for the government for them to -- |
| 16:06:46 | 18 | objections, if they have any. |
| 16:06:50 | 19 | THE COURT:  I beg your pardon? |
| 16:06:56 | 20 | MS. FERNALD:  No objection, your Honor. |
| 16:06:59 | 21 | THE COURT:  Without objection.  How did you identify |
| 16:07:04 | 22 | it, 26? |
| 16:07:05 | 23 | MR. CHRIS FLOOD:  Yes.  Defendant's Exhibit 26. |
| 16:07:07 | 24 | THE COURT:  Defendant's Exhibit 26 is admitted without |
| 16:07:09 | 25 | objection. |

16:07:10    1    Q.    (BY MR. CHRIS FLOOD) Now, if we go to page 2 of that

16:07:14    2    exhibit, that is signed by yourself, correct, on November 25,

16:07:21    3    2008?  You just testified that was your signature, right?

16:07:28    4    A.    Yes.

16:07:29    5    Q.    And your counsel on the same day, Mr. Garcia?

16:07:37    6    A.    Yes.

16:07:38    7    Q.    And Toni Trevino, assistant United States attorney?

16:07:49    8    A.    Yes.

16:07:50    9    Q.    And it says on page 2, if your client understands and is in

16:07:55   10    agreement with the terms of this proffer, have your client sign

16:07:58   11    and date below and return to me no later than November 25, 2008.

16:08:03   12    Do you see that?

16:08:10   13    A.    Yes, I see it.

16:08:27   14    Q.    Okay.  In that agreement, you're the client, right?

16:08:35   15    A.    Yes.

16:08:36   16    Q.    Let's go to page 1 of that agreement.  The first page of

16:08:47   17    this exhibit is addressed to your attorney, Mr. Garcia, right?

16:08:57   18    A.    Yes.

16:08:58   19    Q.    And it says, during our previous conversation, you stated

16:09:02   20    that your client was interested in seeking a proffer agreement.

16:09:07   21    This office will consider pursuing this course to achieve an

16:09:12   22    appropriate and just resolution of this matter.  Correct?

16:09:34   23    A.    Yes.

16:09:41   24    Q.    And to assure that no misunderstandings arise, please be

16:09:46   25    advised that such a proffer would be conducted only as follows.

16:09:51  1    And I'm not going to go through the whole thing but only as

16:09:56  2    follows.  Do you see that?

16:10:11  3    A.    Okay.

16:10:13  4    Q.    Now, the letter then goes further and outlines the agreement

16:10:19  5    between you and Ms. Trevino through your lawyer that nothing you

16:10:24  6    say will be used against you but that you have to be honest with

16:10:28  7    the government when you talk to them.  Wasn't that your

16:10:32  8    understanding of the agreement?

16:10:51  9    A.    Yes.

16:10:54  10          MR. CHRIS FLOOD:  Your Honor, could I retrieve that

16:10:56  11   exhibit that they were using on direct examination that was the

16:10:59  12   search warrant?

16:11:00  13          THE COURT:  I suppose.

16:11:03  14          MR. CHRIS FLOOD:  Thanks.

16:11:05  15   Q.    (BY MR. CHRIS FLOOD) And that agreement, again, was signed

16:11:10  16   on November 25, 2008.  Within 60 or 70 days from the search of

16:11:28  17   your residence that is depicted on Government's Exhibit 420,

16:11:35  18   which you do not have, do you see this was the inventory that was

16:11:54  19   introduced just a minute ago by Ms. Fernald of the search of your

16:11:59  20   residence?  Do you remember seeing that exhibit?

16:12:13  21   A.    Yes.

16:12:14  22   Q.    All right.  And this search took place on September 2, 2008,

16:12:20  23   correct?

16:12:23  24   A.    Yes.

16:12:24  25   Q.    And it's your testimony upon review of the inventory of that

16:12:28    1   search, that this flash drive that you've made reference to was

16:12:33    2   not found by the agent.

16:12:47    3   A.   Yes.

16:12:50    4   Q.   Thank you.  So September, October, November, after your

16:13:05    5   signing of this proffer letter with the government, this

16:13:09    6   agreement that you had, did you meet with them immediately after

16:13:13    7   that?

16:13:29    8   A.   I don't remember the date exactly, but I did meet with them.

16:13:32    9   Q.   If I showed you a report done by Special Agent Raul Vargas

16:13:38   10   reflecting an interview between you and Toni Trevino, the

16:13:44   11   prosecutor, on November 25, the same date of that agreement,

16:13:49   12   would that refresh your memory if you met with them on that day?

16:14:11   13   A.   I do remember meeting with him.

16:14:14   14   Q.   Okay.  I'm showing you -- well, take a look at that document

16:14:21   15   and see if it refreshes your memory on what day you met with Toni

16:14:26   16   Trevino and the agent.

16:14:39   17   A.   I don't remember having seen this.

16:14:41   18   Q.   Okay.  But does that document refresh your memory about the

16:14:45   19   meeting that you had with Ms. Trevino, Special Agent Raul Vargas,

16:14:49   20   and others right after signing that proffer agreement that is

16:14:54   21   Defendant's Exhibit 26?

16:15:13   22   A.   Yes.

16:15:14   23   Q.   And did you, in fact, have that meeting?

16:15:26   24   A.   I mean, I met with him several times.  I don't remember each

16:15:30   25   one specifically.

16:15:33  1    Q.   But if you met with him on November 25, do you know if they

16:15:38  2    went and conducted another search warrant at your residence to

16:15:42  3    find the flash drive that they missed the first time?

16:16:00  4    A.   No.  I don't know.

16:16:02  5    Q.   You don't know if they did or you don't know if they found

16:16:05  6    it?

16:16:12  7    A.   I don't know if they did it.  I also don't know if they ever

16:16:15  8    found it because I don't.

16:16:18  9    Q.   And if we had that flash drive, we would be able to check to

16:16:25  10   see of these entries that you say you made actually occurred,

16:16:31  11   right?

16:16:39  12   A.   Yes, sir.

16:16:46  13   Q.   After that proffer letter, you met with the agents again on

16:16:52  14   November 25th, December 4th of 2008, February 11th of 2009, March

16:17:02  15   16th of 2009, March 23rd and the 27th of 2009, April 4th, 6th,

16:17:11  16   and May 5th of 2009.  Do you recall that?

16:17:21  17   A.   I remember there were a lot of times.  I do not remember the

16:17:43  18   dates.  I remember there are a lot of times.

16:17:45  19   Q.   Do you recall on those occasions that was, again, Assistant

16:17:52  20   United States Toni Trevino, not Ms. Fernald.  Do you recall that

16:17:55  21   on those occasions, you talked to the agents and Ms. Trevino

16:18:01  22   about your dealings with Efrain Torres?

16:18:15  23   A.   Yeah.  They knew about everything.  Yeah.

16:18:21  24   Q.   Right.  Do you remember telling the agents on those

16:18:27  25   occasions back in 2008 and 2009 that you were the accountant for

16:18:32   1   Efrain Torres?

16:18:40   2   A.   Yes.

16:18:41   3   Q.   And that after Efrain Torres was killed, there was a meeting

16:18:45   4   with Miguel Trevino like the one you described a little while

16:18:51   5   ago.

16:18:58   6   A.   Yes.

16:18:58   7   Q.   And do you remember telling the agents that all of the

16:19:02   8   people, the associates at the meeting had to disclose their

16:19:06   9   earnings, accounting logs, and illegal narcotics customers to

16:19:10   10  Miguel Trevino?

16:19:18   11  A.   Yes.

16:19:29   12  Q.   And by the way, at these meetings that I've described, it

16:19:32   13  wasn't just Toni Trevino, there was Agents Raul Vargas and David

16:19:37   14  Buckley of the FBI.  Do you remember those two guys?

16:19:52   15  A.   I remember Raul Vargas.  I don't remember the other one.

16:19:55   16  Q.   All right.  What about Agent Katherine Gutierrez?

16:19:59   17  A.   Yes.

16:20:00   18  Q.   Bill Klaus.  Remember Bill Klaus?

16:20:03   19  A.   No.

16:20:05   20  Q.   Okay.  But you don't remember everybody that was at these

16:20:09   21  meetings that I've named, but you remember that Vargas was there

16:20:13   22  and you remember that Gutierrez was there.

16:20:24   23  A.   Yes.

16:20:25   24  Q.   And the agents appeared to be taking notes of what you were

16:20:29   25  saying.

16:20:34  1   A.   Yes.

16:20:35  2   Q.   In addition to talking about this meeting that took place

16:20:39  3   after Efrain Torres was killed, you also mentioned that Trevino

16:20:47  4   was going to be working with Lazcano, and they were going to

16:20:51  5   resume activities just had been done on Efrain Torres.  Do you

16:20:56  6   recall that?

16:21:11  7   A.   Yes.

16:21:13  8   Q.   And in addition to Efrain Torres, you told the agents about

16:21:17  9   working in the Public Minister's Office, correct?

16:21:28  10  A.   Yes.

16:21:28  11  Q.   And you told them about an individual, a person by the name

16:21:34  12  of Guerra.  Do you remember that?  Raymundo Guerra?

16:21:39  13  A.   Yes.

16:21:42  14  Q.   And he was a corrupt sheriff that you had been working with

16:21:46  15  when you were in Miguel Aleman as a plaza boss, correct?

16:21:59  16  A.   Yes.

16:22:00  17  Q.   Now, how long would these meetings take generally, say, the

16:22:05  18  meeting on November 25th?  Would they be long meetings?

16:22:18  19  A.   An hour, two hours, I don't remember.

16:22:22  20  Q.   Okay.  But it was your understanding that you had to tell

16:22:27  21  them the whole truth at these meetings, correct?

16:22:34  22  A.   Regarding everything that they asked me about.  Yes.

16:22:38  23  Q.   Right.  And when you told them about your dealings with

16:22:42  24  Efrain Torres back in 2008 and 2009, you never mentioned anything

16:22:50  25  about ADT or Pancho Colorado investing money with Efrain Torres,

16:22:57  1  did you?

16:23:06  2  A.   No.  All they were asking about was drug things.

16:23:19  3  Q.   Right.  And you never mentioned anything about $18 million

16:23:25  4  being given by Efrain Torres to Pancho Colorado in all nine of

16:23:29  5  those meetings that you had back in 2008 and 2009.

16:23:42  6  A.   No.

16:23:43  7  Q.   You never testified that you flew in Pancho Colorado's

16:23:47  8  airplane with Efrain Torres or that Pancho Colorado had attended

16:23:52  9  Efrain Torres' son's baptism, did you?

16:24:11  10  A.   I wasn't asked.  And regarding the plane, I've flown in a

16:24:20  11  lot of planes.

16:24:21  12  Q.   Right.  You never mentioned Pancho Colorado one time in all

16:24:26  13  nine of those meetings back in 2008, 2009 before he was charged

16:24:32  14  in this case, did you?

16:24:39  15  A.   No.

16:24:48  16  Q.   Now, even though you then entered into a plea agreement

16:24:57  17  after your proffer letter, the government told you that they

16:25:04  18  still wanted your cooperation; isn't that correct?

16:25:17  19  A.   Yes.

16:25:24  20  Q.   And they told you that if you were going to cooperate with

16:25:29  21  them, you couldn't lie to them and you couldn't commit any more

16:25:33  22  crimes, right?

16:25:42  23  A.   Yes.

16:25:44  24  Q.   I'm sorry?

16:25:45  25  A.   Yes.

16:25:46  1  Q.   Okay.  And you were sentenced on the case that you had in

16:25:58  2  South Texas where Ms. Trevino was the prosecutor, were you not?

16:26:06  3  A.   Yes.

16:26:10  4  Q.   And prior to sentencing, the government filed a motion for

16:26:17  5  downward departure of your sentence to reflect the cooperation

16:26:23  6  you'd given, correct?

16:26:40  7  A.   I don't remember that, but yeah.  Yeah.

16:26:43  8  Q.   All right.  May I approach the witness, your Honor?

16:26:45  9       THE COURT:  You may.

16:26:49 10  Q.   (BY MR. CHRIS FLOOD) I've handed you what I've had marked as

16:26:57 11  Defendant's Exhibit 27.  Have you ever seen that document?

16:27:09 12  A.   Yes.

16:27:15 13  Q.   Have you ever seen that document before?

16:27:26 14  A.   I signed a lot of things.  And since I don't understand much

16:27:30 15  English, all the attorney did was he would bring them to me and

16:27:33 16  say, sign this and I did.

16:27:35 17  Q.   Do you remember earlier today when you testified that, when

16:27:41 18  I started cooperating in 2008, I wasn't entirely cooperative

16:27:45 19  because my brother and uncle and workers were in danger.  Do you

16:27:49 20  remember testifying to that?

16:28:08 21  A.   Yes.

16:28:08 22  Q.   We'd move to admit Defendant's 27, your Honor.

16:28:22 23       THE COURT:  Is there an objection?

16:28:23 24       MS. FERNALD:  May I confer with counsel?

16:28:33 25       MR. CHRIS FLOOD:  We may need a sidebar on this, your

16:28:37   1   Honor.  I could take off the cover page, if necessary.  May we

16:28:41   2   have a sidebar?

16:28:42   3            THE COURT:  Certainly.

16:28:43   4            (At the bench, on the record.)

16:28:53   5            MS. FERNALD:  This is the motion for downward

16:28:55   6   departure.  My only concern -- first, they have an objection.  I

16:28:57   7   believe this is under seal.

16:29:02   8            MR. CHRIS FLOOD:  I think it's filed under seal, Judge.

16:29:03   9   But obviously it's not under seal.  We've got it.

16:29:05  10            THE COURT:  Well, true.

16:29:06  11            MS. FERNALD:  But under the protective order, you have

16:29:08  12   it.  Not under the court --

16:29:08  13            MR. CHRIS FLOOD:  Even documents under the protective

16:29:12  14   order can be exhibits.

16:29:12  15            THE COURT:  So why can't it be received?  This jury can

16:29:15  16   look at it, but it will be put under seal.

16:29:19  17            MR. CHRIS FLOOD:  That's fine.

16:29:20  18            THE COURT:  On motion from the government afterwards.

16:29:21  19   Okay?

16:29:22  20            MS. FERNALD:  That's fine with me, your Honor.

16:29:24  21            MR. CHRIS FLOOD:  By the way, your Honor, I apologize

16:29:26  22   for the comment not being anything other than a repetition of my

16:29:30  23   brother --

16:29:31  24            MR. CHARLES FLOOD:  I'm sorry, Judge.  I was wholly to

16:29:32  25   blame for that.

16:29:50  1      THE COURT:  All right.  It's received under the

16:29:52  2  stipulation.

16:30:02  3  Q.    (BY MR. CHRIS FLOOD) Mr. Hinojosa, this is the motion for

16:30:05  4  downward departure, which has been admitted into evidence, which

16:30:07  5  was filed by the -- Ms. Trevino's office before your sentencing

16:30:12  6  in your case.  I just showed it to you.  Do you see that?

16:30:20  7      MS. FERNALD:  Your Honor, I'm sorry to object to all of

16:30:23  8  this.  But the government continues to object because this is

16:30:27  9  under seal and this is being shown in an open courtroom.

16:30:30  10      THE COURT:  So don't show it in the open courtroom,

16:30:34  11  only to the jury.  Do we have the ability to just show it to the

16:30:39  12  jury?  It's a matter that's under seal in another case, ladies

16:30:44  13  and gentlemen, so it's perfectly proper for you all to see it,

16:30:49  14  but it gives information that's under seal.  So we can just show

16:30:56  15  it in the jury box.  Raise it up, sure, and you can just -- oh,

16:31:08  16  will it still show?

16:31:53  17      Proceed.  Okay.

16:32:34  18      MR. CHRIS FLOOD:  Sorry for the delay, your Honor.

16:32:37  19      THE COURT:  That's all right.

16:32:40  20  Q.    (BY MR. CHRIS FLOOD) I want to draw your attention to Roman

16:33:00  21  numeral III on page 2 of that document.  Do you see about the

16:33:17  22  middle of that paragraph where Ms. Trevino told the Court that

16:33:21  23  she filed this in court, as the government's debriefings began to

16:33:25  24  focus on Mascorro's criminal conduct, it became apparent that

16:33:29  25  Hinojosa was holding back on information pertaining to Mascorro.

16:34:01   1          MS. FERNALD:  Before he answers.

16:34:21   2   Q.   (BY MR. CHRIS FLOOD) But do you see how the prosecutor told

16:34:24   3   the judge that you weren't -- that you're holding back

16:34:27   4   information pertinent to Mascorro initially?

16:34:42   5   A.   Yes.

16:34:43   6   Q.   Okay.  And even though your agreement would have been -- was

16:34:47   7   that you had to fully debrief, be fully honest, they gave you a

16:34:51   8   pass, for lack of a better word, for not fully debriefing

16:34:55   9   initially on Mascorro.  Do you see that?

16:35:11   10   A.   Yes.

16:35:13   11   Q.   And then, if you turn to the next page under Roman numeral

16:35:19   12   IV, about the middle of that paragraph, you were brought in to

16:35:30   13   the U.S. Attorney's Office to debrief regarding an allegation

16:35:34   14   that you had received a cellphone in your cell.  Do you recall

16:35:41   15   that?

16:35:54   16   A.   Yes.

16:35:54   17   Q.   And you lied to Toni Trevino and the agents about your

16:36:00   18   possession of a cellphone.

16:36:10   19   A.   Yes.

16:36:11   20   Q.   And, in fact, they had run a search of your cell later, and

16:36:18   21   they recovered the cellphones that were in your cell.  Do you see

16:36:23   22   that?

16:36:30   23   A.   Yes.

16:36:31   24   Q.   Then you see where Assistant United States Trevino is

16:36:36   25   telling the Court that the memories of those phones contained

16:36:40  1   photographs of you in your cell?

16:36:55  2   A.   Yes.

16:36:55  3   Q.   So while you were cooperating with the government, you first

16:37:00  4   held back information on Mascorro.  And then, when they asked you

16:37:03  5   if you had cellphones, you lied to them.

16:37:20  6   A.   Yeah, because I got scared.  When they asked me about the

16:37:32  7   phones, it -- I got scared, and so, I said no.

16:37:35  8   Q.   Well, no.  You give excuses a lot, Mr. Hinojosa.  Earlier

16:37:39  9   you said, hey, I'm from Mexico, we bribe people --

16:37:41  10              MS. FERNALD:  Your Honor --

16:37:42  11              THE COURT:  Sorry.

16:37:43  12              MS. FERNALD:  Objection, your Honor.  Argumentative.

16:37:45  13              THE COURT:  Basis?

16:37:46  14              MS. FERNALD:  Argumentative and not a form of a

16:37:49  15   question.

16:37:49  16              THE COURT:  It is.  Why don't you just ask a question.

16:37:52  17              MR. CHRIS FLOOD:  I will.

16:37:54  18   Q.   (BY MR. CHRIS FLOOD) You got scared so you lied to them.

16:37:56  19   A.   Yes.

16:37:56  20   Q.   And it's scary to be in prison for a long time, too, isn't

16:38:02  21   it?

16:38:11  22   A.   It depends on what you've done, you know.

16:38:13  23   Q.   I'm saying it's scary to be in prison, isn't it?

16:38:22  24   A.   Not scary.  It's sad.

16:38:25  25   Q.   Okay.  And you didn't tell Assistant United States Toni

16:38:35  1   Trevino or the agents in your debriefings that it wasn't just

16:38:39  2   cellphones that you had, I guess, bribed someone to get, but you

16:38:45  3   had actually bribed the warden where you were housed, too,

16:38:49  4   correct?

16:39:04  5   A.   Told them afterwards.

16:39:05  6   Q.   Right.  You didn't tell them before she filed that motion to

16:39:10  7   get you a lower sentence, did you?

16:39:13  8   A.   Uh-huh.  Yeah.

16:39:19  9   Q.   And even though you had initially lied, you lied about

16:39:30  10  having the cellphones.  The government requested that your

16:39:34  11  sentence be reduced by 15 percent, didn't she?

16:39:44  12  A.   I don't know how much I supposedly got because I got 24

16:40:02  13  years.

16:40:02  14  Q.   Right.  But that's what the record reflects, that the

16:40:05  15  government, knowing you lied, went ahead and recommended that

16:40:09  16  your sentence be reduced by 15 percent.

16:40:21  17  A.   Okay.

16:40:22  18  Q.   And after that motion was presented to Judge Randy Crane,

16:40:29  19  the Judge in your case, he sentenced you to how much time?

16:40:46  20  A.   288 months.

16:40:49  21  Q.   As to Count 1 and 240 months as to Count 12, correct?

16:40:58  22  A.   Yes.

16:41:01  23  Q.   And you weren't happy about that.

16:41:09  24  A.   Well, no.

16:41:09  25  Q.   You felt like that wasn't fair.

| | | |
|---|---|---|
| 16:41:12 | 1 | A.   Yes. |
| 16:41:13 | 2 | Q.   And so, you wrote Toni Trevino a letter? |
| 16:41:23 | 3 | A.   Yes. |
| 16:41:23 | 4 | Q.   If I may have one minute, your Honor. |
| 16:41:28 | 5 | THE COURT:  You may. |
| 16:42:11 | 6 | Q.   (BY MR. CHRIS FLOOD) That letter you wrote to Toni Trevino |
| 16:42:21 | 7 | was dated November 23rd, 2009; isn't that correct?  Or do you |
| 16:42:28 | 8 | recall the date? |
| 16:42:38 | 9 | THE COURT:  Let's stop.  Let's get this done and then. |
| 16:42:44 | 10 | MR. CHRIS FLOOD:  Thank you, your Honor. |
| 16:42:58 | 11 | COURT SECURITY OFFICER:  Nobody saw that. |
| 16:43:01 | 12 | THE COURT:  Okay.  The question is, that letter that |
| 16:43:04 | 13 | you wrote to Toni Trevino was dated November 23, 2009; is that |
| 16:43:11 | 14 | correct? |
| 16:43:13 | 15 | THE WITNESS:  Yes. |
| 16:43:14 | 16 | THE COURT:  All right.  Next question. |
| 16:43:16 | 17 | MR. CHRIS FLOOD:  May I approach the witness, your |
| 16:43:18 | 18 | Honor? |
| 16:43:18 | 19 | THE COURT:  You may.  Keep your voice up, please. |
| 16:43:32 | 20 | Q.   (BY MR. CHRIS FLOOD) I've handed you what's been marked as |
| 16:43:35 | 21 | Defendant's Exhibit No. 28.  Is that the letter that you wrote to |
| 16:43:39 | 22 | Toni Trevino that I've just referenced? |
| 16:43:52 | 23 | A.   Yes. |
| 16:43:53 | 24 | Q.   All right.  And if I can direct your attention to the last |
| 16:43:57 | 25 | page of that exhibit, you read both Spanish and English, correct? |

16:44:13  1    A.    A little.

16:44:14  2    Q.    Does that appear to be an English translation of the letter

16:44:20  3    that you wrote?

16:44:33  4    A.    Yes.

16:44:35  5    Q.    Okay.  Your Honor, I'd move for admission of Defendant's 28.

16:44:45  6              THE COURT:  Is there an objection?

16:45:03  7              MS. FERNALD:  No objection, your Honor.

16:45:05  8              THE COURT:  Without objection, it is received.

16:45:09  9              MR. CHRIS FLOOD:  Let me give this back to the witness,

16:45:12  10   your Honor.

16:45:21  11   Q.    (BY MR. CHRIS FLOOD) So despite the fact that you hadn't

16:45:27  12   been honest with them and you got a reduced sentence, you wrote

16:45:31  13   the prosecutor shortly after your sentence saying -- can we have

16:45:41  14   it?  Can you go to the translation?

16:46:39  15         Do you see -- that's your letter translated.  You wrote

16:46:51  16   part of it in English and part of it in Spanish, right?

16:46:59  17   A.    Yes.

16:47:00  18   Q.    And you're writing to Assistant United States Attorney Toni

16:47:04  19   Trevino, correct?

16:47:08  20   A.    Yes.

16:47:09  21   Q.    That's the May '09 one that you have there.  Let's just use

16:47:19  22   this one right here.  I'm sorry.  Apologize.  Okay.  There.

16:47:30  23         Says, I'm very sad for the sentence I was given.  Do

16:47:35  24   you see that?

16:47:38  25   A.    Yes.

16:47:39   1   Q.   It was not what they had promised and I think it's unfair

16:47:44   2   because there were more people who deserve more than me, right?

16:47:54   3   A.   Yes.

16:47:57   4   Q.   Who's "they" and what did they promise you?

16:48:03   5   A.   The former attorneys I had.

16:48:07   6   Q.   Okay.  Not Toni Trevino and the agents.

16:48:11   7   A.   No.

16:48:11   8   Q.   Okay.  And you said, but what can I do about it now?  Do you

16:48:18   9   see that?

16:48:19   10   A.   Yes.

16:48:20   11   Q.   Richard told me that you would still help me?

16:48:26   12   A.   Yes.

16:48:27   13   Q.   Richard was your lawyer.

16:48:31   14   A.   A lying attorney, yes.

16:48:39   15   Q.   I thought you were laughing, your Honor.  I'm sorry.  You

16:48:42   16   were yawning.

16:48:44   17         The "still help me" that you meant when you wrote that

16:48:50   18   letter to Toni Trevino was you can get me a lower sentence, can't

16:48:54   19   you, Tony?

16:49:06   20   A.   That's what the attorney Richard that I used to have told

16:49:10   21   me.

16:49:11   22   Q.   And then, you go further, you say, the reason for this

16:49:13   23   letter is because I want to know and perhaps you can give me a

16:49:16   24   phone number for someone to contact you all on someone you need

16:49:20   25   is over here in the U.S.C. -- U.S.A. like the fat guys, right?

16:49:26  1    A.   Yes.

16:49:27  2    Q.   You're essentially telling her, look, when there's someone

16:49:31  3    over here in the United States or charged in the United States,

16:49:33  4    you let me know, right?

16:49:40  5    A.   Yes.

16:49:50  6    Q.   Okay.   Then you go further, someone's going to help me with

16:49:54  7    that to try and help me.   Do you see that?

16:50:02  8    A.   Yes.

16:50:03  9    Q.   So that would mean like give you information, or give you

16:50:08  10   newspaper clippings, things like that, right?

16:50:14  11   A.   Yes.

16:50:16  12   Q.   I ask -- at the very end, I ask if it is in your power to

16:50:31  13   help me, please help me, right?

16:50:41  14   A.   Yes.

16:50:45  15   Q.   Now, that was not the only letter that you sent to Toni

16:50:50  16   Trevino, correct?

16:50:53  17   A.   No.

16:50:56  18        MR. CHRIS FLOOD:   Your Honor, I can go through these.

16:50:59  19   It might take me a while, or I may be able to pare it down over

16:51:03  20   the evening to only show one of these letters rather than go

16:51:06  21   through all three or four.   It may save some time, believe it or

16:51:09  22   not.

16:51:09  23        THE COURT:   It's called whispering in your ear.

16:51:12  24        Ladies and gentlemen, we're going to stop.   9:00

16:51:16  25   tomorrow, please.   And remember, don't read, watch, listen, and

| | | |
|---|---|---|
| 16:51:20 | 1 | don't talk to even your nearest and dearest.  See you in the |
| 16:51:23 | 2 | morning. |
| 16:51:53 | 3 | (Jury not present.) |
| 16:51:55 | 4 | THE COURT:  Anything you need me for before I'm |
| 16:51:58 | 5 | through? |
| 16:51:59 | 6 | MR. GARDNER:  Excuse me, your Honor? |
| 16:52:00 | 7 | THE COURT:  Yes, sir. |
| 16:52:00 | 8 | MR. GARDNER:  These are the DEA-6s from Dallas.  There |
| 16:52:06 | 9 | are various -- |
| 16:52:07 | 10 | THE COURT:  Okay. |
| 16:52:08 | 11 | MR. GARDNER:  For your review. |
| 16:52:10 | 12 | THE COURT:  Are they discs? |
| 16:52:11 | 13 | MR. GARDNER:  No, sir.  They're pages. |
| 16:52:17 | 14 | THE COURT:  That one you gave me was not -- this |
| 16:52:20 | 15 | doesn't have to be on the record. |
| 16:52:20 | 16 | (Proceedings adjourned.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |